1  Zoya Kovalenko (Cal. SBN 338624)
2  13221 Oakland Hills Blvd., Apt. 206
   Germantown, MD 20874
3  678 559 4682
   zoyavk@outlook.com
4  Plaintiff Zoya Kovalenko

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                   **NORTHERN DISTRICT OF CALIFORNIA**

10  ZOYA KOVALENKO,                     )  Case No.: _____
                                        )
11          *Plaintiff*,                )  **COMPLAINT FOR DAMAGES AND**
                                        )  **INJUNCTIVE AND OTHER**
12       v.                             )  **EQUITABLE RELIEF**
                                        )
13  KIRKLAND & ELLIS LLP, MICHAEL DE     )  **DEMAND FOR JURY TRIAL**
    VRIES, MICHAEL W. DEVRIES, P.C.,     )
14  ADAM ALPER, ADAM R. ALPER, P.C.,     )  1.  Sex Discrimination, Including Wrongful
    AKSHAY DEORAS, AKSHAY S.             )      Termination, Arising Under Title VII;
15  DEORAS, P.C., LESLIE SCHMIDT,        )  2.  Sex Discrimination Arising Under FEHA
    LESLIE M. SCHMIDT, P.C., AND MARK    )      and San Francisco Ordinance;
16  FAHEY,                               )  3.  Sex Discrimination Arising Under the
                                        )      Federal Equal Pay Act;
17          *Defendants*.               )  4.  Retaliation, Including Wrongful
                                        )      Termination, Arising Under Title VII;
18                                       )  5.  Retaliation Arising Under FEHA and San
                                        )      Francisco Ordinance;
19                                       )  6.  Sex-Based Harassment Constituting
                                        )      Hostile Work Environment Arising Under
20                                       )      Title VII;
                                        )  7.  Failure to Prevent Arising Under FEHA;
21                                       )  8.  Intentional Infliction of Emotional
                                        )      Distress;
22                                       )  9.  Negligent Infliction of Emotional
                                        )      Distress; and
23                                       )  10. Defamation.
                                        )
24  _____      )

25

26

27

28

                                    1
COMPLAINT

1    1.  Plaintiff Zoya Kovalenko ("**Plaintiff**" or "**Zoya**") brings this complaint against

2 Defendants Kirkland & Ellis LLP ("**Kirkland**" or the "**Firm**"); Adam Alper and Adam R. Alper,

3 P.C. (collectively, "**Mr. Alper**"); Michael De Vries (a/k/a Michael DeVries) and Michael W.

4 DeVries, P.C. (a/k/a Michael W. De Vries, P.C.) (collectively, "**Mr. De Vries**"); Akshay Deoras

5 and Akshay S. Deoras, P.C. (collectively, "**Mr. Deoras**"); Leslie Schmidt and Leslie M. Schmidt,

6 P.C. (collectively, "**Ms. Schmidt**"); and Mark Fahey ("**Mr. Fahey**") (collectively,

7 "**Defendants**").  In support thereof, Plaintiff alleges the following:

8                **NATURE OF ACTION**

9    2.  This is an action for sex discrimination, sex harassment constituting a hostile work

10 environment, and retaliation arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §

11 2000e *et seq.*, as amended ("**Title VII**"), specifically including *id.* § 2000e-2(a) (prohibiting, e.g.,

12 discrimination with respect to discharge, compensation, terms, conditions, or privileges of

13 employment because of sex); *id.* § 2000e-3(a) (prohibiting retaliation); *id.* § 2000e-5 (granting

14 jurisdiction to United States district courts for actions brought under Title VII and authorizing

15 certain relief); and under the Civil Rights Act of 1991, 42 U.S.C. § 1981a (authorizing damages

16 for intentional violations of Title VII).

17    3.  Plaintiff brings a related claim for sex discrimination arising under the Fair Labor

18 Standards Act of 1938, 29 U.S.C. § 206 *et seq.*, as amended (the "**federal EPA**"), specifically

19 including *id.* §§ 206(d)(1); *id.* § 215 (prohibiting violations of § 206); *id.* § 216 (granting

20 jurisdiction to United States district courts for actions maintained against any employer,

21 providing for fines for willful violations; liquidated damages; and legal and equitable relief

22 including attorneys' fees, damages).

23    4.  Plaintiff brings related claims for sex discrimination and retaliation arising under

24 California law, namely, the Fair Employment and Housing Act, Cal. Gov't Code § 12940 *et seq.*

25 ("**FEHA**"), specifically including *id.* § 12940(a) (proscribing discrimination) and *id.* § 12940(h)

26 (proscribing retaliation); and arising under a San Francisco ordinance, S.F., Cal., Police Code art.

27 33 § 3301 *et seq.* (the "**San Francisco Ordinance**"), specifically including *id.* § 3303(a)

28 (prohibiting an employer from discriminating on the basis of sex); *id.* § 3305.2 (prohibiting

COMPLAINT

retaliation for opposing unlawful employment practices); *id.* § 3306 (providing for treble special and general damages and for attorneys' fees and costs for violating or aiding in violating Article 33); *id.* 3307 (providing right to enforce with civil action).

5.    Plaintiff brings related claims for failure to prevent discrimination and retaliation arising under FEHA, specifically including Cal. Gov't Code § 12940(k); for defamation arising under Cal. Civ. Code § 43 *et seq.*, specifically including *id.* §§ 43, 44, 45, 45a, 46; for intentional infliction of emotional distress; and for negligent infliction of emotional distress.

6.    Throughout this Complaint, Defendant(s)' conduct related and/or giving rise to any one or more of the aforementioned claims is referred to as Defendant(s)' "**Unlawful Employment Practices**."

## INTRODUCTION

7.    Plaintiff is a member of a protected class with respect to sex (female) and gender (female).[1]

8.    Plaintiff worked for Kirkland, the largest law firm in the world by revenue, from November 16, 2020 through September 28, 2021.  Despite providing objectively excellent work, Plaintiff was summarily fired without notice during what was supposed to be her first review.  Plaintiff was an intellectual property ("**IP**") litigation associate based out of Kirkland's San Francisco office.

9.    In September 2020, Plaintiff, an IP litigator, was thrilled to interview with Defendant Kirkland, which boasted a renowned IP litigation practice and which has been considered one of the most prestigious law firms in the United States since at least when Plaintiff began studying law in 2013.  During Plaintiff's interviews, at least three so-called "share partners"—including Defendants Mr. Alper, Mr. De Vries, and Brandon Brown, a co-chair of the Recruiting Committee for the Firm's Bay Area offices—told Plaintiff that she had "very

---

[1] Although Plaintiff recognizes the important distinction between sex and gender, references to "sex" throughout this Complaint may encompass "gender," and vice versa, as applicable.  For example, factual allegations concerning sex-based discrimination may apply with equal force to gender-based discrimination.

COMPLAINT

impressive" credentials.[2]  Mr. Brown told Plaintiff that, after Mr. De Vries had finished interviewing Plaintiff, Mr. De Vries called Mr. Brown and said he was very pleased with Plaintiff's interview and with her candidacy.  In addition, Mr. Alper, Mr. De Vries, and Mr. Deoras specifically probed to gauge Plaintiff's interest in working on post-grant proceedings before the Patent Trial and Appeal Board (the "**PTAB**") of the United States Patent and Trademark Office ("**USPTO**"), which is not surprising given that a substantial portion of Plaintiff's work at Kirkland involved PTAB proceedings.

10.  On September 15, 2020, the co-chair of the Firm's Recruiting Committee for its Bay Area offices called Plaintiff to extend her an offer.  Plaintiff accepted Kirkland's offer.  On November 16, 2020, Plaintiff joined the Firm as an IP litigation associate based out of the Firm's San Francisco office.

11.  Plaintiff's work performance at Kirkland was excellent, and Plaintiff regularly received high praise throughout her entire tenure at the Firm.  For example, Plaintiff's first assignments included **<u>drafting only winning dispositive motions in preliminary proceedings before the PTAB</u>**[3] and preparing pre-suit patent infringement analyses that persuaded the Firm and a litigation funder to greenlight approval for representing an inventor in asserting integrated-circuit patents with a special fee arrangement involving significant litigation funding.  In addition, Plaintiff acted as the workhorse associate on an International Trade Commission ("**ITC**") investigation and successfully developed and drove litigation defenses, including

---

[2] In 2016, Plaintiff earned a juris doctor degree, with high honors, from Emory University School of Law, where she served as an articles editor on *Emory Law Journal* and graduated with a 3.854 GPA and class rank of 9/291.  Plaintiff is a member of the Emory chapter of the Order of the Coif.  In 2013, Plaintiff earned a bachelor of science in applied mathematics, with high honors, from Georgia Institute of Technology, where she was a member of the honors program.

[3] **Plaintiff won <u>two of two</u> Patent Owner Preliminary Responses ("POPRs"),** in the span of a few months, while **Defendants Mr. Deoras, Mr. Alper, and Mr. De Vries had won merely <u>two of eight</u> POPRs** that they had filed in the three years before they hired Plaintiff to join their team in November 2020.  Mr. Deoras sent Plaintiff a gushing email regarding her work on the preliminary proceedings, stating: "Zoya, just wanted to say that you really did a fabulous job with these."  Moreover, Mr. Deoras raved that Plaintiff's successes "were key wins" and stated that "we were able to use a lot of your work on [your second POPR] with [two other POPRs that were drafted by another associate and also resulted in noninstitution].  Congrats on a great result!"  Mr. Alper stated: "Great job Zoya. What a series of terrific results."  And Mr. De Vries stated: "Same – great job, Zoya; this is terrific to see."

COMPLAINT

managing and obtaining extensive third-party discovery essential to the patent unenforceability and invalidity defenses.  Plaintiff also served as a last-minute trial replacement, during which she substantively and valuably assisted with a key cross-examination of the plaintiff's CEO that was critical in obtaining a complete defense verdict and assisted with direct examination of the damages expert, while also performing considerable substantive work on the aforementioned ITC investigation.  Leading up to and at trial, Plaintiff experienced a clear discrepancy in treatment by Defendants relative to comparator male associates, including with respect to workload, support provided for assignments, access to partners, benefits, and overall treatment. During her short tenure at Kirkland, Plaintiff worked on and substantively contributed to a number of other cases and assignments.  Plaintiff contributed meaningfully to only winning cases and cases that settled favorably.  During Plaintiff's tenure at Kirkland, she consistently received compliments and praise on her work and was never notified of any alleged performance issues, let alone provided with any notice or even any indication that Defendants viewed her work as woefully deficient in every respect as they stated in their defamatory "evaluations," which served as the underlying support for the poor-performance basis for Plaintiff's unlawful termination.

12.     During Plaintiff's tenure at Kirkland, she witnessed an obvious disparity in treatment relative to male associates, and Defendants subjected Plaintiff to a pattern of discriminatory and subsequently retaliatory treatment, including, among other things, with respect to workload, employee benefits and pay, junior associate support and assistance on assignments, accessibility to partners, and respect for scheduled time off.

13.     Defendants Mr. Alper and Mr. De Vries led a discriminatory cadre of Kirkland's IP litigation group, which included Defendants Mr. Deoras, Ms. Schmidt, and Mr. Fahey.  This group produced an alarmingly high turnover of female associates relative to male associates.  This high female turnover is unsurprising given the sex-based discrimination to which Defendants subjected Plaintiff and is indicative of Defendants' discriminatory ethos.  Plaintiff is aware of at least seven female associates who worked for the Defendants named above and who left the Firm during Plaintiff's short tenure at Kirkland (from November 16, 2020 through

1  September 28, 2021).  In contrast, Plaintiff is aware of only one male associate who had worked

2  with these Defendants and left the Firm during the same time period.[4]

3      14.    Plaintiff complained on multiple occasions of Defendants' disparate and unfair

4  treatment of Plaintiff, including as compared to male associates working on the same matters,

5  and thereafter Defendants retaliated against Plaintiff.  In retaliating and further discriminating

6  against Plaintiff, Defendants departed from standard, established Firm practices and procedures

7  for evaluating and assessing associates.  Such departures included Defendants submitting lengthy

8  and unconscionable defamatory "evaluations" of Plaintiff.  These defamatory "evaluations"

9  served as the underlying support for the poor-performance basis for terminating Plaintiff and was

10  tantamount to an assassination on Plaintiff's professional reputation and livelihood.  The four

11  corners of the "evaluations" conveyed an unequivocal—albeit false—message: that Plaintiff was

12  deplorably deficient in every component of practicing law, failed to contribute at all during her

13  time at the Firm, and was nothing more than a burden and liability due to her utter incompetence.

14      15.    On September 28, 2021, Defendant Mr. Deoras, the share partner who directly

15  supervised most of Plaintiff's work at the Firm, told Plaintiff that she was fired and should

16  immediately pursue outside employment.  The only information Mr. Deoras provided to Plaintiff

17  as to why she was being fired was a vague one-sentence statement: "[Plaintiff] has not

18  contributed to her matters at either the substantive or commitment level that is expected of an

19  associate."  This firing occurred during what was supposed to be Plaintiff's first review at the

20  Firm.  The firing came as a total shock to Plaintiff, especially in light of the consistent praise

21  Plaintiff had received from Defendants throughout her short tenure at the Firm (including myriad

22  praise from Mr. Deoras) and the absence of any prior discussion indicating that her standing at

23  the Firm was compromised.

24      16.    During this firing call, Mr. Deoras acknowledged that Plaintiff would be shocked

25  about the firing, told Plaintiff that she is "talented," and expressed certainty that she would be

26

27  ─────────────
[4] In addition, in 2021, Defendants promoted to partner ten male and zero female IP litigation
28  associates.  *Kirkland & Ellis Announces New Partners*, Kirkland & Ellis (Oct. 1, 2021),
https://www.kirkland.com/news/press-release/2021/10/kirkland-announces-new-partners.

COMPLAINT

1    successful.  Despite being in shock and disbelief, Plaintiff asked Mr. Deoras if he could explain

2    why she was being summarily fired.  In response, Mr. Deoras stuttered and stammered and

3    avoided providing an explanation.  The Firm offered Plaintiff four-months' severance, which, if

4    accepted, would have required Plaintiff to waive her claims against Defendants.  The severance

5    offer was set to expire a week later, before Plaintiff would have any ability to first learn of

6    Defendants' defamatory "evaluations."

7           17.    Given the extremity of Defendants' defamatory statements and their knowledge of

8    Plaintiff's propensity to stand up for herself in light of her prior complaints, Defendants

9    intentionally withheld and hid from Plaintiff the completely fabricated statements in their

10   "evaluations" regarding Plaintiff's work that served as the underlying support for the poor-

11   performance basis for Plaintiff's termination knowing full well that upon notice of this

12   information Plaintiff would rebuff such falsehoods and not sign the severance offer.  Defendants'

13   lies were and remain flatly contradicted by Plaintiff's body of excellent work at the Firm—even

14   under hostile and disadvantageous conditions—and the egregiousness of the lies underscores

15   Defendants' malice and complete disregard for Plaintiff's livelihood and professional reputation.

16   Of course, Defendants banked on Plaintiff signing the severance offer before she could access

17   the defamatory "evaluations," thereby depriving Plaintiff of learning the true reasons for her

18   termination—discrimination and retaliation—while allowing Defendants to get off scot-free by

19   virtue of the waiver provision in the severance offer.

20          18.    After Plaintiff rejected the severance offer, Plaintiff had several one-sided

21   discussions with the Firm's chief human resources ("**HR**") officer and assistant general counsel

22   regarding Defendants' Unlawful Employment Practices, during which Plaintiff provided

23   information regarding her claims against the Firm.  On one of the Zoom meetings, both the chief

24   HR officer and assistant general counsel of Kirkland expressed dismay when Plaintiff told them

25   that her "evaluations" had been read to her by (now-erstwhile) Firm personnel.  On the last Zoom

26   meeting, the assistant general counsel claimed to have conducted a purported "investigation"

27   based on Defendants' "recollections" and reiterated that Plaintiff's termination was because of

28   Plaintiff's allegedly poor performance.  When asked multiple times to explain the support for the

7

COMPLAINT

1  falsehoods in the "evaluations," the assistant general counsel became visibly flustered, said

2  Plaintiff's claims would be nothing more than "he-said, she-said," and abruptly ended the Zoom

3  meeting in a very unprofessional manner.

4        19.    After Defendants were served with the administrative complaint/charge,

5  Kirkland's general counsel and the prominent employment defense counsel retained by

6  Defendants sent a series of legally and factually fallacious letters to Plaintiff in an attempt to

7  intimidate and dissuade Plaintiff from filing suit.  This correspondence repeated that Plaintiff

8  was fired because of poor performance.  It was not until Defendants' ninth correspondence

9  (following four letters, one telephonic conference, and four emails) that Defendants, through their

10  outside counsel, for the first time acknowledged that "of course there may have been things

11  [Plaintiff] did well at the firm" and further claimed for the first time that Plaintiff's good work

12  did not outweigh the "many flaws in [Plaintiff's] performance."  In addition to this shift in

13  Defendants' position, their counsel further strayed from Defendants' repeated, original rationale

14  for firing Plaintiff, newly attributing Plaintiff's termination to a novel and generalized assertion

15  that Plaintiff was "not a good fit."  Clearly Defendants seek to rewrite history by proffering new

16  rationale for Plaintiff's termination because the original, exclusively performance-based

17  rationale that was used as pretext to fire Plaintiff is indefensible, demonstrably malicious, and

18  encapsulates Defendants' discriminatory and retaliatory treatment of Plaintiff.

19  <center>**DEFENDANTS[5]**</center>

20  <center>**Kirkland & Ellis LLP**</center>

21        20.    Defendant Kirkland & Ellis LLP ("**Kirkland**" or the "**Firm**") is a limited liability

22  partnership organized under the laws of Illinois.  Kirkland is an international law firm with offices

23  in 18 cities, including in San Francisco; Los Angeles; New York; Washington, D.C.; Houston;

24  and Salt Lake City.  Kirkland's chief executive office is located at 300 North LaSalle, Chicago,

25  IL 60654.  Kirkland may be served through its registered agent for service of process, National

26  Registered Agents Inc., 208 SO LaSalle Street, Suite 814, Chicago, IL 60604-1101.  Kirkland

27

28  [5] *See infra* discussion in ¶¶ 0–300 regarding coverage and liability of each Defendant under Title VII, the federal EPA, FEHA, and the San Francisco Ordinance.

COMPLAINT

may be served through its attorneys, Lynne C. Hermle and Joseph Liburt, partners at Orrick, Herrington & Sutcliffe LLP ("**Orrick**"), 1000 Marsh Road, Menlo Park, CA 94025-1015.  Fed. R. Civ. P. 4(h)(1)(A); Fed. R. Civ. P. 4(e)(1); Cal. R. Ct. 1.21(a); Cal. Civ. Pro. Code § 416.10(b).

21.     On information and belief, at least a significant portion of the partners of Kirkland are professional corporations ("**PCs**").  Similar to Defendants Adam R. Alper, P.C., Michael W. DeVries, P.C., Akshay S. Deoras, P.C., and Leslie M. Schmidt, P.C., each such PC ("**PC Partner**") is named for an attorney who serves as the sole owner, director, and officer of each PC ("**Owner/Officer**").  *See, e.g.*, Notice of Debtors' Application for Entry of an Order Authorizing the Retention and Employment of Kirkland & Ellis LLP and Kirkland & Ellis International LLP as Attorneys for the Debtors and Debtors in Possession Effective as of July 5, 2022, Ex. B (Sussberg Declaration) at ¶ 1, *In re Voyager Digital Holdings, Inc.*, No. 22-10943-MEW (Bankr. S.D.N.Y. July 20, 2022), ECF No. 116 at 37 [hereinafter *Notice re Kirkland*] (stating in declaration by Owner/Officer of eponymous PC Partner that PC Partner is a partner of Kirkland).  A PC Partner holds partnership interest in Kirkland.  This Complaint refers to Kirkland's co-Defendants: (i) Adam R. Alper, P.C.; Michael W. DeVries, P.C.; Akshay S. Deoras, P.C.; and Leslie M. Schmidt, P.C. collectively as "**PC Defendants**"; and (ii) Adam Alper, Michael De Vries, Akshay Deoras, and Leslie Schmidt collectively as "**Owner/Officer Defendants**."

**Adam Alper and Adam R. Alper, P.C.**

22.     Defendant Adam R. Alper, P.C. is a partner of Kirkland.  Adam R. Alper, P.C.  is a professional corporation organized under the laws of the State of California, with a principal executive office and principal place of business at Kirkland's Bay Area office located at 555 California Street, San Francisco, CA 94101.  Adam R. Alper, P.C. may be served through its registered agent for service, National Registered Agents, Inc., 330 N Brand Blvd., Ste. 700, Glendale, CA 91203.  Fed. R. Civ. P. 4(h)(1)(B); Cal. Civ. Proc. Code § 416.10(a).  Adam R. Alper, P.C. may be served through its attorneys, Ms. Hermle and Mr. Liburt, partners at Orrick, 1000 Marsh Road, Menlo Park, CA 94025-1015.  Fed. R. Civ. P. 4(h)(1)(A); Fed. R. Civ. P. 4(e)(1); Cal. R. Ct. 1.21(a); Cal. Civ. Proc. Code § 416.10(b).  Per its articles of incorporation,

9

the purpose of Adam R. Alper, P.C. is "to engage in the profession of [l]aw and any other lawful activities . . . not prohibited to a corporation engaging in such profession by applicable laws and regulations."  Cal. Sec'y of State, *Articles of Incorporation of a Professional Corporation* for Entity No. 3531144, bizfile Online (Jan. 31, 2012), https://bizfileonline.sos.ca.gov/search/business (search for "Adam R. Alper, P.C.").

23.    Defendant Adam Alper is the chief executive officer, secretary, chief financial officer, and sole director of Adam R. Alper, P.C.  Defendants Adam Alper and Adam R. Alper, P.C. (collectively, "**Mr. Alper**") share the aforementioned place of business located at Kirkland's Bay Area office in San Francisco.  Adam Alper acted as an agent and/or authorized representative of and/or formed a partnership, association, joint venture, agency, and/or other instrumentality with Adam R. Alper, P.C. and/or Kirkland.  Adam Alper may be served through his attorneys, Ms. Hermle and Mr. Liburt, partners at Orrick, 1000 Marsh Road, Menlo Park, CA 94025-1015. Fed. R. Civ. P. 4(e)(1); Cal. R. Ct. 1.21(a); Cal. Civ. Pro. Code § 416.70.

24.    At all relevant times, Mr. Alper was or reasonably should have been aware of Plaintiff's work and other Defendants' conduct with respect to her employment at Kirkland, including without limitation because of his roles as a leader within the Firm and its IP litigation practice group and his managerial role on Plaintiff's cases and other matters and because he had hired Plaintiff and directly supervised her work throughout her tenure at the Firm on his *pro bono* matter.

### Michael De Vries and Michael W. DeVries, P.C.

25.    Michael W. DeVries, P.C. (a/k/a Michael W. De Vries, P.C.) is a partner of Kirkland.  Michael W. DeVries, P.C. is a professional corporation organized under the laws of the State of California, with a principal executive office and principal place of business at Kirkland's downtown Los Angeles office, located at 555 South Flower Street, Suite 3700, Los Angeles, CA 90071.  Michael W. DeVries, P.C. may be served through its registered agent, National Registered Agents, Inc., 330 N Brand Blvd., Ste. 700, Glendale, CA 91203.  Fed. R. Civ. P. 4(h)(1)(B); Cal. Civ. Pro. Code § 416.10(a).  Michael W. DeVries, P.C. may be served through its attorneys, Ms. Hermle and Mr. Liburt, partners at Orrick, 1000 Marsh Road, Menlo

COMPLAINT

Park, CA 94025-1015.  Fed. R. Civ. P. 4(h)(1)(A); Fed. R. Civ. P. 4(e)(1); Cal. R. Ct. 1.21(a); Cal. Civ. Pro. Code § 416.10(b).  Per its articles of incorporation, the purpose of Michael W. DeVries, P.C. is "to engage in the profession of [l]aw and any other lawful activities . . . not prohibited to a corporation engaging in such profession by applicable laws and regulations."  Cal. Sec'y of State, *Articles of Incorporation of a Professional Corporation* for Entity No. 3531116, bizfile Online (Jan. 31, 2013), https://bizfileonline.sos.ca.gov/search/business (search for "Michael W. DeVries, P.C.").

26.  Defendant Michael De Vries (a/k/a Michael DeVries) is the president, chief executive officer, secretary, chief financial officer, and sole director of Michael W. DeVries, P.C. Michael De Vries and Michael W. DeVries, P.C. (collectively, "**Mr. De Vries**") share the aforementioned place of business located at Kirkland's office in Los Angeles.  Michael De Vries acted as an agent and/or authorized representative of and/or formed a partnership, association, joint venture, agency, and/or other instrumentality with Michael W. DeVries, P.C. and/or Kirkland.  Michael De Vries may be served through his attorneys, Ms. Hermle and Mr. Liburt, partners at Orrick, 1000 Marsh Road, Menlo Park, CA 94025-1015.  Fed. R. Civ. P. 4(e)(1); Cal. R. Ct. 1.21(a); Cal. Civ. Pro. Code § 416.70.

27.  At all relevant times, Mr. De Vries was or reasonably should have been aware of Plaintiff's work and other Defendants' conduct with respect to her employment at Kirkland, including without limitation because of his roles as a leader within the Firm and its IP litigation practice group and his managerial role on Plaintiff's cases and other matters, including his direct supervision of Plaintiff on a trial matter.

### Akshay Deoras and Akshay S. Deoras, P.C.

28.  Defendant Akshay S. Deoras, P.C. is a partner of Kirkland.  Akshay S. Deoras, P.C. is a professional corporation organized under the laws of the State of California, with a principal executive office and principal place of business at Kirkland's Bay Area office located at 555 California Street, San Francisco, CA 94101.  Akshay S. Deoras, P.C. may be served through its registered agent for service, C T Corporation System, 330 N. Brand Blvd., Ste. 700, Glendale, CA 91203.  Fed. R. Civ. P. 4(h)(1)(B); Cal. Civ. Pro. Code § 416.10(a).  Akshay S.

11

COMPLAINT

Deoras, P.C. may be served through its attorneys, Ms. Hermle and Mr. Liburt, partners at Orrick, 1000 Marsh Road, Menlo Park, CA 94025-1015.  Fed. R. Civ. P. 4(h)(1)(A); Fed. R. Civ. P. 4(e)(1); Cal. R. Ct. 1.21(a); Cal. Civ. Pro. Code § 416.10(b).  Per its articles of incorporation, the purpose of Akshay S. Deoras, P.C. is "to engage in the profession of [l]aw and any other lawful activities . . . not prohibited to a corporation engaging in such profession by applicable laws and regulations."  Cal. Sec'y of State, *Articles of Incorporation of a Professional Corporation* for Entity No. 4552024, bizfile Online (Jan. 10, 2020), https://bizfileonline.sos.ca.gov/search/business (search for "Akshay S. Deoras, P.C.").

29.    Defendant Akshay Deoras is the president, chief executive officer, secretary, chief financial officer, and sole director of Akshay S. Deoras, P.C.  Akshay Deoras and Akshay S. Deoras, P.C. (collectively, "**Mr. Deoras**") share the aforementioned place of business located at Kirkland's Bay Area office in San Francisco.  Akshay Deoras acted as an agent and/or authorized representative of and/or formed a partnership, association, joint venture, agency, and/or other instrumentality with Akshay S. Deoras, P.C. and/or Kirkland.  Akshay Deoras may be served through his attorneys, Ms. Hermle and Mr. Liburt, partners at Orrick, 1000 Marsh Road, Menlo Park, CA 94025-1015.  Fed. R. Civ. P. 4(e)(1); Cal. R. Ct. 1.21(a); Cal. Civ. Pro. Code § 416.70.

30.    At all relevant times, Mr. Deoras supported Mr. Alper's and Mr. De Vries' subset of the Firm's IP litigation practice, e.g., by managing cases and other matters for and reporting to Mr. Alper and Mr. De Vries.  Plaintiff reported to Mr. Deoras on most of her work at Kirkland.

## Leslie Schmidt and Leslie M. Schmidt, P.C.

31.    Defendant Leslie M. Schmidt, P.C. is a partner of Kirkland.  Leslie M. Schmidt, P.C. is a professional corporation organized under the laws of the State of New York, with a principal executive office and principal place of business at Kirkland's New York office, located at 601 Lexington Ave, New York, NY 10022.  Leslie M. Schmidt, P.C. may be served through its registered agent for service, National Registered Agents, Inc., 28 Liberty Street, New York, NY 10005.  Leslie M. Schmidt, P.C. may be served through its attorneys, Ms. Hermle and Mr. Liburt, partners at Orrick, 1000 Marsh Road, Menlo Park, CA 94025-1015.  Fed. R. Civ. P. 4(h)(1)(A); Fed. R. Civ. P. 4(e)(1); Cal. R. Ct. 1.21(a); Cal. Civ. Pro. Code § 416.10(b).

COMPLAINT

32.     Defendant Leslie Schmidt is the chief executive officer of Leslie M. Schmidt, P.C. Leslie Schmidt and Leslie M. Schmidt, P.C. (collectively, "**Ms. Schmidt**") share the aforementioned place of business located at Kirkland's office in New York.  Leslie Schmidt acted as an agent of Kirkland.  Leslie Schmidt acted as an agent and/or authorized representative of and/or formed a partnership, association, joint venture, agency, and/or other instrumentality with Leslie M. Schmidt, P.C. and/or Kirkland.  Leslie Schmidt may be served through her attorneys, Ms. Hermle and Mr. Liburt, partners at Orrick, 1000 Marsh Road, Menlo Park, CA 94025-1015. Fed. R. Civ. P. 4(e)(1); Cal. R. Ct. 1.21(a); Cal. Civ. Pro. Code § 416.70.

33.     At all relevant times, Ms. Schmidt supported Mr. Alper's and Mr. De Vries' subset of the Firm's IP litigation practice, e.g., by managing cases and other matters for and reporting to Mr. Alper and Mr. De Vries.

### Mark Fahey

34.     Defendant Mark Fahey ("**Mr. Fahey**") was[6] a partner in Kirkland's IP litigation group.  Plaintiff is informed that even so-called "non-share partners" make capital contributions in exchange for equity in Kirkland.  Mr. Fahey had been based out of one of the Firm's offices in Los Angeles when Plaintiff began working at Kirkland; he subsequently relocated to the Firm's Salt Lake City office.  Mr. Fahey worked with Mr. Deoras and Ms. Schmidt on cases for Mr. Alper and Mr. De Vries during times relevant to this litigation.  Mr. Fahey acted as an agent of Kirkland.  Mr. Fahey may be served through his attorneys representing him in connection with the administrative complaint/charge, Ms. Hermle and Mr. Liburt, partners at Orrick, 1000 Marsh

---

[6] Mr. Fahey worked at Kirkland for most of his career.  On April 21, 2022, Jeffrey S. Powell, P.C., Kirkland's general counsel, sent Plaintiff a letter in response to service of Plaintiff's administrative complaint/charge, in an attempt to dissuade Plaintiff from filing suit based on unsupported, blanket assertions of privilege.  Approximately one month later, on May 27, 2022, Kirkland filed a notice to remove Mr. Fahey as counsel of record from an active litigation because, per the docket description of the notice, Mr. Fahey was "[n]o longer with [the] [F]irm." *PACT XPP Schweiz AG v. Intel Corp.*, No. 1:19-cv-01006) (D. Del. May 27, 2022) (Dkt. No. 264).  Around one month later, on or around June 24, 2022, Defendant Kirkland removed Mr. Fahey from its website.  Yet Mr. Fahey's LinkedIn profile still falsely stated that he was a partner at the Firm on and after that date, until he obtained an in-house counsel job sometime in July 2022.

COMPLAINT

1 | Road, Menlo Park, CA 94025-1015.  Fed. R. Civ. P. 4(e)(1); Cal. R. Ct. 1.21(a); Cal. Civ. P.
2 | Code § 416.70.

3 | ## JURISDICTION

4 | 35.    Plaintiff hereby restates and re-alleges the allegations set forth in paragraphs 1
5 | through 34 above as if fully set forth herein.

6 | ### Subject-Matter Jurisdiction

7 | ### Federal-Question Jurisdiction

8 | 36.    This Court has subject-matter jurisdiction over Plaintiff's claims in this action.
9 | Each of Plaintiff's claims for Title VII violations—(i) sex discrimination (including wrongful
10 | termination), (ii) retaliation (including wrongful termination), and (iii) sex-based harassment
11 | constituting hostile work environment—arise under federal law and invoke federal-question
12 | jurisdiction.  28 U.S.C. § 1331 (conferring jurisdiction over actions arising under the laws of the
13 | United States); 42 U.S.C. § 2000e-5(f)(3) (conferring jurisdiction over civil actions "brought
14 | under" Title VII, 42 U.S.C. §§ 2000e–2000e-17).

15 | 37.    On February 11, 2022, Plaintiff timely filed her Complaint No. 202202-16114711
16 | against Defendants with the California Department of Fair Employment and Housing (the
17 | "**DFEH**") and her Charge No. 550-2022-00754 with the United States Equal Employment
18 | Opportunity Commission (the "**EEOC**") against Defendants alleging, *inter alia*, sex
19 | discrimination because of sex/gender, harassment constituting a hostile work environment
20 | because of sex/gender, and retaliation.  Plaintiff received a right-to-sue ("**RTS**") letter from the
21 | DFEH on February 11, 2021.   Because 180 days have elapsed since Plaintiff filed her EEOC
22 | Charge, Plaintiff is entitled to a notice of right to sue ("**NRTS**") from the EEOC.[7]  This lawsuit
23 | is timely filed within one year of Plaintiff's RTS letter and within 90 days of Plaintiff becoming
24 | entitled to receive the NRTS.

25 |

26 |

27 | [7] Despite Plaintiff requesting the NRTS from and diligently following up with the EEOC many
times, including by uploading correspondence to its portal, by email, by telephone, and by going
28 | to the field office to which the Charge was transferred, the EEOC has failed to provide Plaintiff
with the NRTS.

COMPLAINT

38.     Plaintiff's claim for violations of the federal EPA arises under federal law and invokes federal-question jurisdiction.  28 U.S.C. § 1331 (conferring jurisdiction over actions arising under the laws of the United States); 29 U.S.C. § 216(b) (conferring jurisdiction over actions arising under the federal EPA, 29 U.S.C. § 206).

### Supplemental Jurisdiction

39.     Plaintiff's claims for sex discrimination under FEHA and the San Francisco ordinance arise from Plaintiff's employment at Kirkland, i.e., arise from the same transaction or occurrence as, and therefore share a common nucleus of operative fact with, each of Plaintiff's claims for sex discrimination and sex-based harassment constituting a hostile work environment arising under Title VII and sex discrimination with respect to pay arising under the federal EPA. (*See infra* ¶¶ 301–324, 0–342.)  Accordingly, because these claims for sex discrimination arising under FEHA and the San Francisco ordinance form part of the same case or controversy under Article III of the United States Constitution, this Court has supplemental jurisdiction over these claims.  28 U.S.C. § 1367(a) (conferring supplemental jurisdiction over all other claims concerning the same case or controversy as the claim(s) conferring original jurisdiction).

40.     Plaintiff's claims for retaliation under FEHA and the San Francisco ordinance arise from Plaintiff's employment at Kirkland, i.e., arise from the same transaction or occurrence as, and therefore share a common nucleus of operative fact with, at least each of Plaintiff's claims for retaliation, sex-based harassment constituting a hostile work environment, and/or sex discrimination with respect to pay arising under the federal EPA. (*See infra* ¶¶ 301–324, 0–342.) Accordingly, because these claims for retaliation arising under FEHA and the San Francisco ordinance form part of the same case or controversy under Article III of the United States Constitution, this Court has supplemental jurisdiction over these claims.  28 U.S.C. § 1367(a).

41.     Plaintiff's claims under FEHA for failure to prevent discrimination and retaliation, arise from Plaintiff's employment at Kirkland, i.e., arise from the same transaction or occurrence as, and therefore share a common nucleus of operative fact with, at least each of Plaintiff's claims for sex discrimination, sex-based harassment constituting a hostile work environment, retaliation, and/or sex discrimination with respect to pay arising under the federal EPA. (*See infra* ¶¶ 301–

15

COMPLAINT

324, 0–342.) Accordingly, because these claims for failure to prevent arising under FEHA form part of the same case or controversy under Article III of the United States Constitution, this Court has supplemental jurisdiction over these claims.  28 U.S.C. § 1367(a).

42.    Plaintiff's claims for intentional infliction of emotional distress and negligent infliction of emotional distress arise from Plaintiff's employment at Kirkland, i.e., arise from the same transaction or occurrence as, and therefore share a common nucleus of operative fact with, at least each of Plaintiff's claims for sex discrimination, sex-based harassment constituting a hostile work environment, and/or retaliation arising under Title VII.  (*See infra* ¶¶ 301–324, 0–342.)  Accordingly, because these claims for intentional infliction of emotional distress, negligent infliction of emotional distress forms part of the same case or controversy under Article III of the United States Constitution, this Court has supplemental jurisdiction over this claim.  28 U.S.C. § 1367(a).

43.    Plaintiff's claim for defamation arises from Plaintiff's employment at Kirkland, i.e., arises from the same transaction or occurrence as, and therefore shares a common nucleus of operative fact with, at least each of Plaintiff's claims for sex discrimination, retaliation, and/or sex-based harassment constituting a hostile work environment arising under Title VII and/or Plaintiff's claim for sex discrimination arising under the federal Equal Pay Act.  (*See infra* ¶¶ 301–324, 0–342.)  Accordingly, because this claim for defamation forms part of the same case or controversy under Article III of the United States Constitution, this Court has supplemental jurisdiction over this claim.  28 U.S.C. § 1367(a).

**Personal Jurisdiction**

44.    The State of California is a proper forum for this action because this Court may properly exercise personal jurisdiction over each Defendant.

45.    Kirkland has minimum contacts with the State of California such that exercising personal jurisdiction does not offend traditional notions of fair play and substantial justice. Kirkland reached out to the State of California by establishing offices out of which its co-Defendants Adam Alper, Adam R. Alper, P.C., Michael De Vries, Michael W. DeVries, P.C., and Mark Fahey were based, namely, its Bay Area office in San Francisco, located at 555

16

COMPLAINT

California Street, 27th Floor, San Francisco, CA 94104, out of which its co-Defendant partners, owners, principal(s), and/or agent(s) Adam Alper, Adam R. Alper, P.C., Akshay Deoras, and Akshay S. Deoras, P.C. were based during all relevant times; and its Los Angeles office, including its downtown location at 555 South Flower Street, Suite 3700, Los Angeles, CA 90071, out of which its co-Defendant partner(s), owner(s), principal(s), and/or agent(s) Michael De Vries and Michael W. DeVries, P.C. were based during all relevant times, and including its Century City location at 2049 Century Park East, Suite 3700, Los Angeles, CA 90067, out of which its co-Defendant agent, servant, and/or employee, and/or, on information and belief, partner, owner, and/or principal Mark Fahey was based during relevant times. Kirkland's contact with the State of California resulted from its reaching out to, or purposeful availment of, the State of California. Given Kirkland's extensive presence in California, being sued in California was foreseeable.

46.  Plaintiff's claims arose from Kirkland's contact with the State of California because Adam Alper extended to Plaintiff, on behalf of Kirkland, and offer to join Kirkland's office in San Francisco as an associate in Kirkland's IP litigation group. Plaintiff's employment at Kirkland gave rise to Plaintiff's claims in this suit. In addition, this Court's exercise of specific personal jurisdiction over Kirkland is fair because it is convenient for and reduces the burden on Defendant Kirkland and its co-Defendants, including at least Adam Alper, Adam R. Alper, P.C., Michael De Vries, Michael W. DeVries, P.C., Akshay Deoras, Akshay S. Deoras, P.C., and Mark Fahey, and on potential witnesses, given the coinciding location of the suit and of the situs of wrongdoing. In addition, the State of California has an interest in preventing Unlawful Employment Practices, such as those that are at issue in this case and that prevented Plaintiff[8] from becoming a productive, successful tax-paying citizen of the State of California. In addition, Plaintiff has an interest in litigating in the State of California given that she would have moved to California, but for Defendants' unlawful conduct, and that the California has general

---

[8] Defendants may have caused harm to others with their sex-based discriminatory conduct, which, if not stopped, could continue to harm the forum state. For example, Plaintiff has knowledge of seven female associates—and only one male associate—who worked with the same partners as Plaintiff (namely, co-Defendants Mr. Alper, Mr. De Vries, Mr. Deoras, and/or Ms. Schmidt) and left the Firm during Plaintiff's (short) tenure at the Firm.

COMPLAINT

1    jurisdiction over most of the Defendants in this suit.  Accordingly, this Court's exercise of

2    specific personal jurisdiction over Kirkland is proper.

3         47.    Adam Alper resides at 314 Woodland Rd., Kentfield, CA 94904.  Adam Alper is

4    domiciled and "at home" in the State of California.  This Court has general personal jurisdiction

5    over Adam Alper.  Adam R. Alper, P.C. is incorporated in California and has its principal place

6    of business at Kirkland & Ellis LLP, 555 California Street, 27th Floor, San Francisco, CA 94104.

7    Accordingly, in the State of California, Adam R. Alper, P.C.'s business is so systematic and

8    continuous such that it is at home.  This Court has general personal jurisdiction over Adam R.

9    Alper, P.C.

10        48.    Michael De Vries resides at 23 Calle Viviana, San Clemente, CA 92673.  Michael

11   De Vries is domiciled and "at home" in the State of California.  This Court has general personal

12   jurisdiction over Michael De Vries.  Michael W. DeVries, P.C. is incorporated in California and

13   has its principal place of business at Kirkland & Ellis LLP, 555 South Flower Street, Suite 3700,

14   Los Angeles, CA 90071.  Accordingly, in the State of California, Michael W. DeVries, P.C.'s

15   business is so systematic and continuous such that it is at home.  This Court has general personal

16   jurisdiction over Michael W. DeVries, P.C.

17        49.    Akshay Deoras resides at 267 Clipper St., San Francisco, CA 94114.  Akshay

18   Deoras is domiciled and "at home" in the State of California.  This Court has general personal

19   jurisdiction over Akshay Deoras.  Akshay S. Deoras, P.C. is incorporated in California and has

20   its principal place of business at Kirkland & Ellis LLP, 555 California Street, 27th Floor, San

21   Francisco, CA 94104.  Accordingly, in the State of California, Akshay S. Deoras, P.C.'s business

22   is so systematic and continuous such that it is at home.  This Court has general personal

23   jurisdiction over Akshay S. Deoras, P.C.

24        50.    Mark Fahey resides at 446 Monterey Blvd., Apt. E2, Hermosa Beach, CA 90254.

25   Mark Fahey is domiciled and "at home" in the State of California.  This Court has general

26   personal jurisdiction over Mark Fahey.

27        51.    Leslie Schmidt and Leslie M. Schmidt, P.C. have minimum contacts with the State

28   of California such that exercising personal jurisdiction does not offend traditional notions of fair

18

COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12

play and substantial justice.  Leslie Schmidt and Leslie M. Schmidt, P.C. purposefully availed themselves of the State of California by reaching out to the same, e.g., by working with its citizens (e.g., each of their other co-Defendants), by establishing a temporary office and presence in California (e.g., at least in late May 2021 and in June 2021 for the LivePerson trial in Oakland), during which time Leslie Schmidt and Leslie M. Schmidt, P.C. met with all co-Defendants to discuss retaliating against Plaintiff, including at least on June 3, 2021, when Ms. Schmidt was in California for the LivePerson trial and attended the "Bay Area IP Team Dinner," which was held at La Mar in San Francisco and was attended by all co-Defendants, and again on July 10, 2021, when Ms. Schmidt was in California for the annual gathering hosted by Mr. Alper for his and Mr. De Vries' subset of the IP litigation group, which gathering was held in San Francisco and was attended by all co-Defendants except Mr. Fahey.  Defendants had ensured Plaintiff could not attend either event by overloading her with work.

13
14
15
16
17
18
19

52.     Leslie Schmidt's and Leslie M. Schmidt, P.C.'s contact with the State of California resulted from their respective reaching out to, or purposeful availment of, the State of California. Given Leslie Schmidt's and Leslie M. Schmidt, P.C.'s extensive presence in California, e.g., due to spending substantial time in California during the relevant time periods, e.g., for the LivePerson trial, when Ms. Schmidt and her co-Defendants were further discriminating against Plaintiff and were retaliating against Plaintiff for her April 29, 2021 reporting, being sued in California was foreseeable.

20
21
22
23
24
25
26
27
28

53.     Plaintiff's claim arose from Leslie Schmidt's and Leslie M. Schmidt, P.C.'s contact with the State of California, e.g., Ms. Schmidt's aforementioned discussions and additional discussions with Defendants Mr. Alper, Mr. De Vries, and Mr. Deoras when she was at trial with them in Oakland in late May and in June.  In addition, this Court's exercise of specific personal jurisdiction over Kirkland is fair because it is convenient for and reduces the burden on at least each of Ms. Schmidt's co-Defendants and potential witnesses, given the coinciding location of the suit and of the situs of wrongdoing.  In addition, other fairness considerations, e.g., those discussed above with respect to the propriety of this Court's exercise of specific personal jurisdiction over Ms. Schmidt's co-Defendant Kirkland apply here with full force.  (*See*

19

COMPLAINT

1    *supra* ¶ 46.)   Accordingly, this Court's exercise of specific personal jurisdiction over Leslie

2    Schmidt and Leslie M. Schmidt, P.C. is proper.

3         54.    This Court's exercise of personal jurisdiction over each Defendant satisfies

4    California's long-arm statute because it comports with due process under the U.S. Constitution,

5    as described above.   Cal. Code Civ. P. § 410.10.

6    **Divisional Assignment**

7         55.    This civil action arises in the county of San Francisco because a substantial part of

8    the events or omissions giving rise to Plaintiff's claims occurred in the county of San Francisco,

9    e.g., at Defendant Akshay Deoras' residence and at Defendant Kirkland's San Francisco office.

10   N.D. Cal. Civ. L.R. 3-2(c).

11        56.    For example, Akshay Deoras' residence, located at 267 Clipper St., San Francisco,

12   CA 94114, was the locus from which, at times relevant to this action, Akshay Deoras and Akshay

13   S. Deoras, P.C. conducted business and engaged in at least discriminatory and retaliatory conduct

14   on behalf of at least Akshay Deoras, Akshay S. Deoras, P.C., and Kirkland.   On at least April 29,

15   2021, when Akshay Deoras was at 267 Clipper St., San Francisco, CA 94114, Plaintiff reported

16   his co-Defendants' Unlawful Employment Practices to him, Akshay S. Deoras, P.C., and

17   Kirkland, each of which failed to take proper corrective and preventive action.

18        57.    In addition, at all relevant times, Kirkland's San Francisco office, located at 555

19   California Street, San Francisco, CA 94104, was the principal place of business for both Adam

20   R. Alper, P.C. and Akshay S. Deoras, P.C. and housed individual offices for each of Adam Alper

21   and Akshay Deoras to conduct business on behalf of himself, his eponymous professional

22   corporation, and Kirkland.   At least Defendants Akshay Deoras, Akshay S. Deoras, P.C., and

23   Kirkland engaged in discriminatory and retaliatory conduct from this Kirkland office.   For

24   example, Plaintiff was wrongfully terminated by co-Defendants Akshay Deoras, Akshay S.

25   Deoras, P.C., and Kirkland when Akshay Deoras joined a Zoom meeting on behalf of these three

26   co-Defendants while located at 555 California Street, San Francisco, CA 94104.

COMPLAINT

58.     Accordingly, because this civil action arises in the county of San Francisco, this action should be assigned to the San Francisco division of the Northern District of California. N.D. Cal. Civ. L.R. 3-2(c).

**VENUE**

59.     Venue is proper in this judicial district pursuant to 42 U.S.C. § 2000e-5(f)(3) and/or 28 U.S.C. § 1391.

60.     Unlawful Employment Practices were committed in this district.  For example, as discussed above, Defendants unlawfully discriminated and retaliated against Plaintiff in this district by wrongfully terminating her.  (*See, e.g.*, *supra* ¶¶ 55–58.)  As another example, Defendants Adam Alper, Adam R. Alper, P.C., and Kirkland discriminated against Plaintiff in this district with respect to pay because of sex by sending discriminatory offer letters from Adam Alper in Kirkland's San Francisco office.

61.     Employment records relevant to Defendants' Unlawful Employment Practices were maintained and administered in this judicial district.  For example, the discriminatory offer letters were sent to Plaintiff from the Firm's legal recruiting manager for the San Francisco office, and the letters' signature and letterhead indicated that they were from Adam Alper on behalf of himself and the Firm's San Francisco office, i.e., that they originated from the Firm's San Francisco office location.  In addition, Firm HR personnel in San Francisco administered and maintained records relevant to Plaintiff's discrimination, retaliation, and federal EPA claims, e.g., Plaintiff's new-hire and termination paperwork, including an employment eligibility and verification form and payroll orders, which were maintained and administered by Kirkland's HR and other administrative staff in the San Francisco office.

62.     Plaintiff would have worked in this judicial district but for Defendants' Unlawful Employment Practices.  For example, Plaintiff's employment agreement required her to relocate to San Francisco.  Plaintiff intended and planned to relocate to San Francisco.  In November 2020, Plaintiff went to San Francisco to look for an apartment and had begun planning her move, e.g., by discussing the same with a relocation company.  In December 2020, Plaintiff applied to rent a condo but subsequently paused her plans to move because Kirkland had not yet announced

21

COMPLAINT

when it would officially reopen the San Francisco office, COVID cases were spiking, and Plaintiff needed to prepare for the February 2021 California Bar Examination.  Thereafter, Plaintiff's relocation to San Francisco was held in abeyance by the continuing COVID pandemic and indefinite closure of the Firm's San Francisco office.  Plaintiff's paychecks identified Plaintiff's "[l]ocation" as San Francisco.  When the Firm announced its tentative plans for its November 2021 San Francisco office reopening (following an approximately 19-month closure), Plaintiff began working on plans for her move and planned to discuss its timing (e.g., given an upcoming trial scheduled for early November 2021) during what Plaintiff thought would be her review in September 2021.

63.     However, Defendants' surprise firing of Plaintiff obviated the need for that discussion. But for Defendants' Unlawful Employment Practices, Plaintiff would have relocated to and worked in this judicial district.  For example, Plaintiff had taken a house-hunting trip to San Francisco in anticipation of relocating.

64.     In addition, a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district, including in the county of San Francisco, as discussed above. (*See, e.g.*, *supra* ¶¶ 55–58.)  In the alternative, venue lies in this judicial district because each Defendant, for example, is subject to this Court's personal jurisdiction with respect to this action. (*See, e.g.*, *supra* ¶¶ 44–54.)

## FACTUAL BACKGROUND

### Defendants Began Discriminating Against Plaintiff on the Basis of Sex When They Extended Her a Job Offer with a Salary Lower Than Those of Male Comparators

65.     On September 15, 2020, Brandon Brown, a partner at Kirkland's San Francisco office, called Plaintiff to extend her an offer to work as an IP litigation associate at Kirkland in the same office.  He told Plaintiff that the offer would require her to take a one-year haircut in class year.  Thus, although Plaintiff had graduated law school in 2016, she would be placed in the class of 2017 for purposes of compensation and reviews.[9]  Mr. Brown claimed the lower classification would place Plaintiff in a better position for elevation to partner.

---

[9] In 2021, standard total compensation for a class-of-2017 associate (around $399,000) was around $50,000 lower than standard total compensation for a class-of-2016 associate (around

COMPLAINT

66.     The following day, September 16, 2020, Plaintiff received Kirkland's offer letter, which was signed by Mr. Alper.  The offer letter stipulated that Plaintiff would be paid the full, market bonus for a class-of-2016 associate in December 2020, which was inconsistent with treating Plaintiff one class year lower than her male comparators.  However, in December 2020, when the Firm announced 2020 bonuses, the Firm tried to pay Plaintiff less than the amount stipulated in the offer letter, which required Plaintiff to reach out to the Firm, including Mr. Alper,[10] to rectify their attempts to underpay Plaintiff.

67.     Additionally, Plaintiff had to request that her offer letter be revised to annualize her hours for the 2021 review and bonus period because the original language would have allowed Defendants to reduce Plaintiff's December 2021 bonus because she began working at Kirkland after the 2021 review and bonus periods had begun.[11]  On September 23, 2020, Plaintiff received the revised offer letter, again signed by Mr. Alper; Plaintiff signed and returned it the same day.

## Male IP Litigation Associates Who Were Comparators to Plaintiff

68.     As shown throughout this Complaint, all or at minimum a significant portion of the job performed by Plaintiff (e.g., tasks, assignments, responsibilities on matters) while classified as a class-of-2017 IP litigation associate were the same or substantially the same as for the positions being compared, e.g., a class-of-2016 IP litigation male associate.

### Andrew Walter

69.     During times relevant to this litigation, Andrew Walter was an IP litigation associate based out of Kirkland's New York City office.  Plaintiff and Mr. Walter worked for, were supervised by, and reported to the same Kirkland partners.  For example, Plaintiff and Mr. Walter both worked on Mr. Alper's and Mr. De Vries' cases managed by Mr. Deoras; Plaintiff

---

$452,500).  *Biglaw Salary Scale*, Biglaw Investor, https://www.biglawinvestor.com/biglaw-salary-scale/.  On information and belief, Defendants Mr. Alper, Mr. De Vries, and Kirkland did not ask any male associates in the IP litigation group to take a comparable haircut in class year.

[10] Adam Alper was a member of the Firm's Associate and Non-Share Partner Compensation Committee, which recommends to the Firm Committee associate bonuses.

[11] The associate review period ran from July 1 to June 30 each year.

COMPLAINT

1    and Mr. Walter performed the same or substantially the same work for Mr. Deoras. In addition,

2    on several of Mr. Alper's and Mr. De Vries' cases managed by Mr. Deoras, Plaintiff and Mr.

3    Walter both reported to and were supervised by Barbara Barath, a non-share partner based out of

4    Kirkland's San Francisco office, and Ryan Kane, a non-share partner based out of Kirkland's

5    New York office. Plaintiff and Mr. Walter graduated from top law schools in 2016. During

6    times relevant to this litigation, Mr. Walter was classified as a class-of-2016 associate. Mr.

7    Walter and Plaintiff were subject to the same general associate review and evaluation process.

8    Mr. Walter continued to be employed at Kirkland after Plaintiff's firing; Mr. Walter is now an

9    IP litigation partner based out of the Kirkland's Chicago office.

### Samuel Blake

10

11    70.    During times relevant to this litigation, Samuel Blake was an IP litigation associate

12    based out of Kirkland's downtown Los Angeles office. Plaintiff and Mr. Blake worked for, were

13    supervised by, and reported to the same Kirkland partners. For example, Plaintiff and Mr. Blake

14    both worked on Mr. Alper's and Mr. De Vries' cases and performed the same or substantially

15    the same work for Mr. De Vries. Plaintiff and Mr. Blake graduated from top law schools in 2016.

16    During times relevant to this litigation, Mr. Blake was classified as a class-of-2016 associate.

17    Mr. Blake and Plaintiff were subject to the same general associate review and evaluation process.

18    Mr. Blake continued to be employed at Kirkland after Plaintiff's firing; Mr. Blake is now an IP

19    litigation partner based out of Kirkland's downtown Los Angeles office.

### Kyle Calhoun

20

21    71.    During times relevant to this litigation, Kyle Calhoun was an IP litigation associate

22    based out of Kirkland's San Francisco office. Plaintiff and Mr. Calhoun worked for, were

23    supervised by, and reported to the same Kirkland partners. For example, Plaintiff and Mr.

24    Calhoun both worked on Mr. Alper's and Mr. De Vries' cases and, on information and belief,

25    performed the same or substantially the same work for Mr. Alper and/or Mr. De Vries. Plaintiff

26    and Mr. Calhoun graduated from top law schools in 2016. During times relevant to this litigation,

27    Mr. Calhoun was classified as a class-of-2016 associate. Mr. Calhoun and Plaintiff were subject

28    to the same general associate review and evaluation process. Mr. Calhoun continued to be

24

COMPLAINT

employed at Kirkland after Plaintiff's firing; Mr. Calhoun is now an IP litigation partner based out of Kirkland's San Francisco office.

### Christian Huehns

72.     Although Christian Huehns, also an IP litigation associate, was a lower class year than Plaintiff, on at least one occasion he and Plaintiff performed the same or substantially the same work, e.g., due to staffing needs.  Mr. Huehns was based out of the Firm's Chicago office. Plaintiff and Mr. Huehns worked for, were supervised by, and reported to the same Kirkland partners.  For example, Plaintiff and Mr. Huehns both worked on Mr. Alper's and Mr. De Vries' cases managed by Mr. Deoras.  On one such case, Plaintiff and Mr. Huehns performed the same or substantially the same work for, while supervised by and reporting to, Mr. Deoras.  On several other cases, Plaintiff and Mr. Huehns both reported to and were supervised by Ms. Barath and Mr. Kane.  Mr. Huehns and Plaintiff were subject to the same general associate review and evaluation process.  Mr. Huehns is still employed at Kirkland.  Accordingly, Defendants' disparate treatment of Mr. Huehns provides a comparative benchmark in demonstrating Defendants' discriminatory and retaliatory conduct.

### Male Associate G

73.     Similarly, although another IP litigation associate who was based out of the Firm's San Francisco office ("**Male Associate G**") was a lower class year (2018) than Plaintiff (2016 but classified as 2017 by Kirkland), on at least one occasion he and Plaintiff performed the same or substantially the same work, e.g., due to staffing needs.  Plaintiff and Male Associate G worked for, were supervised by, and reported to the same Kirkland partners.  For example, Plaintiff and Male Associate G both worked on the ITC investigation discussed above, which was led by Mr. Alper and Mr. De Vries and managed by Mr. Deoras, Ms. Schmidt, and Mr. Fahey (the "**ITC Investigation**").  On the ITC Investigation, Plaintiff and Male Associate G both worked on anticipation and obviousness patent invalidity defenses and assisted with claim construction; Plaintiff and Male Associate G performed the same or substantially the same work for Mr. Deoras while directly supervised by and reporting to Mr. Fahey.  Plaintiff and Male Associate G were subject to the same general associate review and evaluation process.  Accordingly, Defendants'

25

disparate treatment of Male Associate G provides a comparative benchmark in demonstrating Defendants' discriminatory and retaliatory conduct.

**As Compared to Plaintiff, the Male Comparators Performed Substantially Similar Work Requiring Substantially Equal Skill Under Substantially Similar Working Conditions**

74.     As detailed throughout this Complaint, Plaintiff's male comparators' jobs, e.g., as class-of-2016 associates, in the IP litigation group working for the same team (i.e., Mr. De Vries' and Mr. Alper's subset of the IP litigation group) and Plaintiff's job (as a Kirkland-labeled class-of-2017) associate in the IP litigation group: (i) involved similar levels of skill, i.e., similar levels of experience, ability, education, and training; (ii) involved similar levels of mental and physical exertion; (iii) involved similar levels of responsibility or accountability; and (iv) were performed under substantially similar working conditions, except for the discriminatory, hostile, and retaliatory environment to which Plaintiff was subjected by Defendants as a result of her sex and complaints regarding Defendants' unfair treatment of her.

**Plaintiff Joins Kirkland, Earns Critical Wins, and Is Praised for Her Success**

75.     Plaintiff was employed by Defendant Kirkland for ten months, from November 16, 2020 until September 28, 2021.  In total, Plaintiff performed work for Defendant Kirkland for a **mere seven months**, approximately, when accounting for onboarding/training, bar leave, and the seven weeks prior to Plaintiff's firing meeting, when the partners central to her claims froze her out of work and foreclosed her ability to work with other willing and requesting partners after Plaintiff had complained about Defendants' unlawful treatment of Plaintiff.  Despite her short tenure at Kirkland and in stark contrast to the allegedly substantial and pervasive work performance issues proffered as the underlying support for the basis for Plaintiff's termination, Plaintiff provided immense value to the Firm and to the Defendant partners, as detailed further below, including by meaningfully contributing to only winning cases and cases that settled favorably.

76.     Shortly after Plaintiff joined Kirkland in November 2020, she began working on a number of different assignments for Mr. Deoras, leading to additional work on the same and other matters, including: (1) assessing extant patent-assertion analyses and providing additional input; (2) performing patent-assertion analysis for a potential litigation-funded case; and (3)

26
COMPLAINT

1  drafting a dispositive motion for a subsidiary of the Firm's largest client.  Plaintiff directly

2  reported to Mr. Deoras for the first and third aforementioned assignments and to Mr. Fahey (and

3  indirectly to Mr. Deoras, to whom Mr. Fahey reported) for the second assignment.

4  ### December 2020 Patent-Assertion Assessment

5  77.    For the first assignment listed above, assessing extant patent-assertion analyses

6  concerning switches and transceivers and providing additional input, e.g., based on Plaintiff's

7  analysis of the patents' prosecution histories, Plaintiff reported directly to Mr. Deoras. Plaintiff

8  timely sent him the requested work in mid-December 2020.  Plaintiff followed up with Mr.

9  Deoras a few times.  Shortly before Plaintiff went on leave (per Firm policy) in mid-January

10  2021 to study for and take the California Bar Examination, Mr. Deoras told Plaintiff that he

11  thought her analysis "all makes sense," that the next steps would likely happen when Plaintiff

12  was out on leave, so there was no need for Plaintiff to get involved, but that "I just wanted to let

13  you know that I think this is good."  Although this assignment was relatively small in terms of

14  scale compared to other assignments that Plaintiff performed for Mr. Deoras, his "evaluation" of

15  Plaintiff merely acknowledged the existence of this assignment and intentionally omitted his

16  satisfaction with Plaintiff's performance on this assignment.  Mr. Deoras' glossing over this work

17  is a small preview into Defendants' discriminatory and retaliatory treatment of Plaintiff.

18  Defendants, including Mr. Deoras, did not provide similarly negatively slanted and skewed

19  "evaluations" for comparator male associates.

20  ### November/December 2020 and March 2021 Patent-Assertion Analysis for Litigation

21  ### Funding

22  78.    For the second assignment listed above, Plaintiff performed patent-assertion

23  analysis directed to integrated circuits for a potential case to be financed with litigation funding

24  with a team led by Defendants Mr. Alper and Mr. De Vries and managed by Defendants Mr.

25  Deoras, Ms. Schmidt, and Mr. Fahey.  Plaintiff's work was directly supervised by Mr. Fahey and

26  indirectly by Mr. Deoras.  Specifically, Plaintiff worked with a male associate in the Firm's IP

27  litigation group ("**Male Associate Q**") on analyzing potential infringement reads for a target

28

COMPLAINT

defendant's products and drafting infringement charts.  Plaintiff also ran down, at Mr. Fahey's request, certain ancillary issues, e.g., regarding damages and product availability.

79.    In November 2020, this assertion analysis included Mr. Fahey assigning last-minute work to Plaintiff and Male Associate Q over Thanksgiving, for which Mr. Fahey knew Plaintiff would have to bear the laboring oar and would require Plaintiff to work on Thanksgiving (in addition to the day before and after).  Mr. Fahey told Plaintiff that he struggled in working with Male Associate Q because it was difficult to get him to produce usable work, which is why Plaintiff was added to the assignment.  Mr. Fahey indicated that Plaintiff's efforts were a huge lift because Mr. Fahey did not have to continue to bother Male Associate Q to make progress on the assignment.  (Male Associate Q is still employed at Kirkland.)

80.    Every time Defendants Mr. Deoras, Mr. Fahey, Mr. Alper, and Kirkland were aware of Plaintiff having travel plans over weekends (e.g., for multiple national holidays and a brief scheduled vacation), Defendants Mr. Deoras, Mr. Fahey, Mr. Alper, and Kirkland assigned Plaintiff additional work either right before or during her planned travel, ensuring she would have substantial work to complete while traveling or attempting to take time off.[12]  Plaintiff was not opposed to working a fair amount when traveling and on holidays, particularly considering the fact that Defendants had indicated to Plaintiff the good probability of making partner.[13]  To Plaintiff's knowledge, however, Defendants did not show a similar disregard for male associates' travel plans, holidays, and planned time off.  For example, Defendants took affirmative steps to ensure Mr. Huehns would be undisturbed during his vacation, including assigning and attempting to assign Mr. Huehns' work to Plaintiff, which interfered with Plaintiff's own scheduled vacation time.  Plaintiff's willingness to sacrifice personal time was all for naught given that Defendants

---

[12] Another female IP litigation associate who had been based out of the Firm's San Francisco office ("**Female Associate G**") told Plaintiff that she received a conspicuous uptick in work from Defendants that coincided directly with her travel plans, which made her think it was intentional.

[13] Debra Cassens Weiss, *Kirkland Sets Another Record with Latest Partnership*, ABAJournal (Oct. 4, 2022, 2:31 pm CDT), https://www.abajournal.com/news/article/kirkland-sets-another-record-with-latest-partnership-promotions (noting that Kirkland "has once again boosted the number of lawyers promoted to partner with its latest announcement of a record 193 partnership promotions," which is "28% higher than last year's number").

COMPLAINT

summarily terminated Plaintiff on the basis of allegedly poor performance, specifically stating she did "not contribute[] to her matters at either the substantive or commitment level that is expected of an associate." Plaintiff's willingness to always prioritize work over her personal life directly belies the pretextual performance-based rationale for her termination.

81.     In December 2020, Mr. Fahey told Plaintiff that she was doing a great job on the assertion analysis. On December 17, 2020, Mr. Fahey sent Plaintiff's and Male Associate Q's infringement charting on the target-defendant's products, completed largely by Plaintiff, to Mr. Deoras and Ms. Schmidt for review. On December 18, 2020, Mr. Fahey emailed Plaintiff and Male Associate Q, thanking them "for the hard work." Per Mr. Fahey, "Akshay [Deoras] was happy with the [target-defendant] chart." Based on this infringement charting, Defendants Mr. Alper, Mr. De Vries, and Ms. Schmidt sought (and obtained) Firm approval to litigate with an alternative-fee arrangement (namely, with litigation funding), as relayed to Plaintiff by Defendants Mr. De Vries and Mr. Deoras.

82.     Nevertheless, Mr. Deoras' "evaluation" of Plaintiff merely acknowledged the existence of the aforementioned assignment and intentionally omitted his satisfaction with Plaintiff's performance on the same. Mr. Fahey's "evaluation" also intentionally omitted any discussion of Plaintiff's good work. Defendants, including Mr. Deoras and Mr. Fahey, did not provide similarly negatively slanted and skewed "evaluations" for comparator male associates.

83.     To underscore the value of Plaintiff's work, a male associate in the IP litigation group ("**Male Associate A**"), who (like Plaintiff) was based out of the Firm's San Francisco office, completed a substantially similar assignment preparing infringement charting for another target defendant as part of the same litigation funding efforts. However, based on Male Associate A's infringement charting, Mr. Deoras decided not to seek Firm approval to greenlight litigating the case against this other target defendant—the opposite result of Plaintiff's work.

84.     After submitting the infringement charting in December 2020, Plaintiff did not receive any update on the matter until the underline evening of Saturday, March 6, 2021, when Mr. Deoras and Mr. Fahey were aware that Plaintiff was on the east coast and had flown to visit her parents for the weekend. Mr. Fahey emailed Plaintiff and Male Associate Q at 5:33 pm PST / 8:33 pm

COMPLAINT

1    EST and assigned—with no prior warning—infringement charting reading 19 claims (including

2    three independent claims) across two patents on the target defendant's products.

3         85.    Mr. Fahey indicated that he would need to review and submit their charting to Mr.

4    Deoras that weekend, i.e., within around 24 hours.  Given the prior difficulty in getting Male

5    Associate Q to provide usable work, Mr. Fahey knew that Plaintiff would shoulder the lion's

6    share of the surprise assignment and also was aware that she was traveling home to visit family.

7    Plaintiff immediately responded to Mr. Fahey's request and agreed to get started.[14]   Male

8    Associate Q was unable to begin helping until very late that evening at earliest.  Male Associate

9    A stated he was unavailable to help when asked.  That evening and early the next morning,

10   Sunday, March 7, 2021, Plaintiff emailed Mr. Fahey, copying Mr. Deoras and Male Associate

11   Q, attaching charting she completed for the independent claims and proposing a division of labor

12   between Plaintiff and Male Associate Q to complete the remaining dependent claims.  Later that

13   morning, Mr. Fahey sent two responses close in time.  First, he removed Mr. Deoras and Male

14   Associate Q as recipients to privately compliment Plaintiff[15] on her charting ("[n]ice quick/clean

---

[14] A female associate who formerly worked in the IP litigation group at Kirkland ("**Female Associate R**") and had performed work for the same partners at Kirkland as Plaintiff (Defendants Ms. Schmidt, Mr. De Vries, and Mr. Alper) spoke to Plaintiff in the fall of 2021 about her experience at Kirkland.  She worked in Kirkland's IP litigation group for approximately four years.  She stated that, as compared to male associates in the IP litigation group, she was given assignments under less favorable conditions, such that she felt her time as a female associate was valued less.  For example, she said that partners had a habit of dumping last-minute assignments on her (e.g., on a Friday evening needing to be completed ASAP) but not on male associates.  In addition, Female Associate R stated that male associates in the IP litigation group were able to rely on their relationships with partners and get by at Kirkland while doing less, e.g., billing fewer hours on fewer cases, than female associates.  Similarly, Mr. Blake, who had an unusually close relationship with Mr. Alper (e.g., Mr. Blake told Plaintiff (in April 2021) that at one point he was on the phone with Mr. Alper for 12 hours, purportedly discussing work, and had indicated that as a result of his closeness with Mr. Alper, he planned on demanding to be made share partner well ahead of Kirkland's standard track to make partner.  Female Associate R ultimately left Kirkland because she felt undervalued and was not getting a fair shake at the Firm. Based on what Female Associate R told Plaintiff, female associates in IP litigation group shared Female Associate R's negative experiences and expressed concerns regarding their longevity at the Firm.

[15] Mr. Fahey consistently did not include share partner(s) on emails in which he complimented Plaintiff's work but generally included share partner(s) when complimenting male associates' work.

COMPLAINT

work").[16]  Then he sent a response to Plaintiff, Mr. Deoras, and Male Associate Q, which omitted any praise.  As a result of that work, the team secured litigation funding for the case.

86.  In April 2021, Mr. De Vries thanked Plaintiff for her work on the above assertion analysis.  Mr. De Vries told Plaintiff that, due to his and Mr. Alper's recent successes, the litigation financier agreed to fund three cases that would be run by Kirkland's IP litigation group.  The financier would cover all litigation costs and fees (including billable hours), to the tune of tens of millions of dollars, and Kirkland would receive contingency fees that would increase handsomely based on the number of cases won.  Moreover, Kirkland's IP litigation group had potential cases "in the pipeline" for additional litigation-funding candidacy.

87.  On May 7, 2021, Mr. Deoras told Plaintiff that the Firm and the litigation funder had both green-lit representing the inventor in asserting his IC patents because of Plaintiff's work.  Contrary to the defamatory statements proffered by Defendants as pretext for Plaintiff's firing, Plaintiff provided immense value to the Firm and to Defendants' practice.[17]

**December 2020/January 2021 and March 2021 POPRs**

88.  For the third assignment listed above, (*see supra* ¶ 76), Plaintiff drafted a successful dispositive motion for a subsidiary of the Firm's most important client ("**POPR No. 1**").[18]  Plaintiff would draft another successful dispositive motion for a related subsidiary of the

---

[16] In contrast, Mr. Fahey's defamatory "evaluation" of Plaintiff, falsely stated that Plaintiff "needs to work on time management and dependability of [her] work" and "needs to work on developing her understanding of the style of work" that "we want at Kirkland."

[17] In a recent publication, Mr. Alper and Mr. De Vries discussed the Firm's recent push into plaintiff-side contingency fee litigation and the mechanics of accepting such a case.  The American Lawyer Litigation Daily, *Taking Stock of Kirkland's Push into Plaintiff-Side Contingency Fee Litigation*, Kirkland & Ellis (Jan. 10, 2022), https://www.kirkland.com/news/in-the-news/2022/01/taking-stock-of-kirkland-contingency-fee-lit.  Mr. Alper and Mr. De Vries explained that the Firm conducts a "Red Team analysis" to determine whether to accept a case on contingency; Plaintiff understands that her work was analyzed by the Red Team in granting approval for the above-discussed litigation-funded case.  *Id.*  Mr. Alper and Mr. De Vries further noted how the move into contingency fee work has "been a benefit for the firm" and that determinations on whether to proceed required an analysis of the "long-term profile" of a case to ensure it will be successful.  *Id.*

[18] A Patent Owner Preliminary Response ("**POPR**") responds to a petition for *inter partes* review ("**IPR**"), which is a proceeding before the PTAB.

COMPLAINT

same client ("**POPR No. 2**").[19]  Plaintiff drafted these motions for Mr. Deoras, Male Non-Share

Partner Y, Mr. Alper, and Mr. De Vries.  Plaintiff's work received high praise from the same

individuals, as well as from Ms. Schmidt and Male Share Partner C.  As detailed below, Mr. De

Vries', Ms. Schmidt's, and Mr. Deoras' "evaluations" of Plaintiff intentionally omitted that: (1)

they provided effusive praise to Plaintiff for her work on these POPRs; and (2) Plaintiff was

directly responsible for drafting two winning POPRs.[20]  Further, the only reasonable conclusion

that a person reading Mr. Deoras' "evaluation" of Plaintiff could reach is that the POPRs she

drafted resulted in institution, i.e., were unsuccessful.  This abject falsity and the false and

misleading nature of Mr. Deoras' "evaluation" of Plaintiff underscores the maliciousness and the

discriminatory and retaliatory intent of his "evaluation."

89.    Plaintiff drafted POPR No. 1 before she went on bar-exam leave in mid-January

2021.  Kirkland represented the patent owner for both POPR Nos. 1 and 2.  The patent that was

the subject of the IPR petition was one of seven that the patent owner had accused its competitor,

the IPR petitioner, of willfully infringing in co-pending district court litigation run by Mr. Alper,

---

[19] *Platform Sci., Inc. v. Omnitracs, LLC*, No. IPR2020-01613 (PTAB Jan. 19, 2021) (Paper 9) (POPR No. 1); *Platform Sci., Inc. v. Omnitracs, LLC*, No. IPR2020-01613 (PTAB Apr. 13, 2021) (Paper 14) (denying institution); *Platform Sci., Inc. v. XRS Corp.*, No. IPR2021-00324 (PTAB Mar. 22, 2021) (Paper 8) (POPR No. 2); *Platform Sci., Inc. v. XRS Corp.*, No. IPR2021-00324 (PTAB June 21, 2021) (Paper 11) (denying institution).

[20] A POPR, akin to a motion to dismiss, is successful when the PTAB denies a petition to institute IPR proceedings.  The burden of proof for invalidity in PTAB proceedings, which requires merely a preponderance of evidence, is lower than in district court, which requires clear and convincing evidence.  Accordingly, proving invalidity is easier in a PTAB proceeding than in a district court case.  Moreover, invalidating a patent is less expensive at the PTAB than in district court.  Edward Elgar Publ'g Ltd., 1 Research Handbook on the Economics of Intellectual Property Law: Theory (eds. Ben Depoorter & Peter Menell, 2015) (citing Am. Intellectual Prop. Law Assoc., *Report of the Economic Survey* (2015)).  Accordingly, a petition for IPR is usually filed by a defendant to invalidate patent claims asserted against it in district court.  As a general matter, a defendant-petitioner puts forth its best invalidity argument(s) in its petition.  If the PTAB denies institution, the patent claims will not likely be invalidated in district court, given the weight that will likely be assigned to the PTAB decision.  Therefore, a PTAB decision denying institution carries great weight and substantially increases a patent's value by highly increasing the likelihood that a patent-owner plaintiff will receive damages for patent infringement.  E.g., Thomas L. Irving & Stacy D. Lewis, Finnegan, Pre-Institution at PTAB: Obtaining a Denial Is a Patent Owner Win - Part 2: Substantive Bases of Challenge, IPO Law Journal (Oct. 22, 2015), *available at* https://www.finnegan.com/en/insights/articles/pre-institution-at-ptab-obtaining-a-denial-is-a-patent-owner-win.html (last accessed Jan. 11, 2022).

COMPLAINT

Mr. De Vries, Mr. Deoras, Ms. Schmidt, and Male Non-Share Partner Y.  Mr. Deoras directly supervised Plaintiff's work on POPR No. 1.

90.     Plaintiff drafted POPR No. 2 in March 2021 in an abbreviated timeframe due to Mr. Deoras' failure to timely assign this POPR.  Specifically, on Thursday, March 4, 2021, Mr. Deoras asked Plaintiff to draft POPR No. 2, which was due in less than three weeks on Monday, March 22, 2021, and apologized to Plaintiff because the assignment was "a little last minute."[21] Indeed, Male Non-Share Partner Y stated to Plaintiff several times that the turnaround (of two weeks and change) was very tight and that Mr. Deoras had "dropped the ball" by repeatedly failing to assign the POPR to an associate, despite Male Non-Share Partner Y's persistent reminders to Mr. Deoras to do so during the three months before its filing deadline.  Plaintiff's work on POPR No. 2 was supervised by Male Non-Share Partner Y and Mr. Deoras.

91.     Each of Plaintiff's two POPRs successfully resulted in non-institution, thereby increasing the value of the patents-at-issue in the co-pending district-court litigation.  Male Non-Share Partner Y, who worked on the co-pending district-court litigation, told Plaintiff that the patent that was the subject of POPR No. 1 was "important" and the patent that was the subject of POPR No. 2 was "one of the most important" to the district-court litigation.  Male Non-Share Partner Y, who had worked at Kirkland in its IP litigation group since beginning his legal career eight years prior, told Plaintiff that he had "never won a POPR" before prior to working with Plaintiff.  His first POPR win was the one on which he directly supervised Plaintiff's work, POPR No. 2, on which, per Male Non-Share Partner Y, Plaintiff "did the heavy lifting."

---

[21] As discussed below, in late June 2021, Mr. Deoras highly praised Plaintiff's work on preliminary proceedings before the PTAB, gushing that she did a "fabulous job" on them. However, Mr. Deoras' defamatory "evaluation" of Plaintiff falsely stated that "[Plaintiff] struggles to meet deadlines" and that "[Plaintiff's] time management skills also need significant development; . . . she is often unable to complete her assignments in an appropriate amount of time."  As additional salient examples of the falsity of Mr. Deoras' defamatory statements and his knowledge thereof, Plaintiff provided Mr. Deoras her draft POPR No. 1 for his review two weeks in advance of the filing deadline.  Moreover, after Mr. Huehns directed Plaintiff, while she was still out on bar leave, to draft the sur-reply for POPR No. 1 due less than a week later, Plaintiff successfully and timely drafted the same, which was supervised by Mr. Deoras and Male Non-Share Partner Y.

COMPLAINT

<div align="center">Plaintiff's Successful Work on POPRs Compared to Male Associates</div>

92.     Plaintiff's work on POPR Nos. 1 and 2 compared to similar work performed by male associates, including by comparator Mr. Walter, illustrate Defendants' discriminatory, disparate treatment of Plaintiff as compared to male associates, particularly with respect to how Defendant's characterized such work in real time versus during the associate review process.

<div align="center">*Mr. Huehns*</div>

93.     For example, when Plaintiff drafted POPR No. 1, Plaintiff properly and effectively responded to the petitioner's claim-construction argument.  It is common knowledge that claim construction is an important part of patent litigation and may be case-dispositive.  Mr. Deoras had another male associate in the IP litigation group, Mr. Huehns, **copy Plaintiff's claim-construction argument from POPR No. 1 into Mr. Huehns' POPR** (which concerned the same patent as POPR No. 1), to remedy Mr. Huehns' failure to adequately address claim construction in his POPR.

94.     As detailed below, Plaintiff received high praise for her work on POPR Nos. 1 and 2 from Mr. Deoras via email and from Mr. Alper on a phone call.  Moreover, Mr. Deoras also told Plaintiff that he used and borrowed a lot of Plaintiff's work from POPR No. 2 to win two other POPRs.  Conversely, with respect to Plaintiff's work on POPR No. 1 and POPR No. 2, Mr. Deoras falsely claimed in his "evaluation" that Plaintiff's "judgment in deciding which arguments to include and prioritize needed improvement."  However, in his praise, Mr. Deoras expressly complimented the arguments that Plaintiff included in POPR Nos. 1 and 2.

95.     On information and belief, Mr. Huehns' failure to include the important, aforementioned claim-construction argument was not included in Mr. Deoras' "evaluation" of his work.  Mr. Huehns is still employed as an IP litigation associate and in good standing at Kirkland while Plaintiff was fired based in part on Defendants' defamatory, patently-false characterization of Plaintiff's work on POPR Nos. 1 and 2.

<div align="center">*Mr. Walter*</div>

96.     The work of a comparator male associate in the IP litigation group, Mr. Walter, on a comparable assignment concerning claim construction, which similarly was performed for Mr.

<div align="center">34</div>

COMPLAINT

1   Deoras, and Mr. Deoras' response to the same, further evidences Defendants' preferential
2   treatment of males and the unlawful nature of Plaintiff's termination.

3       97.   On this comparable assignment, Mr. Walter proposed that 17 patent claim terms
4   be construed in a district court case; the deadline to exchange terms for construction was two
5   days later.[22]  Despite the general import of claim construction, Mr. Walter sent to Mr. Deoras for
6   his review an incomplete chart, which without explanation was missing roughly more than a
7   quarter of its substantive contents.  Mr. Deoras responded that at most only two of the 17
8   proposed terms were potentially helpful.  In other words, nearly 90% of Mr. Walter's work was
9   not helpful.  Mr. Deoras conveyed to Mr. Walter that his work was largely ineffectual.  However,
10  despite these deficiencies, Mr. Deoras still thanked Mr. Walter for his efforts.

11      98.   In contrast, Plaintiff's claim construction argument in POPR No. 1 was
12  transplanted into other Mr. Huehns' POPR at Mr. Deoras' direction, and Mr. Deoras continued
13  to use Plaintiff's POPR arguments on other POPRs, demonstrating their value and eliciting
14  express praise from Mr. Deoras.  For example, as discussed below, Mr. Deoras emailed Plaintiff
15  in June 2021 and said "we were able to use a lot of your work on [POPR No. 2] with [two POPRs
16  that were drafted by another associate and resulted in noninstitution].  Congrats on a great result!"
17  Moreover, Plaintiff had never been told that any of her work was ineffectual, let alone almost
18  entirely useless, in contradiction to the falsehoods in Defendants' "evaluations" of Plaintiff.

19      99.   Mr. Walter is still employed at Kirkland, and, on information and belief, was not
20  negatively criticized like Plaintiff was in his evaluations, including by Mr. Deoras.

[22] In district-court patent litigation, as a general matter, as part of the claim-construction process, each party initially proposes and exchanges to the opposing party patent claim terms that it believes the judge should interpret.  The parties subsequently provide proposed constructions (i.e., proposed interpretations) of the proposed terms.  It is common knowledge that this process is important in patent litigation and may be case-dispositive.

35

COMPLAINT

*Plaintiff's Extremely Successful POPRs Significantly Improve Defendants' Historically Sub-Par POPR Performance, Earning Plaintiff Real-Time Praise, Which Defendants' Defamatory "Evaluations" Deliberately Excluded*

100.    On Monday, April 5, 2021, Mr. Alper called Plaintiff and told her that she had done "excellent" work on the POPRs and that he had spoken to Mr. Deoras regarding the same.

101.    In mid-April 2021, when the PTAB issued its noninstitution decision concerning POPR No. 1, Male Share Partner C complimented Plaintiff's "[g]reat job" on "identifying [the petition's] deficiency and pressing it." He praised Plaintiff's "[t]errific work," stating that the win would "help immensely" in district-court litigation. Defendants Mr. Deoras, Mr. Alper, Mr. De Vries, and Ms. Schmidt all received this email. Male Share Partner C was on the IP Litigation Associate Review Committee ("**ARC**"), which participated in the decision to summarily fire Plaintiff (without any form of probation) based on allegedly horrific work performance.

102.    In June 2021, when the PTAB issued its noninstitution decision concerning POPR No. 2, Mr. Alper and Mr. De Vries emailed the team thread complimenting Plaintiff's work.

103.    A few days later, in late June 2021, Mr. Deoras sent a gushing email to Plaintiff, copying his superiors, Mr. Alper and Mr. De Vries, stating: "Zoya, just wanted to say that **you really did a fabulous job with these**," referencing all of Plaintiff's work on preliminary proceedings, which resulted only in noninstitution. Moreover, Mr. Deoras raved that Plaintiff's successes "**were key wins**" and stated that "**we were able to use a lot of your work on [POPR No. 2] with [two other POPRs, which also resulted in noninstitution]. Congrats on a great**

COMPLAINT

36

**result!**"[23]  Mr. Alper responded, stating: "Great job Zoya. What a series of terrific results."  And Mr. De Vries responded, stating: "Same – great job, Zoya; this is terrific to see."[24]

104.   The best estimate, based on publicly available data, of the probability of both of Plaintiff's POPRs successfully resulting in the PTAB denying institution of IPRs is approximately **16.81%**.[25]  In sum, every POPR Plaintiff touched turned to gold.

105.   The same cannot be said for Defendants Mr. Alper, Mr. De Vries, and Mr. Deoras. Comparing recent historical, publicly-available data concerning the outcomes of Plaintiff's versus Defendants' POPRs—i.e., comparing how many successfully resulted in noninstitution of IPR—shows that Plaintiff **outperformed Defendants Mr. Alper, Mr. De Vries, and Mr. Deoras by a wide margin.  Plaintiff's batting average on the POPRs was 100%**, while **Defendants Mr. Alper's, Mr. De Vries', and Mr. Deoras' collective historical batting average was a paltry 25%** (i.e., only two of eight POPRs that these Defendants had filed in the three years before they hired Plaintiff to join their team successfully resulted in noninstitution).[26]

---

[23] However, in Mr. Deoras' defamatory "evaluation" of Plaintiff, his only comments, which were false, regarding Plaintiff's work on preliminary proceedings before the PTAB were as follows: "On the Omnitracs IPRs, Zoya's technical analysis met expectations, but **her judgment in deciding which arguments to include and prioritize needed improvement**."  Mr. Deoras also falsely stated more generally that Plaintiff "had difficulty communicating her analysis"; that "[Plaintiff's] writing, analysis, and judgment is not up to her class year, and as a result, she puts the team in a difficult position when her work needs to be redone"; and that Plaintiff "often provides" work "that needs significant reworking."

[24] However, Mr. De Vries' "evaluation" of Plaintiff did not include any reference to her work on POPRs.

[25] *See PTAB Trial Statistics*, U.S. Pat. & Trademark Off., 6 (2021), https://www.uspto.gov/sites/default/files/documents/ptab_aia_fy2021__roundup.pdf (stating institution rate by petition for post-grant proceedings for fiscal year ("**FY**") 2021 was 59%); *Appendix*, U.S. Pat. & Trademark Off., 5 (2021), https://www.uspto.gov/sites/default/files/documents/ptab_aia_fy2021_roundup__appendix.pdf (stating institution rate by petition is calculated from all decisions on institution issued in that FY).  Accordingly, the non-institution rate by petition for post-grant proceedings for FY 2021 was 41%.  The probability of noninstitution of both POPR Nos. 1 and 2, which concerned different patents and unrelated subject matter and had different patent owners and inventors, can be found, e.g., by applying De Morgan's law, which gives $(0.41)^2 = 0.1681 = 16.81\%$.

[26] Defendants' historical performance is based on recent PTAB proceedings that they had identified in moving for *pro hac vice* admission to the PTAB. *See Canon Inc. v. Avigilon Fortress Corp.*, Case IPR2019-00314 (PTAB July 8, 2019) (Paper 13) (granting institution); *Canon Inc. v. Avigilon Fortress Corp.*, Case IPR2019-00311 (PTAB July 8, 2019) (Paper 13) (granting institution); *Axis Commc'ns AB v. Avigilon Fortress Corp.*, Case IPR2019-00236 (PTAB June 12, 2019) (Paper 12) (denying institution); *Axis Commc'ns AB v. Avigilon Fortress Corp.*, Case

COMPLAINT

1

2       106.    Defendants directly and indirectly reaped the benefits of Plaintiff's work.  This

3   included improving Defendants Mr. Alper's, Mr. De Vries', and Mr. Deoras' cumulative POPR

4   performance over the last several years from objectively deficient to respectable courtesy of

5   Plaintiff's direct contributions in a matter of months.  Defendants were aware of their deficient

6   performance in recent years, which is why they specifically probed Plaintiff's interest in PTAB

7   work when interviewing Plaintiff in September 2021, which is right around the time relevant

8   petitions were filed.  Defendants' awareness of their sub-par performance in recent years and

9   their direct knowledge of Plaintiff's outsized successes on the POPRs highlights the abject falsity

10  and maliciousness of Defendants' characterization of Plaintiff's work, specifically with respect

    to the POPRs and more generally.  (*See supra* ¶ 88.)

11      107.    Plaintiff's excellent work on POPR Nos. 1 and 2 is further borne out by Mr. Deoras

12  asking Plaintiff to help on a Patent Owner Response ("**POR**") in an IPR proceeding for which

13  the POPR was drafted by a male associate and resulted in institution.  Specifically, shortly before

14  Plaintiff was fired, Mr. Deoras had Plaintiff begin working on drafting the POR, including

15  preparing a detailed, substantive outline setting forth the arguments to be advanced in the POR.

16  This was the first substantive assignment Plaintiff had in over a month because Defendants had

17  dried up Plaintiff's work in retaliation for her reporting and in further discrimination because of

18  Plaintiff's sex.   Saliently, Mr. Deoras asked Plaintiff to complete this work after he had

19  extensively defamed Plaintiff in his "evaluation" and knew Plaintiff would be fired in a matter

20  of weeks for allegedly pervasive and long-standing incompetence.   Assuming *arguendo* the

21

22  IPR2019-00235 (PTAB June 4, 2019) (Paper 19) (denying institution); *Axis Commc'n AB v.
    Avigilon Patent Holding 1 Corp.*, Case IPR2018-01268 (PTAB Jan. 8, 2019) (Paper 15) (granting
23  institution); *Hytera Commc'ns Corp. Ltd. v. Motorola Solutions Inc.,* IPR2017-02183 (PTAB
    May 14, 2018) (Paper 7) (granting institution); *Hytera Commc'ns Corp. Ltd. v. Motorola
24  Solutions Inc.*, Case IPR2018-00176 (PTAB May 10, 2018) (Paper 7) (granting institution);
    *Hytera Commc'ns Corp. Ltd. v. Motorola Solutions Inc.*, Case IPR2018-00128 (PTAB May 10,
25  2018) (Paper 8) (granting institution).

26  Defendants' noninstitution rate, 25%, was below the 38.5% average industry-wide noninstitution
    rates by petition for FYs 2018 and 2019.  *See PTAB Trial Statistics*, *supra*, at 8 (stating institution
27  rates were 60% and 63% in FY 2018 and FY 2019, respectively, i.e., noninstitution rates were
    40% and 37%, respectively); *see Appendix*, *supra*, at 5 (stating institution rate by petition for a
28  respective FY is calculated from all decisions on institution issued in that FY).

COMPLAINT

defamatory "evaluations" used as the underlying support for the basis for Plaintiff's termination (poor performance) were true, it would make no sense for Mr. Deoras to have Plaintiff bill a client to complete a substantive assignment right before Plaintiff's termination, after Defendants had stopped giving Plaintiff work.  The truth of the matter is that Mr. Deoras knew the defamatory "evaluations" were baseless and could not help but squeeze one more drop of value out of Plaintiff with respect to PTAB work, particularly in light of his and the practice group's historically underwhelming performance.  As detailed below, Defendants only used Plaintiff's arguments that she had provided prior to being fired.

**In March 2021, Mr. Deoras Added Plaintiff to the ITC Investigation, on Which She Served as the Lone Workhorse Associate**

108.   On March 1, 2021, on Plaintiff's first day back after bar leave, Mr. Deoras asked Plaintiff to join another matter for Mr. Alper and Mr. De Vries—representing a respondent that had been accused of infringing 19 claims across seven patents in the ITC Investigation discussed above.  The Kirkland team also included Ms. Schmidt and Mr. Fahey.  Plaintiff's work was largely supervised, directly and indirectly, by Mr. Deoras and directly by Mr. Fahey.   In September 2021, the administrative law judge ("**ALJ**") granted Kirkland's client's motion for summary determination on patent invalidity, terminating the ITC Investigation in its entirety.

109.   Plaintiff served as the lone workhorse associate on the ITC Investigation, in which she would develop and drive the client's invalidity, unenforceability, and noninfringement defenses. More specifically, these defenses included patent invalidity based on improper inventorship, lack of co-pendency, anticipation, and obviousness and patent unenforceability due to inequitable conduct based on improper inventorship and lack of copendency.  Plaintiff's responsibilities on the ITC Investigation included developing the patent invalidity theories and drafting invalidity contentions; developing the non-infringement theories and drafting all non-infringement contentions); managing, handling, and driving the substantial third-party discovery (with around 14 subpoenaed nonparties).

110.   In March 2021, Plaintiff began developing the invalidity theories, including analyzing and assessing potential prior art references to include in the invalidity contentions.  In

COMPLAINT

addition, in March 2021, Plaintiff began driving the extensive third-party discovery, including drafting subpoenas concerning the invalidity defenses based on anticipation, obviousness, lack of copendency, and omitted inventorship and unenforceability defenses due to inequitable conduct concerning lack of copendency and omitted inventorship. Plaintiff's work earned her compliments, including from Mr. Fahey when he told Plaintiff she did "[n]ice work" drafting a subpoena and later referred to her as "our ITC subpoena expert."

**At Trial in April 2021, Plaintiff Sees Defendants' Disturbing Discrimination**

111. **On March 30, 2021**, Defendant Ms. Schmidt called Plaintiff to ask whether Plaintiff would like to join a trial team, representing a defendant accused of patent infringement in the Eastern District of Texas, which is generally a very patent-plaintiff-friendly forum, with trial set to begin in **mid-April 2021**. Ms. Schmidt stated that, because of Plaintiff's excellent work at the Firm, including on the POPRs and on the ITC Investigation, Defendants wanted Plaintiff to join the trial team to replace a key (female) associate who had abruptly resigned. Ms. Schmidt asked Plaintiff whether she was interested in joining, and Ms. Schmidt stated that Plaintiff would not need to worry about Plaintiff's responsibilities for the ITC Investigation, which was a separate, active matter. Because both this trial and the ITC Investigation were Mr. Alper's and Mr. De Vries' cases, managed by both Mr. Deoras and Ms. Schmidt, Ms. Schmidt assured Plaintiff that if Plaintiff joined the trial team, Defendants would remove Plaintiff's work on the ITC Investigation so that Plaintiff could prepare for and focus on trial rather than other matters. Plaintiff was appreciative of the compliments and, despite the obstacles to being a last-minute addition to the trial team, agreed to attend trial relying on the assurance that Plaintiff would not be burdened with work for non-trial matters.

112. Plaintiff was thrilled to go to trial with renowned IP litigators even though the circumstances were unusual. Given that Plaintiff would be working on the damages team with Ms. Schmidt, Plaintiff informed Ms. Schmidt of Plaintiff's limited prior experience with damages. (Plaintiff's practice primarily focused on developing and advancing patent infringement and invalidity theories/arguments.) Ms. Schmidt assured Plaintiff that that would not be an issue and confirmed again that Defendants would offload Plaintiff's work on the ITC

40

COMPLAINT

Investigation so she could focus on trial. But, as Plaintiff would later learn, the repeated promises to offload Plaintiff's work on non-trial matters was a lie. Before trial and while at the trial site, Plaintiff continued to be saddled with work for the ITC Investigation, including, *inter alia*, drafting invalidity contentions and analyzing discovery. In spite of the obstacles Plaintiff faced, Plaintiff continued to do excellent work and garnered praise for both her non-trial and trial work while at trial.

113. During the two weeks in Texas for trial, which was the only time Plaintiff met any of the Defendants in person, Plaintiff experienced and otherwise observed a bevy of discriminatory conduct towards women, as detailed below. That Plaintiff experienced and observed such extensive gender discrimination in such a protracted time period is no surprise given that Defendants were in their comfort zone at trial and could not help but reveal their discriminatory *modus operandi*.

114. At trial, Plaintiff assisted with both Mr. De Vries' key cross-examination of the plaintiff's CEO and with Ms. Schmidt's direct examination of the defendant's damages expert witness. The trial resulted in a complete verdict (of invalidity and non-infringement of all asserted patent claims) for the client-defendant.

115. Mr. De Vries was pleased with Plaintiff's work, as he expressed to Plaintiff multiple times in person and over email. The Firm's own publication touted a line of questioning developed by Plaintiff as key to the trial victory.[27] Mr. De Vries' comments to Plaintiff about

---

[27] On April 17, 2021, Mr. De Vries expressed his approval to Plaintiff of her proposed line of questioning regarding the plaintiff's approximately decade-long delay in filing suit. *Cf. Kirkland Saves Network Security Client from Potential Patent Ruin*, Kirkland & Ellis (Apr. 29, 2021), https://www.kirkland.com/news/in-the-news/2021/04/kirkland-saves-network-security-client ("De Vries elicited at trial that Gigamon had studied APCON's technology a decade ago but decided against bringing a case. Then it did a U-turn in 2019, accusing its much smaller competitor of 'rampant infringement.'"); *see also* Ross Todd, *Litigators of the Week: This Kirkland Duo Landed a Complete Defense Sweep in an East Texas Competitor Patent Trial*, AmLaw Litig. Daily (Apr. 30, 2021), *available at* https://www.kirkland.com/-/media/news/press-mention/2021/04/the-american-lawyer--litigators-of-the-week--alper.pdf (Adam Alper: "In this one, Mike cross-examined Gigamon's CEO in a key examination that set the tone for the case, during which he elicited testimony supporting important case themes, and impeached the witness repeatedly, which he used during the examination to expose key credibility problems for Gigamon. . . . [This cross-examination and the adverse direct examination of the client's CEO] were critical components of our win.").

COMPLAINT

her good work at trial stand in stark contrast to Mr. De Vries' false statements in Plaintiff's "evaluation," in which he claimed that he was allegedly displeased with Plaintiff's work for him at trial.[28]  Plaintiff first learned of his alleged displeasure when she was read her "evaluations" in October 2021, after she had been fired.

116.   Additionally, while at trial, Mr. Fahey praised Plaintiff's work on drafting invalidity charting for the ITC Investigation (the non-trial matter), stating Plaintiff's "nice work" on invalidity charting "looked good" and required no substantive revisions (unlike the substantially similar charting assigned to other associates),[29] for which he thanked Plaintiff.[30]

117.   Besides assisting Mr. De Vries with cross-examination, Plaintiff's trial work consisted of working for Ms. Schmidt.  On March 31, 2021, Plaintiff attended her first meeting with Ms. Schmidt, the other associate who worked with Ms. Schmidt on damages ("**Female Associate L**"), the damages expert, and the expert's assistant.  The damages expert made a comment regarding working on an all-female damages team.  In response, Ms. Schmidt indicated that she did not like working on an all-female damages team.

118.   On Saturday, April 10, 2021, Plaintiff flew to Texas for trial.  Plaintiff and Ms. Schmidt arrived in Houston on the evening of April 10, 2021, in order to meet with the damages

---

[28] For example, in his defamatory "evaluation," Mr. De Vries falsely states, with knowledge of said falsity thereof, that "I generally did not think that [Plaintiff's] work on that project was very good."

[29] Plaintiff, Male Associate G, and Female Associate J each drafted invalidity charting for the ITC Investigation—i.e., they performed similar assignments.  Male Associate G and Female Associate J produced work of substantially similar quality, which required comparable substantive revisions.  When Plaintiff was at the trial site, Mr. Fahey sent a team-facing email, including to share partners whom he added to the thread, to praise Male Associate G's work while characterizing Female Associate J's work as insufficient and requiring significant substantive revisions.  As discussed above, Plaintiff's work required no substantive revisions; however, Mr. Fahey intentionally avoided praising Plaintiff despite praising Male Associate G for inferior work relative to Plaintiff's work.  (Mr. Fahey privately emailed Plaintiff the aforementioned praise only after Plaintiff followed up with him due to his non-responsiveness.)

[30] Mr. Fahey's defamatory "evaluation" of Plaintiff falsely stated that Plaintiff "needs to work on developing her understanding of the style of work" that "we want at Kirkland"; that Plaintiff "needs to continue to develop her judgement [sic]"; and that Plaintiff "needs to work on . . . dependability of [her] work."  Male associates who worked with Plaintiff on cases and assignments for Mr. Fahey were not summarily fired like Plaintiff was.  On information and belief, Mr. Fahey did not provide similarly negatively slanted and skewed "evaluations" for male associates in the IP litigation group.

COMPLAINT

expert for an in-person prep session on Sunday, April 11, 2021.  At the in-person prep session with the expert, her assistant, Ms. Schmidt, and Plaintiff, the expert asked Ms. Schmidt why the female associate who had worked with Ms. Schmidt (and who Plaintiff replaced) quit right before trial.  At the end of her response, Ms. Schmidt stated, "now I'm stuck with this," while Ms. Schmidt waved her hands in a derogatory gesture toward Plaintiff.  Ms. Schmidt and the expert agreed that that was "unfortunate."  Plaintiff was extremely bothered by this demeaning and disparaging conduct directed at Plaintiff, especially considering Ms. Schmidt had asked Plaintiff to join the trial team last-minute because of Plaintiff's excellent work performance and to replace a female associate who had abruptly quit right before trial.

119.    Ms. Schmidt continued to humiliate Plaintiff after making the aforementioned comments.  Ms. Schmidt made Plaintiff order food for Leslie Schmidt, the expert, and the expert's assistant.  Ordinarily partners either relegate such tasks to an assistant (who can make orders remotely and/or in advance) or office-services personnel (who are available on weekends) or handle them personally.  To Plaintiff's knowledge, no male associate had ever been asked or had to order food for any member of the trial team, including themselves.  Clearly, Defendants felt that ordering food and other administrative tasks are tasks best left to females and are too ministerial for a male associate to handle.[31]

120.    During the drive to the trial site after meeting with the expert, Ms. Schmidt divulged to Plaintiff that she does not like working with female experts and prefers working with male experts.  In addition, Ms. Schmidt made disparaging comments directly to Plaintiff regarding Female Associate L's work.[32]

---

[31] As another example, Mr. De Vries inexplicably told Plaintiff to pull a photograph for the direct examination preparation that comparator Mr. Blake was assigned to handle, despite not asking to her to help with anything else for that portion of the case.  Why Mr. Blake was not asked to perform this ministerial task for his own assignment is best explained by Defendants' discriminatory ethos.

[32] Ms. Schmidt's animosity towards females may be explained by her own experiences at the firm.  An associate who had worked in the Firm's IP litigation group, including for some time with Ms. Schmidt, told Plaintiff that Ms. Schmidt had to prove her loyalty to Mr. Alper and Mr. De Vries, including by making sacrifices.  In April 2021, Ms. Schmidt told Plaintiff that she had not lived with her husband prior to the pandemic, despite being married to him, and that she has no children.  A former partner in Kirkland's IP litigation group who had worked at the Firm for a number of years and remained close with her former colleagues who were share partners in

COMPLAINT

121.    Consistent with Ms. Schmidt's willingness to insult Female Associate L's work, Ms. Schmidt also failed to thank Female Associate L for her work on an assignment and instead stated that Female Associate L's work on a trial assignment "obviously needs wordsmithing." Female Associate L resigned shortly after trial.  In contrast, when Male Associate M performed a similar assignment, Ms. Schmidt—who did not work with Male Associate M on that assignment or any other trial work—went out of her way to send Male Associate M a team-facing email (including to other share partners Mr. Alper and Mr. Deoras) thanking him for his work, which she praised.  (Mr. Deoras also sent a team-facing email complimenting Male Associate M's work.)  Both Ms. Schmidt's and Mr. Deoras' praise followed an email from Mr. Alper in which he diplomatically stated one of Male Associate M's proposed objections was ineffectual.

122.    Plaintiff's non-trial matter work was a substantial obstacle that Plaintiff had to unfairly and unreasonably contend with while preparing for and while at trial and was an obstacle that no other associate, particularly comparable or comparative male associates, had to contend with.[33]  Notwithstanding the obstacles imposed on Plaintiff by Defendants, Plaintiff contributed substantively in myriad ways on work that she performed for Ms. Schmidt.  This work included but was not limited to adding to and revising demonstratives for the damages expert's direct examination per requests from Ms. Schmidt and the expert; revising direct examination scripts/outlines for Ms. Schmidt and the damages expert; reviewing trial transcripts, e.g., of cross examinations of CEO and damages expert for direct examination of damages expert; preparing re-direct examination script/outline for Ms. Schmidt and the damages expert; revising same per their comments; and ensuring that all material in the damages expert's demonstratives for direct

leading roles within the Firm told Plaintiff that, to her knowledge, every female share partner in the IP litigation group at Kirkland had either slept with or had been rumored to have slept with a male share partner prior to being elevated to share partner.  Ms. Schmidt is one of few female IP litigation attorneys to have been promoted to share partner at Kirkland.

[33] Because Defendants failed to remove Plaintiff's non-trial matter work as promised, Plaintiff tried to do the same and was met with a message she would see propagated at trial and throughout her tenure at Kirkland: that male associates are treated better than and think they are worth more than female associates.  For example, in early April 2021, Plaintiff asked Male Associate G on the non-trial matter (the ITC Investigation) if he could assist with invalidity charting because Plaintiff had to focus on her trial work.  The male associate refused, stating he had to prepare for his trial for the same partners that would not begin until the end of May 2021.

COMPLAINT

examination was non-objectionable (such that opposing counsel did not have a single objection to the demonstratives that Plaintiff worked on while opposing counsel objected to demonstratives worked on by other Kirkland attorneys, including male(s)).  However, this did not stop Ms. Schmidt from the grossly false and malicious statement in her "evaluation" of Plaintiff that "[Plaintiff] did not contribute at trial"[34] and that the "only work she did . . . was not even usable." Not only did Ms. Schmidt lie about Plaintiff's contributions, Ms. Schmidt fragrantly distorted the nature of the work performed by Plaintiff at trial in an effort to support Ms. Schmidt's false statement that Plaintiff did not contribute whatsoever at trial.  For example, Ms. Schmidt inaccurately characterized as "cite checking" Plaintiff's substantive assignment of ensuring that the damages expert's demonstratives contained no objectionable material, addressing and implementing all of the expert's comments and requests regarding the demonstratives, including adding material.  Moreover, the fact that the Firm billed the client for Plaintiff's work at trial contradicts the false statement that Plaintiff only performed cite checking and produced no usable work at trial.

**Plaintiff's Experience at Trial Relative to Mr. Blake**

123.   Defendants' disparate treatment of Plaintiff as compared to a comparator male associate in the IP litigation group, Mr. Blake, further demonstrates Defendants' preferential treatment of males and the unlawful nature of Plaintiff's termination.  Plaintiff and Mr. Blake joined the trial team at the same time, on or around March 30, 2021.  Defendants assigned Plaintiff and Mr. Blake substantially similar assignments for Mr. De Vries at trial: assisting Mr. De Vries in preparing for cross-examination of the plaintiff's CEO and for adverse direct examination of the defendant's CEO, respectively.

124.   Defendants ensured that Plaintiff had disproportionately more work than Mr. Blake leading up to and at trial.  For example, Defendants ensured that Plaintiff had substantial

---

[34] In addition, Plaintiff also helped prepare demonstratives for Mr. Alper's closing argument. After Plaintiff had requested to attend closing by emailing Mr. Alper and Mr. De Vries, Ms. Schmidt sent a team-facing email saying that only persons who played a role in closing could attend.  Ms. Schmidt listed individuals who were permitted to attend and excluded Plaintiff. However, a male associate whose only role in closing was to perform the same work as Plaintiff by helping to prepare demonstratives for Mr. Alper's closing argument was permitted to attend.

COMPLAINT

non-trial work leading up to and at trial, while Defendants ensured that Mr. Blake did not. Specifically, Defendants cleared Mr. Blake's schedule of all non-trial work when he joined the trial team (at the same time as Plaintiff) so that he could focus on the trial work.  In addition, Mr. Blake told Plaintiff he had never experienced having to perform more than *de minimis* non-trial work leading up to and at trial, and he expressed incredulity at the fact that Plaintiff had non-trial work leading up to and at trial.  In fact, the other associates on the trial team told Plaintiff that her work on another matter leading up to and at trial was highly abnormal for a standard Kirkland trial experience, which made this treatment even more surprising to Plaintiff given her last-minute addition to the team.  This abnormality was further affirmed by a former non-share partner in the IP litigation group at Kirkland.[35]  Both partners for whom Plaintiff worked at trial, Mr. De Vries and Ms. Schmidt, were aware of (and had indirectly assigned) Plaintiff's non-trial work leading up to and at trial.  In sum, Plaintiff had to perform substantial non-trial work leading up to and at trial, while a comparator male associate who was assigned substantially similar trial work for the same partner did not.

125.    Another example of Defendants ensuring Plaintiff had a disproportionate workload as compared to Mr. Blake arose in the context of Plaintiff's and Mr. Blake's comparable assignments for Mr. De Vries.  Defendants provided Plaintiff with no associate or other support on her assignment.  However, Defendants provided Mr. Blake with two junior associates with detailed case knowledge as support on his similar assignment.  Moreover, Mr. De Vries asked Plaintiff to provide ministerial assistance on Mr. Blake's similar assignment.

126.    Plaintiff tried to set up meetings with Mr. De Vries to discuss the assignment, given that she had just been added to the team, had no associate support, was still significantly contributing to the ITC Investigation per Defendants' instructions and assignments, and also was working on damages for Ms. Schmidt.  However, Mr. De Vries canceled, rescheduled, or simply did not attend the meetings scheduled by Plaintiff.  Despite Mr. De Vries blowing off these

---

[35] Compare this with Male Non-Share Partner Y's statement to Plaintiff promising to redirect any work away from Plaintiff after he learned that Plaintiff was away at trial and had emailed Plaintiff a request regarding the issuance of the PTAB's noninstitution decision concerning Plaintiff's first POPR.

COMPLAINT

meetings that were necessary to advance the assignment, he then falsely claimed in Plaintiff's "evaluation" that he viewed her performance as poor because the assignment was allegedly "late," but he intentionally omitted his truancy, which was the reason for the timing of Plaintiff's work.  On the **evening of Saturday, April 17, 2021**, Plaintiff was **first** afforded the privilege of meeting with Mr. De Vries to discuss the assignment for his upcoming **cross-examination on the morning of Monday, April 19, 2021**.  Prior to the first meeting, Plaintiff had sent Mr. De Vries documents and materials supportive of the trial themes, based on a high-level discussion on the evening of April 13, 2021 with Mr. De Vries and Mr. Blake, which discussion was not specific to Plaintiff's assignment for Mr. De Vries.  Contrary to Mr. De Vries' "evaluation," Plaintiff met every deadline for her assignment for Mr. De Vries.  Plaintiff is unaware of Mr. Blake having any difficulty scheduling meetings with or having accessibility to Mr. De Vries to discuss his assignment.  During the discussion on the evening of Tuesday, April 13, 2021 with Mr. De Vries and Mr. Blake, Mr. De Vries told Plaintiff that she need not create an outline because he **always rewrites** outlines that associates prepare for him.  (When Plaintiff expressed surprise about the same during a subsequent discussion with Mr. Blake, he confirmed that Mr. De Vries always rewrites outlines for trial examinations.)  However, Mr. De Vries' "evaluation" included false and malicious criticism: "given the timing and content of the outline she prepared, I had to go back to simply preparing a (separate) outline for myself."

127.    Mr. De Vries was very pleased with Plaintiff's work on the cross-examination and conveyed the same to Plaintiff while they were at trial, including when he characterized her work as "great and very helpful" on April 17, 2021.  Kirkland's press release regarding the trial win touted testimony that Mr. De Vries elicited at trial thanks to Plaintiff's work; this was the only substantive, factual point mentioned in the press release.  After the cross-examination and separately after receiving the jury verdict, Mr. De Vries thanked Plaintiff again for her work.  As a reward for Plaintiff's work, Mr. De Vries later made false statements in his "evaluation" concerning Plaintiff's work for him as pretext to fire Plaintiff.  As a result, Mr. De Vries tarnished Plaintiff's professional reputation, ruined her professional standing, and ensured Plaintiff was unlawfully terminated, all of which caused Plaintiff severe emotional distress and loss of future

47

1  earning capacity and embarrassment, shame, and mortification.  In contrast, Mr. Blake is still

2  employed at Kirkland.

3      128.  In sum, Defendants' discriminatory conduct included burdening Plaintiff with

4  non-trial work, providing no associate support for the assignment for Mr. De Vries, subjecting

5  Plaintiff to disparaging and demeaning conduct and remarks, and requiring Plaintiff to complete

6  ministerial tasks, including for a comparator male associate.  Conversely, Defendants ensured

7  that no male associates were tasked with non-trial work, assigned significant associate support

8  to a comparator male associate on his nearly identical assignment for Mr. De Vries, did not

9  subject male associates to disparaging and demeaning conduct and remarks (and instead provided

10  praise for ineffectual input), and did not ask male associates to perform ministerial tasks.

11              **Leaving Trial:  All-Boys' Club Charter Flight**

12      129.  Typifying the discriminatory ethos of this practice group was Mr. Alper's, Mr. De

13  Vries', and Mr. Deoras' decision to have Mr. Blake personally join them on a charter flight home

14  from trial, while Plaintiff and Female Associate M were not afforded the privilege to fly home

15  exclusively with the male share partners (Defendants Mr. De Vries, Mr. Alper, and Mr. Deoras).

16  Rather, Defendants left behind Plaintiff and Female Associate M at the trial site to fly home in

17  economy seating on commercial flights.  Defendants did not offer Plaintiff a better alternative to

18  travel back home from trial.

19      130.  Mr. Blake told Plaintiff about his all-boys' club flight home but told Plaintiff not

20  to tell anyone, demonstrating that he and the involved partners were trying to hide from others

21  conduct that they knew was wrong and discriminatory.[36]  Indeed, Plaintiff was left wondering

22  why she was left to fly commercial and why Mr. Blake was being given preferential treatment

23  over Plaintiff and another female associate.  Clearly, the Defendants were more than happy to

24  use women and to leave them behind—literally and figuratively.   In sum, during her short tenure

25  at Kirkland, Plaintiff saw an obvious hierarchy between male and female associates, evidenced

26

27  [36] In the fall of 2021, Plaintiff spoke with a female IP litigation associate [Female Associate LL] who had been based out of the Firm's San Francisco office for several years and had worked on cases for Mr. Alper and Mr. De Vries with their acolytes, including Mr. Deoras.  She agreed that the culture reflected that of an all-boys' club.

28

48

COMPLAINT

by the discriminatory, disparate treatment Plaintiff received at trial compared to her male analogues.

### On April 29, 2021, Plaintiff Reported Defendants' Sex-Based Discrimination and Harassment Constituting a Hostile Work Environment

131.   After trial, on Wednesday, April 28, 2021, Mr. Deoras emailed Plaintiff, copying Ms. Schmidt, asking Plaintiff when she would have time to "catch up" to "[d]ebrief" regarding her first trial experience at Kirkland.  Mr. Deoras scheduled a Zoom meeting for the next day, April 29, 2021 ("**First April 29 Zoom Meeting**").  During this Zoom meeting, Plaintiff began complaining about Defendants' Unlawful Employment Practices based on her unfair treatment related to her trial experience.  For the reasons discussed above, Plaintiff had a good-faith, reasonable, and honestly-held belief that the conduct at issue of Defendants Kirkland, Mr. De Vries, Mr. Alper, Ms. Schmidt, and Mr. Fahey constituted unlawful sex-based discrimination and amounted to harassment constituting a hostile work environment or could do so if repeated.

132.   On the Zoom meeting, Mr. Deoras stated multiple times that its purpose was to determine whether there was a personal issue bothering Plaintiff with which they or Kirkland could help because they had noticed a change in Plaintiff's demeanor at trial.  This change in demeanor was caused directly by the unfair and discriminatory treatment that Plaintiff was subjected to throughout her trial experience.  The fact that Defendants noticed a change in Plaintiff's demeanor is demonstrative of the magnitude of the discriminatory treatment to which Defendants subjected Plaintiff.  In direct contrast to Mr. Deoras' and Ms. Schmidt's defamatory "evaluations" of Plaintiff, they indicated multiple times during the Zoom meeting that its purpose was not about performance.  Moreover, as detailed below, Mr. Deoras would reaffirm this point on a separate Zoom meeting with Plaintiff that same day ("**Second April 29 Zoom Meeting**").

133.   In response to Mr. Deoras' question as to whether Plaintiff was suffering from a personal issue, Plaintiff made clear that she was not, and that any change in her demeanor was due to her being subjected to unfair treatment and having to deal with a disproportionate workload at trial.  Plaintiff explained that one major obstacle that she had to unfairly contend with was a significant amount of non-trial work while juggling trial work, which, as noted above, was an obstacle that male associates did not face and were unfamiliar with as a general matter.

Ms. Schmidt falsely claimed that Plaintiff did not work on any non-trial work and that she was unaware of Plaintiff having any non-trial matter work.  Ms. Schmidt eventually tried to take issue for the first time with Plaintiff's handling of a draft shell for a motion for judgment as a matter of law concerning damages, which Plaintiff requested to be reassigned at trial due to her disproportionate and onerous workload that was caused by Defendants and was foreign to other associates.

134.    Mr. Deoras agreed with Ms. Schmidt initially with respect to Plaintiff not having to work on non-trial matter work, prompting Plaintiff to push back and double down on her unfair treatment and offer to provide them with the total number of hours she worked on non-trial work. Mr. Deoras said that was not necessary, and at this point Mr. Deoras refocused the conversation to the purpose of the meeting, which was to check in on Plaintiff generally.  At this point Mr. Deoras also told Plaintiff if she ever had workload or other issues, she should come to him, because he was aware of associate and partner workload in the IP litigation group and was generally responsible for helping to allocate work appropriately.  This statement that he was aware of associate workload did not square with his earlier comments that he was unaware that Plaintiff had to work on a substantial amount of non-trial work at trial but would explain why he told Plaintiff there was no need for her to provide an accounting of her hours worked at trial.

135.    Mr. Deoras also made an overture that Plaintiff could call either him or Ms. Schmidt separately to discuss her concerns or her workload generally in the future.

136.    After this meeting, Plaintiff reviewed Firm policies to determine whether it had any established policies for reporting Unlawful Employment Practices such as discrimination and harassment.  The Firm had a policy for reporting harassment but not discrimination.  The policy provided reporting contacts for each Firm office, namely, two share partners based out of each office.[37]  However, the reporting contacts for the San Francisco office were stale:  they were no longer with the Firm.  As such, Plaintiff decided it was appropriate to report Defendants'

---

[37] One of the share partners had been in the Firm's IP litigation group.

COMPLAINT

Unlawful Employment Practices by further complaining of the same to Mr. Deoras, a share partner with whom Plaintiff worked most closely at Kirkland.

137.    Plaintiff reached out to Mr. Deoras to see if he had availability to speak again that day, and after he confirmed, Plaintiff scheduled the Second April 29 Zoom Meeting with just Mr. Deoras.  Plaintiff began the Zoom meeting by continuing to complain about her unfair treatment, particularly with respect to Ms. Schmidt's lies as to whether Plaintiff had been subjected to disparate treatment at trial.  However, Mr. Deoras stated that Plaintiff would have to continue working with the team at issue, including Ms. Schmidt, and that he had no interest in looking back at the opposed conduct.  Mr. Deoras went on to compliment Plaintiff with respect to her abilities as an attorney and made the express point that he enjoyed working with Plaintiff and that the intention was for her to grow with Kirkland and with the IP litigation group.  He also reiterated that Plaintiff should be comfortable calling him whenever to discuss anything and that he was happy to essentially serve as her mentor at the Firm.  Mr. Deoras was very positive and disarming throughout the Second April 29 Zoom Meeting and conveyed that Plaintiff would have a long career at Kirkland.  Plaintiff took Mr. Deoras' statements at face value because she had no obvious reason to believe at the time that he was not telling the truth and/or that Plaintiff was at risk of facing discriminatory and/or retaliatory conduct at the hands of Mr. Deoras.

138.    On the Second April 29 Zoom Meeting, Mr. Deoras made clear that Plaintiff had no performance issues and instead intimated the opposite, which is shockingly inconsistent with his and Ms. Schmidt's discriminatory and retaliatory "evaluations" of Plaintiff.

139.    Moreover, Mr. Deoras intentionally omitted in his "evaluation" the Second April 29 Zoom Meeting because he knew that discussion was at odds with his "evaluation" and would undermine the false narrative proffered by him and Ms. Schmidt regarding the First April 29 Zoom Meeting.  In his "evaluation" Mr. Deoras brazenly lied and claimed: "Leslie and I had a long conversation with Zoya after the Apcon trial to let her know that her performance was unacceptable."  Ms. Schmidt further promulgated these lies in what was crystal clear discriminatory and retaliatory coordination with Mr. Deoras: "Despite significant concerns about Zoya's performance at the Apcon trial, Akshay and I discussed her poor performance and

COMPLAINT

explained that she would need to improve.  That did not happen."  As purported support for the latter defamatory statement, Ms. Schmidt stated that "Akshay will be able to provide more specifics on her work."[38]

140.   Mr. Deoras' and Ms. Schmidt's false and dishonest "evaluations," combined with Mr. De Vries' and Mr. Fahey's false and dishonest "evaluations," collectively served as the underlying support for the pretextual, poor-performance basis for Plaintiff's unlawful (discriminatory and retaliatory) termination.

141.   After Plaintiff's initial complaints about her unfair treatment on April 29, 2021, Defendants' treatment of Plaintiff continued to worsen over the next several months, as discussed below.  The retaliatory and discriminatory treatment came to a crescendo in July 2021, leading Plaintiff to complain again to Mr. Deoras about her disparate treatment relative to males and her disproportionate workload.

**After Plaintiff's April 2021 Complaint, She Continued Producing Excellent Work Despite
Defendants' Retaliatory and Discriminatory Undermining**

142.   As detailed below, Plaintiff saw her treatment by Defendants gradually worsen after Plaintiff's April 2021 complaint.  But it took time for Plaintiff to fully appreciate the retaliatory nature of her worsening treatment for a number of reasons, including that Plaintiff was eager and willing to work, that this job was Plaintiff's dream job and because Plaintiff's disproportionate workload, as a result of Defendants' conduct, kept her working at such a frenetic pace that she barely had time to appreciate, process, and report the retaliation.  Over time, however, it became increasingly clear that Defendants were subjecting Plaintiff to discriminatory and retaliatory conduct and that Plaintiff's discriminatory experience at trial was not a one-off but rather was Defendants' standard operating procedure.

---

[38] Mr. Deoras' "evaluation" confirmed his discriminatory and retaliatory coordination with Ms. Schmidt, in which evaluation he omitted reference to any of Plaintiff's wins or work he had praised and instead regurgitated the falsehoods from Ms. Schmidt's "evaluation" and spoke of Plaintiff's trial work, none of which was performed for him: "[W]e asked Zoya to join us for trial in the Gigamon v. Apcon matter.  Her work was directly supervised by Leslie Schmidt, but her inability to meet deadlines and her effective disappearance for large portions of the trial caused a number of issues for the rest of the team, who had to pick up work Zoya had not completed."

COMPLAINT

143.    For example, at a high level, Plaintiff was consistently inundated with substantive assignments with little to no support and under condensed and competing deadlines, notwithstanding Defendants' ability to more evenly spread work among associates and Plaintiff's indications that support would be helpful.[39]  In contrast, Defendants timely provided male IP litigation associates with meaningful support and reasonably spaced out their deadlines.  In addition, Defendants responded to emails (e.g., requesting input, proposing draft correspondences, etc.) from male associates more quickly than they did to emails from Plaintiff.  Defendants also sabotaged any attempt by Plaintiff to take short scheduled vacations that were mostly (if not all) over weekends or on holidays.

144.    Multiple male comparator associates stated or indicated that the amount of work Plaintiff had was extreme or unreasonable relative to their customary workload, which, when combined with the below treatment (among other things) reignited Plaintiff's concerns regarding discrimination and also triggered concerns regarding retaliation.  After being subjected to several months of worsening treatment, Plaintiff complained again of Defendants' unlawful conduct.  After Plaintiff's July 23, 2021 complaint, Defendants almost immediately froze Plaintiff out of additional work without explanation.  Plaintiff also saw changes in the degree and visibility of praise she received for her work (despite its quality remaining the same), which changes coincided with the dates of Plaintiff's complaints of Defendants' Unlawful Employment Practices.

### Plaintiff's Work Between April and July 2021 Complaints

145.    After Plaintiff's initial reporting on April 29, 2021, Plaintiff continued working as the primary associate on the ITC Investigation (through its termination in September 2021 due to the patents' invalidity).  Plaintiff continued developing and driving the client's invalidity, unenforceability, and noninfringement defenses.  As a general matter, ITC investigations are fast-paced, time-consuming, and, depending on facts and circumstances, may comprise all or a very substantial portion of an associate's work while the investigation is active.

---

[39] Mr. Deoras told another IP litigation associate based out of the Firm's San Francisco office that he is always aware of each associate's present workload and assignments.

COMPLAINT

146.    In early May 2021, for ITC Investigation, Defendants asked Plaintiff to draft non-infringement contentions for all 19 asserted claims across seven patents.  Defendants Mr. Fahey and Mr. Deoras reassigned the drafting of the contentions from Male Associate G to Plaintiff on the <u>evening of Saturday</u>, May 8, 2021,[40] with a service deadline of Wednesday, May 12, 2021.  When reassigning the work, Mr. Fahey made it seem as if Male Associate G had made progress on the assignment and just needed Plaintiff to "help jump in" over the weekend or Monday to complete the assignment.  However, Male Associate G had not even started the assignment.  Mr. Fahey claimed that he needed to reassign the work to Plaintiff because Male Associate G was "pretty tied up" merely editing a single, already-drafted interrogatory response that was an iota of the amount of work that was reassigned to Plaintiff to the benefit of Male Associate G (and Defendants).  Even on this tight deadline, Plaintiff's work developing the non-infringement theories and drafting the contentions was met with praise from Mr. Deoras, who directly supervised her work, e.g., when he stated, "Thanks, Zoya - thought this looked great."[41]

147.    The praise Plaintiff received on this assignment and Defendants' decision to reassign such an important assignment to Plaintiff with a short turnaround is inconsistent with Defendants' proffered reason for her termination and Mr. Deoras' and Ms. Schmidt's allegations that at this point, Defendants already had a well-established concern regarding Plaintiff's performance, e.g., with Mr. Deoras' false claim in his "evaluation" that in the past Plaintiff's alleged "inability to meet deadlines . . . caused a number of issues of the rest of the team, who had to pick up work [Plaintiff] had not completed."  Moreover, these events underscore the obvious falsity of Defendants' evaluations and the pretext and baselessness of the alleged reason for Plaintiff's termination—poor performance.

---

[40] It is worth noting this was reassigned to Plaintiff right before Mother's Day, which Defendants also knew was Plaintiff's birthday weekend.

[41] In Ms. Schmidt's defamatory "evaluation," she stated that Plaintiff "does not produce much usable work" on the ITC Investigation.  Ms. Schmidt made such statement with knowledge of its falsity or with reckless disregard of its truth.  All of Plaintiff's work on the ITC Investigation was usable and used; examples are discussed throughout this Complaint.  Ms. Schmidt had knowledge of the same.

COMPLAINT

148.   As detailed further below, on the ITC Investigation from May to July 2021, Plaintiff continued to develop and drive the patent invalidity and unenforceability defenses, e.g., by managing, handling, and driving the substantial third-party discovery (with around 14 subpoenaed nonparties), supplementing invalidity contentions, drafting an order of proof, assisting with the inventor and omitted inventor depositions, deposing a product prior art manufacturer, and drafting the invalidity expert report.

**Defendants Pile onto Plaintiff's Already-Heavy Workload with District-Court Cases and More Patent-Assertion Analysis for Litigation Funding**

149.   In addition to Plaintiff's work for the ongoing ITC Investigation, on May 7, 2021, Mr. Deoras and Plaintiff had a call or Zoom meeting during which Mr. Deoras added Plaintiff to six district-court patent infringement cases (the "**District-Court Cases**") on which she helped with third-party and with party discovery before the cases settled in July 2021.  Defendant Mr. Deoras generally supervised these cases for Defendants Mr. Alper and Mr. De Vries.  Plaintiff's work was supervised by Ms. Barath and Mr. Kane, who are and at relevant times were based out of the Firm's offices in San Francisco and New York, respectively.  Kirkland represented the defendants, which were sued in different venues and were customers of an indemnifying subsidiary of the Firm's largest client, for which Plaintiff had successfully drafted POPR No. 1.

150.   Further adding to Plaintiff's workload, during this same May 7, 2021 call or Zoom meeting, Mr. Deoras also asked Plaintiff to conduct pre-suit investigation and analysis for another potential litigation-funded case in which this same subsidiary would assert its patents.  The case would be managed by at least Defendant Mr. Deoras for Defendants Mr. Alper and Mr. De Vries. Plaintiff analyzed and assessed numerous patents' potential infringement reads for a subsidiary of the Firm's most important client across a range of potential target defendants and products and assessed the strength of the patents with the strongest infringement reads.  Throughout May and June 2021, Plaintiff drafted infringement charts.  Male Non-Share Partner Y directly supervised Plaintiff's work and reported to Mr. Deoras.

151.   Ultimately, Plaintiff was asked to and did contribute substantially to the aforementioned District-Court Cases and the additional patent-assertion analyses.  Plaintiff's

COMPLAINT

obligations on the ITC Investigation, District-Court Cases, and patent-assertion analysis far exceeded the amount of work that Mr. Walter and Mr. Blake were asked to complete during the same timeframe.  For example, during May to July 2021, based on Plaintiff's knowledge, Mr. Walter only worked on two of these District-Court Cases, which was substantially less than Plaintiff's workload as noted above, and a substantial amount of work that should have been performed on these District-Court Cases had not been performed, as confirmed by Plaintiff when she emailed the team to ask some basic questions after she was added to the District-Court Cases.

### Mr. Fahey's Contradictory Instructions Unnecessarily Waste Client Money

152.   On the ITC Investigation, Mr. Fahey routinely gave Plaintiff assignment instructions that were poor, misleading, and/or contradictory, the degree of which increased following Plaintiff's April 2021 complaint.  Due to Mr. Fahey's poor instructions, on multiple occasions unnecessary time was spent on assignments because Mr. Fahey would provide input directly contradicting his prior instructions.  For example, on the ITC Investigation in late June 2021, Mr. Fahey tasked Plaintiff with completely unnecessary revisions when he asked Plaintiff to draft correspondence to opposing counsel regarding discovery deficiencies.  Plaintiff expressly followed Mr. Fahey's emailed instructions and sent him the draft correspondence   Importantly, **Plaintiff's first draft was almost identical to the fourth, final draft, which was sent to opposing counsel**.  However, Mr. Fahey made or requested Plaintiff to make major revisions to the first draft, rendering the second draft markedly different from the first draft (and the fourth, final draft sent to opposing counsel).  These revisions were at odds with Mr. Fahey's original instructions to Plaintiff.  As a result, the drafts underwent numerous, unnecessary rounds of edits, which was not only an unethical waste of client money but also forced Plaintiff unnecessarily to lose time that could have been spent on her other myriad assignments that Defendants were heaping on Plaintiff.  After all of this unnecessary back and forth, Mr. Fahey privately emailed Plaintiff, forwarding the sent correspondence, to say "**FYI, nice work on this**."[42]

---

[42] In Mr. Fahey's defamatory "evaluation" of Plaintiff, he falsely stated: "She needs to continue to develop her judgement [sic]."

COMPLAINT

153.   However, in his "evaluation" of Plaintiff, Mr. Fahey tried to pass on to Plaintiff his poor supervision in his "evaluation," claiming that Plaintiff "had issues following instructions or taking instructions to an extreme."  This strained attempt to manufacture alleged issues with Plaintiff's work is one of many examples of discriminatory and retaliatory conduct by Defendants.  Moreover, assuming Mr. Fahey was not as incompetent as his instructions would make him seem, the reasonable conclusion is that Mr. Fahey deliberately wasted client time and resources in an effort to undermine and retaliate against Plaintiff.

## Mr. Walter's Poor Deposition Scheduling

154.   Mr. Walter and Plaintiff both worked on the District-Court Cases.  Based on Mr. Deoras' comments in supervising Mr. Walter's work on the same, Plaintiff knows of Mr. Walter's subpar performance on at least two assignments, claim construction (discussed above, *see supra* ¶¶ 96–99) and deposition scheduling.  When Plaintiff performed similar assignments at Kirkland, her work was also supervised by Mr. Deoras.

155.   In mid to late June 2021, Mr. Walter asked for Plaintiff's general availability so that he could schedule defensive (client) depositions for three of the District-Court Cases.  Fact discovery in two of these District-Court Cases would close over six months later.  Fact discovery in the remaining District-Court Case would close in late July 2021—for this District-Court Case, Plaintiff drove third-party discovery that would involve around five depositions.  Plaintiff informed Mr. Walter of the same and of her heavy workload in July 2021 on the ITC Investigation due to its close of fact discovery in mid-July 2021.  Nevertheless, Mr. Walter proposed a deposition schedule for July 2021 that was patently unreasonable for the clients and Plaintiff but that conveniently spaced out depositions for himself and Mr. Huehns.

156.   Mr. Walter repeatedly ignored numerous partner emails, including at least four from Ms. Barath and one from Mr. Deoras, telling him to stop trying to schedule depositions for the two District-Court Cases in which fact discovery would close in over six months.  Ms. Barath indicated that doing so was <u>unreasonable, including because opposing counsel had not even affirmatively raised the issue of deposition scheduling</u>.  However, Mr. Walter proceeded with scheduling depositions for all three cases in spite of the many partner emails telling him to stop.

COMPLAINT

In sum, Mr. Walter required substantial guidance and supervision in scheduling these unnecessary depositions, which was tantamount to an administrative task. Mr. Walter asked for permission, along with proposed emails, to contact opposing counsel and the client to schedule these depositions. On information and belief, Mr. Walter was not criticized in his evaluation for having difficulty following partner instructions and/or completing assignments that were largely administrative in nature.

157. In contrast, Plaintiff competently and timely scheduled proposed depositions and competently spoke with third parties, including to schedule depositions and to persuade the third parties to comply with subpoenas and to otherwise coordinate and advance production of third-party discovery, with minimal oversight by Mr. Deoras and Mr. Fahey on the ITC Investigation. In fact, **Plaintiff's unsupervised communications with persons outside the Firm resulted in the client obtaining its requested discovery that had been withheld** on various grounds, including alleged lack of good cause to produce e-mails, compliance with prior-litigation protective order, and lack of control over requested documents. For example, Plaintiff teleconferenced (**without anyone else from Kirkland in attendance**) with general counsel of a large, international company that Kirkland's client had subpoenaed and with outside counsel subsequently retained by the general counsel of that company. As a result of Plaintiff's communications, including the teleconferences and written correspondences incorporating Plaintiff's persuasive research, Plaintiff obtained the requested discovery to the direct benefit of Kirkland's client. Saliently, the outside counsel told Plaintiff that he had been told that a female (i.e., Plaintiff) must have tried very hard to get this discovery because the company historically did not produce similar information in response to subpoenas. However, Defendants "evaluations" intentionally and maliciously omitted Plaintiff's objective success with third-party discovery.

158. Rather than complimenting Plaintiff on her fruitful efforts with third-party discovery, Defendants instead maliciously included in their "evaluations" false and defamatory criticisms of Plaintiff that would have been fitting criticisms of Mr. Walter's issues scheduling depositions and emailing opposing counsel regarding the same. On information and belief, Mr.

58

Walter's "evaluations" did not criticize his performance or affect his standing with the Firm, given that he is still employed by Kirkland's IP litigation group. Defendants' recasting of criticisms that would have been fair descriptions of Mr. Walter's work and instead falsely attributing similar criticisms to Plaintiff paint a crystal-clear picture of Defendants sex-based discriminatory and retaliatory conduct targeted at Plaintiff. For example, **Mr. Fahey's** "evaluation" falsely and maliciously claimed that **Plaintiff** allegedly "**needed to be supervised with all discussions with third parties**" because she allegedly "had issues following instructions or taking instructions to an extreme."[43] Similarly, **Mr. Deoras'** defamatory "evaluation" falsely and maliciously stated that **Plaintiff's** "**communications with third-parties required considerable oversight**" and claimed that Plaintiff allegedly needed to "significantly improve" "her communication skills with others . . . outside the firm."[44]

**Despite Plaintiff's Disproportionately Heavier Workload, Partner Offloads Male-Associate Work onto Plaintiff to Accommodate Male Associate's Week-Long Vacation, Forcing Plaintiff to Work Her Entire Holiday-Weekend Vacation**

159.  In June 2021, Ms. Barath offloaded Mr. Huehns' and Mr. Walter's work on the District-Court Cases on Plaintiff, despite Plaintiff's workload already being disproportionately heavier than the workloads of said male associates. This offloading of Mr. Huehns' work onto Plaintiff was specifically to accommodate his week-long vacation in mid-June 2021 so that he

---

[43] As another example, Plaintiff teleconferenced (**without anyone else from Kirkland in attendance**) with outside counsel that had been involved in relevant prior litigation and was subpoenaed (with a subpoena prepared by Plaintiff) in the ITC Investigation. As a result of Plaintiff's communications, including the teleconference and written correspondences incorporating Plaintiff's persuasive research, Plaintiff obtained the requested discovery, including discovery that had been withheld by the outside counsel due to the prior-litigation protective order. On June 15, 2021, Mr. Fahey emailed Plaintiff and said "Nice work on the email[,] [Plaintiff]. They seem to have sent everything."

[44] As discussed further below, Defendant Mr. Deoras' "evaluation" falsely criticized Plaintiff's communication skills numerous times, including with respect to other matters. His criticisms are inconsistent with his and his co-Defendants' real-time praise of Plaintiff's work and with Male Non-Share Partner Y's "evaluation" of Plaintiff. Analogously, in Mr. Deoras' "evaluation" of another female IP litigation associate, who also had based out of the Firm's San Francisco office, Mr. Deoras stated that she needed to improve her communication skills, which was at odds with her other evaluations. *See infra* ¶¶ 210–213.

59

COMPLAINT

did not have to work during that time (at Plaintiff's expense).[45]   In addition, in late June 2021,

after Mr. Huehns' work piled up due to his work-free vacation, Ms. Barath continued attempting

to offload Mr. Huehns' and Mr. Walter's work onto Plaintiff.[46]   These offloading attempts

continued in spite of: (i) Plaintiff's workload continuing to be disproportionately heavier than

Mr. Huehns' and Mr. Walter's; (ii) Plaintiff's upcoming scheduled vacation (of which Ms. Barath

and Mr. Kane were aware); and (iii) the availability of other associates on the team (including an

associate who admitted, during a team call with partners, to "dodging billable work").   Moreover,

these offloading attempts continued notwithstanding Plaintiff repeatedly telling Ms. Barath that

Plaintiff had no bandwidth for additional work and had to prioritize assignments on bigger cases

with competing deadlines for share partners Mr. Alper and Mr. Deoras, who were also Ms.

Barath's supervisors.

160.   In contrast, Defendants paid no respect to Plaintiff's scheduled vacation.   Plaintiff

had requested in advance to have off as scheduled vacation Friday, July 2 through Monday, July

5, 2021 (a federally-recognized national holiday).   The partners, with repeated, advance notice

of Plaintiff's scheduled vacation,[47] dumped an inordinate amount of work on Plaintiff to ensure

(successfully) that she would work during her entire vacation.   (*See supra* ¶ 80 n. 12.)   Despite

---

[45] In contrast, Mr. Huehns felt no obligation to honor Plaintiff's working leave to study for the California Bar Examination and directed Plaintiff during her leave to do work.   In light of the consistent preferential treatment of males on teams for Mr. De Vries' and Mr. Alper's cases, it is unsurprising that a male associate would feel empowered to command a female associate to do work during her designated leave.

[46] In addition, consistent with Female Associate R's comment that male associates could get by doing less than female associates in the IP litigation group at Kirkland, Mr. Huehns joined in Ms. Barath's attempts to offload more of his work onto Plaintiff despite having substantially less work than Plaintiff. Despite this substantially lighter workload, Mr. Huehns felt he was empowered to ask Plaintiff to take on his work.   To the extent that Mr. Huehns' disproportionately lighter workload than Plaintiff's was "burdensome" to him, even after a week-long vacation, Kirkland demonstrated its view that his work was an albatross to be hung around Plaintiff's neck.

[47] On June 4, 2021, Plaintiff had informed Defendants Mr. Deoras, Ms. Schmidt, Mr. Fahey, and Kirkland (in addition to her other supervisors, Male Non-Share Partner Y, Ms. Barath, and Mr. Kane) that she would be traveling and out of office with limited availability on Friday, July 2, 2021 through Monday, July 5, 2021 (a federal holiday).   On June 10, 2021, Plaintiff again informed Defendants Mr. Deoras, Ms. Schmidt, Mr. Fahey, and Kirkland of her travel plans. (At this point in time, Plaintiff told these Defendants to let her know if her travel plans would pose an issue.   Defendants never told Plaintiff her travel plans would pose an issue.)

60

COMPLAINT

working all day on July 2, 2021 and almost missing her evening flight due to such work, around midnight that evening, Plaintiff received a rude email from Ms. Barath about Plaintiff being offline.  What is more, Mr. Deoras tried to schedule a deposition for Plaintiff on July 5, 2021, which was, again, a federal holiday and part of Plaintiff's scheduled vacation.  It was not until Plaintiff informed him that it would be impractical to have a deposition that day due to the federal holiday that he changed the date.[48]

161.    To illustrate Plaintiff's commitment, Plaintiff literally squeezed a 32-inch monitor into her suitcase and flew with the same in order to work productively during her entire vacation. On information and belief, Plaintiff's male comparators Mr. Blake, Mr. Walter, Mr. Calhoun, and/or Mr. Huehns never felt obligated to do or did anything similar.  However, Defendants' alleged basis for terminating Plaintiff—poor performance—specified: "[Plaintiff] has not contributed to her matters at either the substantive or commitment level that is expected of an associate."  (*See infra* ¶ 203.)

**Defendants' Discriminatory, Harassing, and Retaliatory Conduct Exemplified by Expert Report**

162.    By July 2021, Plaintiff had been subjected to multiple months of a constant barrage of work, which constituted a disproportionately heavier workload than that of male comparator associates.  Around early July 2021, in a Skype message to Plaintiff, Mr. Blake expressed shock at Plaintiff's inordinately large workload, saying he had thought he had an insufferable workload until he heard what Defendants had assigned to Plaintiff.  Mr. Blake had previously told Plaintiff at trial in April 2021 that he and another comparator male IP litigation associate (Mr. Calhoun) always billed the most hours out of all IP litigation associates and that Mr. Alper and Mr. De Vries eagerly awaited the regularly-scheduled distribution of reports on associates' hours, demonstrating that they had knowledge of Plaintiff's disproportionate workload.  In sum, Mr.

---

[48] Defendants' (including at least Mr. Deoras' and Mr. Fahey's) treatment of Plaintiff in disregarding her scheduled vacation is consistent with their prior last-minute assignments to Plaintiff either right before or during her planned travel over weekends whenever they had knowledge of the same (e.g., on Thanksgiving 2020 and in early March 2021), as discussed above.

COMPLAINT

Blake did not have to contend with the same sort of onerous and oppressive workload with which Plaintiff had to contend. In addition, Plaintiff's disproportionately heavy workload was confirmed through Plaintiff's communications with comparator associates Mr. Walter and Mr. Huehns.

163. An exemplar of Defendant's discriminatory and retaliatory undermining of Plaintiff was their reassigning to Plaintiff on short notice in the ITC Investigation the expert report on patent invalidity, for which Kirkland's client bore the burden of proof (the "**Burden Expert Report**"). This nearly 2,000-page expert report was the perfect vehicle to carry out Defendants' retaliatory and discriminatory efforts because its inherent complexity and sheer volume provided Defendants with substantial latitude to fabricate purported issues with Plaintiff's work and provided a fitting anchor to try to sink Plaintiff in furtherance of their discriminatory and retaliatory efforts.

164. Additionally, the fact that Defendants would choose to (re)assign such a large assignment to Plaintiff, especially given the tight turnaround, is irreconcilable with Defendants' false purported concerns regarding Plaintiff's "performance" and "abilities." Per their defamatory "evaluations," such false concerns were deep-seated and longstanding at this time, which, if true, would raise serious questions regarding Defendants' adherence to their ethical duties to act in the client's best interest in assigning the Burden Expert Report to Plaintiff.

165. In June 2021, Defendants had originally assigned the lion's share of the Burden Expert Report to an associate also based out of the Firm's San Francisco office, Victoria Huang, and had assigned smaller components of the Burden Expert Report to other associates. Around Plaintiff's short vacation the first weekend of July 2021, Mr. Fahey reassigned the Burden Expert Report—in its entirety—to Plaintiff. None of the associates had started on the portions of the Burden Expert Report that Defendants had previously assigned to them. Ms. Huang had not even asked administrative staff to begin putting together a shell for the Burden Expert Report. The deadline (at that time) for the Burden Expert Report was July 23, 2021.

COMPLAINT

166.    As noted above, Defendants had and continued to inundate Plaintiff with swathes of work[49] to ensure Plaintiff would have no bandwidth to substantively begin working on the Burden Expert Report until mid-July 2021 at earliest.  Because Defendants, when reassigning the Burden Expert Report to Plaintiff, did not transfer to Plaintiff the associate support that they had assigned to Ms. Huang, Defendants effectively assigned the entire Burden Expert Report to one associate (Plaintiff) to complete within 13 days.  Defendants' assignment of such an important assignment to Plaintiff, who they claimed in their "evaluations" was and had been woefully incompetent at every facet of litigation, defies logic unless driven by discriminatory and retaliatory animus.

167.    During the first week of July 2021, Plaintiff requested paralegal assistance (which would be largely ineffectual) to create the lengthy Burden Expert Report shell.  Plaintiff had asked the paralegals to incorporate a multitude of cross references to facilitate drafting of the report.  Plaintiff ultimately had to work with at least three other administrative staff/support personnel to create the very lengthy substantive shell of the Burden Expert Report to send to the joint defense group ("**JDG**"), which had agreed to contribute a relatively small portion of the Burden Expert Report.  After this lengthy shell with a multitude of cross references was created, a Kirkland paralegal inexplicably went into the shell and began deleting the cross references.

---

[49] Such work included, on the ITC Investigation, continuing to develop and drive the patent invalidity and unenforceability defenses, e.g., by handling and driving the extensive third-party discovery.  For example, Plaintiff reviewed and analyzed extensive third-party discovery (as noted above, around 14 parties had been subpoenaed, almost all of which were relevant to the unenforceability and invalidity defenses), coordinated and scheduled third-party depositions and prepared an order of proof on vacation for the many unenforceability and invalidity defenses.  Moreover, Plaintiff had been assigned at least four depositions, including three between July 8 and July 10, 2021 for important fact witnesses (e.g., the inventor and putative pretermitted inventor) relevant to the invalidity and unenforceability defenses.  In addition, on the District-Court Cases, Plaintiff was driving extensive, important third-party discovery relevant to the clients' defenses.  Plaintiff had to spend considerable time working with the conflicts department at Kirkland in connection with extensive third-party discovery on both the District-Court Cases and the ITC Investigation.  Plaintiff is aware that Defendants Kirkland (including by and through Mr. Kane and Ms. Barath), Mr. Deoras, and Mr. Fahey, Ms. Barath did not have male associates in the IP litigation group waste time on such ministerial tasks.  In addition, on the District-Court Cases, Defendants tasked Plaintiff with additional discovery work.

Moreover, Plaintiff had to work on patent-infringement analyses for potential assertion in another litigation funded case, as discussed above.  *See supra* ¶¶ 150–151.

COMPLAINT

168.   Kirkland's portion of the Burden Expert Report (around 1,425 of 1,915 pages) was extremely lengthy because Mr. Deoras refused to let Plaintiff rely on cross references, which would significantly shorten the length of and time to prepare the report.   Instead, based on a vague and conclusory claim that Mr. Deoras'/Mr. Alper's/Mr. De Vries' team had previously gotten into "trouble" by using cross references, Mr. Deoras insisted that Plaintiff create and draft "the expert's" opinion in prose for every limitation of every asserted claim for the prior art references that Kirkland handled.   In patent litigation, it is standard practice to rely on cross references.   In fact, the other members of the JDG did so with the portions of the Burden Expert Report that they handled.

169.   In addition, Defendants did not provide Plaintiff with access to the expert on whose behalf she drafted the Burden Expert Report.[50]   In patent litigation, it is standard practice for an associate working on an expert report to have access to the expert.   This standard practice has many benefits, including increasing the likelihood that the report is deemed "prepared" by the expert, rather than ghostwritten by another; that the expert's opinion is admissible; and that client money is not wasted.   These benefits seem like they would be particularly salient where the "technical analysis" of an associate ghostwriting an expert's report merely "met expectations" according to her supervisor.

170.   Defendants only purported to provide associate support to Plaintiff on the Burden Expert Report right before a week-long extension of time was granted (mere days before the Burden Expert Report the original July 23, 2021 deadline).   Specifically, the associate who Defendants purportedly proffered as assistance at the last hour—Ms. Huang, to whom the Burden Expert Report had originally been assigned—provided *de facto* no assistance.[51]   Over Skype

---

[50] In Mr. Deoras' "evaluation" of Plaintiff, he falsely claimed that her "technical analysis"—which he "evaluated" only with respect to Plaintiff's work on preliminary proceedings before the PTAB—merely "met expectations."   Although Mr. Deoras "evaluated" Plaintiff's work on the Burden Expert Report, he did not comment on her "technical analysis."

[51] In addition to defaming Plaintiff in their purported "evaluations," e.g., when Mr. Fahey stated, with respect to the Burden Expert Report, that "we had to entirely rewrite everything she wrote in a short period of time," Defendants continued to defame Plaintiff when they later told Kirkland's former chief HR officer and assistant general counsel that they "reassigned" the Burden Expert Report to Ms. Huang.   Defendants' outside counsel repeated this bald-faced lie in her May 6, 2022 letter: "Your work on an expert report was untimely and deficient. The work

COMPLAINT

message, Mr. Fahey discouraged Plaintiff from asking Ms. Huang to provide assistance. Consistent with the pretextual nature of Defendants' purported "support" supplied to Plaintiff at the last hour, Ms. Huang dodged most of Plaintiff's requests for assistance, vaguely stating that she was busy doing work for Mr. Fahey.

171.    Plaintiff is aware that on another IP case led by Defendants Mr. Alper and Mr. De Vries and managed by Mr. Deoras and Ms. Schmidt (in which the client sought attorneys' fees), Kirkland attorneys worked on expert reports at a rate of 85 minutes (1.4 hours) per page. Comparator Mr. Calhoun worked on said expert reports.  Although a different case, the per-page drafting rate provides a useful comparative data point and demonstrates the retaliatory, discriminatory, and harassing nature of the assigned Burden Expert Report.  **Applying the same rate (85 minutes per page) to Kirkland's portion of the Burden Expert Report (around 1,400 pages)** yields around **2,000 hours** of expected attorney work (for the Burden Expert Report).  However, the same partners (the named Defendants) assigned Kirkland's portion of the Burden Expert Report to Plaintiff and purportedly expected her to draft the same (alone, with no support) within 13 days, i.e., within **312 hours**.[52]  Despite the near-infeasibility of Plaintiff timely completing the expert report, Defendants also falsely and unbelievably claimed in their "evaluations" that they somehow magically had time to "entirely rewrite" and "essentially . . . redo[]" Plaintiff's work on the expert report in a short period of time.

172.    Plaintiff effectively and timely drove the Burden Expert Report to completion.  Mr. Deoras said the Burden Expert Report was "fine" during a team call.  The only other information that Defendants provided to Plaintiff regarding her work on the Burden Expert Report was on the

was reassigned to a first-year female associate on the team who completed the work successfully."  As noted above, the Burden Expert Report was <u>reassigned to Plaintiff from Ms. Huang</u>, who was a first-year associate; she does not possess a technical degree and holds a BA in "English and Peace and Conflict Studies."  Per her LinkedIn, she is no longer employed at Kirkland and works in mid-law (at Farella Braun + Martel LLP).

[52] In Mr. Deoras' "evaluation" of Plaintiff, he stated: "Her time management skills also need significant development; although her workload has often been low relative to other associates, she is often unable to complete her assignments in an appropriate amount of time."

COMPLAINT

same team call, when a paralegal said it would have been nice to have had additional time to more leisurely finalize the Burden Expert Report.

173.   Mr. Deoras falsely and maliciously stated in his "evaluation" that Plaintiff's "work on invalidity expert reports [*sic*] was inefficient and essentially needed to be redone."  And Mr. Fahey falsely and maliciously stated that "[w]e had to entirely rewrite everything she wrote in a short period of time."   After Plaintiff was read her "evaluations" after she was fired, she compared: (i) her first draft of a section of the Burden Expert Report that first opined on anticipation and/or obviousness based on a certain prior art reference and that she had sent to Mr. Deoras and Mr. Fahey for review, with (ii) the corresponding section in the as-served Burden Expert Report.  Plaintiff's work in the first draft was almost identical to what was in the served Burden Expert Report.  No substantive changes were made.  Defendants simply moved around certain sentences and citations, but that was the extent of the changes.

**On July 23, 2021, Plaintiff Again Opposed Defendants' Unlawful Employment Practices**

174.   For the reasons discussed above, Plaintiff continued having concerns regarding Defendants' conduct, which she reasonably, with good faith, believed constituted sex-based discrimination and/or harassment constituting a hostile work environment and/or retaliation for her prior complaint, or could do so if repeated.

175.   After Defendants subjected Plaintiff to months of worsening treatment, Plaintiff reached an inflection point near the end of July 2021.  This was after Plaintiff had to work during her entire planned vacation, in part because Plaintiff had been forced to assume responsibility for work on the District-Court Cases to allow male associates (including Mr. Huehns and Mr. Walter) to go on vacation and/or bill less.  Moreover, due to the totality of Defendants' unlawful conduct, including but not limited to burdening Plaintiff with a disproportionate workload and attempting to sabotage Plaintiff, Plaintiff did not have an opportunity to start preparing for her scheduled July 23, 2021 deposition that she would lead until the evening prior to this deposition.[53]

---

[53] Further showing Defendants' efforts to sabotage Plaintiff, Defendants did not provide or even try to provide Plaintiff with an exemplar deposition outline, despite Plaintiff asking for the same to aid in her preparation.

66

COMPLAINT

176.    In addition, due to Defendants' unlawful conduct, Plaintiff was consistently forced to operate on well-below reasonable levels of sleep.  Plaintiff was only able to get a few hours at most of sleep the night before the deposition.

177.    Immediately after Plaintiff took her deposition, as a driven associate, she called Mr. Deoras to get general input regarding the deposition but abstained from complaining again of Defendants' unlawful conduct given her fatigue.  Mr. Deoras said the deposition went fine.

178.    After decompressing and briefly resting, Plaintiff decided she needed to report Defendants' Unlawful Employment Practices and felt the most readily available avenue was to speak again with Mr. Deoras.  Given Plaintiff's established rapport with Mr. Deoras and his prior statements that Plaintiff should reach out to him to talk to him about anything, Plaintiff reasonably reported again to Mr. Deoras.  Moreover, Plaintiff reasonably believed at the time that this approach, as opposed to Plaintiff escalating her concerns to the chief HR officer, would reduce the risk of her becoming a pariah at the Firm,[54] especially given that she had been at the Firm for less than a year and Plaintiff had been limited to only working on matters for Defendants Mr. Alper, Mr. De Vries, Mr. Deoras, Ms. Schmidt, and Mr. Fahey.  As noted above, the only applicable reporting contacts for the San Francisco office were two share partners who had left the Firm; and there was simply one firmwide contact, Kirkland's chief HR officer.

179.    Plaintiff had reservations regarding again reporting Defendants' Unlawful Employment Practices, including facing additional repercussions from reporting.  However, Plaintiff was so exasperated by the unfair and unlawful treatment to which Defendants subjected

[54] Plaintiff understood, including based on speaking with a former non-share partner at Kirkland and widespread publicity regarding Mr. Alper's, Mr. De Vries' and Mr. Deoras' recent string of high-profile victories, that Mr. Alper and Mr. De Vries were some of the most, if not the most, important and influential partners at Kirkland.  Mr. Alper's and Mr. De Vries' notoriety and palpable gravitas at the Firm contributed to Plaintiff's reluctance to report her being subjected to unfair and disparate treatment compared to male associates, while performing work for those partners.  Additionally, although Kirkland claimed to utilize an "open-assignment" (i.e., free-market) system with respect to associate assignments and ability to work with different partners, Defendants controlled Plaintiff's workflow and precluded her from working with other partners; Mr. Deoras even told Plaintiff on April 29, 2021 that she would have to continue working with Defendants Mr. Alper, Mr. De Vries, Mr. Alper, and Ms. Schmidt, regardless of how she was being treated.  Accordingly, Plaintiff had reasonable concerns that any reprisal from Defendants arising from her complaining could jeopardize her overall standing at the Firm and her ability to obtain work from other partners.  This concern proved prescient and true.

67

COMPLAINT

Plaintiff that she felt in earnest that the best course of action was for Plaintiff to have a frank discussion with Mr. Deoras, given that he was her direct supervisor and he had urged her to reach out during her April 29, 2021 reporting, in order to stand up for herself by discussing Defendants' extremely unfair treatment of her.

180.   Plaintiff called Mr. Deoras and they spoke for 21 minutes.   When Plaintiff complained of unfair treatment with respect to workload—i.e., having an inordinately larger workload than male associates, let alone any other associate—Mr. Deoras played dumb, claiming that he was not aware that Plaintiff had been assigned a lot of work, despite being her immediate supervisor.[55]  Plaintiff raised concerns regarding being asked to take on work for male associates (including those who were able to observe their vacation to the detriment of Plaintiff). Additionally, Plaintiff raised concerns about Defendants' unreasonably reassigning the entire Burden Expert Report with the lack of associate support that Plaintiff had received to date on the report; and that the unreasonable allocation of work was weighing on Plaintiff's ability to get reasonable amounts of rest.

**After Plaintiff's July 23, 2021 Reporting, Defendants Froze Plaintiff Out of Work**

181.   After Plaintiff's July 23, 2021 reporting, Defendants froze Plaintiff out of work without explanation, which included precluding Plaintiff from working with other interested partners at the Firm based on Mr. Deoras' illusory promise that more work would be provided to Plaintiff from him and his co-Defendants.   Freezing Plaintiff out of work and stymieing additional opportunities is yet another example of Defendants' discrimination and retaliation. From July 31, 2021, the date after the Burden Expert Report was served, to Plaintiff's termination on September 28, 2021, Plaintiff billed only around 100 hours.  This sudden drop-off in hours stands in stark contrast to Plaintiff billing well over 200 hours in each of June and July 2021 and can only be explained by Defendants' discriminatory and retaliatory conduct.

**Defendants Engaged in *Ex-Post Facto* Attempts to Manufacture Purported Support for Defamatory Lies in Their "Evaluations" of Plaintiff**

---

[55] Mr. Deoras used a similar tactic of ignorance during Plaintiff's April 29, 2021 reporting, when he falsely claimed that he was unaware of Plaintiff's non-trial work leading up to and at trial.

COMPLAINT

182.   Because Defendants lacked actual examples showing deficient work performance by Plaintiff, Defendants engaged in efforts to fabricate *ex post facto* evidence as purported support for their false and malicious statements that Plaintiff was dreadfully incompetent at her job as an associate.

183.   In September 2021, for example, after Defendants had provided Plaintiff with little to no work for over a month, Defendants asked Plaintiff out of the blue <u>on the night of</u> September 14, 2021 to draft a letter to the ALJ in the ITC Investigation, which letter would have been due September 15, 2021.  Plaintiff followed Mr. Fahey's instructions for drafting the letter—of note, ***Mr. Fahey explicitly told Plaintiff to focus on finding citations, not on wordsmithing***.  Plaintiff sent Mr. Deoras and Mr. Fahey the letter, along with the documents cited therein, very early the morning of September 15, 2021.

184.   On September 15, 2021 at **<u>10:17 am PST</u>**, a paralegal emailed the Kirkland team for the ITC Investigation, attaching the <u>ALJ's order granting Kirkland's client's motion for summary determination and **terminating the investigation**</u>, thereby rendering the letter Plaintiff drafted moot.  Mr. Deoras sent a team-facing email at **<u>10:19 am PST</u>** acknowledging the win and telling the team to go <u>pencils-down</u> on the matter.

185.   Later that day, Mr. Deoras sent an email at **<u>12:30 pm PST</u>** to Plaintiff regarding her draft later, which, as noted above, was moot due to the ALJ order.  Mr. Deoras' email stated: "We don't need to work on this anymore, but here is how I **had** revised it."  Mr. Deoras attached a local copy showing his revisions to the letter, in which ***Mr. Deoras haphazardly removed almost all, if not all, of Plaintiff's citations (which, as noted above, Mr. Fahey instructed Plaintiff to focus on in drafting the letter)***.  Importantly, Mr. Deoras' **<u>revised draft was created four (4) minutes *after* he had sent the pencils-down email</u>** (per the metadata, he created the draft at 10:23 am PST and revised it until 10:50 am PST).  In other words, Mr. Deoras went against his express instructions to go pencils-down and felt the need to forcibly rush purported revisions to Plaintiff's draft letter and to circulate them to Plaintiff while falsely implying that the revisions were made prior to receiving the ALJ order.

COMPLAINT

186.   Mr. Deoras' pattern of being reticent in terms of providing feedback when sought by Plaintiff and his unwillingness to provide detail in response to Plaintiff's question about why she was fired clearly demonstrate that this forced attempt to provide purported feedback was nothing more than a sham attempt to manufacture *ex post facto* evidence regarding Plaintiff's performance leading up to her termination.

**In September 2021, Mr. Deoras Reassigned Work on an Instituted IPR Proceeding from Mr. Huehns to Plaintiff**

187.   At Mr. Deoras' request, Plaintiff prepared an argument outline for a patent owner response ("**POR**") in an instituted IPR proceeding in which Mr. Huehns had drafted the deficient POPR.  Specifically, on September 7, 2021, three weeks before Plaintiff's surprise hit-job firing, Mr. Deoras sent Plaintiff a Skype message, asking her "to put together ideas for POR strategy" for this instituted IPR proceeding because "that would be helpful."

188.   Mr. Deoras' purported extreme dissatisfaction with Plaintiff's performance at every level of professional practice is inconsistent with his statement that it would be "helpful" for Plaintiff to develop a substantive argument outline mere weeks before he knew she would be fired for allegedly poor performance would be "helpful" to him or anyone at the Firm.[56]  This inconsistency is explained by Mr. Deoras' knowledge that Plaintiff was not being fired for poor performance but because Plaintiff was a strong-willed female who threatened the male-dominated status quo of Defendants' practice.

189.   Plaintiff developed material arguments that Mr. Huehns should have but failed to make, which arguments were in Plaintiff's POR argument outline and accompanying email that she sent to Mr. Deoras.  Mr. Deoras had Plaintiff begin drafting the POR.  Saliently, the POR filed in December 2021 included only Plaintiff's arguments, and the PTAB recently determined that the claims were not unpatentable, i.e., Plaintiff's arguments proved victorious.  Mr. Huehns is still employed at Kirkland.

---

[56] (*See supra* ¶ 107.)

COMPLAINT

190.   What is more, Defendants changed relevant citations from Plaintiff's outline to irrelevant citations and to less authoritative sources in the filed POR to cloak their reliance on Plaintiff's work and arguments, which was a necessary countermeasure given the outlandish and malicious nature of the lies proffered regarding Plaintiff's performance in their defamatory "evaluations."[57]   Given Defendants' wholly unscrupulous behavior, Plaintiff would not be surprised if Defendants billed the client for the time spent covering up their sex discrimination, retaliation, and defamation, which would clearly breach their ethical obligations to clients.

### **Defendants' Conduct Evidences the Hallmarks of Discrimination**

### **Defendants Departed from Kirkland's Standard Practices and Procedures When "Evaluating," "Reviewing," and Firing Plaintiff**

191.   Defendants' widespread departures from standard practices and procedures when "evaluating," "reviewing," and firing Plaintiff further demonstrate Defendants' discriminatory and retaliatory intent.

192.   *First*, Ms. Schmidt interjected herself into Plaintiff's entire review process despite (i) not being selected by Plaintiff as an evaluator; (ii) not being a member of either the IP Litigation Associate Review Committee ("**ARC**") or the Firmwide ARC (or any other Kirkland committee); and (iii) having low familiarity with Plaintiff's work.[58]   Ms. Schmidt submitted an "evaluation" of Plaintiff.   Two co-chairs of the Firmwide ARC confirmed that partners who evaluate an associate are selected by the associate.   Ms. Schmidt attended the August 16, 2021

---

[57] Mr. Deoras' defamatory "evaluation" of Plaintiff falsely and maliciously stated that "every citation and factual and legal assertion needed to be double checked."

[58] As part of her efforts to forcibly insert herself into Plaintiff's "evaluation" and "review" process, Ms. Schmidt mischaracterized her "familiarity" with Plaintiff on her lengthy, unsolicited "evaluation" as "average."   In addition, Ms. Schmidt's "evaluation" misleadingly tallied Plaintiff's hours on the ITC investigation as if Ms. Schmidt had supervised Plaintiff's work on the same, despite Plaintiff doing *de minimis* work on the ITC investigation for Ms. Schmidt. Rather, all of Plaintiff's work on this matter was supervised by Mr. Deoras and Mr. Fahey, with Mr. Alper and Mr. De Vries serving as the managing partners on the matter.   Notably, Mr. De Vries did not include Plaintiff's hours on the ITC investigation despite Mr. De Vries serving as lead counsel on the same.

71

COMPLAINT

IP Litigation ARC meeting with Akshay Deoras (who was a member of the IP Litigation ARC).[59] Like Plaintiff's other "evaluations," Ms. Schmidt's "evaluation" was received by every member of the IP Litigation ARC; was read aloud during the IP Litigation ARC meeting, per Mr. Deoras; and was "considered" by the IP Litigation ARC when it "considered" Plaintiff's "rating," per official Firm documentation. Plaintiff's "rating" was a five (out of five), the worst possible rating, as discussed further below. Thereafter, Defendants' "evaluations" and "rating" of Plaintiff were "approved" and "ultimately decided" by the Firmwide ARC and the Firm Committee, per official Firm documentation.

193. **Second**, contrary to the goals of the review being neutral and controlled, Mr. Deoras and Ms. Schmidt coordinated in their "evaluations" of Plaintiff, going so far as to explicitly call out in his/her own "evaluation" the other's "evaluation." Such coordination is not only inconsistent with the goals of the review, but also a departure from the actual procedures and processes for reviewing associates at Kirkland.

194. **Additionally**, in an attempt to further taint and corrupt the review process, Male Non-Share Partner Y told Plaintiff that he had been told to criticize her work in his "evaluation." Based on Firm communique regarding the review process and purpose and to Plaintiff's knowledge, Defendants did not engage in such coordination or review steering with respect to other associates, including male comparator associates.

195. **Third**, as compared to all other IP litigation associates based out of the Firm's San Francisco office, Plaintiff had a different "review attorney." The other associates had Male Share Partner C as their "review attorney," which made sense given that he was a supervisor on their (and Plaintiff's) matters, including Plaintiff's. (Male Share Partner C had previously sent team-wide praise regarding Plaintiff's work, including noting the significant import of Plaintiff's victory for related litigation.) The review attorney's role is approving an associate's questionnaire, which triggered notice for the evaluators identified by the associate to submit evaluations. Plaintiff's review attorney, however, was Jeanna Wacker, who was based out of the

---

[59] Ironically and sadly, Mr. Deoras was a member of the Firm's inaptly-named "Diversity and Inclusion Committee."

COMPLAINT

Firm's New York office, which conveniently is also the office out of which the interloper, Ms. Schmidt, was based.

196.   **Fourth**, the "evaluations" of Plaintiff by Mr. De Vries, Mr. Deoras, Ms. Schmidt, and Mr. Fahey were extremely lengthy, which is a departure from established practice for reviewing associates at Kirkland.  Plaintiff was informed that "evaluations" at Kirkland are typically short.  For example, Male Non-Share Partner Y's "evaluation," which denoted his "[f]amiliarity" (presumably with respect to performance) was "**[h]igh**" and which was the only "evaluation" of Plaintiff that came anywhere close to being somewhat neutral (yet still was not neutral), included **120 words**.

197.   Mr. De Vries' "evaluation," which denoted "**[a]verage**" "familiarity," included **149 words.**  Ms. Schmidt's (unsolicited) "evaluation," which denoted "**[a]verage**" "familiarity," included **281 words**.  Mr. Fahey's "evaluation," which denoted "**[h]igh**" "familiarity," included **349 words**.  Mr. Deoras' "evaluation," which denoted "**[h]igh**" "familiarity," included **604 words** (and not a single kind one among them).  In other words, despite Male Non-Share Partner Y's "evaluation" accounting for one of five "evaluations" and despite his higher familiarity with Plaintiff's performance than two other "evaluations" (including an unsolicited "evaluation" that was nearly three times the length of his), his "evaluation" comprised **less than 8% of the total words in all five evaluations**.  Clearly Defendants felt the need to dilute Male Non-Share Partner Y's "evaluation" of Plaintiff to minimize the inconsistencies across evaluators and to guarantee Plaintiff would be fired unlawfully based on a sham and hijacked "review" process.

198.   **Fifth**, Kirkland's associate review period runs from July 1 to June 30 every year, i.e., the associate review process was supposed to cover Plaintiff's hours and performance from November 16, 2020 through June 30, 2021.  In contrast, a substantial portion of Plaintiff's "review" included statements regarding work completed by Plaintiff outside of the fixed review period as defined by the Firm in official documentation, including Plaintiff's work on the Burden Expert Report.   On information and belief, Defendants also revised their defamatory "evaluations" to add additional false, malicious and defamatory statements in their "evaluations" of Plaintiff following her July 23, 2021 complaint of Defendants' Unlawful Employment

COMPLAINT

1   Practices, which included, e.g., extreme falsehoods regarding Plaintiff's work on the Burden

2   Expert Report.

3         199.   **Sixth**, Defendants' "evaluations" were patently imbalanced and entirely excluded

4   Plaintiff's numerous accomplishments.   Instead, the "evaluations" consisted of false and

5   defamatory criticisms of Plaintiff's work.  But for Male Non-Share Partner Y's "evaluation," any

6   person reading the "evaluations" would have no indication that Plaintiff had completed even one

7   assignment successfully based on the four corners of Defendants' "evaluations."  Since Plaintiff's

8   firing, Defendants repeatedly gaslit Plaintiff and claimed she was fired because her performance

9   was allegedly horrible.  As discussed further below, Defendants' outside counsel continued this

10  gaslighting and subsequently restated unequivocally that Plaintiff was fired "because" of her poor

11  performance.  However, Defendants' outside counsel recently changed tune and—for the first

12  time—admitted that "some" of Plaintiff's work "may have been good," in a clear attempt to shift

13  the purported reason for Plaintiff's unlawful termination in anticipation of litigation.

14        200.   **Seventh**, with respect to Plaintiff, Kirkland did not follow its established, formal,

15  documented process and procedure designed to allow associates who were failing or purportedly

16  failing to meet performance standards to be notified of issues and to have an opportunity

17  remediate such issues.  Specifically, per Firm policy and established practice, the Firm placed an

18  associate with performance or other issues on so-called "probation" before terminating the

19  associate.  As discussed above, the associate review process resulted in the Firm assigning each

20  associate a rating on a scale of one to five.  Probation was triggered by a rating of four.

21  Termination would be triggered, if at all, only by a subsequent rating of five, which would occur

22  at earliest, if at all, during the next annual review.  Per official Kirkland documentation, receiving

23  an overall rating of four was "rare"; to Plaintiff's knowledge, the Firm hardly ever, if ever,

24  assigned an associate a rating of five.  If the Firm decided to place an associate on probation, an

25  individual in Kirkland's Legal Recruiting and Development ("**LRD**") department would attend

26  the associate's annual review (termed a "feedback meeting" by Kirkland regardless of the

27  associate's rating), when the associate would be informed of performance issues, of being placed

28  on probation, and of the opportunity to remediate such performance issues.  A few months later,

74

COMPLAINT

the Firm would obtain an additional set of evaluations regarding the associate's performance during the probationary period to date; thereafter, the associate would have a mid-year review to discuss the associate's performance and progress in curing the identified issues.  However, the associate's rating would remain unchanged until the next annual review.  Plaintiff is aware of multiple associates in the IP litigation group who had been placed on and subsequently were taken off probation.  Instead, Plaintiff was fired, with HR present, during her first annual "review."  Defendants intentionally ensured that Plaintiff was deprived of this probationary process because they knew that it would offer Plaintiff an opportunity to rebuff their abject lies and would expose the defamatory, baseless, and pretextual nature of their criticisms of Plaintiff's work.  In other words, following Firm protocol regarding probation would have been fatal to Defendants' desire to unlawfully terminate Plaintiff.

201.   ***Eighth***, per Kirkland's official video regarding the associate review process, a "feedback attorney," a share partner who supervised an associate and worked in the same office for the same practice group, would meet with the associate regarding the associate's review.  Per Firm policy, this feedback attorney: (i) would provide actual feedback to the associate, including discussion of "the feedback that was collected, and the rating, and the rest of the review"; and (ii) would be prepared to answer the associate's questions.  The purpose of the meeting was "for [the associate's] career development."  In contrast, as discussed further below, Plaintiff's "feedback" attorney, Mr. Deoras, provided no feedback regarding Plaintiff's performance beyond a vague, one-sentence statement of the reason for her termination and statements that Plaintiff is talented and will be successful.  Mr. Deoras was unwilling to provide detail in response to Plaintiff's question about why she was fired.

202.   These marked departures from Kirkland's standard, established practices regarding its associate review process demonstrate that Plaintiff's "review" was a sham—the atypical process used in her case was not designed to assess, evaluate, or review her performance. Instead, the departures from practice allowed Defendants to use the hollowed-out sham "review" process as a vehicle to carry out their unlawful, discriminatory and retaliatory termination of Plaintiff.

COMPLAINT

1

**On September 28, 2021, Defendants Unlawfully Terminated Plaintiff**

2        203.   On September 28, 2021, Plaintiff was fired with no prior notice during what was

3   supposed to be her first associate review (and would have been Plaintiff's first review at

4   Kirkland).   During this firing meeting, Mr. Deoras provided a short, vague, and ambiguous

5   statement for Plaintiff's firing: "[Plaintiff] has not contributed to her matters at either the

6   substantive or commitment level that is expected of an associate."   Plaintiff was in complete

7   shock, especially in light of Plaintiff's high performance, Defendants' abundant real-time praise

8   of Plaintiff's work, and Defendants' never providing prior notice of alleged work performance

9   issues needing improvement prior to this unlawful termination.   Mr. Deoras was the partner with

10  whom Plaintiff had worked most closely at Kirkland.

11       204.   During this meeting, Mr. Deoras: (i) agreed Plaintiff would be shocked,[60] (ii)

12  thanked Plaintiff for her work, (iii) told Plaintiff she is "talented," and (iv) stated he was certain

13  of Plaintiff's future success as an IP litigator.   Mr. Deoras' acknowledgments of the shocking

14  nature of Plaintiff's firing and of Plaintiff's talent, contributions, and certain future success were

15  consistent with the praise Plaintiff had received from partners, including Defendants, throughout

16  her tenure at Kirkland, given that she had consistently provided excellent work and met or

17  surpassed expectations, as detailed above.   Saliently, such acknowledgments by Mr. Deoras were

18  flatly inconsistent with the aforementioned vague and ambiguous statement and with Defendants'

19  "evaluations."

20       205.   During this firing meeting, Plaintiff received no information regarding any

21  evaluation or alleged evaluation of her work performance.   The Firm offered four-months'

22  severance in exchange for Plaintiff's waiver of legal claims.   The severance offer was set to

23  expire one week later, on October 5, 2021, well before Plaintiff would be able to learn the

24  contents of the "evaluations."   On October 4, 2021, Plaintiff had a call with Chelsea Zbesko, an

25

26  [60] After Plaintiff expressed shock regarding her termination and asked Mr. Deoras—a successful
    patent litigator whose job requires excellent communication skills—to provide details, he
27  stuttered, stammered, agreed Plaintiff's shock was reasonable, and avoided answering Plaintiff's
    question while tripping over his own words.   ("**Sure, yeah, sure, so, um [stutter] u-u-u-
28  nderstand [stutter] I understand that you're [stutter] th-th-that this may come as a shock**.")
    Plaintiff was nonplussed.

COMPLAINT

1    HR supervisor who had attended the firing meeting, to decline the severance offer and inform

2    Defendants that she would seek legal redress for her sex-based discrimination, sex-based

3    harassment constituting hostile work environment, and retaliation claims under federal, state, and

4    local laws.

5    **Plaintiff Was Informed for the First Time of Alleged Deficiencies in Her Work After She**

6    **Was Fired**

7         206.   On Thursday, September 30, 2021, Plaintiff received an email from Frank

8    Tuccillo, a director of attorney engagement, with a link for associates based out of the Firm's

9    Bay Area offices to schedule appointments to "review" their evaluations in controlled conditions,

10   either in-person in the office or remotely by telephone.  Per Firm policy, this was the only way

11   associates could learn the contents of their evaluations because the Firm did not provide

12   associates with any copies of the same.  Mr. Tuccillo stated, consistent with Firm policy, that an

13   associate would be able to review his/her/their evaluations only after the feedback meeting.

14   Plaintiff scheduled an appointment to have her "evaluations" read to her telephonically.   On

15   Friday, October 1, 2021, Plaintiff accepted an Outlook calendar invitation for the "Kovalenko—

16   Bay Area Associate Review Feedback" meeting on Monday, October 11, 2021, at 10:15 am PST,

17   when Mr. Tuccillo would call Plaintiff or meet with Plaintiff via Zoom.  Plaintiff could not have

18   learned the contents of the defamatory "evaluations" prior to October 11, 2021 in light of the

19   Firm's aforementioned scheduling process to learn the contents of evaluations, the Firm's policy

20   of not providing copies of evaluations to associates, and Mr. Deoras' refusal (in contravention of

21   established Firm policies) to provide details regarding the reason for Plaintiff's termination in

22   response to her question during her September 28, 2021 firing.

23        207.   On October 11, 2021, Plaintiff's "evaluations" were read to her, which is when

24   Plaintiff was informed, <u>for the first time</u> of: (1) alleged work performance deficiencies; (2) the

25   alleged detail supporting the basis for Plaintiff's termination; (3) the fact that each of Defendants

26   Kirkland, Mr. De Vries, Mr. Deoras, Ms. Schmidt, and Mr. Fahey had published without

27   Plaintiff's consent a slew of malicious, defamatory statements regarding Plaintiff's profession

28

COMPLAINT

with knowledge or reckless disregard of falsity thereof, examples of which are noted throughout this Complaint; and (4) the extremely defamatory content of Defendants' "evaluations."

**Plaintiff's "Evaluations" Contained Inconsistent Statements, Intentionally Omitted**

**Material Information and Context, and Exhibited Clear Coordination**

208.   Defendants' "evaluations" contained statements inconsistent with Defendants' statements and conduct preceding the firing meeting, including without limitations Defendants' statements to Plaintiff in emails, telephonically, on meetings, and in person, non-exhaustive examples of which appear throughout this Complaint.

209.   In addition, Male Non-Share Partner Y's "evaluation" is inconsistent with Defendants' "evaluations," including with respect to length and characterization of Plaintiff's performance.  For example, Male Non-Share Partner Y's evaluation stated: "Zoya helped defeat IPRs on multiple challenging patents."  Conversely, when Mr. Deoras spoke of Plaintiff's work on the same assignments, he omitted the fact that Plaintiff defeated IPRs by drafting multiple successful POPRs and instead claimed that "[Plaintiff's] judgment in deciding which arguments to include and prioritize needed improvement" and that "[Plaintiff] also had difficulty communicating her analysis."

210.   As discussed throughout the Complaint, Defendants intentionally and maliciously stripped their "evaluations" of any and all relevant, material information and context because such information and context would have contradicted the false and malicious narrative that Defendants tried to spin in their defamatory "evaluations" with respect to Plaintiff's performance. For example, Defendants Mr. De Vries, Ms. Schmidt, and Mr. Deoras deliberately excluded that they had asked Plaintiff to serve as a last-minute substitute on their trial team because Plaintiff was doing incredibly good work.[61]   Additionally, Defendants intentionally and maliciously avoided acknowledging any of Plaintiff's successes or wins and relevant context, underscoring

---

[61] For instance, Mr. Deoras' "evaluation" falsely criticizes Plaintiff's work on POPR Nos. 1 and 2 and then immediately states: "Following the Omnitracs IPRs, we asked Zoya to join us for trial in the Gigamon v. Apcon matter."  The following sentence and remainder of Mr. Deoras' "evaluation" proceed to continue falsely criticizing Plaintiff's work.  Ms. Schmidt's "evaluation" states: "Zoya joined the Apcon matter shortly before trial to take the place of an associate who had left Although she was enthusiastic about joining the team, she did not contribute at trial."

78

COMPLAINT

the excellent nature of Plaintiff's performance, e.g., tight deadlines. For example, as noted above, Defendants' "evaluations" deliberately excluded Plaintiff's extremely successful results with POPR Nos. 1 and 2, which Mr. Deoras had previously—in real-time—characterized as "key wins" in his email stating "[Plaintiff] really did a fabulous job with these." Moreover, Mr. Deoras' "evaluation" failed to mention that Mr. Deoras had asked Plaintiff to draft POPR No. 2 on a condensed timeline and that Defendants Mr. Deoras, Mr. De Vries, Mr. Alper, and Kirkland "were able to use a lot of [Plaintiff's] work on [POPR No. 2] with [two other POPRs addressing the same primary prior art reference that POPR No. 2 addressed]."

211. As another example, as discussed above, in the ITC Investigation Plaintiff, *inter alia*, successfully obtained discovery for a large international company notoriously intransigent with respect to complying with third-party subpoenas, and Plaintiff's efforts were expressly acknowledged by the company and its outside counsel. In contrast, Mr. Fahey and Mr. Deoras falsely and maliciously criticized Plaintiff's communications with third parties and communication skills. (*See supra* ¶¶ 155–158.) However, Defendants' false criticisms in their "evaluations" were not limited to her work on the ITC Investigation, e.g., Mr. Deoras stated that Plaintiff "had difficulty communicating her analysis" on POPR Nos. 1 and 2. (*But see supra* ¶¶ 88–107.) Mr. Deoras' defamatory "evaluation" also falsely stated, without referencing a particular matter, that Plaintiff "has a lot of trouble expressing herself" and that Plaintiff's "communication skills need significant development."

212. Similarly, Female Associate G told Plaintiff that Mr. Deoras' "evaluation" of her included a false criticism stating she needed to improve her communication skills, inconsistent with her evaluations from other partners. Analogously, false criticisms of Plaintiff's communication skills in Mr. Deoras' "evaluation" were inconsistent with Male Non-Share Partner Y's "evaluation," notwithstanding Defendants' express instruction to Male Non-Share Partner Y to criticize Plaintiff in his "evaluation" of Plaintiff.[62] For example, Mr. Deoras falsely stated that Plaintiff "needs to significantly improve her communication skills . . . with others in

---

[62] Defendants' instruction was discriminatory and retaliatory; Defendants did not similarly instruct evaluators, including Male Non-Share Partner Y, to criticize male comparator associates.

COMPLAINT

the team" and that Plaintiff's "communication with team members has consistently been poor." In contrast, Male Non-Share Partner Y stated that "[Plaintiff] makes a concerted effort to communicate well with her colleagues[,] and it is always appreciated."

213.    Moreover, the falsity of Mr. Deoras' defamatory statements concerning Plaintiff's communication skills is contradicted by Mr. Deoras' and his co-Defendants' conduct.  For example, Mr. Deoras falsely stated in his evaluation that he "would be reluctant to have [Plaintiff] speak directly with clients or opposing counsel."  However, in April 2021 Defendants Mr. Deoras, Mr. Alper, Mr. De Vries, and Kirkland watched Plaintiff converse with their client's CEO, while in the same room and in very close proximity, for around 30 minutes and were perfectly comfortable letting Plaintiff do so.

### Defendants Coordinated in the Hit-Job "Review"

214.    The "review" is chock-full of examples of coordination by Defendants. Defendants' coordination was necessary to create a facially-believable false narrative and to avoid glaring inconsistencies that would unravel Defendants' web of lies.

215.    For example, as discussed above, Male Non-Share Partner Y told Plaintiff that Defendants had directed him (Male Non-Share Partner Y) to criticize Plaintiff in his "evaluation" of her.  Defendants' directive steered the narrative of Plaintiff's "review" and "evaluations," ensuring they were unfair, impartial, and prejudicial, which was entirely at odds with Kirkland's touted goals for the associate review process, e.g., fairly and objectively assessing associates.

216.    As another example, Ms. Schmidt's "evaluation" expressly admitted to coordinating with Mr. Deoras.  In reference to the ITC Investigation, Ms. Schmidt stated that "[Plaintiff] does not produce usable work" and that "Akshay [Deoras] will be able to provide more specifics on her work."[63]

---

[63] Defendants' "substantial" cutting of Plaintiff's time is an example of their attempts to back up their defamatory "evaluations' of Plaintiff to gap-fill for the absence of contemporaneous support for their false claims regarding Plaintiff's allegedly poor work.  Based on the chronology of the evaluations, Plaintiff understands that Defendants cut a substantial amount of her time in late July 2021, after Plaintiff complained again of Defendants' Unlawful Employment Practices.

COMPLAINT

217.   In addition, Ms. Schmidt's "evaluation" demonstrated that she, Mr. Deoras, and Mr. Fahey coordinated with Mr. Alper and Mr. De Vries in discriminating, harassing, retaliating, and defaming Plaintiff.  For example, Ms. Schmidt's "evaluation" further alleged that Plaintiff "does not produce usable work," which "has required us to cut a substantial amount of her time" on the ITC Investigation.  In or around June 2021, Mr. Fahey told Plaintiff he handled billing for the ITC Investigation and met weekly with the client regarding the same.  Accordingly, on information and belief, Mr. Fahey coordinated with Ms. Schmidt and Mr. Deoras to cut Plaintiff's hours on the ITC Investigation, in order to fabricate *ex post facto* support for their defamatory evaluations of Plaintiff.  In addition, because Mr. De Vries and Mr. Alper were lead counsel on the ITC Investigation, they had knowledge of Plaintiff's good work on the same.  In addition, Mr. Alper and Mr. De Vries knew or reasonably should have known about Ms. Schmidt's and Mr. Fahey's discriminatory and retaliatory write-off(s) because at all relevant times Mr. Alper and Mr. De Vries were on the Firm's Finance Committee, which "reviews" "client write-offs." Mr. Alper and Mr. De Vries sanctioned, or, at minimum, intentionally overlooked, the unlawful conduct.  These Defendants had the opportunity to do so given the loose controls that were in place at Kirkland, which Kirkland has since attempted to remediate as demonstrated by its myriad remedial job postings (which concern, e.g., ensuring compliance with write-off policies, handling "difficult" requests by partners, and generating variance reports).

218.   In addition, similar language and statements and common themes among Defendants' "evaluations" further demonstrate coordination.

**Defendants Defamed Plaintiff**

219.   The four corners of Defendants' "evaluations" of Plaintiff convey an unequivocal message: that Plaintiff was woefully deficient in every facet of practicing law, failed to contribute at all during her time at the Firm, and was nothing more than a burden and liability due to her professional incompetence.  All of the statements by Defendants in the summary of Plaintiff's "review" are either statements of fact or statements of opinion implying an underlying basis in fact.  All of the statements are false.  For any and all purported statements of opinion, the underlying factual basis is false.  Defendants' "evaluations"—individually and collectively—are

COMPLAINT

defamatory because they are each without basis, indisputably contradict the truth, and directly denigrate Plaintiff's professional skills and acumen.  The gravity, magnitude, and extent of the lies regarding Plaintiff's professional abilities and acumen and Defendants' coordination show that Defendants made the defamatory statements with malice, i.e., with knowledge or reckless disregard of their falsity.  Defendants' publication was malicious, intentional, willful and done with callous disregard for the foreseeable injury and damage to Plaintiff's professional career, reputation, and livelihood and to foreseeable collateral damage to third parties who are close with Plaintiff.  Defendants' defamation of Plaintiff caused and has continued to cause Plaintiff severe emotional, psychological, and physical harm and injury.

220.    Defendants knowingly and maliciously published false, defamatory statements of fact regarding Plaintiff's profession; each statement in Defendants' "evaluations" was not privileged and had a natural tendency to injure Plaintiff's profession and occupation, including without limitation Plaintiff's professional reputation, abilities, and performance.   Defendants published such statements maliciously, with a state of mind arising from hatred or ill will toward Plaintiff.  No Defendant had a good faith belief in the truth of any of the statements included in their "evaluations."  As discussed above, each Defendant knew each statement was false when each statement was published.

221.    The purpose of Defendants' "evaluations" of Plaintiff was not to serve as a management tool for evaluation and documentation of Plaintiff's performance.  Rather, the exclusive purpose of the "evaluations" was to provide a vehicle to publish defamatory statements of fact about Plaintiff to harm Plaintiff's professional reputation and standing and to effectuate Defendants' unlawful termination of Plaintiff.  Defendants' "evaluations" of Plaintiff served as the support for the purported poor-performance basis for terminating Plaintiff.

222.    **Defendants' defamatory "evaluations" were published to and considered by at least around <u>118</u> individuals, including those on the IP Litigation ARC, Firmwide ARC, Associate and Non-Share Partner Compensation Committee, and Firm Committee, which collectively include numerous prominent, highly successful IP litigators**.  Per Kirkland's official video regarding the 2021 Associate Review Process, Nicole Greenblatt, co-chair of the

COMPLAINT

Firmwide ARC, stated that the IP Litigation ARC met to "consider" each IP litigation associate's rating and evaluations.  Mr. Deoras told Plaintiff during her firing meeting that the IP Litigation ARC listened to each associate's evaluations. After Plaintiff was fired, she received her "summary," which included Defendants' "evaluations."

223.   Per official Firm policy, the IP Litigation ARC was "established to review the performance of the Firm's associates and report the results to the Firmwide Associate Review Committee."   The IP Litigation ARC was comprised of 47 individuals—including numerous highly successful, prominent IP litigators and unnecessary personnel[64]—to whom Defendants published Plaintiff's defamatory "evaluations."   In addition, Leslie Schmidt and/or Leslie M. Schmidt, P.C., neither of which were members of either the IP Litigation ARC, the Firmwide ARC or any other Firm Committee, and Akshay Deoras (who was a member of the IP Litigation ARC) and/or Akshay S. Deoras, P.C. attended the August 16, 2021 IP Litigation ARC meeting, during which, on information and belief, he/she/they published additional defamatory statements regarding Plaintiff and/or, at minimum, the defamatory "evaluations" of their co-Defendants were published to them (e.g., the defamatory "evaluations" of Michael De Vries and/or Michael W. DeVries, P.C. and of Mr. Fahey were published to Leslie Schmidt and/or Leslie M. Schmidt, P.C. and to Akshay Deoras and/or Akshay S. Deoras, P.C., and the defamatory "evaluation" of Leslie Schmidt and/or Leslie M. Schmidt, P.C. was published to Akshay Deoras and/or Akshay S. Deoras, P.C., and vice versa).   The IP Litigation ARC published Defendants' defamatory "evaluations" to the Firmwide ARC.[65]   Moreover, on information and belief, some if not all of

[64] This included someone who was responsible for training onboarding associates.   This individual sent Plaintiff an email with a perplexing, demeaning remark after he had attended the August 16, 2021 meeting but before Plaintiff was fired.

[65] In late September 2022, after Defendants had published their defamatory "evaluations" of Plaintiff but before she was fired, Plaintiff attended the PTAB Bar Association Annual Conference.  Kirkland had paid for seats at a table.  During the conference, a share partner based out of one of Kirkland's Los Angeles offices who was a member of the IP Litigation ARC and Firmwide ARC acted strangely toward Plaintiff, including quickly ending any conversations Plaintiff attempted to start and leaving the table as soon as practicable when Plaintiff was at the same table.  Plaintiff managed to sit next to him during lunch one day.  When Plaintiff tried to discuss PTAB work and her recent POPR successes, he quickly changed the topic to the Ryder Cup and left the table shortly thereafter after quickly finishing his meal.

COMPLAINT

83

Defendants' statements contained in Defendants' "evaluations" of Plaintiff were published to third parties outside of Kirkland by Defendants and/or their agents. This is consistent with a former Kirkland IP litigation partner telling Plaintiff that she was informed of the content of a former associate's evaluation, which served as the basis for that associate's termination from Plaintiff. Given the extremely widespread publication of the defamatory "evaluations" to myriad individuals in different locations, practice groups, departments, positions and roles at Kirkland, including personnel not involved in management of Kirkland or any of its PC Partners, it is reasonable to conclude that the defamatory statements have been subsequently and foreseeably republished and further disseminated outside the Firm. Defendants' absence of established and/or enforced policies or procedures concerning operational checks, controls, oversight, and/or compliance, including specifically with respect to the associate review process, further supports the reasonable conclusion that the defamatory statements comprising the evaluations have been further republished and disseminated to other individuals, including external third parties.

224. Moreover, Plaintiff has been unable to obtain even a single interview at any comparable or even close to comparable law firms, further underscoring the damage to Plaintiff's professional standing and reputation.

225. In addition, Kirkland is part of an insurance conglomerate, Attorneys' Liability Assurance Society ("**ALAS**"), which is comprised of 223 law firms with over 74,000 lawyers including 89 firms in the AmLaw 200. Per ALAS' website, it is "managed and staffed by lawyers, most of whom are former partners at ALAS-caliber firms." ALAS, https://www.alas.com. Over the past several years, ALAS developed a program currently called "Data View" or similar, that provides information regarding outstanding claims against a member firm to all other member firms. In addition, based on publicly available data, in the fall of each year, ALAS meets with each member firm and informs each of details regarding all open claims against member firms, purportedly to explain any rate increases in the upcoming year. Plaintiff has not been able to secure a single job interview with a single member firm since her termination at Kirkland, despite having applied to numerous such firms since her termination at Kirkland.

COMPLAINT

On information and belief, the defamatory "evaluations" were published to ALAS personnel and to member firms.

226.    Per official Firm policy, the Firmwide ARC was supposed to ensure "consistency" of associate reviews "on a Firmwide basis" and was "expected to review Associate Review Committee activities with the objective of achieving uniform application of performance standards."  The Firmwide ARC was comprised of an additional 29 individuals—including numerous highly successful, prominent attorneys, including IP litigators—to whom Defendants published the defamatory "evaluations."  The defamatory "evaluations" were also published to the Firm Committee and the Associate & Non-Share Partner Compensation Committee, including at least around 51 additional individuals including unnecessary personnel.  (Per the official Kirkland video regarding the 2021 associate review process, the Associate & Non-Share Partner Compensation Committee determines bonuses "on a grid basis" based on hours and rating—i.e., there was no need for Kirkland to disseminate the defamatory summary to that committee, which included a total of 72 members (some of which were also a member of one or more of the aforementioned committees that received the "evaluations.")

227.    Plaintiff had no knowledge of the defamatory statements in Defendants' "evaluations" of her until October 11, 2021.  Plaintiff could not have learned of the defamatory content of her "evaluations" prior to October 11, 2021, due to Defendants' conduct discussed above, e.g., Mr. Deoras' failure to discuss the content of the "evaluations" during Plaintiff's "feedback"/firing meeting beyond providing the vague, one-sentence statement of the reason for her termination; Mr. Deoras' non-answer in response to Plaintiff asking him to provide details; and the Firm's policies regarding keeping evaluations from associates, who do not receive copies of the same, as discussed above.  Additionally, during Plaintiff's firing call, Mr. Deoras intentionally and misleadingly characterized the aforementioned one-sentence statement as the "summary" of Plaintiff's review.  Per official Firm communique, the "summary" of an associate's review is sent to multiple Firm committees for consideration, approval, and ultimate decision on the same.  Mr. Deoras' mischaracterization, combined with the fact that this was

COMPLAINT

Plaintiff's first "review" at Kirkland, led Plaintiff to believe that the one-sentence statement he conveyed constituted Plaintiff's review (i.e., was the review "summary").

228.   However, as discussed above, on September 30, 2021, Plaintiff received an email from Kirkland for scheduling an appointment to have her "review" read to her; the email stated that associates would not be provided with any copies of the same.   That same day, as soon as practicable, Plaintiff used the link in the email to schedule the same.   On October 1, 2021, Defendants scheduled Plaintiff's review reading for October 11, 2021 and sent Plaintiff a calendar invitation for the same.   On October 11, 2021, Plaintiff first learned of the defamatory content and existence of Defendants' "evaluations," including the fact that Ms. Schmidt had submitted an "evaluation" of Plaintiff.   At this time, Plaintiff learned that the review "summary" was actually comprised of the individual "evaluations," i.e., Defendants' defamatory evaluations of Plaintiff.   The copy of Plaintiff's review that was subsequently provided by Kirkland's assistant general counsel or chief HR officer in late November 2021 confirms that the review "summary" includes Defendants' individual "evaluations."   Plaintiff exercised reasonable diligence in scheduling a call or Zoom meeting to have her "evaluations" read to her as soon as practicable.

229.   Defendants' statements set forth in their alleged "evaluations" of Plaintiff were not performance evaluations.   Here, Plaintiff was terminated immediately during her first "review" and was never notified of or provided an opportunity to cure any purported work performance issues.   Moreover, Defendants' numerous departures from practice, including without limitation Ms. Schmidt inappropriately inserting herself into the arc process, Plaintiff not being placed on any formal or informal probation, the length of the "evaluations" and the express coordination among Defendants' evaluations clearly demonstrate that the purpose of the "evaluations" Mr. Deoras review process was not to serve as a management tool for examining, appraising, judging, or documenting Plaintiff's performance.   In addition, Mr. Deoras' unwillingness to provide any details during Plaintiff's "review," even when asked for details by Plaintiff, demonstrated that the process was not intended to evaluate Plaintiff and that its exclusive purpose was to defame Plaintiff unbeknownst to her.

COMPLAINT

**Sham "Investigation"**

230.    During Plaintiff's October 4, 2021 call with Ms. Zbesko, she told Plaintiff that Kirkland's chief HR officer, Wendy Cartland, would contact Plaintiff regarding her claims against the Firm either that evening or the next day, October 5, 2021.  Defendants delayed contacting Plaintiff.

231.    On November 5, 2021, Plaintiff and a third party met with Ms. Cartland and Kirkland's assistant general counsel, Sarah Herlihy.  During this meeting, Ms. Herlihy said that she "investigated" Plaintiff's claims of sex discrimination, sex harassment, and retaliation, and that Plaintiff's alleged "poor" performance was the "reason for [Plaintiff's] termination."  Ms. Herlihy stated that her "findings" were corroborated by "the partners' [i.e., Defendants'] recollections."  The only examples she provided for reaching her conclusion were that the Firm employs females and that one of the people whose sex-based discriminatory and harassing conduct Plaintiff had complained of (Leslie Schmidt) is a woman.  Plaintiff pointed out that both reasons were legally irrelevant and unavailing.

232.    When asked multiple times about support for the defamatory "evaluations," Ms. Herlihy stated that Plaintiff's dispute over her performance was nothing more than "he-said, she-said."  When asked about the "review" and "evaluations" lacking any details regarding Plaintiff's positive contributions and wins, Ms. Herlihy republished the defamatory statements made in Defendants "evaluations" of Plaintiff and became increasingly agitated, evasive, and unprofessional.  After Plaintiff dismantled Ms. Herlihy's efforts to use red herrings to gaslight Plaintiff into believing she had no claims against the Firm, Ms. Herlihy abruptly hung up on Plaintiff and the third party.  During this meeting, Ms. Cartland stated nothing at all.

**Kirkland Continued Retaliating Against Plaintiff Long After Her Unlawful Termination**

233.    After Kirkland fired Plaintiff, Plaintiff applied in November 2021 for unemployment benefits with the D.C. Office of Employment Services ("**DOES**").  The unemployment benefits application requested the name of and contact information for Plaintiff's supervisor at Kirkland; Plaintiff listed Akshay Deoras with his contact information from the Kirkland website. Despite Plaintiff following the procedures for applying for unemployment and

COMPLAINT

following up multiple times with DOES, it did not process her claims. Eventually, after speaking to multiple DOES employees, a claims examiner, and an adjudication specialist, DOES informed Plaintiff that her receipt of benefits had been delayed because Kirkland had brazenly lied to DOES and said Plaintiff had never worked at the Firm. DOES further informed Plaintiff that Kirkland would have to pay a penalty for lying. Defendants, including Kirkland, Akshay Deoras, and Akshay S. Deoras, P.C., knowingly lied about Plaintiff's employment in further retaliation and in an attempt to inappropriately, unlawfully withhold benefits from Plaintiff, thereby increasing the financial pressure on Plaintiff to drop her claims against Defendants. To date, Plaintiff has still not received a very large portion of the benefits to which she is entitled. That Defendants would lie to a government agency to retaliate against and gain leverage over Plaintiff speaks volumes of Defendants' integrity and ethicality and is especially jarring given Kirkland's stature as the largest law firm by revenue in human history.

234. In addition, Kirkland deliberately failed to timely send Plaintiff her W-2 form for her 2021 tax return in advance of the filing deadline in further retaliation and in an effort to prejudice Plaintiff. After serving Kirkland with the administrative complaint/charge, Plaintiff reached out to Kirkland on April 15, 2021 regarding its failure to comply with its legal obligation. Ms. Cartland[66] acknowledged receipt that same date; however, Kirkland did not send Plaintiff her W-2 until the evening of the date taxes were due, requiring Plaintiff to request an extension from the IRS.

**Results of Defendants' Unlawful Conduct**

235. As a direct and proximate result of the acts and omissions of the Defendants, Plaintiff has suffered, and continues to suffer, emotional distress and psychological damage, as well as physical manifestations of the emotional distress and psychological damage. This includes, but is not limited to: humiliation, mental anguish, stress, fear, and depression. The physical manifestations include but are not limited to: nausea, vomiting, and migraines.

---

[66] On or around April 27, 2022, Kirkland uploaded a job posting for a chief HR officer. Kirkland filled the role in June or July 2022. Ms. Cartland is now a senior advisor to Kirkland's HR department.

COMPLAINT

236.    Defendants' actions have also resulted in wage and benefit losses and are expected to lead to additional economic loss in the future.

237.    Defendants' actions have disrupted Plaintiff's personal life, including requiring her to downsize and move far outside the city where she used to reside for years.

238.    As a result of the Defendants' actions, Plaintiff will hire private counsel to prosecute this action and the civil action that will follow.  Pursuant to federal and California law, Plaintiff will be entitled to recover attorneys' fees associated with the prosecution of these claims.

239.    Defendants' acts and omissions were malicious or oppressive, and intended to vex, injure, annoy, humiliate, and embarrass Plaintiff, all with conscious disregard of the rights and safety of Plaintiff. Plaintiff is informed and believes, and based thereon alleges, that Defendants', including without limitation Defendant Kirkland's, managing agents ratified the wrongful conduct of its and other Defendants' supervisors, principals, alter egos, joint ventures, employees, and/or agents, because they were aware of the discriminatory conduct, and failed to take immediate remedial action after Plaintiff's April 29, 2021 reporting of Defendants' discriminatory, harassing, and oppressive conduct and after Plaintiff's July 23, 2021 reporting of Defendants' discriminatory, harassing, retaliatory, and oppressive conduct.

**Defendants Are Covered Employers Under Title VII, the Federal EPA, FEHA, and the San Francisco Ordinance**

240.    In simple terms, each of the individuals named as Defendants (Adam Alper, Michael De Vries, Akshay Deoras, Leslie Schmidt, and Mark Fahey, collectively, "**Individual Defendants**") were owners of Kirkland and managed its operations.  Such management included hiring and firing Kirkland's personnel, e.g., Plaintiff, and generating profit for Kirkland by running cases, including by supervising, directly and indirectly, assignments performed by its personnel, e.g., Plaintiff.

241.    Individual Defendants held partnership interest (i.e., ownership interest) in Kirkland.  Defendants Adam Alper, Michael De Vries, Akshay Deoras, and Leslie Schmidt ("**Owner/Officer Defendants**") each formed an eponymous professional corporation ("**PC**") to hold his/her respective partnership interest in Kirkland (namely, Defendants Adam R. Alper,

COMPLAINT

1    P.C., Michael W. DeVries, P.C., Akshay S. Deoras, P.C., and Leslie M. Schmidt, P.C.,

2    collectively, "**PC Defendants**").

3    242.    Each Owner/Officer Defendant deliberately formed such PCs (essentially shell

4    companies) to facilitate operation of the entire integrated enterprise, to the benefit of the

5    Owner/Officer Defendants and Kirkland.  Per Ms. Schmidt, such benefits included reducing tax

6    and other legal liability.  For example, by funneling distributions from partnership interest in

7    Kirkland—i.e., income—through these PCs, Owner/Officer Defendants did not have to pay

8    certain taxes on a significant portion of such income.  However, if Defendants had instead

9    received the income directly through Kirkland rather than indirectly through the PC Defendants,

10    Defendants would have had to pay such taxes on the entire amount of income.  The portion of

11    income on which Defendants paid fewer taxes included certain income attributable to Plaintiff's

12    work.

13    243.    Kirkland and its co-Defendants were so related, e.g., with respect to the

14    discriminatory, retaliatory, and harassing conduct, that they formed an integrated enterprise and

15    should be treated as a single entity for purposes of liability.

16    244.    First, the operations of the Individual Defendants and the PC Defendants were

17    highly interrelated with the operations of Kirkland.  For example, each of Owner/Officer

18    Defendants acted as the sole owner, officer, and director of his/her eponymous PC (his/her

19    respective PC Defendant), which held such Owner/Officer Defendant's ownership interest in

20    Kirkland—i.e., the right to receive distributions from Kirkland[67] and the right to manage

21    Kirkland.  In carrying out the discriminatory, retaliatory, and harassing conduct giving rise to

22    Plaintiff's claims, which occurred in connection with Plaintiff's work on cases and matters led

23    and managed by Individual Defendants and PC Defendants, on behalf of Kirkland, the Individual

24    Defendants acted or purported to act in their capacities as owners, officers, directors, and/or

25    agents of the PC Defendants.

26

27

28    [67] In 2021, such distributions were an average of $ 7.4 million ($ 7,388,000,000) per partner at
Kirkland.

COMPLAINT

245.   Second, Individual Defendants, PC Defendants, and Kirkland shared common management.  For example, PC Defendants directly owned Kirkland; each PC Defendant held its corresponding Owner/Officer Defendant's partnership interest in (and therefore management rights to) Kirkland.  The Owner/Officer Defendants managed Kirkland with such management rights and with the Owner/Officer Defendants' memberships on multiple Kirkland standing committees that managed Kirkland's operations.  In addition, each Owner/Officer Defendant was the sole owner, officer, and director of his/her respective PC Defendant.   In other words, Owner/Officer Defendants managed both Kirkland and the PC Defendants.

246.   [§ repeated below; trim?] Third, Individual Defendants, PC Defendants, and Kirkland shared centralized control of labor relations.  For example, Adam Alper, Michael De Vries, and Akshay Deoras (i.e., indirect owners of Kirkland) each were members of multiple Firm standing committees that managed its operations, e.g., the IP Litigation ARC, which purportedly was supposed to review associates in a fair manner.  Adam Alper, Michael De Vries, and Akshay Deoras had the right to manage the operations of Kirkland, and exercised such right, on behalf of Kirkland and its direct owners (PC Defendants) and indirect owners (Owner/Officer Defendants) by unlawfully terminating Plaintiff.  In addition,  Leslie Schmidt, an indirect owner of Kirkland, and Leslie M. Schmidt, P.C., a direct owner of Kirkland, even had such extensive rights to manage Kirkland that she was able to insert herself into Kirkland's "review" of Plaintiff despite the fact that neither Leslie M. Schmidt, P.C. (a direct owner of Kirkland) nor Leslie Schmidt (an indirect owner of Plaintiff) was a member of any Kirkland standing committee, per Kirkland's official committee membership policy delineating the membership and roles of its standing committees that had responsibilities for managing various aspects of Kirkland's operations.

247.   Fourth, Individual Defendants, PC Defendants, and Kirkland shared common ownership.  For example, each Individual Defendant indirectly owned Kirkland through its respective PC Defendant, which directly owned Kirkland. Based on information presently available to Plaintiff, as to Owner/Officer Defendants, the PC Defendants were the sole direct owners of Kirkland.

COMPLAINT

1

**Defendants Are Covered Under Title VII**

2      248.    Each Defendant was engaged in an industry affecting commerce (e.g., the legal

3    industry).  Each Defendant was Plaintiff's employer within the meaning of and is covered and

4    liable under Title VII.  During relevant times, each Defendant jointly employed Plaintiff with

5    his/her/its co-Defendants, e.g., Kirkland.   Kirkland and its co-Defendants formed a single

6    integrated enterprise at least with respect to their Unlawful Employment Practices in violation of

7    Title VII as to Plaintiff.   Plaintiff is informed and believes that, in committing the acts alleged

8    herein, each Defendant, alone or with any one or more of its co-Defendants, was a principal,

9    agent, servant, employee, employer, joint employer, associate, joint venture, unincorporated

10   organization, trustee, beneficiary, joint stock company, partner, corporation, legal representative,

11   owner, officer, and/or director, alter ego, and/or legal representative of any one or more of

12   his/her/their/its co-Defendant(s), and, in committing the acts alleged herein, was acting within

13   the course and scope of said agency, employment, joint employment, integrated enterprise,

14   association, joint venture, partnership, trust, legal representation and/or other legal relationship

15   such that the actions of the Defendant(s) are and can be attributed to the any one or more of

16   his/her/its/their co-Defendant(s).  Defendants acted as joint tortfeasors in committing Unlawful

17   Employment Practice(s) as to Plaintiff and are jointly liable for the same.

18                        Plaintiff Was Jointly Employed by All Defendants

19      249.    Defendant Kirkland had at least 15 employees (e.g., associates, paralegals, and

20   practice assistants) on its payroll for each working day in each of 20 or more calendar weeks in

21   2020, 2021, and 2022, the same years the Unlawful Employment Practices occurred.   For

22   example, Kirkland's San Francisco office alone had 15 or more employees for each working day

23   in each of 20 or more calendar weeks in each of 2020, 2021, and 2022.  Kirkland, which has no

24   headquarters location, had over 2,000 attorneys during each of those years and well over 15

25   associates during 20-week periods.  During times relevant to this litigation, each of Kirkland's

26   co-Defendants also met the Title VII 15-employee numerosity requirement. For example,

27   Kirkland and its co-Defendants jointly employed at least 15 or more individuals (e.g., associates,

28   paralegals, and practice assistants) on each working day in each of 20 or more calendar weeks in

92

COMPLAINT

each of 2020, 2021, and 2022. (E.g., in 2021, Kirkland and its co-Defendants were joint employers of Plaintiff (as discussed below), Mr. Walter, Mr. Blake, Mr. Calhoun, Mr. Huehns, Male Associate M, Mr. Blake, Female Associate Z, Female Associate B, Male Associate Q, Male Associate A, Female Associate U, Ms. Huang, Female Associate Z, Female Associate J, Practice Assistant B, Paralegal C, Paralegal B, and Paralegal F.)

250.   Each Defendant was Plaintiff's employer.   Each Defendant simultaneously controlled the terms and conditions of Plaintiff's employment and the means and manner of Plaintiff's work performance. Each of Kirkland's co-Defendants exercised significant control over the details over of the manner, degree, volume, nature, and timing of the work performed by Plaintiff while employed at Kirkland.

a.      Each Defendant had the right to control when, where, and how Plaintiff performed her job. For example, Defendants Kirkland, Mr. Alper, Mr. De Vries, and Mr. Deoras had the right to exercise where Plaintiff performed her job, and they began exercising that right by extending Plaintiff an offer as an associate based out of the Firm's San Francisco office, which would require Plaintiff to relocate to San Francisco after cessation of its COVID-19 closure and by requiring Plaintiff, as a term of her offer, to become licensed to practice law in California, including by taking the February 2021 the California Bar Examination, both of which Plaintiff did. Defendants Kirkland and Mr. Alper stipulated that Plaintiff had to be available to work West Coast hours before she would relocate to San Francisco upon its reopening after the lengthy COVID-19 closure (following Plaintiff's termination), and Defendants Mr. Fahey, Mr. Deoras, Mr. Alper, Mr. De Vries, and Ms. Schmidt regularly exercised that right throughout Plaintiff's tenure at Kirkland. As discussed below, Defendants Kirkland, Ms. Schmidt, Mr. De Vries, Mr. Fahey, and Mr. Deoras exercised the right to control where and when Plaintiff performed trial and non-trial work in April 2021 in Washington, D.C., and in Texas. Ms. Schmidt exercised control over Plaintiff attending a meeting with the damages expert on a Sunday in April 2021 at Kirkland's office in Houston. Mr. De Vries exercised control over Plaintiff meeting with him with no prior notice one evening in the kitchen at the trial site. Defendants Kirkland, Mr. Fahey, Mr. Deoras, Mr. De Vries, and Mr. Alper regularly exercised their right to control Plaintiff

93

1   working on holidays (e.g., Thanksgiving 2020), on weekends and/or evenings (e.g., when

2   Plaintiff was in Atlanta in March 2021 and Mr. Fahey emailed her on Saturday evening to

3   complete infringement charting that evening and Sunday morning for his and Mr. Deoras' review

4   and ultimately for use by Mr. Alper and Mr. De Vries); in Florida on scheduled vacation in July

5   2021; in Washington, DC on myriad other evenings and weekends).

6         b.      Each Defendant had a continuing relationship with Plaintiff.  For example,

7   Plaintiff was directly paid by Kirkland throughout Plaintiff's tenure at the Firm as compensation

8   for the work she performed for Kirkland's co-Defendants.  Plaintiff regularly received emails

9   from Kirkland concerning Firm matters (including, e.g., a regularly-distributed

10  "Announcements" email, which on April 30, 2021 described "Kirkland [s]cor[ing] [a] [c]omplete

11  [v]ictory for Apcon in [j]ury [t]rial," stating that "[t]he team was led by Adam Alper, Michael

12  De Vries, Akshay Deoras, and Leslie Schmidt" and that "[c]ritical contributions were made at

13  trial by IP litigation . . . associates Sam Blake, Zoya Kovalenko [i.e., Plaintiff], [and others].").

14  Plaintiff also regularly corresponded with each Defendant throughout her tenure at the Firm,

15  including with respect to the conduct giving rise to Plaintiff's Title VII claims.  Defendants Mr.

16  Deoras, Mr. Fahey, Ms. Schmidt, Mr. De Vries, and Mr. Alper directly supervised Plaintiff's

17  work at Kirkland, at least 99% of which was for cases and matters managed by both Mr. Deoras

18  and Ms. Schmidt and led by both Mr. Alper and Mr. De Vries.  Mr. Deoras, Mr. Fahey, and

19  Kirkland regularly assigned and directly supervised Plaintiff's work throughout the entirety of

20  her tenure at the Firm.  Plaintiff's work was ultimately performed (and in certain instances was

21  directly supervised by) Mr. Alper and Mr. De Vries.  Ms. Schmidt and Mr. De Vries assigned

22  and directly supervised Plaintiff's work on a trial matter for the Firm.  Mr. Alper directly

23  supervised Plaintiff's work on an assignment for one of his patent litigation cases and Plaintiff's

24  work on his *pro bono* matter (representing a nonprofit founded and run by the spouse of a

25  paralegal employed at Kirkland and working for Mr. Alper and Mr. De Vries) throughout

26  Plaintiff's tenure at the Firm.[68]  To Plaintiff's knowledge, from at least December 2020 through

27

28  ────────────────────

[68] This *pro bono* work included, e.g., conducting research and corresponding and conferencing with partners at Kirkland, including one who was responsible for professional responsibility matters at the Firm.  As a result of Plaintiff's work, including such correspondence and

94

COMPLAINT

July 2021, Plaintiff was the only associate who worked on this *pro bono* matter for Adam Alper's and Kirkland's client.

c.    Each Defendant had the right to assign additional projects to Plaintiff.  For example, each Defendant regularly exercised such right directly and indirectly, as detailed throughout this Complaint.  Each named Defendant both directly and/or indirectly assigned Plaintiff work giving rise to her claims.  Almost all if not all of the work, including cases, other matters, and assignments or work on/for each, giving rise to Plaintiff's claims was directly and/or indirectly assigned by any one or more of Defendants Adam Alper, Adam R. Alper, P.C., Michael De Vries, Michael W. DeVries, P.C., Akshay Deoras, Akshay S. Deoras, P.C., Leslie Schmidt, Leslie M. Schmidt, P.C., and/or Mr. Fahey and was also directly and/or indirectly assigned by Defendant Kirkland.  At least 99% of Plaintiff's work was for cases and matters directly and/or indirectly supervised by Defendants Mr. Deoras, Mr. Alper, Mr. De Vries, Ms. Schmidt, and Mr. Fahey.  Defendants Mr. Deoras, Mr. Fahey, and Kirkland regularly and consistently exercised the right to assign additional projects to Plaintiff, and Mr. Alper, Mr. De Vries, and Ms. Schmidt always had the right to assign additional work to Plaintiff and did so regularly and directly and indirectly (e.g., through their owners, principals, agents and/or subordinates, as applicable, e.g., Mr. Deoras, Ms. Schmidt, Mr. Fahey, Male Non-Share Partner Y, Mr. Kane, Ms. Barath, and Kirkland).

d.    Each Defendant set the hours of work and the duration of the assignments and matters on which Plaintiff worked and of Plaintiff's job, e.g., when each Defendant (on behalf of him/her/itself) assigned or approved assignment of Plaintiff to its various matters; when Defendants Kirkland and Mr. Alper told Plaintiff she would have to be available California hours before she relocated and Defendants Kirkland, Mr. Alper, Mr. De Vries, Ms. Schmidt, Mr. De Vries, and Mr. Fahey exercised such right, e.g., as described in this Complaint.

---

conferencing, Adam Alper resigned from his director role on the client's board of directors due to, e.g., ethical and professional responsibility concerns arising from his dual roles as counsel and director.

95

COMPLAINT

e.    Each Defendant was in the same business, e.g., of providing legal services. Plaintiff performed work that was part of each Defendant's regular business (e.g., providing legal services).  Plaintiff did not engage in her own distinct occupation or business.  For example, while employed at Kirkland, Plaintiff only worked for Defendant Kirkland and its co-Defendants, which are its partners and/or owners, direct and indirect, and/or principals, servants, masters, supervisors, and/or agents.

f.    Each Defendant did and could discharge Plaintiff, e.g., when they exercised such rights in September 2021.  For example, Defendant Akshay Deoras was on the Firm's IP Litigation ARC.  Defendants Akshay Deoras and Kirkland (including at least by and through its IP Litigation ARC, including by and through its agents Akshay Deoras and Jeanna Wacker, and by and through the Firm's partners, owners, and principals Akshay S. Deoras, P.C. and Jeanna M. Wacker, P.C.) coordinated to have Defendants Leslie Schmidt and/or Leslie M. Schmidt, P.C. attend the August 16, 2021 IP Litigation ARC meeting, despite the fact that she was not a member of that committee or of the Firmwide ARC.  In addition, Defendants Akshay Deoras and/or Akshay S. Deoras, P.C., Mr. Fahey, Michael De Vries and/or Michael W. DeVries, P.C., and Leslie Schmidt and/or Leslie M. Schmidt, P.C. exercised such right by submitting defamatory "evaluations" of Plaintiff (including unsolicited "evaluations" from Leslie Schmidt and/or Leslie M. Schmidt, P.C., which was a departure from Kirkland's standard practices with respect to the associate review process) to effect Plaintiff's termination without notice.

g.    Each Defendant intended to create an employer-employee relationship with Plaintiff.[69]  For example, Mr. Alper and Kirkland sent Plaintiff her offer letter.  Plaintiff is

___

[69] On or around April 11, 2021, Ms. Schmidt told Plaintiff that the partners of Kirkland were professional corporations to reduce tax and other liability.  On information and belief, each such PC made an S-corporation election with the IRS to reduce tax liability.  *See* Mike Baker, *Partners at Kirkland & Ellis Use This One Trick...*, LinkedIn (Jan. 5, 2020), https://www.linkedin.com/pulse/lawyers-qbi-deduction-corps-mike-baker.  The P.C. Partner's income—i.e., the distributions received from its partnership interest in Kirkland—was divided into three groups: (i) income attributable to the services of the Owner/Officer; (ii) income attributable to services of other employees (e.g., associates or paralegals working for the Owner/Officer); and (iii) income attributable to capital and equipment, e.g., P.C. Partner Defendant's "pro-rata share of forms, . . . document management infrastructure and research databases, etc." *Id.*  The second and third groups of income receive tax savings of 3.8%.  *Id.* Accordingly, because the P.C. Partner was formed to reduce tax liability, on information and belief, the P.C. Partner maximizes its income (i.e., distributions received from its partnership

COMPLAINT

96

informed that an interviewed candidate only received an offer if every interviewer approved hiring the associate.  Mr. De Vries and the co-chair of the Firm's Bay Area office also interviewed and approved Plaintiff.  Accordingly, each partner intended to create an employer-employee relationship with Plaintiff.  And Ms. Schmidt and Mr. Fahey intended to do the same by, as partners, asking Plaintiff to work for them and continuing to have Plaintiff perform work on their matters throughout her entire tenure at Kirkland.

h.      Plaintiff believed that she and each Defendant were creating an employer-employee relationship.  For example, when Plaintiff was hired, she believed she was creating an employer-employee relationship with Kirkland, Mr. Alper, Mr. De Vries, and Mr. Deoras when she was hired.  And when she began working with Mr. Fahey and Ms. Schmidt on matters for Mr. Deoras, Mr. Alper, and Mr. De Vries, Plaintiff believed she was furthering the same relationships and additionally creating employer-employee relationships with each such Defendant.

i.      Plaintiff was paid bimonthly rather than the agreed cost of performing a particular assignment.

j.      Each Defendant furnished tools, materials, and equipment.  For example, Kirkland furnished Plaintiff with a work laptop and iPhone.  PC Partner Defendants provided Plaintiff with access to research databases, Outlook with unlimited storage, Skype messaging, Avaya telephone service, Zoom conferencing, and FileSite/iManage document management infrastructure.  (*See* Baker, *supra* ¶ 250.g note 69.)  Mr. Fahey provided Plaintiff with a "sample" document from another litigation (that he should not have sent given his obligations to current and/or former clients) from which Plaintiff was purportedly "walled-off" due to conflicts.[70]  In addition,

interest in Kirkland) attributable to the services of employees other than the Owner/Officer and to capital and equipment.  *Id.*

[70] This is but one of many examples of Kirkland's half-baked attempts to pay lip service to ethical and professional obligations.  For example, each of Plaintiff's defamatory "evaluations" reference Plaintiff's purported work on specific client matters with no regard to ethical walls, e.g., due to the current and/or prior work of the members of the Firm's IP Litigation Associate Review Committee ("**ARC**") or Firmwide ARC.

COMPLAINT

Owner/Officer Defendants Adam Alper and Akshay Deoras provided Plaintiff with their practice assistant, Julie Bueno.

      k.    Plaintiff did not hire and pay assistants.

251.   In sum, each Defendant was Plaintiff's employer. As joint employers of Plaintiff,

252.   Kirkland acted as a joint tortfeasor with its co-Defendants in violating Title VII.

253.   In addition, as discussed throughout this Complaint, each Defendant knew or should have known about the conduct in violation of Title VII of each of its/his/her/their co-Defendant yet failed to undertake prompt corrective measures within such Defendant's control.

<u>Kirkland and Its Co-Defendants Formed an Integrated Enterprise</u>

254.   As discussed above, each Defendant was Plaintiff's joint employer.  As discussed below, Kirkland and its co-Defendants formed a single integrated enterprise (and are treated as a single employer for purposes of coverage and liability (joint)) at least with respect to their Unlawful Employment Practices as to Plaintiff, e.g., in violation of Title VII.  Kirkland and its co-Defendants acted as joint tortfeasors and are jointly liable.  Kirkland and its co-Defendants formed a single integrated enterprise because they had highly interrelated operations, shared common management, centralized control of labor relations, and had common ownership and/or financial control.

*Defendants Had Highly Interrelated Operations*

255.   Defendants' operations had a high degree of interrelation.  Defendants shared (i) management services, (ii) payroll, (iii) services of managers and personnel, and (iv) use of office space, equipment, and storage; and Defendants operated as a single unit. For example, the operations of Kirkland were highly interrelated with the operations of each of its co-Defendants.

256.   For example, Kirkland and its co-Defendants shared management services and services of managers and personnel.  All co-Defendants shared the same accounting firm and, on information and belief, payroll.  During Plaintiff's employment at Kirkland, a Kirkland partner told Plaintiff that Kirkland required each of its partners (including so-called "non-share partners") to use the same accounting firm used by Kirkland.  As discussed above, PC Partner income (i.e., distributions from its partnership, i.e., ownership, interest in Kirkland) attributable

COMPLAINT

to the following two categories is maximized to reduce tax liability: services of other employees (e.g., associates or paralegals working for the Owner/Officer, the PC Partner, and Kirkland); and capital and equipment (e.g., PC Partner Defendant's "pro-rata share of forms, . . . document management infrastructure and research databases, etc."). (*See, e.g.*, Baker, *supra* ¶ 250.g note 69.) This tax liability reduction is accomplished by Kirkland's accounting firm using, e.g., Kirkland payroll and billing information, to prepare tax filings for PC Partners (including PC Partner Defendants) on behalf of Owners/Officers and, on information and belief, Defendant Mr. Fahey.

257.    For example, the same individuals (including Owners/Officers) prepared policy manuals for Kirkland and its partners (e.g., PC Partners). For example, Owners/Officers—rather than their respective eponymous PC Partners of Kirkland—updated and sent Kirkland's official policy manual from the relevant time period concerning Firm management (specifically, describing responsibilities and members of the Firm's standing committees).

258.    For example, the Owner/Officer Defendants, PC Partner Defendants, and Kirkland shared management services. For example, personnel in Kirkland's Legal Recruiting and Development ("**LRD**") department, performed tasks on behalf of Owner/Officer Defendants, PC Partner Defendants, and Kirkland. For example, per Firm policy, associates did not receive copies of their evaluations. During Plaintiff's firing meeting, Mr. Deoras did not discuss the contents of Defendants' "evaluations" of her. After Plaintiff was fired, an LRD employee read to Plaintiff Defendants' defamatory "evaluations.".

259.    For example, Kirkland shared management services, such as completing business licenses, maintaining up-to-date attorney-licensure statuses and records regarding bar compliance for attorneys, with each of its co-Defendants (Mr. Fahey, Owner/Officer Defendants, and PC Partner Defendants). For example, Alex Nakaba, an employee in Kirkland's Legal Recruiting and Development ("**LRD**") department, emailed Plaintiff on behalf of Kirkland and its co-Defendants, after she became licensed in California, stating it was a "long time coming" or similar (despite Plaintiff's passing the California Bar Examination on her first attempt), and, on information and belief, the same LRD personnel tracked Owner/Officer Defendants' and Mr.

COMPLAINT

1    Fahey's licensure records for the benefit of Kirkland, Owner/Officer Defendants, PC Partner
2    Defendants, and Mr. Fahey.

3        260.   In addition, Mr. Nakaba and Akshay Deoras were on the IP Litigation ARC. Per
4    Defendants' outside counsel, as stated in her May 6, 2022 letter, "the ultimate power to fire
5    associates is entrusted to the Firm's Associate Review Committees."  Accordingly, at least
6    Defendants Kirkland, Akshay Deoras, Akshay S. Deoras, P.C., Leslie Schmidt, and Leslie M.
7    Schmidt, P.C., shared certain LRD personnel, to whom they published their and their co-
8    Defendants Kirkland, Mr. De Vries, and Mr. Fahey's defamatory "evaluations" of Plaintiff to
9    unlawfully terminate Plaintiff.

10        261.   For example, all Defendants shared personnel, including without limitation
11   Plaintiff, other associates, paralegals, case assistants, and practice assistants; certain examples
12   are described throughout this Complaint.  For example, Plaintiff performed work for each
13   Defendant, and, as described below, for all Defendants simultaneously (e.g., when working on
14   the first litigation-funded matter described below).  In addition, Mr. Alper and Mr. Deoras shared
15   a practice assistant, and Defendants Kirkland, Mr. Alper, and Mr. Deoras assigned her to be
16   Plaintiff's practice assistant as well.  (However, Mr. Fahey told Plaintiff she could not really take
17   advantage of Ms. Bueno for much if at all anything given that she worked for Adam Alper and
18   Mr. Deoras so had no time to help Plaintiff and was of de facto no assistance to Plaintiff.)  As an
19   additional example, in April 2021, Mr. De Vries told Plaintiff that the Firm had pre-approved
20   his, Mr. Alper's, Mr. Deoras', and Ms. Schmidt's hiring of ten additional associates and/or so-
21   called "non-share partners."

22        262.   For example, Kirkland shared services of managers with each of its co-Defendants
23   and vice versa; the co-Defendants also shared the services of managers between and among
24   themselves.  For example, Male Non-Share Partner Y managed multiple matters (including those
25   relevant to this case, as described below) for Defendants Kirkland, PC Partner Defendants, and
26   Owner/Officer Defendants, in addition to other matters for Defendant Kirkland and other PC
27   Partners and Owners/Officers.

28

100

COMPLAINT

263.   For example, Kirkland shared with each of its co-Defendants, and co-Defendants shared between and amongst themselves and with Kirkland, the use of office space, equipment, and storage.   Equipment included without limitation monitors; office chairs; desks; A/V equipment; laptops; iPhones; and various productivity and performance tools provided with laptops and iPhones, e.g., Microsoft Outlook, Word, and Excel; Zoom, Avaya, Cisco subscriptions and conferencing capabilities; Skype messenger; Wi-Fi; access to and use of research databases (e.g., Lexis, Westlaw, Docket Navigator) and document-management platforms (e.g., File Site, iManage).   Storage included without limitation local storage (e.g., on laptops, iPhones) and/or remote storage (e.g., for documents stored on FileSite/iManage). Kirkland, each PC Partner Defendant, and its respective Owner/Officer Defendant shared designated office space, equipment, and storage, e.g., within a Kirkland office location out of which each such PC Partner Defendant and Owner/Officer Defendant were based or were temporarily working (e.g., for trial).   (*See supra* ¶¶ 22–33.)   For example, during Plaintiff's employment at Kirkland and relevant to Plaintiff's claims, Kirkland shared with Ms. Schmidt office space, equipment (e.g., A/V equipment in a conference room and monitors, a desk, and chairs in an office), and storage in Kirkland's Houston and San Francisco offices.   In addition, Kirkland shared with Defendants Mr. De Vries, Mr. Alper, Ms. Schmidt, and Mr. Deoras temporary office space, equipment, and storage in April 2021 at a trial site in Texas, when Plaintiff attended trial with them.   In addition, during Kirkland's office closures during Plaintiff's entire employment at the Firm, Owner/Officer Defendants shared with their eponymous PC Partner Defendants and with Kirkland office space, equipment, and storage in the Owner/Officer Defendants' personal residences.   For example, Defendants Kirkland, Mr. Alper, and Mr. De Vries interviewed Plaintiff via Zoom from the respective personal residences of Adam Alper and Michael De Vries.   In addition, from March through mid-September 2021, Plaintiff had nearly weekly Zoom meetings with Defendants Mr. Deoras (from office space in the personal residence of Akshay Deoras shared with Akshay S. Deoras, P.C. and Kirkland) and Ms. Schmidt (from office space in the personal residence of Leslie Schmidt shared with Leslie M. Schmidt, P.C. and Kirkland) for a case led by Mr. Alper and Mr. De Vries.   Kirkland (and PC Partner Defendants

COMPLAINT

given their respective partnership interests in Kirkland) shared with Mr. Fahey designated office spaces, equipment, and storage within Kirkland offices located in Los Angeles and Salt Lake City and also within his home office(s) while working remotely (e.g., due to COVID office closures).  (*See supra* ¶ 34.)

264.   For example, Kirkland and its co-Defendants operated as a single unit.   For example, Kirkland has intentionally obfuscated its partnership structure with respect to whether any or all of its Owners/Officers are also partners of Kirkland and/or formed with Kirkland an association, joint venture, agency, and/or instrumentality.[71]

265.   For example, Kirkland and Owner/Officer Defendants operated and continue to operate Kirkland, Owner/Officer Defendants, and PC Partner Defendants as a single unit by conflating and treating interchangeably the Owner/Officer Defendants with PC Partner Defendants in public-facing marketing materials.  *See, e.g.*, *Akshay S. Deoras, P.C.*, Kirkland & Ellis LLP, https://www.kirkland.com/lawyers/d/deoras-akshay (last visited Sept. 27, 2022) (describing "Akshay S. Deoras, P.C." as a "Partner" of Kirkland while stating "Akshay Deoras is an intellectual property litigation partner in Kirkland's Bay Area office"); *Leslie M. Schmidt, P.C.*, Kirkland & Ellis LLP, https://www.kirkland.com/lawyers/s/schmidt-leslie-m (last visited Sept. 28, 2022) (describing "Leslie M. Schmidt, P.C." as a "Partner" of Kirkland while stating "Leslie Schmidt is a partner in Kirkland's New York office"); *see also Adam R. Alper, P.C.*, Kirkland & Ellis LLP, https://www.kirkland.com/lawyers/a/alper-adam-r-pc (last visited Sept.

---

[71] *Compare, e.g.*, *Notice re Kirkland*, *supra* ¶ **Error! Reference source not found.**, ECF No. 116 at 4 ("[T]he Debtors submit the declaration of Joshua A. Sussberg, the president of Joshua A. Sussberg, P.C., a partner of Kirkland & Ellis LLP, and a partner of Kirkland & Ellis International LLP."), *with id.* at 37 ("I am the president of Joshua A. Sussberg, P.C., a partner of the law firm of Kirkland & Ellis LLP, located at 601 Lexington Avenue, New York, New York 10022, and a partner of Kirkland & Ellis International, LLP (together with Kirkland & Ellis LLP, collectively, 'Kirkland').").  In addition, the signature block reads:

Joshua A. Sussberg
as President of Joshua A. Sussberg, P.C., as
Partner of Kirkland & Ellis LLP; and as Partner
of Kirkland & Ellis International LLP

*Id.* at 60.

COMPLAINT

16, 2022) (describing "Adam R. Alper, P.C." as a "Partner" of Kirkland while stating "Adam Alper is a leading member of the intellectual property litigation group in Kirkland's Bay Area office"); *Michael W. DeVries, P.C.*, Kirkland & Ellis LLP, https://www.kirkland.com/lawyers/d/de-vries-michael-w-pc (last visited Sept. 16, 2022) (describing "Michael W. DeVries, P.C." as a "Partner" of Kirkland while stating "Mike is a member of the Kirkland practices [receiving praise for intellectual property litigation]" and "Mike is a key figure in the Firm's patent practice"; describing "Michael De Vries . . . . as phenomenal at managing a case"; discussing a client's "successful representation" by "Mike and his team," a recommendation of "Mike for his work on the Firm's Tier 1 Patent Litigation team" (internal quotations omitted)).

266. For example, Owner/Officer Defendants entered into contracts and filed papers on Kirkland's behalf. For example, each of Plaintiff's original and revised offer letters to work as an associate at Kirkland were signed by Owner/Officer Adam Alper with letterhead naming Adam Alper and Kirkland but not PC Partner Adam R. Alper, P.C. The client-engagement letters for the matters on which Plaintiff worked were signed on Kirkland's behalf by Owner/Officer Defendants rather than by PC Partner Defendants.[72] On Plaintiff's cases, Owner/Officer Defendants and Mr. Fahey filed papers on Kirkland's behalf without referencing PC Partner Defendants. *E.g.*, Respondent SimpliSafe, Inc.'s Response to SkyBell Technologies, Inc., SB IP Holdings, LLC, and Eyetalk365, LLC's Verified Complaint under Section 337 of the Tariff Act of 1930, as Amended, and Notice of Investigation (Public Version), *Certain IP Camera Systems Including Video Doorbells and Components Thereof*, Inv. No. 337-TA-1242, USITC Doc. ID 735971 at 98 (Mar. 4, 2021) (Inactive). For example, when Plaintiff was employed at Kirkland, its official policy delineating membership and responsibilities of its standing committees, which managed the Firm, named as its members Owners/Officers.

---

[72] As a publicly-available example, although filed outside the relevant time period, see *Notice re Kirkland*, *supra* ¶ **Error! Reference source not found.**, at 23–31 (showing engagement letter with letterhead naming Kirkland and P.C. Partner but not Owner/Officer, *id.* at 23, signed by Owner/Officer on behalf of Kirkland without reference to P.C. Partner, *id.* at 31); *cf. id.* at 3 (signature block for Kirkland attorneys lists P.C. Partners).

COMPLAINT

267.    For example, Owner/Officer Defendants Akshay Deoras, Michael De Vries, and Adam Alper (rather than PC Partner Defendants Adam R. Alper, P.C., Michael W. DeVries, P.C., and Akshay S. Deoras, P.C.) collectively held 10 spots on several relevant committees, including the IP Litigation Associate Review Committee ("**ARC**"), the Associate and Non-Share Partner Compensation Committee (which receives the ARC's evaluations), the Finance Committee (which approves write-offs, *see infra* ¶ 215), the Non-Share Partner Review Committee, the Bay Area and Los Angeles Operations Committees (to which an Associate Review Committee co-chair was supposed to report problems concerning the associate review process).

268.    Adam Alper was the sole owner, officer, and director of Adam R. Alper, P.C. Michael De Vries was the sole owner, officer, and director of Michael W. DeVries, P.C.  In addition to the complete authority that they levied over the operations of their PCs, in April 2021, Michael De Vries told Plaintiff that he and Adam Alper had full authority (i.e., requiring no additional Firm approval because it had given its carte blanche preapproval) to hire 10 additional associates and/or non-share partners (with the view that any such non-share partners would want to become a full equity partner at Kirkland, per Mr. De Vries) for the IP litigation group.

*Defendants Closely Shared Common Management*

269.    Defendants shared common management to a great degree.  The same individuals managed or supervised different Defendants, and the Defendants had common officers and boards of directors (or analogs thereof).  For example, Mr. Alper, Mr. De Vries, Mr. Deoras, Ms. Schmidt, and Mr. Fahey closely shared common management with Kirkland.  And at least Kirkland and PC Partner Defendants shared common management:  the Owner/Officer Defendants, each of whom managed and supervised the operations of Kirkland and its respective PC Partner Defendant.

270.    For example, Owner/Officer Defendants managed and supervised PC Partner Defendants and Kirkland.  (*See infra* ¶¶ __–__; *see supra* ¶¶ __–__.)

271.    For example, the PC Partner Defendants had common officers and boards of directors or analogs thereof.  The sole owner, officer, and director of each PC Partner Defendant also controlled the Firm, at minimum with respect to Plaintiff's employment, e.g., by virtue of

104

COMPLAINT

his membership on various Firm standing committees directed to promotion and retention of associates and non-share partners, receiving complaints of issues with the associate review process, receiving associate-review evaluations, (*see supra* ¶¶ __–__), and approving client write-offs (e.g., those described in the defamatory "evaluations" of Plaintiff, (*see infra* ¶¶ __–__)).   In addition, although Ms. Schmidt was not on any ARC (let alone any other Firm committee), she and/or it managed and/or controlled the Firm at least with respect to Plaintiff's employment and wrongful  termination by inserting herself into Plaintiff's "review" process in contravention of established Firm policies and practices by submitting an unsolicited "evaluation" of Plaintiff and attending, with Mr. Deoras, the August, 16, 2021 IP Litigation ARC meeting to ensure Plaintiff's unlawful discriminatory and retaliatory termination.  (*See supra* ¶¶ __–__.)

### *Kirkland and Its Co-Defendants Centralized Control of Labor Management*

272.    Defendants centralized control of labor management.   A centralized source of authority for development of personnel policy existed between and among Defendants.   All Defendants—Individual Defendants, PC Defendants, and Kirkland—were involved in creating, approving, and maintaining personnel records.  Defendants shared a personnel (human resources) department, and inter-company transfers and promotions of personnel were common.  The same persons made employment decisions for co-Defendants.

273.    As discussed throughout this Complaint, the same persons make the employment decisions for all entities.  E.g., Akshay Deoras, Leslie Schmidt, Mr. Fahey, Adam Alper, and Michael De Vries made employment decisions—e.g., concerning Plaintiff's unlawful termination—that concerned each of Mr. Deoras, Ms. Schmidt, Mr. Fahey, Mr. Alper, Mr. De Vries, and Kirkland.   In addition, Akshay Deoras and/or Akshay S. Deoras, P.C. screened Plaintiff for employment by Kirkland, Akshay S. Deoras, P.C., Michael De Vries, Michael W. DeVries, P.C., Adam Alper, and Adam R. Alper, P.C.   Thereafter, Michael De Vries, Michael W. DeVries, P.C., Adam Alper, and Adam R. Alper, P.C. screened Plaintiff for employment by Kirkland and made the decision to employ Plaintiff on behalf of Kirkland.  Plaintiff did not interview with, e.g., HR personnel or similar.

COMPLAINT

274.    For example, Adam Alper, Michael De Vries, and Akshay Deoras (i.e., indirect owners of Kirkland) each were members of multiple Firm standing committees that managed its operations, e.g., the IP Litigation ARC, which purportedly was supposed to review associates in a fair manner.  Adam Alper, Michael De Vries, and Akshay Deoras had the right to manage the operations of Kirkland, and exercised such right, on behalf of Kirkland and its direct owners (PC Defendants) and indirect owners (Owner/Officer Defendants) by unlawfully terminating Plaintiff.  In addition, Leslie Schmidt, an indirect owner of Kirkland, and Leslie M. Schmidt, P.C., a direct owner of Kirkland, even had such extensive rights to manage Kirkland that she was able to insert herself into Kirkland's "review" of Plaintiff despite the fact that neither Leslie M. Schmidt, P.C. (a direct owner of Kirkland) nor Leslie Schmidt (an indirect owner of Plaintiff) was a member of any Kirkland standing committee, per Kirkland's official committee membership policy delineating the membership and roles of its standing committees that had responsibilities for managing various aspects of Kirkland's operations.

275.    Defendants shared a personnel/human resources ("**HR**") department.  For example, the listed reporting contacts in Kirkland's anti-harassment policy were, for the San Francisco office, supposed to be Owners/Officers.  (As noted above, the Owners/Officers had departed Kirkland before the policy was updated.)  In other words, Kirkland had or purported to have its owners play a *de facto* role in its human resources department.  In addition, the same HR personnel served the various owners of Kirkland spread across different offices. Moreover, the Firm's "Benefits" committee was comprised of a substantial number of Kirkland's partners and also included Kirkland's former chief HR officer, Wendy Cartland.

276.    For example, the owners of Kirkland, including Owner/Officer Defendants and PC Defendants, neutered the HR department's authority to manage and control labor relations and instead vested the authority in Kirkland partners, including Owner/Officer Defendants, PC Defendants, and Mr. Fahey.  These partners made personnel decisions on behalf of Kirkland, Owners/Officers, including Owner/Officer Defendants, and PC Partners, including PC Defendants, and Mr. Fahey.  For example, Owners/Officers comprised a significant portion of the membership of each of the four committees involved in Plaintiff's "review," including

COMPLAINT

defaming and unlawfully terminating Plaintiff and approving the defamation and unlawful termination.  On information and belief, Kirkland's "HR" department was not involved.  For example, Kirkland's chief HR officer at the time, Wendy Cartland, was not a member of any of these three committees, nor was she a member of the fourth committee that received and disseminated Plaintiff's review, the Non-Share Partner and Associate Compensation Committee, of which Adam Alper was a member.  The only committee of which Ms. Cartland was a member was the Benefits Committee.   However, Kirkland's chief administrative officer, Chiara Wroncinski, was on each of the four committees that received the defamatory evaluations, considered the same, disseminated, and approved and decided Plaintiff's "review" summary and sanctioned the unlawful termination and defamation of Plaintiff.  Per a recent job posting for an executive assistant for Ms. Wroncinski, she purports to engage in certain HR tasks and processes "data related to firm management[] [and] human resources."  In addition, as noted above, the IP Litigation ARC included at least four individuals from Kirkland's administrative departments (e.g., Legal Recruiting and Development, which deals with recruiting and training associates) but, to Plaintiff's knowledge, did not include HR personnel.

277.   All Defendants maintained personnel records.  As a general matter, because Kirkland, an LLP, was owned by its partners, e.g., PC Partner Defendants, any maintenance of personnel records, e.g., of Plaintiff's, was performed on behalf of PC Partner Defendants.  The defamatory "review" summary was in Plaintiff's personnel file; this summary was maintained by (e.g., created, approved, disseminated, and received by) various Firm standing committees, which were comprised of Firm personnel and partners of Kirkland, including Owners/Officers, e.g., Akshay Deoras and Adam Alper.  Moreover, Plaintiff's W-2 for 2021 taxes was improperly not timely sent to Plaintiff, on information and belief, at the direction and instruction of Owner/Officer Defendants and PC Partner Defendants.

278.   In addition, the same HR personnel worked for the various owners of Kirkland spread across different offices, e.g., each of Owner/Officer Defendants, PC Partner Defendants, and Kirkland shared the "services" of Kirkland's chief HR officer at the time, Wendy Cartland, when Kirkland purported to conduct an investigation after Plaintiff was fired.

COMPLAINT

279.    Inter-company transfers and promotions of personnel were common.  For example, Owner/Officer Defendants had been employed by Kirkland prior to becoming employees (officers) of PC Defendants.

*Defendants Had a High Degree of Common Control and/or Financial Management*

280.    Defendants had a high degree of common control and/or financial management.

281.    The same person(s) owned and/or controlled the different Defendants.  For example, Adam Alper owned and controlled Adam R. Alper, P.C. and Kirkland; Michael De Vries owned and controlled Michael W. DeVries, P.C. and Kirkland; Akshay Deoras owned and controlled Akshay S. Deoras, P.C. and Kirkland; Leslie Schmidt owned and controlled Leslie M. Schmidt, P.C. and Kirkland.  Each Owner/Officer Defendant was the sole owner and sole officer and director of his/her respective PC Defendant.  And each Owner/Officer Defendant owned and controlled Kirkland because each PC Defendant held partnership interest in Kirkland (i.e., ownership interest in and management rights to Kirkland).  Moreover, Adam Alper, Michael De Vries, and Akshay Deoras controlled Kirkland because each of them were members of multiple Firm standing committees that controlled the operations of the Firm.  In addition, as discussed above, each Owner/Officer Defendant and Mr. Fahey controlled Kirkland given their ability to have the Firm depart from standard practices and procedures with respect to Plaintiff's "review" process in order to unlawfully terminate and defame Plaintiff.

282.    In addition to controlling and managing finances for Adam R. Alper, P.C., Mr. Alper also controlled and managed Kirkland finances.  For example, Mr. Alper was a member of the Firm's Finance Committee, which: (i) reviewed the Firm's financial decisions concerning capital expenditures, leases, budgets, health care, client write-offs, and other expenses; (ii) collaborated with other committees, including the Audit Committee, the Billing and Collections Committee, and the Benefits Committee, to recommend policies for the Firm's cash management, capital markets, benefits, client billing practices, and financial reporting; and (iii) worked closely with the Firm's financial staff in reviewing systems, operations, and accounting practices.  In addition, Adam Alper was a member of the Non-Share Partner and Associate Compensation Committee.

COMPLAINT

283.   All Defendants shared a high degree of common financial management.   As discussed above, the Firm required each of the Owner/Officer Defendants, PC Partner Defendants, and Mr. Fahey to use the same accounting firm that the Firm used for preparing and submitting tax returns.   On information and belief, the accounting firm used by each Defendant is Topel Forman LLC, 500 N. Michigan Ave., Ste. 1700, Chicago IL 60611).

284.   All Defendants shared extensive control over Plaintiff.   For example, Plaintiff's New Hire Form, which she received in November 2020, included, *inter alia*, Plaintiff's location (San Francisco), establishment (San Francisco), business unit (intellectual property), department (IP litigation), job code (associate), but listed nothing corresponding to "manager."   This is because Plaintiff's managers were the various owners (direct and indirect) of Kirkland, e.g., Owner/Officer Defendants, PC Partner Defendants, and Mr. Fahey.

285.   [* **J**: delete?  Not sure I want it because the analogy seems weak] The same persons served as officers and/or directors (or analogs thereof) of different Defendants.   For example, each Owner/Officer Defendant served as the sole officer and director of his/her respective PC Defendant and had management rights in Kirkland given his/her partnership interest in Kirkland held by the PC Defendant and given Adam Alper's, Michael De Vries', and Akshay Deoras' collective 10 spots on the Firm's standing committees.

286.   [* **J**: cut??  Will this undercut the "Kirkland-should-have-let-me-work-with-other-partners theme, e.g., by implying these partners are so important that they have final say in Kirkland matters?]. Certain Defendants owned the majority or all of the shares or partnership interest of certain co-Defendants.   For example, Kirkland's co-Defendants had a high degree of common ownership and/or financial control over Kirkland, and vice versa.   Adam Alper had complete ownership and control over Adam R. Alper, P.C. Michael De Vries had complete ownership and control over Michael W. DeVries, P.C.  Leslie Schmidt had complete ownership and control over Leslie M. Schmidt, P.C.  Akshay Deoras had complete ownership and control over Akshay S. Deoras, P.C.  Adam Alper indirectly and Adam R. Alper, P.C. directly held partnership (i.e., ownership) interest in Kirkland, which, on information and belief, was significant relative to the mean amount of ownership interest in Kirkland held by each of its other

109

COMPLAINT

partners.  Michael De Vries indirectly and Michael W. DeVries, P.C. directly held partnership (i.e., ownership) interest in Kirkland, which, on information and belief, was significant relative to the mean amount of ownership interest in Kirkland held by each of its other partners.  Akshay Deoras indirectly and Akshay S. Deoras, P.C. directly held partnership (i.e., ownership) interest in Kirkland, which, on information and belief, was significant relative to the median amount of ownership interest in Kirkland held by each of its other partners.  Leslie Schmidt indirectly and Leslie M. Schmidt, P.C. directly held partnership (i.e., ownership) interest in Kirkland, which, on information and belief, was significant relative to the median amount of ownership interest in Kirkland held by each of its other partners.  In addition, on information and belief, the collective partnership interest in Kirkland held directly by Adam R. Alper, P.C., Michael De Vries, P.C., Akshay S. Deoras, P.C., and Leslie M. Schmidt, P.C. (and indirectly by Adam Alper, Michael De Vries, Akshay Deoras, and Leslie Schmidt) was relatively significant.

<u>In the Alternative, Kirkland's Co-Defendants Were Joint Employers with Kirkland</u>

287.   In the alternative, any co-Defendant of Kirkland that is not sufficiently related to Kirkland to qualify as an integrated enterprise with Kirkland is an employer under Title VII at least because it exercised sufficient control over Plaintiff to qualify as a joint employer of Plaintiff with Kirkland.  Any such Defendant is covered by Title VII.  (*See supra* ¶¶ 240–286.)

288.   Each Defendant knew or should have known of its co-Defendants discriminatory, retaliatory, and/or harassing conduct but failed to undertake prompt corrective measures within his/her/its/their control.  (*See, e.g.*, *supra* ¶¶ 14, 19, 34 n.6, 88, 101, 131–144, 174–202, 223 n.65, 230–234, 234 n.66, 250.b, 275, 281.)

<u>Agency</u>

289.   As discussed above, each Defendant is liable for the actions of its agents, e.g., unlawful actions, as described throughout this Complaint, of its/his/her/their co-Defendants having the authority to act on behalf of, or at the direction of, any one or more of Defendant(s) that is or together are a covered entity, as applicable.

**Kirkland and Mr. Alper Are Covered Under the Federal EPA**

COMPLAINT

290.   Kirkland, Adam Alper, and Adam R. Alper, P.C. were each an employer for purposes of the Federal EPA.  Each such Defendant engaged in commerce or in the production of goods for commerce with an annual gross volume of sales or business done of at least $500,000.  (*See, e.g.*, *supra* ¶¶ 8, 244, 244 n.67; 248–289; *see infra* ¶ 296.)

291.   For example, Kirkland's profits in each of 2020, 2021, and 2022 were billions of dollars.  In addition, the average profit per share partner exceeded $7 million ($7,388,000) in 2021.  *Kirkland & Ellis LLP*, ALM | Law.com (2022), https://www.law.com/law-firm-profile/?id=173&name=Kirkland-Ellis (last visited Aug. 21, 2022).

292.   Each Defendant was Plaintiff's employer for purposes of the Federal EPA because, as discussed above, Complaint, each of these Defendants acted directly or indirectly in the interest of any one or more of Plaintiff's employers (i.e., any named Defendant) in relation to Plaintiff, who was its/his/her/their employee.  (*See, e.g.*, *supra* ¶¶ 248–289.)

293.   As discussed above, Kirkland's multiple offices are part of the same establishment.  The offices share a common website and personnel.  Kirkland is owned and managed by its owners based out of Kirkland's many offices.  Its standing committees (i.e., management committees) are comprised of Owners/Officers and PC Partners who are based out of different Kirkland offices.  Plaintiff was interviewed by Mr. Alper, Mr. De Vries, and Mr. Deoras, to work for them; Mr. De Vries was based out of an office in Los Angeles while Mr. Alper and Mr. Deoras are based out of the San Francisco office.  Plaintiff's work was also supervised by Male Non-Share Partner Y, who was based out of the Firm's Los Angeles office.  In addition, Plaintiff worked for and was supervised regularly by Mr. Fahey, who was based out of one of the Los Angeles offices and then the Salt Lake City office while supervising Plaintiff.  In addition, Plaintiff was supervised by Ms. Schmidt and by Mr. Kane, each of whom are based out of the Firm's New York office, out of which Mr. Walter was based (who is now based out of the Chicago office).  Plaintiff's work on POPR Nos. 1 and 2 was performed for Male Share Partner C, who praised her work at least on POPR No. 1 in a team-wide email and who was based out of the Firm's Chicago office.  Accordingly, Kirkland's offices collectively form one establishment.

COMPLAINT

294.   As discussed above, Plaintiff performed work equal to her comparator male associates.  The jobs required equal skill, effort, and responsibility; and were performed under similar working conditions.  Kirkland and Mr. Alper paid Plaintiff less than male comparator associates, e.g., Mr. Walter, Mr. Blake, and Mr. Calhoun, because of sex.  The difference in pay was not made pursuant to a seniority system, a measure system, a system measuring earnings by quantity or quality of production, or a differential based on any other factor other than sex.

295.   As discussed above, Defendants' compensation discrimination of Plaintiff affected, e.g., salary, bonuses (including at least the 2020 year-end bonus, 2021 special bonus and the 2021 year-end bonus Plaintiff did not receive due to Defendants' unlawful termination of Plaintiff), vacation, and benefits (e.g., Plaintiff's travel accommodations to return home from the trial site in April 2021, as compared to Mr. Blake's).

296.   The prohibition against compensation discrimination under the EPA applies only to jobs within an establishment. An establishment is a distinct physical place of business rather than an entire business or enterprise consisting of several places of business. In some circumstances, physically separate places of business may be treated as one establishment. For example, if a central administrative unit hires employees, sets their compensation, and assigns them to separate work locations, the separate work sites can be considered part of one establishment.

**Defendants Are Covered Under FEHA**

297.   As described above, each Defendant was Plaintiff's employer.  During relevant times, each of Kirkland's co-Defendants Adam Alper; Adam R. Alper, P.C.; Michael De Vries; Michael W. DeVries, P.C.; Akshay Deoras; Akshay S. Deoras, P.C.; Leslie Schmidt; Leslie M. Schmidt, P.C.; and Mr. Fahey formed a single integrated enterprise with Kirkland or was a joint employer with Kirkland, and/or was a principal, agent, servant, employee, partner, joint venture, and/or alter ego, of one or more of his/her/their/its co-Defendant(s), and, in committing the acts alleged herein, was acting within the course and scope of said integrated enterprise, joint employment, agency, employment, partnership, and/or joint venture with his/her/their/its co-Defendant(s).  (*See supra* ¶¶ 240–286.)

COMPLAINT

298.   Each of Defendants Kirkland and each PC Defendant is an employer within the meaning of FEHA, e.g., because each such Defendant is a person within the meaning of FEHA regularly employing five or more persons, or is a person acting as an agent of an employer (e.g., another Defendant), directly or indirectly.   Cal. Gov't Code § 12926(d).   Each PC Partner Defendant is a corporation organized for private profit.  *Id.*

299.   Each Defendant is an employer within the meaning of FEHA, e.g., because Defendant is a person regularly employing one or more persons or regularly receiving the services of one or more persons providing services pursuant to a contract, or is a person acting as an agent of an employer, directly or indirectly.   Cal. Gov't Code § 12940(j)(4)(A); *id.* § 12925(d).   For any Defendant that is an employer within the meaning of FEHA because it regularly receives the services of one or more persons providing services pursuant to a contract, the Defendant has the right to control the performance of the contract for services and discretion as to the manner of performance, is customarily engaged in an independently established business (e.g., practicing law), and has control over the time and place the work is performed, supplies the tools and instruments used in the work, and performs work that requires a particular skill not ordinarily used in the course of the employer's work (e.g., assignments given to a subordinate attorney or to staff, e.g., a practice assistant, paralegal, case assistant, or document services worker).   Cal. Gov't Code §12940(j)(5).

## Defendants Are Covered Under the San Francisco Ordinance

300.   As described above, each Defendant was Plaintiff's employer.   During relevant times, each of Kirkland's co-Defendants Adam Alper; Adam R. Alper, P.C.; Michael De Vries; Michael W. DeVries, P.C.; Akshay Deoras; Akshay S. Deoras, P.C.; Leslie Schmidt; Leslie M. Schmidt, P.C.; and Mr. Fahey formed a single integrated enterprise with Kirkland, was a joint employer with Kirkland, and/or was a principal, agent, servant, employee, partner, joint venture, alter ego, and/or aider and abettor of one or more of his/her/their/its co-Defendant(s), and, in committing the acts alleged herein, was acting within the course and scope of said integrated enterprise, joint employment, agency, employment, partnership, joint venture, and/or were aiding and abetting with his/her/their/its co-Defendant(s). (*See supra* ¶¶ 240–286.)  For at least the same

COMPLAINT

1    reasons, each Defendant is liable under the San Francisco Ordinance.  *See* S.F., Cal., Police Code

2    art. 33 §§ 3303, 3305.2, 3310.

3                                    **CAUSES OF ACTION**

4                                **FIRST CAUSE OF ACTION**
     **SEX DISCRIMINATION IN VIOLATION OF TITLE VII**
5                              **(Against All Defendants)**

6          301.    Plaintiff hereby restates and re-alleges the allegations set forth in the paragraphs

7    above as if fully set forth herein.

8          302.    In violation of Title VII, Defendants discharged Plaintiff and discriminated against

9    Plaintiff with respect to compensation, terms, conditions, and privileges of employment because

10   of sex.  *See* 42 U.S.C. § 2000e *et seq.*, as amended; 42 U.S.C. § 2000e-2; *see also* 42 U.S.C. §

11   2000e-5(g); 42 U.S.C. § 1981a(a)(1), (b).  Plaintiff was discharged Plaintiff is and was member

12   of a protected class because of her sex.

13         303.    Plaintiff was discharged by Defendants.  During all relevant times herein, Plaintiff

14   was employed at Kirkland and was jointly employed by all Defendants.  Each Defendant met the

15   15-employee numerosity requirement of Title VII and was therefore a covered employer subject

16   to liability under Title VII.  *See* 42 U.S.C. § 2000e.  Each of Kirkland's co-Defendants is jointly

17   liable with Kirkland for violating Title VII as to Plaintiff.

18         304.    Defendants discharged Plaintiff because of (i.e., by reason of or on account of)

19   Plaintiff's sex.  If Plaintiff was male, Defendants would not have discharged Plaintiff.

20         305.    Plaintiff was qualified for her position.  For example, when interviewing Plaintiff,

21   each of Mr. Alper, Mr. De Vries, and a recruiting committee co-chair told Plaintiff her credentials

22   were "very impressive," and Plaintiff produced excellent work at Kirkland, e.g., by substantially

23   improving Defendants Mr. Alper's, Mr. De Vries', and Mr. Deoras' success rate with POPRs.

24         306.    Similarly-situated  males  were  treated  more  favorably.    For  example,  male

25   comparators are now IP litigation partners at Kirkland.

26         307.    In addition, Plaintiff was discriminated against by Defendants with respect to

27   compensation,  terms,  conditions,  and  privileges  of  employment.  Defendants  discriminated

28   against Plaintiff because of her sex.  If Plaintiff was male, Plaintiff would not have been

                                           114

COMPLAINT

discriminated against with respect to compensation, terms, conditions, or privileges of employment.  Plaintiff was qualified for her position.  Similarly-situated males were treated more favorably.  For example, Defendants discriminated against Plaintiff with respect to pay (e.g., with respect to wages, salary, bonuses (including special and year-end bonuses in 2021), salary increases at the end of 2020 and 2021), benefits (e.g., traveling home from trial site in rural area on commercial airfare in economy seating after having to arrange her own ride to the airport an hour away by asking Kirkland personnel left at trial site if any of them had availability to kindly transport Plaintiff to airport given that Ms. Schmidt had ensured Plaintiff would not have a rental car at the trial site because she suggested they ride together four hours to trial site from Houston versus traveling home in luxe, private accommodations on charter flight with male share-partner Defendants (Mr. Alper, Mr. De Vries, and Mr. Deoras) at their invitation, despite having performed substantially the same work for Mr. De Vries under worse working conditions), working conditions (e.g., with respect to Defendants consistently ensuring Plaintiff's workload was disproportionately heavier; assigning deluge of work coinciding with Plaintiff's brief, scheduled travel plans largely weekends/federal holidays and offloading male associate work onto Plaintiff so he could enjoy week-long vacation undisturbed; assigning work with short turnarounds, competing deadlines, and, e.g., no notice on Saturday evenings;  Defendants providing Plaintiff with relatively limited partner access and less associate support on substantially the same work; failing to remove Plaintiff's non-trial work leading up to and at trial as promised while removing male comparator's non-trial work while providing him with substantial support, partner access, and Plaintiff's assistance for trial, where they both worked on substantially the same assignments for Mr. De Vries, were added to the trial team at the same time, and generally worked on Mr. Alper's and Mr. De Vries' cases/matters), and the privilege of being employed at Kirkland.

308.   As a result of Defendants' discrimination, Plaintiff has suffered and continues to suffer harm, including but not limited to financial loss, including without limitation lost wages, loss of benefits, loss of earnings, future lost earnings, lost future earning potential, impairment

COMPLAINT

to Plaintiff's name, character, reputation, and professional standing; humiliation; psychological, physical, emotional, and other harm.

309.   Defendants engaged in the acts alleged herein intentionally, willfully, maliciously, fraudulently, and oppressively; with the wrongful intention of injuring Plaintiff; with conscious disregard of, and with reckless indifference to, the protected rights and safety of Plaintiff, including federally-protected rights; and with an improper and evil motive amounting to malice. Plaintiff is thus entitled to recover compensatory damages for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and to recover punitive damages, in an amount according to proof.

310.   Plaintiff is entitled to all other remedies available for Title VII violations, including without limitation injunctive and other equitable relief, including without limitation back pay, including for lost benefits, interest on backpay, front pay in lieu of reinstatement due to the continuing hostility between Plaintiff and Defendants and psychological injuries suffered by Plaintiff as a result of Defendants' discrimination, retaliation, and harassment, and any other equitable relief as this Court deems appropriate.

311.   By reason of the conduct of Defendants as alleged herein, Plaintiff necessarily will retain attorneys to litigate the action.  Plaintiff therefore will be entitled to reasonable attorneys' fees and litigation expenses, including expert-witness fees and costs, incurred in vindicating her rights by bringing an action.

## SECOND CAUSE OF ACTION
### SEX DISCRIMINATION IN VIOLATION OF FEHA
#### (Against All Defendants)

312.   Plaintiff hereby restates and re-alleges the allegations set forth in the paragraphs above as if fully set forth herein.

313.   Defendants wrongfully discriminated against Plaintiff in violation of FEHA because of Plaintiff's sex.  Cal. Gov't Code § 12940(a).

314.   Defendant Kirkland was Plaintiff's employer under FEHA.  Each of Kirkland's co-Defendants, Adam Alper, Adam R. Alper, P.C., Michael De Vries, Michael W. DeVries, P.C., Leslie Schmidt, Leslie M. Schmidt, P.C., Akshay Deoras, Akshay S. Deoras, P.C., and Mr.

116

COMPLAINT

Fahey, was Plaintiff's (joint) employer.  Kirkland, together with each of its co-Defendants, formed a single integrated enterprise, at least with respect to carrying out the acts alleged herein, e.g., in discriminating against Plaintiff because of sex and/or gender in violation of FEHA.  Each Defendant was a covered entity under FEHA.  At all relevant times, Plaintiff was an employee of each Defendant.

315.    Defendant Kirkland and its co-Defendants discharged Plaintiff.  Plaintiff's sex was a substantial motivating reason for Defendants' decision to discharge Plaintiff.  Plaintiff was harmed.  The conduct of each Defendant alone and of Defendants collectively was a substantial factor in causing Plaintiff's harm.

316.    Defendant Kirkland and its co-Defendants discriminated against Plaintiff in compensation or in terms, conditions, or privileges of employment.  Plaintiff's sex was a substantial motivating reason for Defendants' decision to discriminate against Plaintiff in compensation or in terms, conditions, or privileges of employment.  Plaintiff was harmed.  The conduct of each Defendant alone and of Defendants collectively was a substantial factor in causing Plaintiff's harm.

317.    Defendants failed to take any action in response to Plaintiff's complaints because of her sex.  Defendants' practice of failing to take any action in response to Plaintiff's complaints was a substantial factor in causing Plaintiff's harm.  Defendants' violations of FEHA caused Plaintiff to suffer harm as set forth above.

318.    Defendants engaged in the acts alleged herein intentionally, willfully, maliciously, fraudulently, and oppressively; with the wrongful intention of injuring Plaintiff; with conscious disregard of, and with reckless indifference to, the protected rights and safety of Plaintiff; and with an improper and evil motive amounting to malice.  Plaintiff is thus entitled to recover punitive damages, in an amount according to proof.  The Owners/Officers of each respective PC Defendant engaged in the acts alleged herein intentionally, willfully, maliciously, fraudulently, and oppressively, and/or authorized and ratified the acts alleged herein, and acted with advance knowledge and conscious disregard of the protected rights and safety of Plaintiff.  Cal. Civ. Code § 3294.  Kirkland and each of its co-Defendants Owners/Officers, PC Defendants, and Mr. Fahey

COMPLAINT

1    authorized or ratified the acts alleged herein.  *Id.*  Each of Defendants Owners/Officers and Mr.

2    Fahey personally engaged in the acts alleged herein intentionally, willfully, maliciously,

3    fraudulently, and oppressively.  *Id.*  Plaintiff is thus entitled to recover punitive damages, in an

4    amount according to proof.

**THIRD CAUSE OF ACTION**
5    **SEX DISCRIMINATION IN VIOLATION OF SAN FRANCISCO ORDINANCE**
6    **(Against All Defendants)**

7        319.    Plaintiff hereby restates and re-alleges the allegations set forth in the paragraphs

8    above as if fully set forth herein.

9        320.    Plaintiff is and was member of a protected class because of her sex (female).

10       321.    Each Defendant is an employer within the meaning of the San Francisco

11   Ordinance. *See* S.F., CAL., POLICE CODE art. 33 § 3303(a); *id.* § 3310.  Plaintiff was an employee

12   of each Defendant.  In violation of the San Francisco Ordinance, Defendants discharged Plaintiff

13   and discriminated against Plaintiff with respect to compensation, terms, conditions, and

14   privileges of employment wholly or partially because of sex.  *See* S.F., CAL., POLICE CODE art.

15   33 § 3301 *et seq.*, as amended; *id.* § 3303(a); *id.* § 3306; *id.* § 3307; *id.* § 3310.

16       322.    As a result of Defendants' discrimination, Plaintiff has suffered and continues to

17   suffer harm, including but not limited to financial loss, including without limitation lost wages,

18   loss of benefits, loss of earnings, future lost earnings, lost future earning potential, impairment

19   to Plaintiff's name, character, reputation, and professional standing; humiliation; psychological,

20   physical, emotional, and other harm.

21       323.    Defendants engaged in the acts alleged herein intentionally, willfully, maliciously,

22   fraudulently, and oppressively; with the wrongful intention of injuring Plaintiff; with conscious

23   disregard of, and with reckless indifference to, the protected rights and safety of Plaintiff,

24   including federally-protected rights; and with an improper and evil motive amounting to malice.

25   Plaintiff is thus entitled to recover compensatory damages for future pecuniary losses, emotional

26   pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary

27   losses, and punitive damages, in an amount according to proof.  Plaintiff is thus entitled to recover

28   punitive damages from Defendants in an amount according to proof.

COMPLAINT

324.   By reason of the conduct of Defendants as alleged herein, Plaintiff necessarily will retain attorneys to litigate the action.  Plaintiff therefore will be entitled to reasonable attorneys' fees and litigation expenses, including expert-witness fees and costs, incurred in vindicating her rights by bringing an action.

## FOURTH CAUSE OF ACTION
### SEX DISCRIMINATION IN VIOLATION OF FEDERAL EQUAL PAY ACT
### (Against Defendants Kirkland; Adam Alper; Adam R. Alper, P.C.)

325.   Plaintiff hereby restates and re-alleges the allegations set forth in the paragraphs above as if fully set forth herein.

326.   Defendants Kirkland, Adam Alper, and Adam R. Alper, P.C. violated the Federal EPA by discriminating against Plaintiff with respect to pay because of her sex.  *See* 29 U.S.C. 206(d).  Defendants Kirkland, Adam Alper, and Adam R. Alper, P.C. classified Plaintiff as a class-of-2017 associate rather than a male class-of-2016 associate even though she had graduated from law school in 2016 and performed work that required equal skill, effort, and responsibility, and which was performed under similar working conditions.  Defendants Kirkland, Adam Alper, and Adam R. Alper, P.C. paid Plaintiff a lower salary, lower bonuses (e.g., the 2021 special bonuses) and provided fewer benefits / benefits worth significantly less than such male class-of-2016 IP litigation associates who worked for the same partners (e.g., Mr. Alper and Mr. De Vries) and performed such work requiring equal skill, effort, and responsibility, under similar working conditions.  Such jobs were performed within the same establishment.  Defendants' conduct was intentional, willful, and malicious.

## FIFTH CAUSE OF ACTION
### RETALIATION IN VIOLATION OF TITLE VII, 42 U.S.C. § 2000e *et seq.*
### (Against All Defendants)

327.   Plaintiff re-alleges and incorporates every allegation in this Complaint.

328.   Plaintiff opposed Defendants' employment practices made unlawful under Title VII, that is, sex discrimination and sex harassment.  Defendants subjected Plaintiff to an adverse employment action, that is discharge.  Plaintiff was subjected to the adverse employment action because she opposed unlawful employment practices.

119

COMPLAINT

329.   As a result of Defendants' harassment, discrimination, and retaliation, Plaintiff has suffered and continues to suffer harm, including but not limited to financial loss, including without limitation lost wages, loss of benefits, loss of earnings, future lost earnings, lost future earning potential, impairment to Plaintiff's name, character, reputation, and professional standing; humiliation; psychological, physical, emotional, and other harm.

330.   Each of Kirkland's co-Defendants was empowered to take tangible employment actions against Plaintiff; accordingly Kirkland, the Owner/Officer Defendants, and PC Defendants are liable for the harassment of each of its/his/her/their co-Defendants.

331.   Defendants engaged in the acts alleged herein intentionally, willfully, maliciously, fraudulently, and oppressively; with the wrongful intention of injuring Plaintiff; with conscious disregard of, and with reckless indifference to, the protected rights and safety of Plaintiff, including federally-protected rights; and with an improper and evil motive amounting to malice. Plaintiff is thus entitled to recover compensatory damages for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and punitive damages, in an amount according to proof.  Plaintiff is thus entitled to recover punitive damages from Defendants in an amount according to proof.

332.   Plaintiff is entitled to all other remedies available for Title VII violations, including without limitation injunctive and other equitable relief, including without limitation back pay, including for lost benefits, interest on backpay, front pay in lieu of reinstatement due to the continuing hostility between Plaintiff and Defendants and psychological injuries suffered by Plaintiff as a result of Defendants' discrimination, retaliation, and harassment, and any other equitable relief as this Court deems appropriate.

333.   By reason of the conduct of Defendants as alleged herein, Plaintiff necessarily will retain attorneys to litigate the action.  Plaintiff therefore will be entitled to reasonable attorneys' fees and litigation expenses, including expert-witness fees and costs, incurred in vindicating her rights by bringing an action.

**SIXTH CAUSE OF ACTION**
**RETALIATION IN VIOLATION OF FEHA**
**(Against All Defendants)**

COMPLAINT

334.   Plaintiff hereby restates and re-alleges the allegations set forth in the paragraphs above as if fully set forth herein.

335.   Plaintiff complained of harassment and discrimination that violated FEHA.  Cal. Gov't Code § 12940(h).  Defendants, including without limitation Kirkland, Mr. Deoras, and Akshay Deoras, took no action to ensure that Plaintiff was not retaliated against for having complained.  As a result of Defendants' action or inaction, Plaintiff was subject to additional discrimination, retaliation, and additional sex-based harassment.  Defendants' violations of the FEHA caused Plaintiff to suffer harm as set forth above.

336.   Defendants engaged in the acts alleged herein intentionally, willfully, maliciously, fraudulently, and oppressively; with the wrongful intention of injuring Plaintiff; with conscious disregard of, and with reckless indifference to, the protected rights and safety of Plaintiff; and with an improper and evil motive amounting to malice.  Plaintiff is thus entitled to recover punitive damages, in an amount according to proof.  The Owners/Officers of each respective PC Defendant engaged in the acts alleged herein intentionally, willfully, maliciously, fraudulently, and oppressively, and/or authorized and ratified the acts alleged herein, and acted with advance knowledge and conscious disregard of the protected rights and safety of Plaintiff.  Cal. Civ. Code § 3294.  Kirkland and each of its co-Defendants Owners/Officers, PC Defendants, and Mr. Fahey authorized or ratified the acts alleged herein.  *Id.*  Each of Defendants Owners/Officers and Mr. Fahey personally engaged in the acts alleged herein intentionally, willfully, maliciously, fraudulently, and oppressively.  *Id.*  Plaintiff is thus entitled to recover punitive damages, in an amount according to proof.

337.   By reason of the conduct of Defendants as alleged herein, Plaintiff necessarily will retain attorneys to litigate the action.  Plaintiff therefore will be entitled to reasonable attorneys' fees and litigation expenses, including expert-witness fees and costs, incurred in vindicating her rights by bringing an action.

**SEVENTH CAUSE OF ACTION**
**RETALIATION IN VIOLATION OF SAN FRANCISCO ORDINANCE**
**(Against All Defendants)**

121

COMPLAINT

338.   Plaintiff hereby restates and re-alleges the allegations set forth in the paragraphs above as if fully set forth herein.

339.   In violation of the San Francisco Ordinance, Defendants discharged Plaintiff a wholly or partially because of sex.  *See* S.F., CAL., POLICE CODE art. 33 § 3301 *et seq.*, as amended; *id.* § 3305.2; *id.* § 3306; *id.* § 3307; *id.* § 3310.

340.   As a result of Defendants' retaliation, Plaintiff has suffered and continues to suffer harm, including but not limited to financial loss, including without limitation lost wages, loss of benefits, loss of earnings, future lost earnings, lost future earning potential, impairment to Plaintiff's name, character, reputation, and professional standing; humiliation; psychological, physical, emotional, and other harm.

341.   Defendants engaged in the acts alleged herein intentionally, willfully, maliciously, fraudulently, and oppressively; with the wrongful intention of injuring Plaintiff; with conscious disregard of, and with reckless indifference to, the protected rights and safety of Plaintiff, including federally-protected rights; and with an improper and evil motive amounting to malice. Plaintiff is thus entitled to recover compensatory damages for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and punitive damages, in an amount according to proof.  Plaintiff is thus entitled to recover punitive damages from Defendants in an amount according to proof.

342.   By reason of the conduct of Defendants as alleged herein, Plaintiff necessarily will retain attorneys to litigate the action.  Plaintiff therefore will be entitled to reasonable attorneys' fees and litigation expenses, including expert-witness fees and costs, incurred in vindicating her rights by bringing an action.

## EIGHTH CAUSE OF ACTION
### SEX HARASSMENT CONSTITUTING HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII, 42 U.S.C. § 2000e *et seq.*, as amended
### (Against All Defendants)

343.   Plaintiff hereby restates and re-alleges the allegations set forth in the paragraphs above as if fully set forth herein.

344.   Plaintiff was subjected to working in a severe, persistent and/or pervasive sex-based hostile work environment, which interfered with her work performance, denied her

COMPLAINT

employment privileges, and adversely affected the terms and conditions of her job on the basis of her sex.  The harassing conduct to which Plaintiff was subjected to was so severe, widespread, and/or persistent that a reasonable woman in Plaintiff's circumstances would have considered the work environment to be hostile and/or abusive.  Plaintiff considered the work environment to be hostile and/or abusive.  Each Defendant failed to take prompt, remedial and effective action to stop the harassers, which included themselves and their co-Defendants.

345.    All Defendants failed to exercise reasonable care to prevent and promptly correct the sex-based harassing behavior constituting a hostile work environment.  Plaintiff reasonably tried to take advantage of any preventive or corrective opportunities provided by the employer and reasonably tried to avoid harm.

346.    As a result of Defendants' harassment, discrimination, and retaliation, Plaintiff has suffered and continues to suffer harm, including but not limited to financial loss, including without limitation lost wages, loss of benefits, loss of earnings, future lost earnings, lost future earning potential, impairment to Plaintiff's name, character, reputation, and professional standing; humiliation; psychological, physical, emotional, and other harm.

347.    Each of Kirkland's co-Defendants was empowered to take tangible employment actions against Plaintiff; accordingly Kirkland, the Owner/Officer Defendants, and PC Defendants are liable for the harassment of each of its/his/her/their co-Defendants.

348.    Defendants engaged in the acts alleged herein intentionally, willfully, maliciously, fraudulently, and oppressively; with the wrongful intention of injuring Plaintiff; with conscious disregard of, and with reckless indifference to, the protected rights and safety of Plaintiff, including federally-protected rights; and with an improper and evil motive amounting to malice. Plaintiff is thus entitled to recover compensatory damages for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and punitive damages, in an amount according to proof.  Plaintiff is thus entitled to recover punitive damages from Defendants in an amount according to proof.

349.    Plaintiff is entitled to all other remedies available for Title VII violations, including without limitation injunctive and other equitable relief, including without limitation back pay,

COMPLAINT

including for lost benefits, interest on backpay, front pay in lieu of reinstatement due to the continuing hostility between Plaintiff and Defendants and psychological injuries suffered by Plaintiff as a result of Defendants' discrimination, retaliation, and harassment, and any other equitable relief as this Court deems appropriate.

350.    By reason of the conduct of Defendants as alleged herein, Plaintiff necessarily will retain attorneys to litigate the action.  Plaintiff therefore will be entitled to reasonable attorneys' fees and litigation expenses, including expert-witness fees and costs, incurred in vindicating her rights by bringing an action.

<div align="center">

**NINTH CAUSE OF ACTION**
**FAILURE TO PREVENT DISCRIMINATION AND RETALIATION**
**Cal. Gov't Code § 12940 *et seq.***
**(Against All Defendants)**

</div>

351.    Plaintiff hereby restates and re-alleges the allegations set forth in the paragraphs above as if fully set forth herein.

352.    All Defendants failed to take reasonable steps to prevent harassment, discrimination, and retaliation based on Plaintiff's sex and/or gender.  Plaintiff was an employee of each Defendant.  Plaintiff was subjected to harassment, discrimination, and retaliation in the course of employment.  Defendants failed to take all reasonable steps to prevent the harassment, discrimination, and retaliation.  Plaintiff was harmed.  Each Defendant's failure to take all reasonable steps to prevent harassment, discrimination, and retaliation was a substantial factor in causing Plaintiff's harm.  Cal. Gov't Code § 12940(j)(1).

353.    Defendants failed to take any action in response to Plaintiff's complaints because of her sex.  Each of Defendant's practice of failing to take any action in response to Plaintiff's complaints was a substantial factor in causing Plaintiff's harm.  Each Defendant's and collectively all Defendants' violations of FEHA caused Plaintiff to suffer harm as set forth above.

354.    Defendants engaged in the acts alleged herein intentionally, willfully, maliciously, fraudulently, and oppressively; with the wrongful intention of injuring Plaintiff; with conscious disregard of, and with reckless indifference to, the protected rights and safety of Plaintiff; and with an improper and evil motive amounting to malice.  Plaintiff is thus entitled to recover punitive damages, in an amount according to proof.  The Owners/Officers of each respective PC

COMPLAINT

Defendant engaged in the acts alleged herein intentionally, willfully, maliciously, fraudulently, and oppressively, and/or authorized and ratified the acts alleged herein, and acted with advance knowledge and conscious disregard of the protected rights and safety of Plaintiff.  Cal. Civ. Code § 3294.  Kirkland and each of its co-Defendants Owners/Officers, PC Defendants, and Mr. Fahey authorized or ratified the acts alleged herein.  *Id.*  Each of Defendants Owners/Officers and Mr. Fahey personally engaged in the acts alleged herein intentionally, willfully, maliciously, fraudulently, and oppressively.  *Id.*  Plaintiff is thus entitled to recover punitive damages, in an amount according to proof.

355.   As a result of Defendants' violations of the FEHA, Plaintiff has been harmed as set forth above.

356.   By reason of the conduct of Defendants as alleged herein, Plaintiff necessarily will have to retain attorneys to litigate the present action.  Plaintiff is therefore entitled to reasonable attorneys' fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

### TENTH CAUSE OF ACTION
**DEFAMATION**
**(Against All Defendants)**

357.   Plaintiff hereby restates and re-alleges the allegations set forth in the paragraphs above as if fully set forth herein.

358.   Defendants published statements in their "evaluations" regarding Plaintiff, each of which was false, defamatory, and unprivileged, and had a natural tendency to injure because each concerned Plaintiff's profession and practice and/or caused special damage.  Cal. Civ. Code §§ 44, 45, 45a, 46.  Defendants acted with actual malice in making the statements, because each Defendant knew the statement was false or subjectively entertained serious doubt as to its truth. The statements were written.  Their republication was reasonably foreseeable given the Firm's official policies and procedures. The "evaluations" and statements therein were not used as a management tool for evaluation or documentation of Plaintiff's performance.  Rather, each statement in each of Defendant's "evaluations" served as the alleged factual basis for Plaintiff's termination.

COMPLAINT

359.   Plaintiff is not a public figure.

360.   In publishing the statements, they were communicated to third persons, e.g., those on the ARCs, the Firm Committee, the Associate & NSP Committee, and others outside the Firm, who understood both the defamatory meaning of the statement and its application to Plaintiff, to whom reference was made.  All the statements in the "evaluations" were statements of fact or statements of opinion that implied a provably false factual assertion.  Plaintiff discovered, with reasonable diligence, the defamatory content of the "evaluations" on October 11, 202 as described above.

361.   Defendants' defamation of Plaintiff resulted in Plaintiff's loss of reputation, shame, mortification, hurt feelings, emotional distress, and damages to Plaintiff's profession or occupation, unemployment, inability to find gainful, comparable employment, derailed career trajectory, and other harms, resulting in damages exceeding $75,000, in an amount to be proven at trial.  For Plaintiff's defamation claim, Plaintiff is entitled to general damages for loss of reputation, shame, mortification, and hurt feelings; to special damages to compensate Plaintiff for damages to Plaintiff's profession or occupation, and to punitive damages.

**ELEVENTH CAUSE OF ACTION**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(As to All Defendants)**

362.   Plaintiff re-alleges and incorporates every allegation in this Complaint.

363.   When Defendants failed to take corrective action, Defendants knew that Plaintiff would continue to suffer extreme emotional distress and harm as a result of their failure to act.

364.   When Defendants retaliated against Plaintiff in lieu of taking corrective action in response to her April and July 2021 complaints and her post-firing October 2021 complaint, Defendants knew that Plaintiff would continue to suffer extreme emotional distress and harm as a result of their actions.

365.   As a direct and consequential result of Defendants' actions, Plaintiff has suffered severe emotional distress to her person.  Such harm includes without limitation pain, bodily ailments, anxiety, humiliation, anger, shame, embarrassment, frustration, and fear.  Plaintiff alleges Defendants are responsible for the harm she suffered.

COMPLAINT

366.   By reason of the conduct of Defendants as alleged herein, Plaintiff necessarily will have to retain attorneys to litigate the present action.  Plaintiff is therefore entitled to reasonable attorneys' fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

367.   Defendants engaged in the acts alleged herein maliciously, fraudulently, and oppressively; with the wrongful intention of injuring Plaintiff with the conscious disregard of the rights and safety of Plaintiff; and with an improper and evil motive amounting to malice.  Plaintiff is thus entitled to recover punitive damages from Defendants in an amount according to proof.

<div align="center">

**TWELTH CAUSE OF ACTION**
**NEGLIGENT INFLICATION OF EMOTIONAL DISTRESS**
**(As to All Defendants)**

</div>

368.   Plaintiff re-alleges and incorporates every allegation in this Complaint.

369.   As an employee of Defendants, Plaintiff was owed a duty of due care by Defendants, and each of them, to ensure that Plaintiff was not exposed to foreseeable harms. Defendants, and each of them, knew, or should have known, that Plaintiff was being subjected to sex discrimination, sex-based harassment, and retaliation, and that, by failing to exercise due care to prevent sex-based discriminatory, retaliatory, and harassing course of conduct could and would cause Plaintiff to suffer serious emotional distress.  Defendants, and each of them, failed to exercise their duty of due care to prevent their employees, managers, supervisors and/or officers from sex-based discriminating against, retaliating against, and subjecting Plaintiff to a sex-based hostile work environment.  As a direct and consequential result of Defendants' actions, Plaintiff suffered serious mental and emotional distress, includes, but is not limited to, pain, anxiety, humiliation, anger, shame, embarrassment, frustration, and fear.   Plaintiff alleges Defendants are responsible for the harm she has and continued so suffer. By reason of the conduct of Defendants as alleged herein, Plaintiff will have to retain attorneys to litigate the present action. Plaintiff is therefore entitled to reasonable attorneys' fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action. Defendants engaged in the acts alleged herein maliciously, fraudulently, and oppressively; with the wrongful intention of injuring Plaintiff; with the conscious disregard of the rights and safety of Plaintiff; and with

COMPLAINT

1    an improper and evil motive amounting to malice.  Plaintiff is thus entitled to recover punitive

2    damages from Defendants in an amount according to proof.

3                                    **PRAYER FOR RELIEF**

4        370.    WHEREFORE, Plaintiff respectfully requests this Court:

5        i.    Find that Defendants intentionally discriminated against Plaintiff because of sex

6              in violation of Title VII, the federal EPA, FEHA, and/or the San Francisco

7              ordinance;, 42 U.S.C. § 2000e-2(a);

8        ii.   Find that Defendants intentionally harassed Plaintiff, constituting a hostile work

9              environment, because of sex in violation of Title VII, 42 U.S.C. § 2000e-2(a);

10       iii.  Find that Defendants intentionally retaliated against Plaintiff because she engaged

11             in protected activity by opposing Defendants' employment practice(s) made

12             unlawful by Title VII, 42 U.S.C. § 2000e-3(a);

13       iv.   Find that Defendants engaged in discriminating against, harassing, and/or

14             retaliating against Plaintiff with malice or with reckless indifference to Plaintiff's

15             federally-protected rights, 42 U.S.C. § 1981a(b);

16       v.    Award Plaintiff punitive damages and compensatory damages under Title VII to

17             compensate Plaintiff for future pecuniary losses, emotional pain, suffering,

18             inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary

19             losses, and punitive damages, for Defendants' discrimination, harassment, and/or

20             retaliation, in an amount not exceeding the statutory limits, 42 U.S.C. § 1981a(b);

21       vi.   Award Plaintiff equitable relief under Title VII, including without limitation

22             injunctive relief and affirmative action, including without limitation awarding

23             Plaintiff front pay in lieu of reinstatement, with backpay and interest; enjoining

24             Defendants from further retaliating against Plaintiff; requiring Defendants to:

25             require Defendants to train its partners (including those conducting purported

26             investigations), associates, and staff on sex discrimination, retaliation, and sex

27             harassment and to develop effective policies and procedures to ensure that when

28             harassment or any other unlawful employment practice is reported, the company

                                            128

COMPLAINT

takes effective remedial measures develop policies and procedures to ensure that when sex discrimination, sex harassment, and/or retaliation are reported, effective, nonretaliatory remedial measures are taken; update Kirkland's policy concerning reporting harassment and other unlawful employment practices to include at least one reporting contact for each office who is presently with the Firm at least as of the date the policy is updated; to include at least one person from the HR department of each office (i.e., not solely the Firmwide chief HR officer) as a reporting contact; to develop safeguards and policies to ensure the associate review process is fair; to develop safeguards to ensure investigations of reported unlawful employment practices are not sham investigations, to require training on a Firmwide basis (including training partners) regarding sex discrimination, sex harassment, and retaliation, including in particular to ensure anyone conducting an investigation in response to reported unlawful employment practice understands what is and what is not sex discrimination and to ensure such person does not gaslight the reporting party; and other equitable relief as this Court deems appropriate, 42 U.S.C. § 1981a(b); 42 U.S.C. 2000e-5(g); 42 U.S.C. 2000e-5(e)(3)(B);

vii.   Award Plaintiff costs under Title VII, including without limitation reasonable attorneys' fees, including without limitation expert fees, 42 U.S.C. § 2000e-5;

viii.   Award Plaintiff any other relief authorized under Title VII;

ix.   General damages according to proof, in an amount no less than the jurisdictional limit of this court;

x.   Special damages in amounts according to proof, together with prejudgment interest; Exemplary and punitive damages in amounts according to proof;

xi.   Attorneys' fees and costs; section 12965(b) of the California Government Code, and any other applicable statute;

xii.   Interest as provided by law;

xiii.   Grant any and all other relief to which this Court deems just and proper.

COMPLAINT

371.   WHEREFORE, Plaintiff prays that the Court grant such relief as may be appropriate, including injunctive orders, damages, costs, and attorneys' fees.

## **DEMAND FOR JURY TRIAL**

372.   Plaintiff respectfully requests a trial by jury of any and all issues on which a trial by jury is available under applicable law.

Respectfully submitted this 11th day of October, 2022.


By:   */s/ Zoya V. Kovalenko*
Zoya V. Kovalenko (Cal. SBN 338624)
**Plaintiff**
13221 Oakland Hills Blvd., Apt. 206
Germantown, MD 20874
678 559 4682
zoyavk@outlook.com

COMPLAINT