1  Zoya Kovalenko (Cal. SBN 338624)
2  13221 Oakland Hills Blvd., Apt. 206
   Germantown, MD 20874
3  678 559 4682
   zoyavk@outlook.com

4  Plaintiff Zoya Kovalenko

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                   **NORTHERN DISTRICT OF CALIFORNIA**

10                         **OAKLAND DIVISION**

11  ZOYA KOVALENKO,                    ) Case No.: 22-cv-05990-HSG (TSH)
                                       )
12            *Plaintiff,*             ) **AMENDED COMPLAINT**
                                       )
13         v.                          ) **DEMAND FOR JURY TRIAL**
                                       )
14  KIRKLAND & ELLIS LLP, MICHAEL DE   ) 1.  Sex Discrimination, Including Wrongful
    VRIES, MICHAEL W. DEVRIES, P.C.,   )     Termination, Arising Under Title VII;
15  ADAM ALPER, ADAM R. ALPER, P.C.,   ) 2.  Sex Discrimination Arising Under FEHA;
    AKSHAY DEORAS, AKSHAY S.           ) 3.  Sex Discrimination Arising Under the
16  DEORAS, P.C., AND MARK FAHEY,      )     Federal Equal Pay Act;
                                       ) 4.  Retaliation, Including Wrongful
17            *Defendants.*            )     Termination, Arising Under Title VII;
                                       ) 5.  Retaliation Arising Under FEHA;
18                                     ) 6.  Sex-Based Harassment Constituting
                                       )     Hostile Work Environment Arising Under
19                                     )     Title VII;
                                       ) 7.  Failure to Prevent Arising Under FEHA;
20                                     ) 8.  Intentional Infliction of Emotional
                                       )     Distress; and
21                                     ) 9.  Defamation.
                                       )
22                                     )
                                       )
23                                     )
                                       )
24                                     )
                                       )
25  _____ )

26

27

28

                                      1
FIRST AMENDED COMPLAINT                              No. 4:22-cv-05990- HSG (TSH)

Plaintiff Zoya Kovalenko ("**Plaintiff**" or "**Zoya**") brings this Amended Complaint against Defendants Kirkland & Ellis LLP ("**Kirkland**" or the "**Firm**"); Adam Alper and Adam R. Alper, P.C. (collectively, "**Mr. Alper**"); Michael De Vries (a/k/a Michael DeVries) and Michael W. DeVries, P.C. (a/k/a Michael W. De Vries, P.C.) (collectively, "**Mr. De Vries**"); Akshay Deoras and Akshay S. Deoras, P.C. (collectively, "**Mr. Deoras**"); and Mark Fahey ("**Mr. Fahey**") (collectively, "**Defendants**").  In support thereof, Plaintiff alleges the following:

## NATURE OF ACTION

1.      This is an action for sex discrimination, sex harassment constituting a hostile work environment, and retaliation arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended ("**Title VII**"), specifically including *id.* § 2000e-2(a) (prohibiting, e.g., discrimination with respect to discharge, compensation, terms, conditions, or privileges of employment because of sex); *id.* § 2000e-3(a) (prohibiting retaliation); *id.* § 2000e-5 (granting jurisdiction to United States district courts for actions brought under Title VII and authorizing certain relief); and under the Civil Rights Act of 1991, 42 U.S.C. § 1981a (authorizing damages for intentional violations of Title VII).

2.      Plaintiff brings a related claim for sex discrimination arising under the Fair Labor Standards Act of 1938, 29 U.S.C. § 206 *et seq.*, as amended (the "**federal EPA**"), specifically including *id.* §§ 206(d)(1); *id.* § 215 (prohibiting violations of § 206); *id.* § 216 (granting jurisdiction to United States district courts for actions maintained against any employer, providing for fines for willful violations; liquidated damages; and legal and equitable relief including attorneys' fees, damages).

3.      Plaintiff brings related claims for sex discrimination and retaliation arising under California law, namely, the Fair Employment and Housing Act, Cal. Gov't Code § 12940 *et seq.* ("**FEHA**"), specifically including *id.* § 12940(a) (proscribing discrimination) and *id.* § 12940(h) (proscribing retaliation).

4.      Plaintiff brings related claims for failure to prevent discrimination and retaliation arising under FEHA, specifically including Cal. Gov't Code § 12940(k); for defamation arising

under Cal. Civ. Code § 43 *et seq.*, specifically including *id.* §§ 43, 44, 45, 45a, 46; and for intentional infliction of emotional distress.

5.      Throughout this Amended Complaint, Defendants' conduct related and/or giving rise to any one or more of the aforementioned claims is referred to as Defendants' "**Unlawful Employment Practices**."

## INTRODUCTION

6.      Plaintiff is a member of a protected class with respect to sex (female) and gender (female).[1]

7.      Plaintiff worked for Kirkland, the largest law firm in the world by revenue, from November 16, 2020, through September 28, 2021.  Despite providing objectively excellent work, Plaintiff was summarily fired without notice during what was supposed to be her first performance review.  Plaintiff was an intellectual property ("**IP**") litigation associate based out of Kirkland's San Francisco office.

8.      In September 2020, Plaintiff, an IP litigator, was thrilled to interview with Defendant Kirkland, which boasted a renowned IP litigation practice, and which has been considered one of the most prestigious law firms in the United States since at least when Plaintiff began studying law in 2013.  During Plaintiff's interviews, at least three so-called "share partners"—including Defendants Mr. Alper, Mr. De Vries, and Brandon Brown, a co-chair of the Recruiting Committee for the Firm's Bay Area offices—told Plaintiff that she had "very impressive" credentials.[2]  Mr. Brown told Plaintiff that, after Mr. De Vries had finished interviewing Plaintiff, Mr. De Vries called Mr. Brown and said he was very pleased with Plaintiff's interview and with her candidacy.  In addition, Mr. Alper, Mr. De Vries, and Mr.

---

[1] Although Plaintiff recognizes the important distinction between sex and gender, references to "sex" throughout this Complaint may encompass "gender," and vice versa, as applicable.  For example, factual allegations concerning sex-based discrimination may apply with equal force to gender-based discrimination.

[2] In 2016, Plaintiff earned a juris doctor degree, with high honors, from Emory University School of Law, where she served as an articles editor on *Emory Law Journal* and graduated with a 3.854 GPA and class rank of 9/291.  Plaintiff is a member of the Emory chapter of the Order of the Coif.  In 2013, Plaintiff earned a bachelor of science degree in applied mathematics, with high honors, from Georgia Institute of Technology, where she was a member of the honors program.

FIRST AMENDED COMPLAINT                                    No. 4:22-cv-05990- HSG (TSH)

1    Deoras specifically probed to gauge Plaintiff's interest in working on post-grant proceedings

2    before the Patent Trial and Appeal Board (the "**PTAB**") of the United States Patent and

3    Trademark Office ("**USPTO**"), which is not surprising given that a substantial portion of

4    Plaintiff's work at Kirkland involved PTAB proceedings.

5          9.    On September 15, 2020, the co-chair of the Firm's Recruiting Committee for its

6    Bay Area offices called Plaintiff to extend her an offer of employment.  Plaintiff accepted

7    Kirkland's offer.  On November 16, 2020, Plaintiff joined the Firm as an IP litigation associate

8    based out of the Firm's San Francisco office.

9          10.   Plaintiff's work performance at Kirkland was excellent, and Plaintiff regularly

10   received high praise throughout her tenure at the Firm.  For example, Plaintiff's first assignments

11   included **drafting dispositive papers in preliminary proceedings before the PTAB (each of**

12   **which was decided in Kirkland's client's favor and successfully resulted in non-institution**

13   **of _inter partes_ review)**[3] and preparing pre-suit patent infringement analyses that persuaded the

14   Firm and a litigation funder to greenlight approval for representing an inventor in asserting

15   integrated-circuit patents with a special fee arrangement involving significant litigation funding.

16   In addition, Plaintiff acted as the workhorse associate on an International Trade Commission

17   ("**ITC**") investigation and successfully developed and drove litigation defenses, including

18   managing and obtaining extensive third-party discovery essential to the patent unenforceability

19   and invalidity defenses.  Plaintiff also served as a last-minute trial replacement, during which she

20   substantively and valuably assisted with a key cross-examination of the plaintiff's CEO that was

21   critical in obtaining a complete defense verdict and assisted with direct examination of the

22   damages expert, while also performing considerable substantive work on the aforementioned ITC

---

23

24   [3] **Plaintiff won _two of two_ Patent Owner Preliminary Responses ("POPRs")**, in the span of a
     few months, while **Defendants Mr. Deoras, Mr. Alper, and Mr. De Vries had won merely
25   _two of eight_ POPRs** that they had filed in the three years before they hired Plaintiff to join their
     team in November 2020.  Mr. Deoras sent Plaintiff a gushing email regarding her work on the
26   preliminary proceedings, stating: "Zoya, just wanted to say that you really did a fabulous job
     with these."  Moreover, Mr. Deoras raved that Plaintiff's successes "were key wins" and stated
27   that "we were able to use a lot of your work on [your second POPR] with [two other POPRs that
     were drafted by another associate and also resulted in noninstitution].  Congrats on a great result!"
28   Mr. Alper stated: "Great job Zoya.  What a series of terrific results."  And Mr. De Vries stated:
     "Same – great job, Zoya; this is terrific to see."

FIRST AMENDED COMPLAINT                                    No. 4:22-cv-05990- HSG (TSH)

investigation.  However, leading up to and at trial, Plaintiff experienced a clear discrepancy in treatment by Defendants relative to comparator male associates, including with respect to workload, support provided for assignments, access to partners, benefits, and overall treatment. During her tenure at Kirkland, Plaintiff worked on and substantively contributed to a number of other cases and assignments.  Plaintiff contributed meaningfully to only winning/successful cases and cases that settled favorably.  During Plaintiff's tenure at Kirkland, she consistently received compliments and praise on her work and was never notified of any alleged performance issues, let alone provided with any notice or even any indication that Defendants viewed her work as woefully deficient in every respect as they stated in their defamatory "evaluations," which served as the underlying support for the poor-performance basis for Plaintiff's unlawful termination.

11.    During Plaintiff's tenure at Kirkland, she witnessed an obvious disparity in treatment relative to male associates, and Defendants subjected Plaintiff to a pattern of discriminatory and subsequently retaliatory treatment, including, among other things, with respect to workload, employee benefits and pay, junior associate support and assistance on assignments, accessibility to partners, and respect for scheduled time off.

12.    Defendants Mr. Alper and Mr. De Vries led a discriminatory cadre of Kirkland's IP litigation group, which included Defendants Mr. Deoras and Mr. Fahey as well as Leslie Schmidt, a partner based out of Kirkland's New York office (collectively, "**Kirkland Partners**").[4]  This group produced an alarmingly high turnover of female associates relative to male associates.  This high female turnover is unsurprising given the sex-based discrimination to which Defendants subjected Plaintiff and is indicative of Defendants' discriminatory ethos. Plaintiff is aware of at least seven female associates who worked for the partners named above and who left the Firm during Plaintiff's tenure at Kirkland.  In contrast, Plaintiff is aware of only

---

[4] At all relevant times, Ms. Schmidt supported Mr. Alper's and Mr. De Vries' subset of the Firm's IP litigation practice, e.g., by managing cases and other matters for and reporting to Mr. Alper and Mr. De Vries.  At all relevant times, Leslie Schmidt and/or Leslie M. Schmidt, P.C. acted as an agent and/or authorized representative of and/or formed a partnership, association, joint venture, agency, and/or other instrumentality with Kirkland or with Kirkland and any one or more of its co-Defendants.

FIRST AMENDED COMPLAINT                              No. 4:22-cv-05990- HSG (TSH)

one male associate who had worked with these partners and left the Firm during the same time period.[5]

13.     Plaintiff complained on multiple occasions of Defendants' and Ms. Schmidt's disparate and unfair treatment of Plaintiff, including as compared to male associates working on the same matters.   Thereafter, Defendants and Ms. Schmidt retaliated against Plaintiff.   In retaliating and further discriminating against Plaintiff, Defendants and Ms. Schmidt departed from standard, established Firm practices and procedures for evaluating and assessing associates. Such departures included Kirkland Partners submitting lengthy and unconscionable defamatory "evaluations" of Plaintiff.  These defamatory "evaluations" served as the underlying support for the poor-performance basis for terminating Plaintiff and was tantamount to an assassination on Plaintiff's professional reputation and livelihood.   The four corners of the "evaluations" conveyed an unequivocal—albeit false—message: that Plaintiff was deplorably deficient in every component of practicing law, failed to contribute at all during her time at the Firm, and was nothing more than a burden and liability due to her utter incompetence.

14.     On September 28, 2021, Defendant Mr. Deoras, the share partner who directly supervised most of Plaintiff's work at the Firm, told Plaintiff that she was fired and should immediately pursue outside employment.  The only information Mr. Deoras provided to Plaintiff as to why she was being fired was a vague one-sentence statement: "[Plaintiff] has not contributed to her matters at either the substantive or commitment level that is expected of an associate."  This firing occurred during what was supposed to be Plaintiff's first review at the Firm.  The firing came as a total shock to Plaintiff, especially in light of the consistent praise Plaintiff had received from Defendants throughout her tenure at the Firm (including myriad praise from Mr. Deoras) and the absence of any prior discussion indicating that her standing at the Firm was compromised.

---

[5] In addition, in 2021, Defendants promoted to partner ten male and zero female IP litigation associates.  *Kirkland & Ellis Announces New Partners*, Kirkland & Ellis (Oct. 1, 2021), https://www.kirkland.com/news/press-release/2021/10/kirkland-announces-new-partners.

FIRST AMENDED COMPLAINT                         No. 4:22-cv-05990- HSG (TSH)

15.     During this firing call, Mr. Deoras acknowledged that Plaintiff would be shocked about the firing, told Plaintiff that she is "talented," and expressed certainty that she would be successful.  Despite being in shock and disbelief, Plaintiff asked Mr. Deoras if he could explain why she was being summarily fired.  In response, Mr. Deoras stuttered and stammered and avoided providing an explanation.  The Firm offered Plaintiff four-months' severance, which, if accepted, would have required Plaintiff to waive her claims against Defendants.  The severance offer was set to expire a week later, before Plaintiff would have any ability to first learn of Defendants' and Ms. Schmidt's defamatory "evaluations."

16.     Given the extremity of Defendants' and Ms. Schmidt's defamatory statements and their knowledge of Plaintiff's propensity to stand up for herself in light of her prior complaints, Defendants intentionally withheld and hid from Plaintiff the completely fabricated statements in their "evaluations" regarding Plaintiff's work that served as the underlying support for the poor-performance basis for Plaintiff's termination knowing full well that upon notice of this information, Plaintiff would rebuff such falsehoods and not sign the severance offer.  Defendants' and Ms. Schmidt's lies were and remain flatly contradicted by Plaintiff's body of excellent work at the Firm—even under hostile and disadvantageous conditions—and the egregiousness of the lies underscores Defendants' and Ms. Schmidt's malice and complete disregard for Plaintiff's livelihood and professional reputation.  Of course, Defendants banked on Plaintiff signing the severance offer before she could access the defamatory "evaluations," thereby depriving Plaintiff of learning the true reasons for her termination—discrimination and retaliation—while allowing Defendants to get off scot-free by virtue of the waiver provision in the severance offer.

17.     After Plaintiff rejected the severance offer, Plaintiff had several one-sided discussions with the Firm's chief human resources ("**HR**") officer and assistant general counsel regarding Defendants' Unlawful Employment Practices, during which Plaintiff provided information regarding her claims against the Firm.  On one of these Zoom meetings, both the chief HR officer and assistant general counsel of Kirkland expressed dismay when Plaintiff told them that her "evaluations" had been read to her by (now-erstwhile) Firm personnel.  On the last Zoom meeting, the assistant general counsel claimed to have conducted a purported

FIRST AMENDED COMPLAINT                          No. 4:22-cv-05990- HSG (TSH)

1    "investigation" based on Defendants' "recollections" and reiterated that Plaintiff's termination

2    was because of Plaintiff's allegedly poor performance.  When asked multiple times to explain

3    the support for the falsehoods in the "evaluations," the assistant general counsel became visibly

4    flustered, said Plaintiff's claims would be nothing more than "he-said, she-said," and abruptly

5    ended the Zoom meeting in a very unprofessional manner.

6        18.    After Defendants and Ms. Schmidt were served with Plaintiff's administrative

7    complaint/charge concerning her claims alleged herein, Kirkland's general counsel and the

8    prominent employment defense counsel retained by Defendants and Ms. Schmidt sent a series of

9    legally and factually fallacious letters to Plaintiff in an attempt to intimidate and dissuade Plaintiff

10   from filing suit.  This correspondence repeated that Plaintiff was fired because of poor

11   performance.  It was not until Defendants' ninth correspondence (following four letters, one

12   telephonic conference, and four emails) that Defendants, through their outside counsel, for the

13   first time acknowledged that "of course there may have been things [Plaintiff] did well at the

14   firm" and further claimed for the first time that Plaintiff's good work did not outweigh the "many

15   flaws in [Plaintiff's] performance." In addition to this shift in Defendants' position, their counsel

16   further strayed from Defendants' repeated, original rationale for firing Plaintiff, newly attributing

17   Plaintiff's termination to a novel and generalized assertion that Plaintiff was "not a good fit."

18   Clearly Defendants seek to rewrite history by proffering new rationale for Plaintiff's termination

19   because the original, exclusively performance-based rationale that was used as pretext to fire

20   Plaintiff is indefensible, demonstrably malicious, and encapsulates Defendants' discriminatory

21   and retaliatory treatment of Plaintiff.

22                            **DEFENDANTS**

23                        **Kirkland & Ellis LLP**

24       19.    Defendant Kirkland & Ellis LLP ("**Kirkland**" or the "**Firm**") is a limited liability

25   partnership organized under the laws of Illinois.  Kirkland is an international law firm with offices

26   in 18 cities, including in San Francisco; Los Angeles; New York; Washington, D.C.; Houston;

27   and Salt Lake City.  Kirkland's chief executive office is located at 300 North LaSalle, Chicago,

28   IL 60654.

FIRST AMENDED COMPLAINT                              No. 4:22-cv-05990- HSG (TSH)

20.     On information and belief, at least a significant portion of the partners of Kirkland are professional corporations ("**PCs**").  Similar to Defendants Adam R. Alper, P.C., Michael W. DeVries, P.C., and Akshay S. Deoras, P.C., each such PC ("**PC Partner**") is named for an attorney who serves as the sole owner, director, and officer of each PC ("**Owner/Officer**").  A PC Partner holds partnership interest in Kirkland.  This Amended Complaint refers to Kirkland's co-Defendants: (i) Adam R. Alper, P.C.; Michael W. DeVries, P.C.; and Akshay S. Deoras, P.C. collectively as "**PC Defendants**"; and (ii) Adam Alper, Michael De Vries, and Akshay Deoras collectively as "**Owner/Officer Defendants**."

**Adam Alper and Adam R. Alper, P.C.**

21.     Defendant Adam R. Alper, P.C. is a partner of Kirkland.  Adam R. Alper, P.C.  is a professional corporation organized under the laws of the State of California, with a principal executive office and principal place of business at Kirkland's Bay Area office located at 555 California Street, San Francisco, CA 94101.  Per its articles of incorporation, the purpose of Adam R. Alper, P.C. is "to engage in the profession of [l]aw and any other lawful activities . . . not prohibited to a corporation engaging in such profession by applicable laws and regulations."

22.     Defendant Adam Alper is the chief executive officer, secretary, chief financial officer, and sole director of Adam R. Alper, P.C.  Defendants Adam Alper and Adam R. Alper, P.C. (collectively, "**Mr. Alper**") share the aforementioned place of business located at Kirkland's Bay Area office in San Francisco.  Adam Alper acted as an agent and/or authorized representative of and/or formed a partnership, association, joint venture, agency, and/or other instrumentality with Kirkland or with Kirkland and any one or more of its co-Defendants.

23.     At all relevant times, Mr. Alper was or reasonably should have been aware of Plaintiff's work and the other Defendants' conduct with respect to her employment at Kirkland, including without limitation because of his roles as a leader within the Firm and its IP litigation practice group and his managerial role on Plaintiff's cases and other matters and because he had hired Plaintiff and directly supervised her work throughout her tenure at the Firm on his *pro bono* matter.

**Michael De Vries and Michael W. DeVries, P.C.**

FIRST AMENDED COMPLAINT                                    No. 4:22-cv-05990- HSG (TSH)

24.     Michael W. DeVries, P.C. (a/k/a Michael W. De Vries, P.C.) is a partner of Kirkland.  Michael W. DeVries, P.C. is a professional corporation organized under the laws of the State of California, with a principal executive office and principal place of business at Kirkland's downtown Los Angeles office, located at 555 South Flower Street, Suite 3700, Los Angeles, CA 90071.  Per its articles of incorporation, the purpose of Michael W. DeVries, P.C. is "to engage in the profession of [l]aw and any other lawful activities . . . not prohibited to a corporation engaging in such profession by applicable laws and regulations."

25.     Defendant Michael De Vries (a/k/a Michael DeVries) is the president, chief executive officer, secretary, chief financial officer, and sole director of Michael W. DeVries, P.C.  Michael De Vries and Michael W. DeVries, P.C. (collectively, "**Mr. De Vries**") share the aforementioned place of business located at Kirkland's office in Los Angeles.  Michael De Vries acted as an agent and/or authorized representative of and/or formed a partnership, association, joint venture, agency, and/or other instrumentality with Kirkland or with Kirkland and any one or more of its co-Defendants.

At all relevant times, Mr. De Vries was or reasonably should have been aware of Plaintiff's work and the other Defendants' conduct with respect to her employment at Kirkland, including without limitation because of his roles as a leader within the Firm and its IP litigation practice group and his managerial role on Plaintiff's cases and other matters, including his direct supervision of Plaintiff on a trial matter.Akshay Deoras and Akshay S. Deoras, P.C.

26.     Defendant Akshay S. Deoras, P.C. is a partner of Kirkland.  Akshay S. Deoras, P.C. is a professional corporation organized under the laws of the State of California, with a principal executive office and principal place of business at Kirkland's Bay Area office located at 555 California Street, San Francisco, CA 94101.  Per its articles of incorporation, the purpose of Akshay S. Deoras, P.C. is "to engage in the profession of [l]aw and any other lawful activities . . . not prohibited to a corporation engaging in such profession by applicable laws and regulations."

27.     Defendant Akshay Deoras is the president, chief executive officer, secretary, chief financial officer, and sole director of Akshay S. Deoras, P.C.  Akshay Deoras and Akshay S.

10

Deoras, P.C. (collectively, "Mr. Deoras") share the aforementioned place of business located at Kirkland's Bay Area office in San Francisco.  Akshay Deoras acted as an agent and/or authorized representative of and/or formed a partnership, association, joint venture, agency, and/or other instrumentality with Kirkland or with Kirkland and any one or more of its co-Defendants.   At all relevant times, Mr. Deoras supported Mr. Alper's and Mr. De Vries' subset of the Firm's IP litigation practice, e.g., by managing cases and other matters for and reporting to Mr. Alper and Mr. De Vries.  Plaintiff reported to Mr. Deoras on most of her work at Kirkland.  Mark Fahey

28.     Defendant Mark Fahey ("**Mr. Fahey**") was[6] a partner in Kirkland's IP litigation group.  Plaintiff is informed that even so-called "non-share partners" make capital contributions in exchange for equity in Kirkland.  Mr. Fahey had been based out of one of the Firm's offices in Los Angeles when Plaintiff began working at Kirkland; he subsequently relocated to the Firm's Salt Lake City office.  Mr. Fahey worked with Mr. Deoras and Ms. Schmidt on cases and matters for Mr. Alper and Mr. De Vries during times relevant to this litigation.  Mr. Fahey acted as an agent and/or authorized representative of and/or formed a partnership, association, joint venture, agency, and/or other instrumentality with Kirkland or with Kirkland and any one or more of its co-Defendants.

## JURISDICTION

29.     Plaintiff hereby restates and re-alleges the allegations above as if fully set forth herein.

### Subject-Matter Jurisdiction

### Federal-Question Jurisdiction

30.     This Court has subject-matter jurisdiction over Plaintiff's claims in this action.  Each of Plaintiff's claims for Title VII violations—(i) sex discrimination (including wrongful

---

[6] Mr. Fahey worked at Kirkland for most of his career.  On April 21, 2022, Jeffrey S. Powell, P.C., Kirkland's general counsel, sent Plaintiff a letter in response to service of Plaintiff's administrative complaint/charge, in an attempt to dissuade Plaintiff from filing suit based on unsupported, blanket assertions of privilege.  Approximately one month later, on May 27, 2022, Kirkland filed a notice to remove Mr. Fahey as counsel of record from an active litigation because, per the docket description of the notice, Mr. Fahey was "[n]o longer with [the] [F]irm." *PACT XPP Schweiz AG v. Intel Corp.*, No. 1:19-cv-01006) (D. Del. May 27, 2022) (Dkt. No. 264).  He obtained an in-house counsel job in July 2022.

FIRST AMENDED COMPLAINT                              No. 4:22-cv-05990- HSG (TSH)

1  termination), (ii) retaliation (including wrongful termination), and (iii) sex-based harassment

2  constituting hostile work environment—arise under federal law and invoke federal-question

3  jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3).

4      31.   On February 11, 2022, Plaintiff timely filed her Complaint No. 202202-16114711

5  against Defendants with the California Department of Fair Employment and Housing (the

6  "**DFEH**") and her Charge No. 550-2022-00754 with the United States Equal Employment

7  Opportunity Commission (the "**EEOC**") against Defendants alleging, *inter alia*, sex

8  discrimination because of sex/gender, harassment constituting a hostile work environment

9  because of sex/gender, and retaliation.  Plaintiff received a right-to-sue ("**RTS**") letter from the

10 DFEH on February 11, 2021.   Because 180 days had elapsed since Plaintiff filed her EEOC

11 Charge, Plaintiff was entitled to a notice of right to sue ("**NRTS**") from the EEOC when she filed

12 this case on October 11, 2022.[7]  This lawsuit was timely filed within one year of Plaintiff's RTS

13 letter and within 90 days of Plaintiff becoming entitled to receive or receiving the NRTS.

14     32.   Plaintiff's claim for violations of the federal EPA arises under federal law andalso

15 invokes federal-question jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 216(b).

**Supplemental Jurisdiction**

17     33.   Plaintiff's claims for sex discrimination and retaliation under FEHA arise from

18 Plaintiff's employment at Kirkland, i.e., arise from the same transaction or occurrence as, and

19 therefore share a common nucleus of operative fact with, each of Plaintiff's claims for sex

20 discrimination, sex-based harassment constituting a hostile work environment arising under Title

21 VII, retaliation, and sex discrimination with respect to pay arising under the federal EPA.

22 Accordingly, because these claims for sex discrimination arising under FEHA form part of the

23 same case or controversy under Article III of the United States Constitution, this Court has

24 supplemental jurisdiction over these claims under 28 U.S.C. § 1367(a).

---

[7] Despite Plaintiff requesting the NRTS from and diligently following up with the EEOC many
times, including by uploading correspondence to its portal, by email, by telephone, and by going
to the field office to which the Charge was transferred, the EEOC failed to provide Plaintiff with
the NRTS until October 26, 2022.

FIRST AMENDED COMPLAINT                          No. 4:22-cv-05990- HSG (TSH)

34.     Plaintiff's claims under FEHA for failure to prevent discrimination and retaliation, arise from Plaintiff's employment at Kirkland, i.e., arise from the same transaction or occurrence as, and therefore share a common nucleus of operative fact with, at least each of Plaintiff's claims for sex discrimination, sex-based harassment constituting a hostile work environment, retaliation, and/or sex discrimination with respect to pay arising under the federal EPA.  Accordingly, because these claims for failure to prevent arising under FEHA form part of the same case or controversy under Article III of the United States Constitution, this Court has supplemental jurisdiction over these claims.  28 U.S.C. § 1367(a).

35.     Plaintiff's claim for intentional infliction of emotional distress arises from Plaintiff's employment at Kirkland, i.e., arises from the same transaction or occurrence as, and therefore shares a common nucleus of operative fact with, at least each of Plaintiff's claims for sex discrimination, sex-based harassment constituting a hostile work environment, and/or retaliation arising under Title VII.  Accordingly, because these claims for intentional infliction of emotional distress form part of the same case or controversy under Article III of the United States Constitution, this Court has supplemental jurisdiction over this claim pursuant to 28 U.S.C. § 1367(a).

36.     Plaintiff's claim for defamation arises from Plaintiff's employment at Kirkland, i.e., arises from the same transaction or occurrence as, and therefore shares a common nucleus of operative fact with, at least each of Plaintiff's claims for sex discrimination, retaliation, and/or sex-based harassment constituting a hostile work environment arising under Title VII and/or Plaintiff's claim for sex discrimination arising under the federal Equal Pay Act.    Accordingly, because this claim for defamation forms part of the same case or controversy under Article III of the United States Constitution, this Court has supplemental jurisdiction over this claim pursuant to  28 U.S.C. § 1367(a).

**<u>Personal Jurisdiction</u>**

37.     The State of California is a proper forum for this action because this Court may properly exercise personal jurisdiction over each Defendant.

FIRST AMENDED COMPLAINT                                No. 4:22-cv-05990- HSG (TSH)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

38.     Kirkland has minimum contacts with the State of California such that exercising personal jurisdiction does not offend traditional notions of fair play and substantial justice. Kirkland reached out to the State of California by establishing offices out of which its co-Defendants Adam Alper, Adam R. Alper, P.C., Michael De Vries, Michael W. DeVries, P.C., and Mark Fahey were based, namely, its Bay Area office in San Francisco, located at 555 California Street, 27th Floor, San Francisco, CA 94104, out of which its co-Defendant partners, owners, principal(s), and/or agent(s) Adam Alper, Adam R. Alper, P.C., Akshay Deoras, and Akshay S. Deoras, P.C. were based during all relevant times; and its Los Angeles office, including its downtown location at 555 South Flower Street, Suite 3700, Los Angeles, CA 90071, out of which its co-Defendant partner(s), owner(s), principal(s), and/or agent(s) Michael De Vries and Michael W. DeVries, P.C. were based during all relevant times, and including its Century City location at 2049 Century Park East, Suite 3700, Los Angeles, CA 90067, out of which its co-Defendant agent, servant, and/or employee, and/or, on information and belief, partner, owner, and/or principal Mark Fahey was based during relevant times.  Kirkland's contact with the State of California resulted from its reaching out to, or purposeful availment of, the State of California. Given Kirkland's extensive presence in California, being sued in California was foreseeable.

39.     Plaintiff's claims arose from Kirkland's contact with the State of California because Adam Alper extended to Plaintiff, on behalf of Kirkland, and offer to join Kirkland's office in San Francisco as an associate in Kirkland's IP litigation group.  Plaintiff's employment at Kirkland gave rise to Plaintiff's claims in this suit.  In addition, this Court's exercise of specific personal jurisdiction over Kirkland is fair because it is convenient for and reduces the burden on Defendant Kirkland and its co-Defendants, including at least Adam Alper, Adam R. Alper, P.C., Michael De Vries, Michael W. DeVries, P.C., Akshay Deoras, Akshay S. Deoras, P.C., and Mark Fahey, and on potential witnesses, given the coinciding location of the suit and of the situs of wrongdoing.  In addition, the State of California has an interest in preventing Unlawful Employment Practices, such as those that are at issue in this case and that prevented Plaintiff[8]

---

[8] Defendants may have caused harm to others with their sex-based discriminatory conduct, which, if not stopped, could continue to harm the forum state.  For example, Plaintiff has knowledge of seven female associates—and only one male associate—who worked with the

FIRST AMENDED COMPLAINT                                    No. 4:22-cv-05990- HSG (TSH)

1   from becoming a productive, successful tax-paying citizen of the State of California.  In addition,

2   Plaintiff has an interest in litigating in the State of California given that she would have moved

3   to California but for Defendants' unlawful conduct, and that California has general jurisdiction

4   over most of the Defendants in this suit.  Accordingly, this Court's exercise of specific personal

5   jurisdiction over Kirkland is proper.

6       40.    Adam Alper resides in Kentfield, CA.  Adam Alper is domiciled and "at home" in

7   the State of California.  This Court has general personal jurisdiction over Adam Alper.  Adam R.

8   Alper, P.C. is incorporated in California and has its principal place of business at Kirkland &

9   Ellis LLP, 555 California Street, 27th Floor, San Francisco, CA 94104.  Accordingly, in the State

10  of California, Adam R. Alper, P.C.'s business is so systematic and continuous such that it is at

11  home.  This Court has general personal jurisdiction over Adam R. Alper, P.C.

12      41.    Michael De Vries resides in San Clemente, CA.  Michael De Vries is domiciled

13  and "at home" in the State of California.  This Court has general personal jurisdiction over

14  Michael De Vries.  Michael W. DeVries, P.C. is incorporated in California and has its principal

15  place of business at Kirkland & Ellis LLP, 555 South Flower Street, Suite 3700, Los Angeles,

16  CA 90071.  Accordingly, in the State of California, Michael W. DeVries, P.C.'s business is so

17  systematic and continuous such that it is at home.  This Court has general personal jurisdiction

18  over Michael W. DeVries, P.C.

19      42.    Akshay Deoras resides in San Francisco, CA.  Akshay Deoras is domiciled and "at

20  home" in the State of California.  This Court has general personal jurisdiction over Akshay

21  Deoras.  Akshay S. Deoras, P.C. is incorporated in California and has its principal place of

22  business at Kirkland & Ellis LLP, 555 California Street, 27th Floor, San Francisco, CA 94104.

23  Accordingly, in the State of California, Akshay S. Deoras, P.C.'s business is so systematic and

24  continuous such that it is at home.  This Court has general personal jurisdiction over Akshay S.

25  Deoras, P.C.

26

27  _____

28  same partners as Plaintiff (namely, co-Defendants Mr. Alper, Mr. De Vries and/or Mr. Deoras as
    well as Ms. Schmidt) and left the Firm during Plaintiff's tenure at the Firm.

FIRST AMENDED COMPLAINT                          No. 4:22-cv-05990- HSG (TSH)

1    43.    Mark Fahey resides in Hermosa Beach, CA 90254.  Mark Fahey is domiciled and

2    "at home" in the State of California.  This Court has general personal jurisdiction over Mark

3    Fahey.

4    44.    This Court's exercise of personal jurisdiction over each Defendant satisfies

5    California's long-arm statute because it comports with due process under the U.S. Constitution,

6    as described above.  Cal. Code Civ. P. § 410.10.

7    **Divisional Assignment**

8    45.    This civil action arises in the county of San Francisco because a substantial part of

9    the events or omissions giving rise to Plaintiff's claims occurred in the county of San Francisco,

10   e.g., at Defendant Akshay Deoras' residence and at Defendant Kirkland's San Francisco office.

11   N.D. Cal. Civ. L.R. 3-2(c).

12   46.    For example, Akshay Deoras' residence in San Francisco was the locus from

13   which, at times relevant to this action, Akshay Deoras and Akshay S. Deoras, P.C. conducted

14   business and engaged in at least discriminatory and retaliatory conduct on behalf of at least

15   Akshay Deoras, Akshay S. Deoras, P.C., and Kirkland.  On at least April 29, 2021, when Akshay

16   Deoras was at his San Francisco home, Plaintiff reported his co-Defendants' Unlawful

17   Employment Practices to him, Akshay S. Deoras, P.C., and Kirkland, each of which failed to

18   take proper corrective and preventive action.

19   47.    In addition, at all relevant times, Kirkland's San Francisco office, located at 555

20   California Street, San Francisco, CA 94104, was the principal place of business for both Adam

21   R. Alper, P.C. and Akshay S. Deoras, P.C. and housed individual offices for each of Adam Alper

22   and Akshay Deoras to conduct business on behalf of himself, his eponymous professional

23   corporation, and Kirkland.  Kirkland engaged in discriminatory and retaliatory conduct from this

24   office.  For example, Plaintiff was wrongfully terminated by Kirkland when Akshay Deoras

25   joined a Zoom meeting while located at 555 California Street, San Francisco, CA 94104.

26   Accordingly, because this civil action arises in the county of San Francisco, this action should be

27   assigned to the San Francisco division of the Northern District of California.  N.D. Cal. Civ. L.R.

28   3-2(c).

FIRST AMENDED COMPLAINT                              No. 4:22-cv-05990- HSG (TSH)

1

## **VENUE**

2    48.    Venue is proper in this judicial district pursuant to 42 U.S.C. § 2000e-5(f)(3)

3    and/or 28 U.S.C. § 1391.

4    49.    Unlawful Employment Practices were committed in this district. For example, as

5    discussed above, Defendants unlawfully discriminated and retaliated against Plaintiff in this

6    district by wrongfully terminating her. (*See, e.g.*, *supra* ¶¶ 45–47.) As another example,

7    Defendants Adam Alper, Adam R. Alper, P.C., and Kirkland discriminated against Plaintiff in

8    this district with respect to pay because of sex by sending discriminatory offer letters from Adam

9    Alper in Kirkland's San Francisco office.

10    50.    Employment records relevant to Defendants' Unlawful Employment Practices

11    were maintained and administered in this judicial district. For example, the discriminatory offer

12    letters were sent to Plaintiff from the Firm's legal recruiting manager for the San Francisco office,

13    and the letters' signature and letterhead indicated that they were from Adam Alper on behalf of

14    himself and the Firm's San Francisco office, i.e., that they originated from the Firm's San

15    Francisco office location. In addition, Firm HR personnel in San Francisco administered and

16    maintained records relevant to Plaintiff's discrimination, retaliation, and federal EPA claims,

17    e.g., Plaintiff's new-hire and termination paperwork, including an employment eligibility and

18    verification form and payroll orders, which were maintained and administered by Kirkland's HR

19    and other administrative staff in the San Francisco office.

20    51.    Plaintiff would have worked and lived in this judicial district but for Defendants'

21    Unlawful Employment Practices. Plaintiff's employment agreement required her to relocate to

22    San Francisco. Plaintiff intended and planned to relocate to San Francisco and took multiple

23    steps in furtherance thereof. In November 2020, Plaintiff went to San Francisco to look for an

24    apartment and had begun planning her move, e.g., by discussing the same with a relocation

25    company. In December 2020, Plaintiff applied to rent a condo but subsequently paused her plans

26    to move because Kirkland had not yet announced when it would officially reopen the San

27    Francisco office, COVID cases were spiking, and Plaintiff needed to prepare for the February

28    2021 California Bar Examination. Thereafter, Plaintiff's relocation to San Francisco was held in

FIRST AMENDED COMPLAINT                           No. 4:22-cv-05990- HSG (TSH)

abeyance by the continuing COVID pandemic and indefinite closure of the Firm's San Francisco office. Plaintiff's paychecks identified Plaintiff's "[l]ocation" as San Francisco. When the Firm announced its tentative plans for its November 2021 San Francisco office reopening (following an approximately 19-month closure), Plaintiff began working on plans for her move and planned to discuss its timing (e.g., given an upcoming trial scheduled for early November 2021) during what Plaintiff thought would be her review in September 2021.

52.     However, Defendants' surprise firing of Plaintiff obviated the need for that discussion. But for Defendants' Unlawful Employment Practices, Plaintiff would have relocated to and worked in this judicial district. For example, Plaintiff had taken a house-hunting trip to San Francisco in anticipation of relocating.

53.     In addition, a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district, including in the county of San Francisco, as discussed above. (*See, e.g.*, *supra* ¶¶ 45–47.) In the alternative, venue lies in this judicial district because each Defendant, for example, is subject to this Court's personal jurisdiction with respect to this action. (*See, e.g.*, *supra* ¶¶ 37–44.)

## **FACTUAL BACKGROUND**

### **Defendants Began Discriminating Against Plaintiff on the Basis of Sex When They Extended Her a Job Offer with a Salary Lower Than Those of Male Comparators**

54.     On September 15, 2020, Brandon Brown, a partner at Kirkland's San Francisco office, called Plaintiff to extend her an offer to work as an IP litigation associate at Kirkland in the same office. He told Plaintiff that the offer would require her to take a one-year haircut in class year. Thus, although Plaintiff had graduated law school in 2016, she would be placed in the class of 2017 for purposes of compensation and reviews.[9] Mr. Brown claimed the lower classification would place Plaintiff in a better position for elevation to partner.

[9] In 2021, standard total compensation for a class-of-2017 associate (around $399,000) was around $50,000 lower than standard total compensation for a class-of-2016 associate (around $452,500). *Biglaw Salary Scale*, Biglaw Investor, https://www.biglawinvestor.com/biglaw-salary-scale/. On information and belief, Defendants Mr. Alper, Mr. De Vries, and Kirkland did not ask any male associates in the IP litigation group to take a comparable haircut in class year.

FIRST AMENDED COMPLAINT                                No. 4:22-cv-05990- HSG (TSH)

55.     The following day, September 16, 2020, Plaintiff received Kirkland's offer letter, which was signed by Mr. Alper.  The offer letter stipulated that Plaintiff would be paid the full, market bonus for a class-of-2016 associate in December 2020, which was inconsistent with treating Plaintiff one class year lower than her male comparators.  However, in December 2020, when the Firm announced 2020 bonuses, the Firm tried to pay Plaintiff less than the amount stipulated in the offer letter, which required Plaintiff to reach out to the Firm, including Mr. Alper,[10] to rectify their attempts to underpay Plaintiff.

56.     Additionally, Plaintiff had to request that her offer letter be revised to annualize her hours for the 2021 review and bonus period because the original language would have allowed Defendants to reduce Plaintiff's December 2021 bonus because she began working at Kirkland after the 2021 review and bonus periods had begun.[11]  On September 23, 2020, Plaintiff received the revised offer letter, again signed by Mr. Alper; Plaintiff signed and returned it the same day.

### Male IP Litigation Associates Who Were Comparators to Plaintiff

57.     As shown throughout this Amended Complaint, all or at minimum a significant portion of the job performed by Plaintiff (e.g., tasks, assignments, responsibilities on matters) while classified as a class-of-2017 IP litigation associate were the same or substantially the same as for the positions being compared, e.g., a class-of-2016 IP litigation male associate.

### Andrew Walter

58.     During times relevant to this litigation, Andrew Walter was an IP litigation associate based out of Kirkland's New York City office.  Plaintiff and Mr. Walter worked for, were supervised by, and reported to the same Kirkland partners.  For example, Plaintiff and Mr. Walter both worked on Mr. Alper's and Mr. De Vries' cases managed by Mr. Deoras; Plaintiff and Mr. Walter performed the same or substantially the same work for Mr. Deoras.  In addition, on several of Mr. Alper's and Mr. De Vries' cases managed by Mr. Deoras, Plaintiff and Mr.

---

[10] Adam Alper was a member of the Firm's Associate and Non-Share Partner Compensation Committee, which recommends to the Firm Committee associate bonuses.

[11] The associate review period ran from July 1 to June 30 each year.

FIRST AMENDED COMPLAINT                          No. 4:22-cv-05990- HSG (TSH)

Walter both reported to and were supervised by Barbara Barath, a non-share partner based out of Kirkland's San Francisco office, and Ryan Kane, a non-share partner based out of Kirkland's New York office.  Plaintiff and Mr. Walter graduated from top law schools in 2016.  During times relevant to this litigation, Mr. Walter was classified as a class-of-2016 associate.  Mr. Walter and Plaintiff were subject to the same general associate review and evaluation process.  Mr. Walter continued to be employed at Kirkland after Plaintiff's firing; Mr. Walter is now an IP litigation partner based out of the Kirkland's Chicago office.

### Samuel Blake

59.     During times relevant to this litigation, Samuel Blake was an IP litigation associate based out of Kirkland's downtown Los Angeles office.  Plaintiff and Mr. Blake worked for, were supervised by, and reported to the same Kirkland partners.  For example, Plaintiff and Mr. Blake both worked on Mr. Alper's and Mr. De Vries' cases and performed the same or substantially the same work for Mr. De Vries.  Plaintiff and Mr. Blake graduated from top law schools in 2016.  During times relevant to this litigation, Mr. Blake was classified as a class-of-2016 associate.  Mr. Blake and Plaintiff were subject to the same general associate review and evaluation process.  Mr. Blake continued to be employed at Kirkland after Plaintiff's firing; Mr. Blake is now an IP litigation partner based out of Kirkland's downtown Los Angeles office.

### Kyle Calhoun

60.     During times relevant to this litigation, Kyle Calhoun was an IP litigation associate based out of Kirkland's San Francisco office.  Plaintiff and Mr. Calhoun worked for, were supervised by, and reported to the same Kirkland partners.  For example, Plaintiff and Mr. Calhoun both worked on Mr. Alper's and Mr. De Vries' cases and, on information and belief, performed the same or substantially the same work for Mr. Alper and/or Mr. De Vries.  Plaintiff and Mr. Calhoun graduated from top law schools in 2016.  During times relevant to this litigation, Mr. Calhoun was classified as a class-of-2016 associate.  Mr. Calhoun and Plaintiff were subject to the same general associate review and evaluation process.  Mr. Calhoun continued to be employed at Kirkland after Plaintiff's firing; Mr. Calhoun is now an IP litigation partner based out of Kirkland's San Francisco office.

FIRST AMENDED COMPLAINT                              No. 4:22-cv-05990- HSG (TSH)

1

**Christian Huehns**

2      61.     Although Christian Huehns, also an IP litigation associate, was a lower class year

3  than Plaintiff, on at least one occasion he and Plaintiff performed the same or substantially the

4  same work, e.g., due to staffing needs.  Mr. Huehns was based out of the Firm's Chicago office.

5  Plaintiff and Mr. Huehns worked for, were supervised by, and reported to the same Kirkland

6  partners.  For example, Plaintiff and Mr. Huehns both worked on Mr. Alper's and Mr. De Vries'

7  cases managed by Mr. Deoras.  On one such case, Plaintiff and Mr. Huehns performed the same

8  or substantially the same work for, while supervised by and reporting to, Mr. Deoras.  On several

9  other cases, Plaintiff and Mr. Huehns both reported to and were supervised by Ms. Barath and

10  Mr. Kane.  Mr. Huehns and Plaintiff were subject to the same general associate review and

11  evaluation process.  Mr. Huehns is still employed at Kirkland.  Accordingly, Defendants'

12  disparate treatment of Mr. Huehns provides a comparative benchmark in demonstrating

13  Defendants' discriminatory and retaliatory conduct.

14

**Male Associate G**

15      62.     Similarly, although another IP litigation associate who was based out of the Firm's

16  San Francisco office ("**Male Associate G**") was a lower class year (2018) than Plaintiff (2016

17  but classified as 2017 by Kirkland), on at least one occasion he and Plaintiff performed the same

18  or substantially the same work, e.g., due to staffing needs.  Plaintiff and Male Associate G worked

19  for, were supervised by, and reported to the same Kirkland partners.  For example, Plaintiff and

20  Male Associate G both worked on the ITC investigation discussed above, which was led by Mr.

21  Alper and Mr. De Vries and managed by Mr. Deoras, Ms. Schmidt, and Mr. Fahey (the "**ITC**

22  **Investigation**").   On the ITC Investigation, Plaintiff and Male Associate G both worked on

23  anticipation and obviousness patent invalidity defenses and assisted with claim construction;

24  Plaintiff and Male Associate G performed the same or substantially the same work for Mr. Deoras

25  while directly supervised by and reporting to Mr. Fahey.  Plaintiff and Male Associate G were

26  subject to the same general associate review and evaluation process.  Accordingly, Defendants'

27  disparate treatment of Male Associate G provides a comparative benchmark in demonstrating

28  Defendants' discriminatory and retaliatory conduct.

FIRST AMENDED COMPLAINT                              No. 4:22-cv-05990- HSG (TSH)

**As Compared to Plaintiff, the Male Comparators Performed Substantially Similar Work Requiring Substantially Equal Skill Under Substantially Similar Working Conditions**

63.     As detailed throughout this Amended Complaint, Plaintiff's male comparators' jobs, e.g., as class-of-2016 associates, in the IP litigation group working for the same team (i.e., Mr. De Vries' and Mr. Alper's subset of the IP litigation group) and Plaintiff's job (as a Kirkland-labeled class-of-2017 associate in the IP litigation group: (i) involved similar levels of skill, i.e., similar levels of experience, ability, education, and training; (ii) involved similar levels of mental and physical exertion; (iii) involved similar levels of responsibility or accountability; and (iv) were performed under substantially similar working conditions, except for the discriminatory, hostile, and retaliatory environment to which Plaintiff was subjected by Defendants as a result of her sex and complaints regarding Defendants' unfair treatment of her.

**Plaintiff Joins Kirkland, Earns Critical Wins, and Is Praised for Her Success**

64.     Plaintiff was employed by Defendant Kirkland from November 16, 2020, until September 28, 2021.  Plaintiff had a meaningful period of employment at Kirkland, which was baselessly cut short by Defendants' unlawful conduct.  The partners central to her claims froze her out of work and foreclosed her ability to work with other willing and requesting partners after Plaintiff's complaints about Defendants' unlawful treatment of her.  In stark contrast to the allegedly substantial and pervasive work performance issues proffered as the underlying support for the basis for Plaintiff's termination, Plaintiff provided immense value to the Firm and to the Kirkland Partners, as detailed further below, including by meaningfully contributing to only winning cases and cases that settled favorably.

65.     Shortly after Plaintiff joined Kirkland in November 2020, she began working on a number of different assignments for Mr. Deoras, leading to additional work on the same and other matters, including: (1) assessing extant patent-assertion analyses and providing additional input; (2) performing patent-assertion analysis for a potential litigation-funded case; and (3) drafting a dispositive motion for a subsidiary of the Firm's largest client.  Plaintiff directly reported to Mr. Deoras for the first and third aforementioned assignments and to Mr. Fahey (and indirectly to Mr. Deoras, to whom Mr. Fahey reported) for the second assignment.

**December 2020 Patent-Assertion Assessment**

FIRST AMENDED COMPLAINT                              No. 4:22-cv-05990- HSG (TSH)

66.     For the first assignment listed above, assessing extant patent-assertion analyses concerning switches and transceivers and providing additional input, e.g., based on Plaintiff's analysis of the patents' prosecution histories, Plaintiff reported directly to Mr. Deoras. Plaintiff timely sent him the requested work in mid-December 2020.  Plaintiff followed up with Mr. Deoras a few times.  Shortly before Plaintiff went on leave (per Firm policy) in mid-January 2021 to study for and take the California Bar Examination, Mr. Deoras told Plaintiff that he thought her analysis "all makes sense," that the next steps would likely happen when Plaintiff was out on leave, so there was no need for Plaintiff to get involved, but that "I just wanted to let you know that I think this is good."  Although this assignment was relatively small in terms of scale compared to other assignments that Plaintiff performed for Mr. Deoras, his "evaluation" of Plaintiff merely acknowledged the existence of this assignment and intentionally omitted his satisfaction with Plaintiff's performance on this assignment.  Mr. Deoras' glossing over this work is a small preview into Defendants' discriminatory and retaliatory treatment of Plaintiff. Defendants, including Mr. Deoras, did not provide similarly negatively slanted and skewed "evaluations" for comparator male associates.

### November/December 2020 and March 2021 Patent-Assertion Analysis for Litigation Funding

67.     For the second assignment listed above, Plaintiff performed patent-assertion analysis directed to integrated circuits for a potential case to be financed with litigation funding with a team led by Defendants Mr. Alper and Mr. De Vries and managed by Defendants Mr. Deoras, Ms. Schmidt, and Mr. Fahey.  Plaintiff's work was directly supervised by Mr. Fahey and indirectly by Mr. Deoras.  Specifically, Plaintiff worked with a male associate in the Firm's IP litigation group ("**Male Associate Q**") on analyzing potential infringement reads for a target defendant's products and drafting infringement charts.  Plaintiff also ran down, at Mr. Fahey's request, certain ancillary issues, e.g., regarding damages and product availability.

68.     In November 2020, this assertion analysis included Mr. Fahey assigning last-minute work to Plaintiff and Male Associate Q over Thanksgiving, for which Mr. Fahey knew Plaintiff would have to bear the laboring oar and would require Plaintiff to work on Thanksgiving

FIRST AMENDED COMPLAINT                                    No. 4:22-cv-05990- HSG (TSH)

1  (in addition to the days before and after).  Mr. Fahey told Plaintiff that he struggled in working

2  with Male Associate Q because it was difficult to get him to produce usable work, which is why

3  Plaintiff was added to the assignment.  Mr. Fahey indicated that Plaintiff's efforts were a huge

4  lift because Mr. Fahey did not have to continue to bother Male Associate Q to make progress on

5  the assignment.  (Male Associate Q is still employed at Kirkland.)

6      69.     Every time Defendants Mr. Deoras, Mr. Fahey, Mr. Alper, and Kirkland were

7  aware of Plaintiff having travel plans over weekends (e.g., for multiple national holidays and a

8  brief scheduled vacation), Defendants Mr. Deoras, Mr. Fahey, Mr. Alper, and Kirkland assigned

9  Plaintiff additional work either right before or during her planned travel, ensuring she would have

10 substantial work to complete while traveling or attempting to take time off.[12]  Plaintiff was not

11 opposed to working a fair amount when traveling and on holidays, particularly considering the

12 fact that Defendants had indicated to Plaintiff the good probability of making partner.[13]  To

13 Plaintiff's knowledge, however, Defendants did not show a similar disregard for male associates'

14 travel plans, holidays, and planned time off.  For example, Defendants took affirmative steps to

15 ensure Mr. Huehns would be undisturbed during his vacation, including assigning and attempting

16 to assign Mr. Huehns' work to Plaintiff, which interfered with Plaintiff's own scheduled vacation

17 time.  Plaintiff's willingness to sacrifice personal time was all for naught given that Defendants

18 summarily terminated Plaintiff on the basis of allegedly poor performance, specifically stating

19 she did "not contribute[] to her matters at either the substantive or commitment level that is

20 expected of an associate."  Plaintiff's willingness to always prioritize work over her personal life

21 directly belies the pretextual performance-based rationale for her termination.

---

[12] Another female IP litigation associate who had been based out of the Firm's San Francisco office ("**Female Associate G**") told Plaintiff that she received a conspicuous uptick in work from Defendants that coincided directly with her travel plans, which made her think it was intentional.

[13] Debra Cassens Weiss, *Kirkland Sets Another Record with Latest Partnership*, ABAJournal (Oct. 4, 2022, 2:31 pm CDT), https://www.abajournal.com/news/article/kirkland-sets-another-record-with-latest-partnership-promotions (noting that Kirkland "has once again boosted the number of lawyers promoted to partner with its latest announcement of a record 193 partnership promotions," which is "28% higher than last year's number").

FIRST AMENDED COMPLAINT                              No. 4:22-cv-05990- HSG (TSH)

70.     In December 2020, Mr. Fahey told Plaintiff that she was doing a great job on the assertion analysis.  On December 17, 2020, Mr. Fahey sent Plaintiff's and Male Associate Q's infringement charting on the target-defendant's products, completed largely by Plaintiff, to Mr. Deoras and Ms. Schmidt for review.  On December 18, 2020, Mr. Fahey emailed Plaintiff and Male Associate Q, thanking them "for the hard work." Per Mr. Fahey, "Akshay [Deoras] was happy with the [target-defendant] chart."  Based on this infringement charting, Defendants Mr. Alper and Mr. De Vries and Ms. Schmidt sought (and obtained) Firm approval to litigate with an alternative-fee arrangement (namely, with litigation funding), as relayed to Plaintiff by Defendants Mr. De Vries and Mr. Deoras.

71.     Nevertheless, Mr. Deoras' "evaluation" of Plaintiff merely acknowledged the existence of the aforementioned assignment and intentionally omitted his satisfaction with Plaintiff's performance on the same.  Mr. Fahey's "evaluation" also intentionally omitted any discussion of Plaintiff's good work.  Defendants, including Mr. Deoras and Mr. Fahey, did not provide similarly negatively slanted and skewed "evaluations" for comparator male associates.

72.     To underscore the value of Plaintiff's work, a male associate in the IP litigation group ("**Male Associate A**"), who (like Plaintiff) was based out of the Firm's San Francisco office, completed a substantially similar assignment preparing infringement charting for another target defendant as part of the same litigation funding efforts.  However, based on Male Associate A's infringement charting, Mr. Deoras decided not to seek Firm approval to greenlight litigating the case against this other target defendant—the opposite result of Plaintiff's work.

73.     After submitting the infringement charting in December 2020, Plaintiff did not receive any update on the matter until the <u>evening of Saturday</u>, March 6, 2021, when Mr. Deoras and Mr. Fahey were aware that Plaintiff was on the east coast and had flown to visit her parents for the weekend.  Mr. Fahey emailed Plaintiff and Male Associate Q at 5:33 pm PST / 8:33 pm EST and assigned—with no prior warning—infringement charting reading 19 claims (including three independent claims) across two patents on the target defendant's products.

74.     Mr. Fahey indicated that he would need to review and submit their charting to Mr. Deoras that weekend, i.e., within around 24 hours.  Given the prior difficulty in getting Male

Associate Q to provide usable work, Mr. Fahey knew that Plaintiff would shoulder the lion's share of the surprise assignment and also was aware that she was traveling home to visit family. Plaintiff immediately responded to Mr. Fahey's request and agreed to get started.[14]  Male Associate Q was unable to begin helping until very late that evening at earliest.  Male Associate A stated he was unavailable to help when asked.  That evening and early the next morning, Sunday, March 7, 2021, Plaintiff emailed Mr. Fahey, copying Mr. Deoras and Male Associate Q, attaching charting she completed for the independent claims and proposing a division of labor between Plaintiff and Male Associate Q to complete the remaining dependent claims.  Later that morning, Mr. Fahey sent two responses close in time.  First, he removed Mr. Deoras and Male Associate Q as recipients to privately compliment Plaintiff[15] on her charting ("[n]ice quick/clean work").[16]  Then he sent a response to Plaintiff, Mr. Deoras, and Male Associate Q, which omitted any praise.  As a result of that work, the team secured litigation funding for the case.

75.    In April 2021, Mr. De Vries thanked Plaintiff for her work on the above assertion analysis.  Mr. De Vries told Plaintiff that, due to his and Mr. Alper's recent successes, the

---

[14] A female associate who formerly worked in the IP litigation group at Kirkland ("**Female Associate R**") and had performed work for the same partners at Kirkland as Plaintiff (Defendants Mr. De Vries and Mr. Alper as well as Ms. Schmidt) spoke to Plaintiff in the fall of 2021 about her experience at Kirkland.  She worked in Kirkland's IP litigation group for approximately four years.  She stated that, as compared to male associates in the IP litigation group, she was given assignments under less favorable conditions, such that she felt her time as a female associate was valued less.  For example, she said that partners had a habit of dumping last-minute assignments on her (e.g., on a Friday evening needing to be completed ASAP) but not on male associates.  In addition, Female Associate R stated that male associates in the IP litigation group were able to rely on their relationships with partners and get by at Kirkland while doing less, e.g., billing fewer hours on fewer cases, than female associates.  Similarly, Mr. Blake, who had an unusually close relationship with Mr. Alper (e.g., Mr. Blake told Plaintiff (in April 2021) that at one point he was on the phone with Mr. Alper for 12 hours, purportedly discussing work, and had indicated that as a result of his closeness with Mr. Alper, he planned on demanding to be made share partner well ahead of Kirkland's standard track to make partner.  Female Associate R ultimately left Kirkland because she felt undervalued and was not getting a fair shake at the Firm.  Based on what Female Associate R told Plaintiff, female associates in IP litigation group shared Female Associate R's negative experiences and expressed concerns regarding their longevity at the Firm.

[15] Mr. Fahey consistently did not include share partner(s) on emails in which he complimented Plaintiff's work but generally included share partner(s) when complimenting male associates' work.

[16] In contrast, Mr. Fahey's defamatory "evaluation" of Plaintiff falsely stated that Plaintiff "needs to work on time management and dependability of [her] work" and "needs to work on developing her understanding of the style of work" that "we want at Kirkland."

FIRST AMENDED COMPLAINT                                    No. 4:22-cv-05990- HSG (TSH)

1   litigation financier agreed to fund three cases that would be run by Kirkland's IP litigation group.

2   The financier would cover all litigation costs and fees (including billable hours), to the tune of

3   tens of millions of dollars, and Kirkland would receive contingency fees that would increase

4   handsomely based on the number of cases won.  Moreover, Kirkland's IP litigation group had

5   potential cases "in the pipeline" for additional litigation-funding candidacy.

6          76.   On May 7, 2021, Mr. Deoras told Plaintiff that the Firm and the litigation funder

7   had both green-lit representing the inventor in asserting his IC patents because of Plaintiff's work.

8   Contrary to the defamatory statements proffered by Defendants as pretext for Plaintiff's firing,

9   Plaintiff provided immense value to the Firm and to Defendants' practice.[17]

10                **December 2020/January 2021 and March 2021 POPRs**

11         77.   For the third assignment listed above, Plaintiff drafted a successful dispositive

12   motion for a subsidiary of the Firm's most important client ("**POPR No. 1**").[18]  Plaintiff would

13   draft another successful dispositive motion for a related subsidiary of the same client ("**POPR**

14   **No. 2**").[19]  Plaintiff drafted these motions for Mr. Deoras, Male Non-Share Partner Y, Mr. Alper,

15   and Mr. De Vries.  Plaintiff's work received high praise from the same individuals, as well as

16   from Ms. Schmidt and Male Share Partner C.  As detailed below, Mr. De Vries', Ms. Schmidt's,

17   and Mr. Deoras' "evaluations" of Plaintiff intentionally omitted that: (1) they provided effusive

18   ────────────────

19   [17] In a recent publication, Mr. Alper and Mr. De Vries discussed the Firm's recent push into
     plaintiff-side contingency fee litigation and the mechanics of accepting such a case. The American

20   Lawyer Litigation Daily, *Taking Stock of Kirkland's Push into Plaintiff-Side Contingency Fee*
     *Litigation*, Kirkland & Ellis (Jan. 10, 2022), https://www.kirkland.com/news/in-the-

21   news/2022/01/taking-stock-of-kirkland-contingency-fee-lit.   Mr. Alper and Mr. De Vries
     explained that the Firm conducts a "Red Team analysis" to determine whether to accept a case on

22   contingency; Plaintiff understands that her work was analyzed by the Red Team in granting
     approval for the above-discussed litigation-funded case.  *Id.*  Mr. Alper and Mr. De Vries further

23   noted how the move into contingency fee work has "been a benefit for the firm" and that
     determinations on whether to proceed required an analysis of the "long-term profile" of a case to

24   ensure it will be successful.  *Id.*

25   [18] A Patent Owner Preliminary Response ("**POPR**") responds to a petition for *inter partes* review
     ("**IPR**"), which is a proceeding before the PTAB.

26   [19] *Platform Sci., Inc. v. Omnitracs, LLC*, No. IPR2020-01613 (PTAB Jan. 19, 2021) (Paper 9)
     (POPR No. 1); *Platform Sci., Inc. v. Omnitracs, LLC*, No. IPR2020-01613 (PTAB Apr. 13, 2021)

27   (Paper 14) (denying institution); *Platform Sci., Inc. v. XRS Corp.*, No. IPR2021-00324 (PTAB
     Mar. 22, 2021) (Paper 8) (POPR No. 2); *Platform Sci., Inc. v. XRS Corp.*, No. IPR2021-00324

28   (PTAB June 21, 2021) (Paper 11) (denying institution).

FIRST AMENDED COMPLAINT                    No. 4:22-cv-05990- HSG (TSH)

praise to Plaintiff for her work on these POPRs; and (2) Plaintiff was directly responsible for drafting two winning POPRs.[20]  Further, the only reasonable conclusion that a person reading Mr. Deoras' "evaluation" of Plaintiff could reach is that the POPRs she drafted resulted in institution, i.e., were unsuccessful.  This abject falsity and the false and misleading nature of Mr. Deoras' "evaluation" of Plaintiff underscores the maliciousness and the discriminatory and retaliatory intent of his "evaluation."

78.  Plaintiff drafted POPR No. 1 before she went on bar-exam leave in mid-January 2021.  Kirkland represented the patent owner for both POPR Nos. 1 and 2.  The patent that was the subject of the IPR petition was one of seven that the patent owner had accused its competitor, the IPR petitioner, of willfully infringing in co-pending district court litigation run by Mr. Alper, Mr. De Vries, Mr. Deoras, Ms. Schmidt, and Male Non-Share Partner Y.  Mr. Deoras directly supervised Plaintiff's work on POPR No. 1.

79.  Plaintiff drafted POPR No. 2 in March 2021 in an abbreviated timeframe due to Mr. Deoras' failure to timely assign this POPR.  Specifically, on Thursday, March 4, 2021, Mr. Deoras asked Plaintiff to draft POPR No. 2, which was due in less than three weeks on Monday, March 22, 2021, and apologized to Plaintiff because the assignment was "a little last minute."[21]

---

[20] A POPR, akin to a motion to dismiss, is successful when the PTAB denies a petition to institute IPR proceedings.  The burden of proof for invalidity in PTAB proceedings, which requires merely a preponderance of evidence, is lower than in district court, which requires clear and convincing evidence.  Accordingly, proving invalidity is easier in a PTAB proceeding than in a district court case.  Moreover, invalidating a patent is less expensive at the PTAB than in district court.  Edward Elgar Publ'g Ltd., 1 Research Handbook on the Economics of Intellectual Property Law: Theory (eds. Ben Depoorter & Peter Menell, 2015) (citing Am. Intellectual Prop. Law Assoc., *Report of the Economic Survey* (2015)).  Accordingly, a petition for IPR is usually filed by a defendant to invalidate patent claims asserted against it in district court.  As a general matter, a defendant-petitioner puts forth its best invalidity argument(s) in its petition.  If the PTAB denies institution, the patent claims will not likely be invalidated in district court, given the weight that will likely be assigned to the PTAB decision.  Therefore, a PTAB decision denying institution carries great weight and substantially increases a patent's value by highly increasing the likelihood that a patent-owner plaintiff will receive damages for patent infringement.  E.g., Thomas L. Irving & Stacy D. Lewis, Finnegan, Pre-Institution at PTAB: Obtaining a Denial Is a Patent Owner Win - Part 2: Substantive Bases of Challenge, IPO Law Journal (Oct. 22, 2015), *available at* https://www.finnegan.com/en/insights/articles/pre-institution-at-ptab-obtaining-a-denial-is-a-patent-owner-win.html (last accessed Jan. 11, 2022).

[21] As discussed below, in late June 2021, Mr. Deoras highly praised Plaintiff's work on preliminary proceedings before the PTAB, gushing that she did a "fabulous job" on them.  However, Mr. Deoras' defamatory "evaluation" of Plaintiff falsely stated that "[Plaintiff] struggles to meet deadlines" and that "[Plaintiff's] time management skills also need significant

FIRST AMENDED COMPLAINT                          No. 4:22-cv-05990- HSG (TSH)

Indeed, Male Non-Share Partner Y stated to Plaintiff several times that the turnaround (of two weeks and change) was very tight and that Mr. Deoras had "dropped the ball" by repeatedly failing to assign the POPR to an associate, despite Male Non-Share Partner Y's persistent reminders to Mr. Deoras to do so during the three months before its filing deadline. Plaintiff's work on POPR No. 2 was supervised by Male Non-Share Partner Y and Mr. Deoras.

80.     Each of Plaintiff's two POPRs successfully resulted in non-institution, thereby increasing the value of the patents-at-issue in the co-pending district-court litigation. Male Non-Share Partner Y, who worked on the co-pending district-court litigation, told Plaintiff that the patent that was the subject of POPR No. 1 was "important" and the patent that was the subject of POPR No. 2 was "one of the most important" to the district-court litigation. Male Non-Share Partner Y, who had worked at Kirkland in its IP litigation group since beginning his legal career eight years prior, told Plaintiff that he had "never won a POPR" before prior to working with Plaintiff. His first POPR win was the one on which he directly supervised Plaintiff's work, POPR No. 2, on which, per Male Non-Share Partner Y, Plaintiff "did the heavy lifting."

<u>Plaintiff's Successful Work on POPRs Compared to Male Associates</u>

81.     Plaintiff's work on POPR Nos. 1 and 2 compared to similar work performed by male associates, including by comparator Mr. Walter, illustrate Defendants' discriminatory, disparate treatment of Plaintiff as compared to male associates, particularly with respect to how Defendant's characterized such work in real time versus during the associate review process.

*Mr. Huehns*

82.     For example, when Plaintiff drafted POPR No. 1, Plaintiff properly and effectively responded to the petitioner's claim-construction argument. It is common knowledge that claim construction is an important part of patent litigation and may be case-dispositive. Mr. Deoras

---

development; . . . she is often unable to complete her assignments in an appropriate amount of time." As additional salient examples of the falsity of Mr. Deoras' defamatory statements and his knowledge thereof, Plaintiff provided Mr. Deoras her draft POPR No. 1 for his review two weeks in advance of the filing deadline. Moreover, after Mr. Huehns directed Plaintiff, while she was still out on bar leave, to draft the sur-reply for POPR No. 1 due less than a week later, Plaintiff successfully and timely drafted the same, which was supervised by Mr. Deoras and Male Non-Share Partner Y.

FIRST AMENDED COMPLAINT                              No. 4:22-cv-05990- HSG (TSH)

1   had another male associate in the IP litigation group, Mr. Huehns, **copy Plaintiff's claim-**

2   **construction argument from POPR No. 1 into Mr. Huehns' POPR** (which concerned the

3   same patent as POPR No. 1), <u>to remedy Mr. Huehns' failure to adequately address claim</u>

4   <u>construction in his POPR.</u>

5       83.    As detailed below, Plaintiff received high praise for her work on POPR Nos. 1 and

6   2 from Mr. Deoras via email and from Mr. Alper on a phone call.  Moreover, Mr. Deoras also

7   told Plaintiff that he used and borrowed a lot of Plaintiff's work from POPR No. 2 to win two

8   other POPRs.  Conversely, with respect to Plaintiff's work on POPR No. 1 and POPR No. 2, Mr.

9   Deoras falsely claimed in his "evaluation" that Plaintiff's "judgment in deciding which

10  arguments to include and prioritize needed improvement."  However, in his praise, Mr. Deoras

11  expressly complimented the arguments that Plaintiff included in POPR Nos. 1 and 2.

12      84.    On information and belief, Mr. Huehns' failure to include the important,

13  aforementioned claim-construction argument was not included in Mr. Deoras' "evaluation" of

14  his work.  Mr. Huehns is still employed as an IP litigation associate and in good standing at

15  Kirkland while Plaintiff was fired based in part on Defendants' defamatory, patently-false

16  characterization of Plaintiff's work on POPR Nos. 1 and 2.

17                *Mr. Walter*

18      85.    The work of a comparator male associate in the IP litigation group, Mr. Walter, on

19  a comparable assignment concerning claim construction, which similarly was performed for Mr.

20  Deoras, and Mr. Deoras' response to the same, further evidences Defendants' preferential

21  treatment of males and the unlawful nature of Plaintiff's termination.

22      86.    On this comparable assignment, Mr. Walter proposed that 17 patent claim terms

23  be construed in a district court case; the deadline to exchange terms for construction was two

24  days later.[22]  Despite the general import of claim construction, Mr. Walter sent to Mr. Deoras for

25

26  ---

    [22] In district-court patent litigation, as a general matter, as part of the claim-construction process,

27  each party initially proposes and exchanges to the opposing party patent claim terms that it
    believes the judge should interpret.  The parties subsequently provide proposed constructions

28  (i.e., proposed interpretations) of the proposed terms.  It is common knowledge that this process
    is important in patent litigation and may be case-dispositive.

FIRST AMENDED COMPLAINT              No. 4:22-cv-05990- HSG (TSH)

1   his review an incomplete chart, which without explanation was missing roughly more than a

2   quarter of its substantive contents.  Mr. Deoras responded that at most only two of the 17

3   proposed terms were potentially helpful.  In other words, nearly 90% of Mr. Walter's work was

4   not helpful.  Mr. Deoras conveyed to Mr. Walter that his work was largely ineffectual.  However,

5   despite these deficiencies, Mr. Deoras still thanked Mr. Walter for his efforts.

6          87.    In contrast, Plaintiff's claim construction argument in POPR No. 1 was

7   transplanted into other Mr. Huehns' POPR at Mr. Deoras' direction, and Mr. Deoras continued

8   to use Plaintiff's POPR arguments on other POPRs, demonstrating their value and eliciting

9   express praise from Mr. Deoras.  For example, as discussed below, Mr. Deoras emailed Plaintiff

10  in June 2021 and said "we were able to use a lot of your work on [POPR No. 2] with [two POPRs

11  that were drafted by another associate and resulted in noninstitution].  Congrats on a great result!"

12  Moreover, Plaintiff had never been told that any of her work was ineffectual, let alone almost

13  entirely useless, in contradiction to the falsehoods in Defendants' "evaluations" of Plaintiff.

14         88.    Mr. Walter is still employed at Kirkland, and, on information and belief, was not

15  negatively criticized like Plaintiff was in his evaluations, including by Mr. Deoras.

16    _Plaintiff's Extremely Successful POPRs Significantly Improve Defendants' Historically Sub-_

17  _Par POPR Performance, Earning Plaintiff Real-Time Praise, Which Defendants' Defamatory_

18                  _"Evaluations" Deliberately Excluded_

19         89.    On Monday, April 5, 2021, Mr. Alper called Plaintiff and told her that she had

20  done "excellent" work on the POPRs and that he had spoken to Mr. Deoras regarding the same.

21         90.    In mid-April 2021, when the PTAB issued its noninstitution decision concerning

22  POPR No. 1, Male Share Partner C complimented Plaintiff's "[g]reat job" on "identifying [the

23  petition's] deficiency and pressing it."  He praised Plaintiff's "[t]errific work," stating that the

24  win would "help immensely" in district-court litigation.  Defendants Mr. Deoras, Mr. Alper, Mr.

25  De Vries, and Ms. Schmidt all received this email.  Male Share Partner C was on the IP Litigation

26  Associate Review Committee ("**ARC**"), which participated in the decision to summarily fire

27  Plaintiff (without any form of probation) based on allegedly horrific work performance.

28

FIRST AMENDED COMPLAINT                                    No. 4:22-cv-05990- HSG (TSH)

91.     In June 2021, when the PTAB issued its noninstitution decision concerning POPR No. 2, Mr. Alper and Mr. De Vries emailed the team thread complimenting Plaintiff's work.

92.     A few days later, in late June 2021, Mr. Deoras sent a gushing email to Plaintiff, copying his superiors, Mr. Alper and Mr. De Vries, stating: "Zoya, just wanted to say that **you really did a fabulous job with these**," referencing all of Plaintiff's work on preliminary proceedings, which resulted only in noninstitution.  Moreover, Mr. Deoras raved that Plaintiff's successes "**were key wins**" and stated that "**we were able to use a lot of your work on [POPR No. 2] with [two other POPRs, which also resulted in noninstitution].  Congrats on a great result!**"[23] Mr. Alper responded, stating: "Great job Zoya. What a series of terrific results."  And Mr. De Vries responded, stating: "Same – great job, Zoya; this is terrific to see."[24]

93.     The best estimate, based on publicly available data, of the probability of both of Plaintiff's POPRs successfully resulting in the PTAB denying institution of IPRs is approximately **16.81%**.[25]  In sum, every POPR Plaintiff touched turned to gold.

94.     The same cannot be said for Defendants Mr. Alper, Mr. De Vries, and Mr. Deoras.  Comparing recent historical, publicly-available data concerning the outcomes of Plaintiff's versus Defendants' POPRs—i.e., comparing how many successfully resulted in noninstitution of

---

[23] However, in Mr. Deoras' defamatory "evaluation" of Plaintiff, his only comments, which were false, regarding Plaintiff's work on preliminary proceedings before the PTAB were as follows: "On the Omnitracs IPRs, Zoya's technical analysis met expectations, but **her judgment in deciding which arguments to include and prioritize needed improvement**."  Mr. Deoras also falsely stated more generally that Plaintiff "had difficulty communicating her analysis"; that "[Plaintiff's] writing, analysis, and judgment is not up to her class year, and as a result, she puts the team in a difficult position when her work needs to be redone"; and that Plaintiff "often provides" work "that needs significant reworking."

[24] However, Mr. De Vries' "evaluation" of Plaintiff did not include any reference to her work on POPRs.

[25] *See PTAB Trial Statistics*, U.S. Pat. & Trademark Off., 6 (2021), https://www.uspto.gov/sites/default/files/documents/ptab_aia_fy2021__roundup.pdf (stating institution rate by petition for post-grant proceedings for fiscal year ("**FY**") 2021 was 59%); *Appendix*, U.S. Pat. & Trademark Off., 5 (2021), https://www.uspto.gov/sites/default/files/documents/ptab_aia_fy2021_roundup__appendix.pdf (stating institution rate by petition is calculated from all decisions on institution issued in that FY).  Accordingly, the non-institution rate by petition for post-grant proceedings for FY 2021 was 41%.  The probability of noninstitution of both POPR Nos. 1 and 2, which concerned different patents and unrelated subject matter and had different patent owners and inventors, can be found, e.g., by applying De Morgan's law, which gives $(0.41)^2 = 0.1681 = 16.81\%$.

1    IPR—shows that Plaintiff **outperformed Defendants Mr. Alper, Mr. De Vries, and Mr.**

2    **Deoras by a wide margin.**   **Plaintiff's batting average on the POPRs was 100%**, while

3    **Defendants Mr. Alper's, Mr. De Vries', and Mr. Deoras' collective historical batting**

4    **average was a paltry 25%** (i.e., only two of eight POPRs that these Defendants had filed in the

5    three years before they hired Plaintiff to join their team successfully resulted in noninstitution).[26]

6          95.    Defendants directly and indirectly reaped the benefits of Plaintiff's work.  This

7    included improving Defendants Mr. Alper's, Mr. De Vries', and Mr. Deoras' cumulative POPR

8    performance over the last several years from objectively deficient to respectable courtesy of

9    Plaintiff's direct contributions in a matter of months.  Defendants were aware of their deficient

10   performance in recent years, which is why they specifically probed Plaintiff's interest in PTAB

11   work when interviewing Plaintiff in September 2021, which is right around the time relevant

12   petitions were filed.  Defendants' awareness of their sub-par performance in recent years and

13   their direct knowledge of Plaintiff's outsized successes on the POPRs highlights the abject falsity

14   and maliciousness of Defendants' characterization of Plaintiff's work, specifically with respect

15   to the POPRs and more generally.  (*See supra* ¶ 77.)

16         96.    Plaintiff's excellent work on POPR Nos. 1 and 2 is further borne out by Mr. Deoras

17   asking Plaintiff to help on a Patent Owner Response ("**POR**") in an IPR proceeding for which

18

19   _____

     [26] Defendants' historical performance is based on recent PTAB proceedings that they had
20   identified in moving for *pro hac vice* admission to the PTAB.  *See Canon Inc. v. Avigilon Fortress
     Corp.*, Case IPR2019-00314 (PTAB July 8, 2019) (Paper 13) (granting institution); *Canon Inc.
21   v. Avigilon Fortress Corp.*, Case IPR2019-00311 (PTAB July 8, 2019) (Paper 13) (granting
     institution); *Axis Commc'ns AB v. Avigilon Fortress Corp.*, Case IPR2019-00236 (PTAB June
22   12, 2019) (Paper 12) (denying institution); *Axis Commc'ns AB v. Avigilon Fortress Corp.*, Case
     IPR2019-00235 (PTAB June 4, 2019) (Paper 19) (denying institution); *Axis Commcn's AB v.
23   Avigilon Patent Holding 1 Corp.*, Case IPR2018-01268 (PTAB Jan. 8, 2019) (Paper 15) (granting
     institution); *Hytera Commc'ns Corp. Ltd. v. Motorola Solutions Inc.,* IPR2017-02183 (PTAB
24   May 14, 2018) (Paper 7) (granting institution); *Hytera Commc'ns Corp. Ltd. v. Motorola
     Solutions Inc.*, Case IPR2018-00176 (PTAB May 10, 2018) (Paper 7) (granting institution);
25   *Hytera Commc'ns Corp. Ltd. v. Motorola Solutions Inc.*, Case IPR2018-00128 (PTAB May 10,
     2018) (Paper 8) (granting institution).

26   Defendants' noninstitution rate, 25%, was below the 38.5% average industry-wide noninstitution
     rates by petition for FYs 2018 and 2019.  *See PTAB Trial Statistics*, *supra*, at 8 (stating institution
27   rates were 60% and 63% in FY 2018 and FY 2019, respectively, i.e., noninstitution rates were
     40% and 37%, respectively); *see Appendix*, *supra*, at 5 (stating institution rate by petition for a
28   respective FY is calculated from all decisions on institution issued in that FY).

FIRST AMENDED COMPLAINT                              No. 4:22-cv-05990- HSG (TSH)

the POPR was drafted by a male associate and resulted in institution.  Specifically, shortly before Plaintiff was fired, Mr. Deoras had Plaintiff begin working on drafting the POR, including preparing a detailed, substantive outline setting forth the arguments to be advanced in the POR. This was the first substantive assignment Plaintiff had in over a month because Defendants had dried up Plaintiff's work in retaliation for her reporting and in further discrimination because of Plaintiff's sex.  Saliently, Mr. Deoras asked Plaintiff to complete this work after he had extensively defamed Plaintiff in his "evaluation" and knew Plaintiff would be fired in a matter of weeks for allegedly pervasive and long-standing incompetence.  Assuming *arguendo* the defamatory "evaluations" used as the underlying support for the basis for Plaintiff's termination (poor performance) were true, it would make no sense for Mr. Deoras to have Plaintiff bill a client to complete a substantive assignment right before Plaintiff's termination, after Defendants had stopped giving Plaintiff work.  The truth of the matter is that Mr. Deoras knew the defamatory "evaluations" were baseless and could not help but squeeze one more drop of value out of Plaintiff with respect to PTAB work, particularly in light of his and the practice group's historically underwhelming performance.  As detailed below, Defendants only used Plaintiff's arguments that she had provided prior to being fired.

**In March 2021, Mr. Deoras Added Plaintiff to the ITC Investigation, on Which She Served as the Lone Workhorse Associate**

97.     On March 1, 2021, on Plaintiff's first day back after bar leave, Mr. Deoras asked Plaintiff to join another matter for Mr. Alper and Mr. De Vries—representing a respondent that had been accused of infringing 19 claims across seven patents in the ITC Investigation discussed above.  The Kirkland team also included Ms. Schmidt and Mr. Fahey.  Plaintiff's work was largely supervised, directly and indirectly, by Mr. Deoras and directly by Mr. Fahey.   In September 2021, the administrative law judge ("**ALJ**") granted Kirkland's client's motion for summary determination on patent invalidity, terminating the ITC Investigation in its entirety.

98.     Plaintiff served as the lone workhorse associate on the ITC Investigation, in which she would develop and drive the client's invalidity, unenforceability, and noninfringement defenses.  More specifically, these defenses included patent invalidity based on improper

FIRST AMENDED COMPLAINT                              No. 4:22-cv-05990- HSG (TSH)

inventorship, lack of co-pendency, anticipation, and obviousness and patent unenforceability due to inequitable conduct based on improper inventorship and lack of copendency.  Plaintiff's responsibilities on the ITC Investigation included developing the patent invalidity theories and drafting invalidity contentions; developing the non-infringement theories and drafting all non-infringement contentions); managing, handling, and driving the substantial third-party discovery (with around 14 subpoenaed nonparties).

99.  In March 2021, Plaintiff began developing the invalidity theories, including analyzing and assessing potential prior art references to include in the invalidity contentions.  In addition, in March 2021, Plaintiff began driving the extensive third-party discovery, including drafting subpoenas concerning the invalidity defenses based on anticipation, obviousness, lack of copendency, and omitted inventorship and unenforceability defenses due to inequitable conduct concerning lack of copendency and omitted inventorship.  Plaintiff's work earned her compliments, including from Mr. Fahey when he told Plaintiff she did "[n]ice work" drafting a subpoena and later referred to her as "our ITC subpoena expert."

**At Trial in April 2021, Plaintiff Sees Defendants' Disturbing Discrimination**

100.  **On March 30, 2021**, Defendant Ms. Schmidt called Plaintiff to ask whether Plaintiff would like to join a trial team, representing a defendant accused of patent infringement in the Eastern District of Texas, which is generally a very patent-plaintiff-friendly forum, with trial set to begin in **mid-April 2021**.  Ms. Schmidt stated that, because of Plaintiff's excellent work at the Firm, including on the POPRs and on the ITC Investigation, Defendants wanted Plaintiff to join the trial team to replace a key (female) associate who had abruptly resigned.  Ms. Schmidt asked Plaintiff whether she was interested in joining, and Ms. Schmidt stated that Plaintiff would not need to worry about Plaintiff's responsibilities for the ITC Investigation, which was a separate, active matter.  Because both this trial and the ITC Investigation were Mr. Alper's and Mr. De Vries' cases, managed by both Mr. Deoras and Ms. Schmidt, Ms. Schmidt assured Plaintiff that if Plaintiff joined the trial team, Defendants would remove Plaintiff's work on the ITC Investigation so that Plaintiff could prepare for and focus on trial rather than other matters.  Plaintiff was appreciative of the compliments and, despite the obstacles to being a last-

FIRST AMENDED COMPLAINT                    No. 4:22-cv-05990- HSG (TSH)

minute addition to the trial team, agreed to attend trial relying on the assurance that Plaintiff would not be burdened with work for non-trial matters.

101.   Plaintiff was thrilled to go to trial with renowned IP litigators even though the circumstances were unusual.  Given that Plaintiff would be working on the damages team with Ms. Schmidt, Plaintiff informed Ms. Schmidt of Plaintiff's limited prior experience with damages.  (Plaintiff's practice primarily focused on developing and advancing patent infringement and invalidity theories/arguments.)  Ms. Schmidt assured Plaintiff that that would not be an issue and confirmed again that Defendants would offload Plaintiff's work on the ITC Investigation so she could focus on trial.  But, as Plaintiff would later learn, the repeated promises to offload Plaintiff's work on non-trial matters was a lie.  Before trial and while at the trial site, Plaintiff continued to be saddled with work for the ITC Investigation, including, *inter alia*, drafting invalidity contentions and analyzing discovery.  In spite of the obstacles Plaintiff faced, Plaintiff continued to do excellent work and garnered praise for both her non-trial and trial work while at trial.

102.   During the two weeks in Texas for trial, which was the only time Plaintiff met any of the Defendants in person, Plaintiff experienced and otherwise observed a bevy of discriminatory conduct towards women, as detailed below.  That Plaintiff experienced and observed such extensive gender discrimination in such a protracted time period is no surprise given that Defendants were in their comfort zone at trial and could not help but reveal their discriminatory *modus operandi*.

103.   At trial, Plaintiff assisted with both Mr. De Vries' key cross-examination of the plaintiff's CEO and with Ms. Schmidt's direct examination of the defendant's damages expert witness.  The trial resulted in a complete verdict (of invalidity and non-infringement of all asserted patent claims) for the client-defendant.

104.   Mr. De Vries was pleased with Plaintiff's work, as he expressed to Plaintiff multiple times in person and over email.  The Firm's own publication touted a line of questioning

FIRST AMENDED COMPLAINT                                    No. 4:22-cv-05990- HSG (TSH)

developed by Plaintiff as key to the trial victory.[27]  Mr. De Vries' comments to Plaintiff about her good work at trial stand in stark contrast to Mr. De Vries' false statements in Plaintiff's "evaluation," in which he claimed that he was allegedly displeased with Plaintiff's work for him at trial.[28]  Plaintiff first learned of his alleged displeasure when she was read her "evaluations" in October 2021, after she had been fired.

105.  Additionally, while at trial, Mr. Fahey praised Plaintiff's work on drafting invalidity charting for the ITC Investigation (the non-trial matter), stating Plaintiff's "nice work" on invalidity charting "looked good" and required no substantive revisions (unlike the substantially similar charting assigned to other associates),[29] for which he thanked Plaintiff.[30].

---

[27] On April 17, 2021, Mr. De Vries expressed his approval to Plaintiff of her proposed line of questioning regarding the plaintiff's approximately decade-long delay in filing suit.  *Cf. Kirkland Saves Network Security Client from Potential Patent Ruin*, Kirkland & Ellis (Apr. 29, 2021), https://www.kirkland.com/news/in-the-news/2021/04/kirkland-saves-network-security-client ("De Vries elicited at trial that Gigamon had studied APCON's technology a decade ago but decided against bringing a case. Then it did a U-turn in 2019, accusing its much smaller competitor of 'rampant infringement.'"); *see also* Ross Todd, *Litigators of the Week: This Kirkland Duo Landed a Complete Defense Sweep in an East Texas Competitor Patent Trial*, AmLaw Litig. Daily (Apr. 30, 2021), *available at* https://www.kirkland.com/-/media/news/press-mention/2021/04/the-american-lawyer--litigators-of-the-week--alper.pdf (Adam Alper: "In this one, Mike cross-examined Gigamon's CEO in a key examination that set the tone for the case, during which he elicited testimony supporting important case themes, and impeached the witness repeatedly, which he used during the examination to expose key credibility problems for Gigamon. . . . [This cross-examination and the adverse direct examination of the client's CEO] were critical components of our win.").

[28] For example, in his defamatory "evaluation," Mr. De Vries falsely states, with knowledge of said falsity thereof, that "I generally did not think that [Plaintiff's'] work on that project was very good."

[29] Plaintiff, Male Associate G, and Female Associate J each drafted invalidity charting for the ITC Investigation—i.e., they performed similar assignments.  Male Associate G and Female Associate J produced work of substantially similar quality, which required comparable substantive revisions.  When Plaintiff was at the trial site, Mr. Fahey sent a team-facing email, including to share partners whom he added to the thread, to praise Male Associate G's work while characterizing Female Associate J's work as insufficient and requiring significant substantive revisions.  As discussed above, Plaintiff's work required no substantive revisions; however, Mr. Fahey intentionally avoided praising Plaintiff despite praising Male Associate G for inferior work relative to Plaintiff's work.  (Mr. Fahey privately emailed Plaintiff the aforementioned praise only after Plaintiff followed up with him due to his non-responsiveness.)

[30] Mr. Fahey's defamatory "evaluation" of Plaintiff falsely stated that Plaintiff "needs to work on developing her understanding of the style of work" that "we want at Kirkland"; that Plaintiff "needs to continue to develop her judgement [*sic*]"; and that Plaintiff "needs to work on . . . dependability of [her] work."  Male associates who worked with Plaintiff on cases and assignments for Mr. Fahey were not summarily fired like Plaintiff was.  On information and

FIRST AMENDED COMPLAINT                              No. 4:22-cv-05990- HSG (TSH)

106.   Besides assisting Mr. De Vries with cross-examination, Plaintiff's trial work consisted of working for Ms. Schmidt.  On March 31, 2021, Plaintiff attended her first meeting with Ms. Schmidt, the other associate who worked with Ms. Schmidt on damages ("**Female Associate L**"), the damages expert, and the expert's assistant.  The damages expert made a comment regarding working on an all-female damages team.  In response, Ms. Schmidt indicated that she did not like working on an all-female damages team.

107.   On Saturday, April 10, 2021, Plaintiff flew to Texas for trial.  Plaintiff and Ms. Schmidt arrived in Houston on the evening of April 10, 2021, in order to meet with the damages expert for an in-person prep session on Sunday, April 11, 2021.  At the in-person prep session with the expert, her assistant, Ms. Schmidt, and Plaintiff, the expert asked Ms. Schmidt why the female associate who had worked with Ms. Schmidt (and who Plaintiff replaced) quit right before trial.  At the end of her response, Ms. Schmidt stated, "now I'm stuck with this," while Ms. Schmidt waved her hands in a derogatory gesture toward Plaintiff.  Ms. Schmidt and the expert agreed that that was "unfortunate."  Plaintiff was extremely bothered by this demeaning and disparaging conduct directed at Plaintiff, especially considering Ms. Schmidt had asked Plaintiff to join the trial team last-minute because of Plaintiff's excellent work performance and to replace a female associate who had abruptly quit right before trial.

108.   Ms. Schmidt continued to humiliate Plaintiff after making the aforementioned comments.  Ms. Schmidt made Plaintiff order food for Leslie Schmidt, the expert, and the expert's assistant.  Ordinarily partners either relegate such tasks to an assistant (who can make orders remotely and/or in advance) or office-services personnel (who are available on weekends) or handle them personally.  To Plaintiff's knowledge, no male associate had ever been asked or had to order food for any member of the trial team, including themselves.  Clearly, Defendants felt that ordering food and other administrative tasks are tasks best left to females and are too ministerial for a male associate to handle.[31]

---

belief, Mr. Fahey did not provide similarly negatively slanted and skewed "evaluations" for male associates in the IP litigation group.

[31] As another example, Mr. De Vries inexplicably told Plaintiff to pull a photograph for the direct examination preparation that comparator Mr. Blake was assigned to handle, despite not asking

FIRST AMENDED COMPLAINT                                    No. 4:22-cv-05990- HSG (TSH)

109.    During the drive to the trial site after meeting with the expert, Ms. Schmidt divulged to Plaintiff that she does not like working with female experts and prefers working with male experts.   In addition, Ms. Schmidt made disparaging comments directly to Plaintiff regarding Female Associate L's work.[32]

110.    Consistent with Ms. Schmidt's willingness to insult Female Associate L's work, Ms. Schmidt also failed to thank Female Associate L for her work on an assignment and instead stated that Female Associate L's work on a trial assignment "obviously needs wordsmithing." Female Associate L resigned shortly after trial.   In contrast, when Male Associate M performed a similar assignment, Ms. Schmidt—who did not work with Male Associate M on that assignment or any other trial work—went out of her way to send Male Associate M a team-facing email (including to other share partners Mr. Alper and Mr. Deoras) thanking him for his work, which she praised.   (Mr. Deoras also sent a team-facing email complimenting Male Associate M's work.)  Both Ms. Schmidt's and Mr. Deoras' praise followed an email from Mr. Alper in which he diplomatically stated one of Male Associate M's proposed objections was ineffectual.

111.    Plaintiff's non-trial matter work was a substantial obstacle that Plaintiff had to unfairly and unreasonably contend with while preparing for and while at trial and was an obstacle that no other associate, particularly comparable or comparative male associates, had to contend with.[33]  Notwithstanding the obstacles imposed on Plaintiff by Defendants, Plaintiff contributed

---

to her to help with anything else for that portion of the case.  Why Mr. Blake was not asked to perform this ministerial task for his own assignment is best explained by Defendants' discriminatory ethos.

[32] Ms. Schmidt's animosity towards females may be explained by her own experiences at the firm.  An associate who had worked in the Firm's IP litigation group, including for some time with Ms. Schmidt, told Plaintiff that Ms. Schmidt had to prove her loyalty to Mr. Alper and Mr. De Vries, including by making sacrifices.  In April 2021, Ms. Schmidt told Plaintiff that she had not lived with her husband prior to the pandemic, despite being married to him, and that she has no children.  A former partner in Kirkland's IP litigation group who had worked at the Firm for a number of years and remained close with her former colleagues who were share partners in leading roles within the Firm told Plaintiff that, to her knowledge, every female share partner in the IP litigation group at Kirkland had either slept with or had been rumored to have slept with a male share partner prior to being elevated to share partner.  Ms. Schmidt is one of few female IP litigation attorneys to have been promoted to share partner at Kirkland.

[33] Because Defendants failed to remove Plaintiff's non-trial matter work as promised, Plaintiff tried to do the same and was met with a message she would see propagated at trial and throughout her tenure at Kirkland: that male associates are treated better than and think they are worth more

39

1   substantively in myriad ways on work that she performed for Ms. Schmidt.  This work included

2   but was not limited to adding to and revising demonstratives for the damages expert's direct

3   examination per requests from Ms. Schmidt and the expert; revising direct examination

4   scripts/outlines for Ms. Schmidt and the damages expert; reviewing trial transcripts, e.g., of cross

5   examinations of CEO and damages expert for direct examination of damages expert; preparing

6   re-direct examination script/outline for Ms. Schmidt and the damages expert; revising same per

7   their comments; and ensuring that all material in the damages expert's demonstratives for direct

8   examination was non-objectionable (such that opposing counsel did not have a single objection

9   to the demonstratives that Plaintiff worked on while opposing counsel objected to demonstratives

10  worked on by other Kirkland attorneys, including male(s)).  However, this did not stop Ms.

11  Schmidt from the grossly false and malicious statement in her "evaluation" of Plaintiff that

12  "[Plaintiff] did not contribute at trial"[34] and that the "only work she did . . . was not even usable."

13  Not only did Ms. Schmidt lie about Plaintiff's contributions, Ms. Schmidt fragrantly distorted

14  the nature of the work performed by Plaintiff at trial in an effort to support Ms. Schmidt's false

15  statement that Plaintiff did not contribute whatsoever at trial.  For example, Ms. Schmidt

16  inaccurately characterized as "cite checking" Plaintiff's substantive assignment of ensuring that

17  the damages expert's demonstratives contained no objectionable material, addressing and

18  implementing all of the expert's comments and requests regarding the demonstratives, including

19  adding material.  Moreover, the fact that the Firm billed the client for Plaintiff's work at trial

20  contradicts the false statement that Plaintiff only performed cite checking and produced no usable

21  work at trial.

22

23  than female associates.  For example, in early April 2021, Plaintiff asked Male Associate G on
    the non-trial matter (the ITC Investigation) if he could assist with invalidity charting because
24  Plaintiff had to focus on her trial work.  The male associate refused, stating he had to prepare for
    his trial for the same partners that would not begin until the end of May 2021.
25

26  [34] In addition, Plaintiff also helped prepare demonstratives for Mr. Alper's closing argument.
    After Plaintiff had requested to attend closing by emailing Mr. Alper and Mr. De Vries, Ms.
27  Schmidt sent a team-facing email saying that only persons who played a role in closing could
    attend.  Ms. Schmidt listed individuals who were permitted to attend and excluded Plaintiff.
28  However, a male associate whose only role in closing was to perform the same work as Plaintiff
    by helping to prepare demonstratives for Mr. Alper's closing argument was permitted to attend.

FIRST AMENDED COMPLAINT                    No. 4:22-cv-05990- HSG (TSH)

**Plaintiff's Experience at Trial Relative to Mr. Blake**

112. Defendants' disparate treatment of Plaintiff as compared to a comparator male associate in the IP litigation group, Mr. Blake, further demonstrates Defendants' preferential treatment of males and the unlawful nature of Plaintiff's termination.  Plaintiff and Mr. Blake joined the trial team at the same time, on or around March 30, 2021.  Defendants assigned Plaintiff and Mr. Blake substantially similar assignments for Mr. De Vries at trial: assisting Mr. De Vries in preparing for cross-examination of the plaintiff's CEO and for adverse direct examination of the defendant's CEO, respectively.

113. Defendants ensured that Plaintiff had disproportionately more work than Mr. Blake leading up to and at trial.  For example, Defendants ensured that Plaintiff had substantial non-trial work leading up to and at trial, while Defendants ensured that Mr. Blake did not. Specifically, Defendants cleared Mr. Blake's schedule of all non-trial work when he joined the trial team (at the same time as Plaintiff) so that he could focus on the trial work.  In addition, Mr. Blake told Plaintiff he had never experienced having to perform more than *de minimis* non-trial work leading up to and at trial, and he expressed incredulity at the fact that Plaintiff had non-trial work leading up to and at trial.  In fact, the other associates on the trial team told Plaintiff that her work on another matter leading up to and at trial was highly abnormal for a standard Kirkland trial experience, which made this treatment even more surprising to Plaintiff given her last-minute addition to the team.  This abnormality was further affirmed by a former non-share partner in the IP litigation group at Kirkland.[35]  Both partners for whom Plaintiff worked at trial, Mr. De Vries and Ms. Schmidt, were aware of (and had indirectly assigned) Plaintiff's non-trial work leading up to and at trial.  In sum, Plaintiff had to perform substantial non-trial work leading up to and at trial, while a comparator male associate who was assigned substantially similar trial work for the same partner did not.

---

[35] Compare this with Male Non-Share Partner Y's statement to Plaintiff promising to redirect any work away from Plaintiff after he learned that Plaintiff was away at trial and had emailed Plaintiff a request regarding the issuance of the PTAB's noninstitution decision concerning Plaintiff's first POPR.

FIRST AMENDED COMPLAINT                    No. 4:22-cv-05990- HSG (TSH)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

114.    Another example of Defendants ensuring Plaintiff had a disproportionate workload as compared to Mr. Blake arose in the context of Plaintiff's and Mr. Blake's comparable assignments for Mr. De Vries.  Defendants provided Plaintiff with no associate or other support on her assignment.  However, Defendants provided Mr. Blake with two junior associates with detailed case knowledge as support on his similar assignment.  Moreover, Mr. De Vries asked Plaintiff to provide ministerial assistance on Mr. Blake's similar assignment.

115.    Plaintiff tried to set up meetings with Mr. De Vries to discuss the assignment, given that she had just been added to the team, had no associate support, was still significantly contributing to the ITC Investigation per Defendants' instructions and assignments, and also was working on damages for Ms. Schmidt.  However, Mr. De Vries canceled, rescheduled, or simply did not attend the meetings scheduled by Plaintiff.  Despite Mr. De Vries blowing off these meetings that were necessary to advance the assignment, he then falsely claimed in Plaintiff's "evaluation" that he viewed her performance as poor because the assignment was allegedly "late," but he intentionally omitted his truancy, which was the reason for the timing of Plaintiff's work.  On the **evening of Saturday, April 17, 2021**, Plaintiff was **first** afforded the privilege of meeting with Mr. De Vries to discuss the assignment for his upcoming **cross-examination on the morning of Monday, April 19, 2021**.  Prior to the first meeting, Plaintiff had sent Mr. De Vries documents and materials supportive of the trial themes, based on a high-level discussion on the evening of April 13, 2021 with Mr. De Vries and Mr. Blake, which discussion was not specific to Plaintiff's assignment for Mr. De Vries.  Contrary to Mr. De Vries' "evaluation," Plaintiff met every deadline for her assignment for Mr. De Vries.  Plaintiff is unaware of Mr. Blake having any difficulty scheduling meetings with or having accessibility to Mr. De Vries to discuss his assignment.  During the discussion on the evening of Tuesday, April 13, 2021 with Mr. De Vries and Mr. Blake, Mr. De Vries told Plaintiff that she need not create an outline because he **always rewrites** outlines that associates prepare for him.  (When Plaintiff expressed surprise about the same during a subsequent discussion with Mr. Blake, he confirmed that Mr. De Vries always rewrites outlines for trial examinations.)  However, Mr. De Vries' "evaluation"

FIRST AMENDED COMPLAINT

1   included false and malicious criticism: "given the timing and content of the outline she prepared,

2   I had to go back to simply preparing a (separate) outline for myself."

3       116.   Mr. De Vries was very pleased with Plaintiff's work on the cross-examination and

4   conveyed the same to Plaintiff while they were at trial, including when he characterized her work

5   as "great and very helpful" on April 17, 2021.  Kirkland's press release regarding the trial win

6   touted testimony that Mr. De Vries elicited at trial thanks to Plaintiff's work; this was the only

7   substantive, factual point mentioned in the press release.  After the cross-examination and

8   separately after receiving the jury verdict, Mr. De Vries thanked Plaintiff again for her work.  As

9   a reward for Plaintiff's work, Mr. De Vries later made false statements in his "evaluation"

10  concerning Plaintiff's work for him as pretext to fire Plaintiff.  As a result, Mr. De Vries tarnished

11  Plaintiff's professional reputation, ruined her professional standing, and ensured Plaintiff was

12  unlawfully terminated, all of which caused Plaintiff severe emotional distress and loss of future

13  earning capacity and embarrassment, shame, and mortification.  In contrast, Mr. Blake is still

14  employed at Kirkland.

15      1.  In sum, Defendants' discriminatory conduct included burdening Plaintiff with

16          non-trial work, providing no associate support for the assignment for Mr. De

17          Vries, subjecting Plaintiff to disparaging and demeaning conduct and remarks,

18          and requiring Plaintiff to complete ministerial tasks, including for a comparator

19          male associate.  Conversely, Defendants ensured that no male associates were

20          tasked with non-trial work, assigned significant associate support to a comparator

21          male associate on his nearly identical assignment for Mr. De Vries, did not subject

22          male associates to disparaging and demeaning conduct and remarks (and instead

23          provided praise for ineffectual input), and did not ask male associates to perform

24          ministerial tasks.

25                  **Leaving Trial:  All-Boys' Club Charter Flight**

26      117.   Typifying the discriminatory ethos of this practice group was Mr. Alper's, Mr. De

27  Vries', and Mr. Deoras' decision to have Mr. Blake personally join them on a charter flight home

28  from trial, while Plaintiff and Female Associate M were not afforded the privilege to fly home

                                        43

1   exclusively with the male share partners (Defendants Mr. De Vries, Mr. Alper, and Mr. Deoras).

2   Rather, Defendants left behind Plaintiff and Female Associate M at the trial site to fly home in

3   economy seating on commercial flights.  Defendants did not offer Plaintiff a better alternative to

4   travel back home from trial.

       118.   Mr. Blake told Plaintiff about his all-boys' club flight home but told Plaintiff not

to tell anyone, demonstrating that he and the involved partners were trying to hide from others

conduct that they knew was wrong and discriminatory.[36]  Indeed, Plaintiff was left wondering

why she was left to fly commercial and why Mr. Blake was being given preferential treatment

over Plaintiff and another female associate.  Clearly, the Defendants were more than happy to

use women and to leave them behind—literally and figuratively.   In sum, during her tenure at

Kirkland, Plaintiff saw an obvious hierarchy between male and female associates, evidenced by

the discriminatory, disparate treatment Plaintiff received at trial compared to her male analogues.

**On April 29, 2021, Plaintiff Reported Defendants' Sex-Based Discrimination and
Harassment Constituting a Hostile Work Environment**

       119.   After trial, on Wednesday, April 28, 2021, Mr. Deoras emailed Plaintiff, copying

Ms. Schmidt, asking Plaintiff when she would have time to "catch up" to "[d]ebrief" regarding

her first trial experience at Kirkland.  Mr. Deoras scheduled a Zoom meeting for the next day,

April 29, 2021 ("**First April 29 Zoom Meeting**").  During this Zoom meeting, Plaintiff began

complaining about Defendants' Unlawful Employment Practices based on her unfair treatment

related to her trial experience.  For the reasons discussed above, Plaintiff had a good-faith,

reasonable, and honestly-held belief that the conduct at issue of Defendants Kirkland, Mr. De

Vries, Mr. Alper, Ms. Schmidt, and Mr. Fahey constituted unlawful sex-based discrimination and

amounted to harassment constituting a hostile work environment or could do so if repeated.

       120.   On the Zoom meeting, Mr. Deoras stated multiple times that its purpose was to

determine whether there was a personal issue bothering Plaintiff with which they or Kirkland

---

[36] In the fall of 2021, Plaintiff spoke with a female IP litigation associate [Female Associate LL] who had been based out of the Firm's San Francisco office for several years and had worked on cases for Mr. Alper and Mr. De Vries with their acolytes, including Mr. Deoras.  She agreed that the culture reflected that of an all-boys' club.

FIRST AMENDED COMPLAINT               No. 4:22-cv-05990- HSG (TSH)

could help because they had noticed a change in Plaintiff's demeanor at trial. This change in demeanor was caused directly by the unfair and discriminatory treatment that Plaintiff was subjected to throughout her trial experience. The fact that Defendants noticed a change in Plaintiff's demeanor is demonstrative of the magnitude of the discriminatory treatment to which Defendants subjected Plaintiff. In direct contrast to Mr. Deoras' and Ms. Schmidt's defamatory "evaluations" of Plaintiff, they indicated multiple times during the Zoom meeting that its purpose was not about performance. Moreover, as detailed below, Mr. Deoras would reaffirm this point on a separate Zoom meeting with Plaintiff that same day ("**Second April 29 Zoom Meeting**").

121. In response to Mr. Deoras' question as to whether Plaintiff was suffering from a personal issue, Plaintiff made clear that she was not, and that any change in her demeanor was due to her being subjected to unfair treatment and having to deal with a disproportionate workload at trial. Plaintiff explained that one major obstacle that she had to unfairly contend with was a significant amount of non-trial work while juggling trial work, which, as noted above, was an obstacle that male associates did not face and were unfamiliar with as a general matter. Ms. Schmidt falsely claimed that Plaintiff did not work on any non-trial work and that she was unaware of Plaintiff having any non-trial matter work. Ms. Schmidt eventually tried to take issue for the first time with Plaintiff's handling of a draft shell for a motion for judgment as a matter of law concerning damages, which Plaintiff requested to be reassigned at trial due to her disproportionate and onerous workload that was caused by Defendants and was foreign to other associates.

122. Mr. Deoras agreed with Ms. Schmidt initially with respect to Plaintiff not having to work on non-trial matter work, prompting Plaintiff to push back and double down on her unfair treatment and offer to provide them with the total number of hours she worked on non-trial work. Mr. Deoras said that was not necessary, and at this point Mr. Deoras refocused the conversation to the purpose of the meeting, which was to check in on Plaintiff generally. At this point Mr. Deoras also told Plaintiff if she ever had workload or other issues, she should come to him, because he was aware of associate and partner workload in the IP litigation group and was generally responsible for helping to allocate work appropriately. This statement that he was

aware of associate workload did not square with his earlier comments that he was unaware that Plaintiff had to work on a substantial amount of non-trial work at trial but would explain why he told Plaintiff there was no need for her to provide an accounting of her hours worked at trial.

123.   Mr. Deoras also made an overture that Plaintiff could call either him or Ms. Schmidt separately to discuss her concerns or her workload generally in the future.

124.   After this meeting, Plaintiff reviewed Firm policies to determine whether it had any established policies for reporting Unlawful Employment Practices such as discrimination and harassment.  The Firm had a policy for reporting harassment but not discrimination.  The policy provided reporting contacts for each Firm office, namely, two share partners based out of each office.[37]  However, the reporting contacts for the San Francisco office were stale:  they were no longer with the Firm.  As such, Plaintiff decided it was appropriate to report Defendants' Unlawful Employment Practices by further complaining of the same to Mr. Deoras, a share partner with whom Plaintiff worked most closely at Kirkland.

125.   Plaintiff reached out to Mr. Deoras to see if he had availability to speak again that day, and after he confirmed, Plaintiff scheduled the Second April 29 Zoom Meeting with just Mr. Deoras.  Plaintiff began the Zoom meeting by continuing to complain about her unfair treatment, particularly with respect to Ms. Schmidt's lies as to whether Plaintiff had been subjected to disparate treatment at trial.  However, Mr. Deoras stated that Plaintiff would have to continue working with the team at issue, including Ms. Schmidt, and that he had no interest in looking back at the opposed conduct.  Mr. Deoras went on to compliment Plaintiff with respect to her abilities as an attorney and made the express point that he enjoyed working with Plaintiff and that the intention was for her to grow with Kirkland and with the IP litigation group.  He also reiterated that Plaintiff should be comfortable calling him whenever to discuss anything and that he was happy to essentially serve as her mentor at the Firm.  Mr. Deoras was very positive and disarming throughout the Second April 29 Zoom Meeting and conveyed that Plaintiff would have a long career at Kirkland.  Plaintiff took Mr. Deoras' statements at face value because she had

---

[37] One of the share partners had been in the Firm's IP litigation group.

FIRST AMENDED COMPLAINT                                   No. 4:22-cv-05990- HSG (TSH)

no obvious reason to believe at the time that he was not telling the truth and/or that Plaintiff was at risk of facing discriminatory and/or retaliatory conduct at the hands of Mr. Deoras.

126.   On the Second April 29 Zoom Meeting, Mr. Deoras made clear that Plaintiff had no performance issues and instead intimated the opposite, which is shockingly inconsistent with his and Ms. Schmidt's discriminatory and retaliatory "evaluations" of Plaintiff.

127.   Moreover, Mr. Deoras intentionally omitted in his "evaluation" the Second April 29 Zoom Meeting because he knew that discussion was at odds with his "evaluation" and would undermine the false narrative proffered by him and Ms. Schmidt regarding the First April 29 Zoom Meeting.  In his "evaluation" Mr. Deoras brazenly lied and claimed: "Leslie and I had a long conversation with Zoya after the Apcon trial to let her know that her performance was unacceptable."  Ms. Schmidt further promulgated these lies in what was crystal clear discriminatory and retaliatory coordination with Mr. Deoras: "Despite significant concerns about Zoya's performance at the Apcon trial, Akshay and I discussed her poor performance and explained that she would need to improve.  That did not happen."  As purported support for the latter defamatory statement, Ms. Schmidt stated that "Akshay will be able to provide more specifics on her work."[38]

128.   Mr. Deoras' and Ms. Schmidt's false and dishonest "evaluations," combined with Mr. De Vries' and Mr. Fahey's false and dishonest "evaluations," collectively served as the underlying support for the pretextual, poor-performance basis for Plaintiff's unlawful (discriminatory and retaliatory) termination.

129.   After Plaintiff's initial complaints about her unfair treatment on April 29, 2021, Defendants' treatment of Plaintiff continued to worsen over the next several months, as discussed below.  The retaliatory and discriminatory treatment came to a crescendo in July 2021, leading

---

[38] Mr. Deoras' "evaluation" confirmed his discriminatory and retaliatory coordination with Ms. Schmidt, in which evaluation he omitted reference to any of Plaintiff's wins or work he had praised and instead regurgitated the falsehoods from Ms. Schmidt's "evaluation" and spoke of Plaintiff's trial work, none of which was performed for him: "[W]e asked Zoya to join us for trial in the Gigamon v. Apcon matter.  Her work was directly supervised by Leslie Schmidt, but her inability to meet deadlines and her effective disappearance for large portions of the trial caused a number of issues for the rest of the team, who had to pick up work Zoya had not completed."

FIRST AMENDED COMPLAINT                                    No. 4:22-cv-05990- HSG (TSH)

Plaintiff to complain again to Mr. Deoras about her disparate treatment relative to males and her disproportionate workload.

**After Plaintiff's April 2021 Complaint, She Continued Producing Excellent Work Despite Defendants' Retaliatory and Discriminatory Undermining**

130.  As detailed below, Plaintiff saw her treatment by Defendants gradually worsen after Plaintiff's April 2021 complaint.  But it took time for Plaintiff to fully appreciate the retaliatory nature of her worsening treatment for a number of reasons, including that Plaintiff was eager and willing to work, that this job was Plaintiff's dream job and because Plaintiff's disproportionate workload, as a result of Defendants' conduct, kept her working at such a frenetic pace that she barely had time to appreciate, process, and report the retaliation.  Over time, however, it became increasingly clear that Defendants were subjecting Plaintiff to discriminatory and retaliatory conduct and that Plaintiff's discriminatory experience at trial was not a one-off but rather was Defendants' standard operating procedure.

131.  For example, at a high level, Plaintiff was consistently inundated with substantive assignments with little to no support and under condensed and competing deadlines, notwithstanding Defendants' ability to more evenly spread work among associates and Plaintiff's indications that support would be helpful.[39]  In contrast, Defendants timely provided male IP litigation associates with meaningful support and reasonably spaced out their deadlines.  In addition, Defendants responded to emails (e.g., requesting input, proposing draft correspondences, etc.) from male associates more quickly than they did to emails from Plaintiff.  Defendants also sabotaged any attempt by Plaintiff to take short scheduled vacations that were mostly (if not all) over weekends or on holidays.

132.  Multiple male comparator associates stated or indicated that the amount of work Plaintiff had was extreme or unreasonable relative to their customary workload, which, when combined with the below treatment (among other things) reignited Plaintiff's concerns regarding discrimination and also triggered concerns regarding retaliation.  After being subjected to several

[39] Mr. Deoras told another IP litigation associate based out of the Firm's San Francisco office that he is always aware of each associate's present workload and assignments.

FIRST AMENDED COMPLAINT                              No. 4:22-cv-05990- HSG (TSH)

months of worsening treatment, Plaintiff complained again of Defendants' unlawful conduct. After Plaintiff's July 23, 2021 complaint, Defendants almost immediately froze Plaintiff out of additional work without explanation.  Plaintiff also saw changes in the degree and visibility of praise she received for her work (despite its quality remaining the same), which changes coincided with the dates of Plaintiff's complaints of Defendants' Unlawful Employment Practices.

### Plaintiff's Work Between April and July 2021 Complaints

133.   After Plaintiff's initial reporting on April 29, 2021, Plaintiff continued working as the primary associate on the ITC Investigation (through its termination in September 2021 due to the patents' invalidity).  Plaintiff continued developing and driving the client's invalidity, unenforceability, and noninfringement defenses.  As a general matter, ITC investigations are fast-paced, time-consuming, and, depending on facts and circumstances, may comprise all or a very substantial portion of an associate's work while the investigation is active.

134.   In early May 2021, for ITC Investigation, Defendants asked Plaintiff to draft non-infringement contentions for all 19 asserted claims across seven patents.  Defendants Mr. Fahey and Mr. Deoras reassigned the drafting of the contentions from Male Associate G to Plaintiff on the underline evening of Saturday, May 8, 2021,[40] with a service deadline of Wednesday, May 12, 2021. When reassigning the work, Mr. Fahey made it seem as if Male Associate G had made progress on the assignment and just needed Plaintiff to "help jump in" over the weekend or Monday to complete the assignment.  However, Male Associate G had not even started the assignment.  Mr. Fahey claimed that he needed to reassign the work to Plaintiff because Male Associate G was "pretty tied up" merely editing a single, already-drafted interrogatory response that was an iota of the amount of work that was reassigned to Plaintiff to the benefit of Male Associate G (and Defendants).  Even on this tight deadline, Plaintiff's work developing the non-infringement

---

[40] It is worth noting this was reassigned to Plaintiff right before Mother's Day, which Defendants also knew was Plaintiff's birthday weekend.

FIRST AMENDED COMPLAINT                    No. 4:22-cv-05990- HSG (TSH)

theories and drafting the contentions was met with praise from Mr. Deoras, who directly supervised her work, e.g., when he stated, "Thanks, Zoya - thought this looked great."[41]

135.    The praise Plaintiff received on this assignment and Defendants' decision to reassign such an important assignment to Plaintiff with a short turnaround is inconsistent with Defendants' proffered reason for her termination and Mr. Deoras' and Ms. Schmidt's allegations that at this point, Defendants already had a well-established concern regarding Plaintiff's performance, e.g., with Mr. Deoras' false claim in his "evaluation" that in the past Plaintiff's alleged "inability to meet deadlines . . . caused a number of issues of the rest of the team, who had to pick up work [Plaintiff] had not completed."  Moreover, these events underscore the obvious falsity of Defendants' evaluations and the pretext and baselessness of the alleged reason for Plaintiff's termination—poor performance.

136.    As detailed further below, on the ITC Investigation from May to July 2021, Plaintiff continued to develop and drive the patent invalidity and unenforceability defenses, e.g., by managing, handling, and driving the substantial third-party discovery (with around 14 subpoenaed nonparties), supplementing invalidity contentions, drafting an order of proof, assisting with the inventor and omitted inventor depositions, deposing a product prior art manufacturer, and drafting the invalidity expert report.

**Defendants Pile onto Plaintiff's Already-Heavy Workload with District-Court Cases and More Patent-Assertion Analysis for Litigation Funding**

137.    In addition to Plaintiff's work for the ongoing ITC Investigation, on May 7, 2021, Mr. Deoras and Plaintiff had a call or Zoom meeting during which Mr. Deoras added Plaintiff to six district-court patent infringement cases (the "**District-Court Cases**") on which she helped with third-party and with party discovery before the cases settled in July 2021.  Defendant Mr. Deoras generally supervised these cases for Defendants Mr. Alper and Mr. De Vries.  Plaintiff's

---

[41] In Ms. Schmidt's defamatory "evaluation," she stated that Plaintiff "does not produce much usable work" on the ITC Investigation.  Ms. Schmidt made such statement with knowledge of its falsity or with reckless disregard of its truth.  All of Plaintiff's work on the ITC Investigation was usable and used; examples are discussed throughout this Amended Complaint.  Ms. Schmidt had knowledge of the same.

FIRST AMENDED COMPLAINT                                No. 4:22-cv-05990- HSG (TSH)

work was supervised by Ms. Barath and Mr. Kane, who are and at relevant times were based out of the Firm's offices in San Francisco and New York, respectively. Kirkland represented the defendants, which were sued in different venues and were customers of an indemnifying subsidiary of the Firm's largest client, for which Plaintiff had successfully drafted POPR No. 1.

138. Further adding to Plaintiff's workload, during this same May 7, 2021 call or Zoom meeting, Mr. Deoras also asked Plaintiff to conduct pre-suit investigation and analysis for another potential litigation-funded case in which this same subsidiary would assert its patents. The case would be managed by at least Defendant Mr. Deoras for Defendants Mr. Alper and Mr. De Vries. Plaintiff analyzed and assessed numerous patents' potential infringement reads for a subsidiary of the Firm's most important client across a range of potential target defendants and products and assessed the strength of the patents with the strongest infringement reads. Throughout May and June 2021, Plaintiff drafted infringement charts. Male Non-Share Partner Y directly supervised Plaintiff's work and reported to Mr. Deoras.

139. Ultimately, Plaintiff was asked to and did contribute substantially to the aforementioned District-Court Cases and the additional patent-assertion analyses. Plaintiff's obligations on the ITC Investigation, District-Court Cases, and patent-assertion analysis far exceeded the amount of work that Mr. Walter and Mr. Blake were asked to complete during the same timeframe. For example, duridng May to July 2021, based on Plaintiff's knowledge, Mr. Walter only worked on two of these District-Court Cases, which was substantially less than Plaintiff's workload as noted above, and a substantial amount of work that should have been performed on these District-Court Cases had not been performed, as confirmed by Plaintiff when she emailed the team to ask some basic questions after she was added to the District-Court Cases.

**Mr. Fahey's Contradictory Instructions Unnecessarily Waste Client Money**

140. On the ITC Investigation, Mr. Fahey routinely gave Plaintiff assignment instructions that were poor, misleading, and/or contradictory, the degree of which increased following Plaintiff's April 2021 complaint. Due to Mr. Fahey's poor instructions, on multiple occasions unnecessary time was spent on assignments because Mr. Fahey would provide input directly contradicting his prior instructions. For example, on the ITC Investigation in late June

2021, Mr. Fahey tasked Plaintiff with completely unnecessary revisions when he asked Plaintiff to draft correspondence to opposing counsel regarding discovery deficiencies.  Plaintiff expressly followed Mr. Fahey's emailed instructions and sent him the draft correspondence   Importantly, **Plaintiff's first draft was almost identical to the fourth, final draft, which was sent to opposing counsel**.  However, Mr. Fahey made or requested Plaintiff to make major revisions to the first draft, rendering the second draft markedly different from the first draft (and the fourth, final draft sent to opposing counsel).  These revisions were at odds with Mr. Fahey's original instructions to Plaintiff.  As a result, the drafts underwent numerous, unnecessary rounds of edits, which was not only an unethical waste of client money but also forced Plaintiff unnecessarily to lose time that could have been spent on her other myriad assignments that Defendants were heaping on Plaintiff.  After all of this unnecessary back and forth, Mr. Fahey privately emailed Plaintiff, forwarding the sent correspondence, to say "**FYI, nice work on this**."[42]

141.   However, in his "evaluation" of Plaintiff, Mr. Fahey tried to pass on to Plaintiff his poor supervision in his "evaluation," claiming that Plaintiff "had issues following instructions or taking instructions to an extreme."  This strained attempt to manufacture alleged issues with Plaintiff's work is one of many examples of discriminatory and retaliatory conduct by Defendants.  Moreover, assuming Mr. Fahey was not as incompetent as his instructions would make him seem, the reasonable conclusion is that Mr. Fahey deliberately wasted client time and resources in an effort to undermine and retaliate against Plaintiff.

### Mr. Walter's Poor Deposition Scheduling

142.   Mr. Walter and Plaintiff both worked on the District-Court Cases.  Based on Mr. Deoras' comments in supervising Mr. Walter's work on the same, Plaintiff knows of Mr. Walter's subpar performance on at least two assignments, claim construction (discussed above, *see supra ¶¶ 85–88*) and deposition scheduling.  When Plaintiff performed similar assignments at Kirkland, her work was also supervised by Mr. Deoras.

---

[42] In Mr. Fahey's defamatory "evaluation" of Plaintiff, he falsely stated: "She needs to continue to develop her judgement [sic]."

FIRST AMENDED COMPLAINT                           No. 4:22-cv-05990- HSG (TSH)

143.   In mid to late June 2021, Mr. Walter asked for Plaintiff's general availability so that he could schedule defensive (client) depositions for three of the District-Court Cases.  Fact discovery in two of these District-Court Cases would close over six months later.  Fact discovery in the remaining District-Court Case would close in late July 2021—for this District-Court Case, Plaintiff drove third-party discovery that would involve around five depositions.  Plaintiff informed Mr. Walter of the same and of her heavy workload in July 2021 on the ITC Investigation due to its close of fact discovery in mid-July 2021.  Nevertheless, Mr. Walter proposed a deposition schedule for July 2021 that was patently unreasonable for the clients and Plaintiff but that conveniently spaced out depositions for himself and Mr. Huehns.

144.   Mr. Walter repeatedly ignored numerous partner emails, including at least four from Ms. Barath and one from Mr. Deoras, telling him to stop trying to schedule depositions for the two District-Court Cases in which fact discovery would close in over six months.  Ms. Barath indicated that doing so was <u>unreasonable, including because opposing counsel had not even affirmatively raised the issue of deposition scheduling</u>.  However, Mr. Walter proceeded with scheduling depositions for all three cases in spite of the many partner emails telling him to stop.  In sum, Mr. Walter required substantial guidance and supervision in scheduling these unnecessary depositions, which was tantamount to an administrative task.  Mr. Walter asked for permission, along with proposed emails, to contact opposing counsel and the client to schedule these depositions.  On information and belief, Mr. Walter was not criticized in his evaluation for having difficulty following partner instructions and/or completing assignments that were largely administrative in nature.

145.   In contrast, Plaintiff competently and timely scheduled proposed depositions and competently spoke with third parties, including to schedule depositions and to persuade the third parties to comply with subpoenas and to otherwise coordinate and advance production of third-party discovery, with minimal oversight by Mr. Deoras and Mr. Fahey on the ITC Investigation. In fact, **Plaintiff's unsupervised communications with persons outside the Firm resulted in the client obtaining its requested discovery that had been withheld** on various grounds, including alleged lack of good cause to produce e-mails, compliance with prior-litigation

FIRST AMENDED COMPLAINT                    No. 4:22-cv-05990- HSG (TSH)

protective order, and lack of control over requested documents.   For example, Plaintiff teleconferenced (**without anyone else from Kirkland in attendance**) with general counsel of a large, international company that Kirkland's client had subpoenaed and with outside counsel subsequently retained by the general counsel of that company.   As a result of Plaintiff's communications, including the teleconferences and written correspondences incorporating Plaintiff's persuasive research, Plaintiff obtained the requested discovery to the direct benefit of Kirkland's client.   Saliently, the outside counsel told Plaintiff that he had been told that a female (i.e., Plaintiff) must have tried very hard to get this discovery because the company historically did not produce similar information in response to subpoenas.   However, Defendants "evaluations" intentionally and maliciously omitted Plaintiff's objective success with third-party discovery.

146.   Rather than complimenting Plaintiff on her fruitful efforts with third-party discovery, Defendants instead maliciously included in their "evaluations" false and defamatory criticisms of Plaintiff that would have been fitting criticisms of Mr. Walter's issues scheduling depositions and emailing opposing counsel regarding the same.   On information and belief, Mr. Walter's "evaluations" did not criticize his performance or affect his standing with the Firm, given that he is still employed by Kirkland's IP litigation group.   Defendants' recasting of criticisms that would have been fair descriptions of Mr. Walter's work and instead falsely attributing similar criticisms to Plaintiff paint a crystal-clear picture of Defendants sex-based discriminatory and retaliatory conduct targeted at Plaintiff.   For example, **Mr. Fahey's** "evaluation" falsely and maliciously claimed that **Plaintiff** allegedly "**needed to be supervised with all discussions with third parties**" because she allegedly "had issues following instructions or taking instructions to an extreme."[43]   Similarly, **Mr. Deoras'** defamatory "evaluation" falsely

---

[43] As another example, Plaintiff teleconferenced (**without anyone else from Kirkland in attendance**) with outside counsel that had been involved in relevant prior litigation and was subpoenaed (with a subpoena prepared by Plaintiff) in the ITC Investigation.   As a result of Plaintiff's communications, including the teleconference and written correspondences incorporating Plaintiff's persuasive research, Plaintiff obtained the requested discovery, including discovery that had been withheld by the outside counsel due to the prior-litigation protective order.   On June 15, 2021, Mr. Fahey emailed Plaintiff and said "Nice work on the email[,] [Plaintiff].   They seem to have sent everything."

FIRST AMENDED COMPLAINT                    No. 4:22-cv-05990- HSG (TSH)

1    and maliciously stated that **Plaintiff's** "**communications with third-parties required**

2    **considerable oversight**" and claimed that Plaintiff allegedly needed to "significantly improve"

3    "her communication skills with others . . . outside the firm."[44]

4    **Despite Plaintiff's Disproportionately Heavier Workload, Partner Offloads Male-Associate**

5    **Work onto Plaintiff to Accommodate Male Associate's Week-Long Vacation, Forcing**

6    **Plaintiff to Work Her Entire Holiday-Weekend Vacation**

7    147.    In June 2021, Ms. Barath offloaded Mr. Huehns' and Mr. Walter's work on the

8    District-Court Cases on Plaintiff, despite Plaintiff's workload already being disproportionately

9    heavier than the workloads of said male associates.  This offloading of Mr. Huehns' work onto

10   Plaintiff was specifically to accommodate his week-long vacation in mid-June 2021 so that he

11   did not have to work during that time (at Plaintiff's expense).[45]   In addition, in late June 2021,

12   after Mr. Huehns' work piled up due to his work-free vacation, Ms. Barath continued attempting

13   to offload Mr. Huehns' and Mr. Walter's work onto Plaintiff.[46]   These offloading attempts

14   continued in spite of: (i) Plaintiff's workload continuing to be disproportionately heavier than

15   Mr. Huehns' and Mr. Walter's; (ii) Plaintiff's upcoming scheduled vacation (of which Ms. Barath

16   and Mr. Kane were aware); and (iii) the availability of other associates on the team (including an

17

18   [44] As discussed further below, Defendant Mr. Deoras' "evaluation" falsely criticized Plaintiff's communication skills numerous times, including with respect to other matters.  His criticisms are
19   inconsistent with his and his co-Defendants' real-time praise of Plaintiff's work and with Male Non-Share Partner Y's "evaluation" of Plaintiff.  Analogously, in Mr. Deoras' "evaluation" of
20   another female IP litigation associate, who also had based out of the Firm's San Francisco office, Mr. Deoras stated that she needed to improve her communication skills, which was at odds with
     her other evaluations.  *See infra* ¶¶ 197–200.

21
22   [45] In contrast, Mr. Huehns felt no obligation to honor Plaintiff's working leave to study for the California Bar Examination and directed Plaintiff during her leave to do work.  In light of the
23   consistent preferential treatment of males on teams for Mr. De Vries' and Mr. Alper's cases, it is unsurprising that a male associate would feel empowered to command a female associate to do
     work during her designated leave.

24
25   [46] In addition, consistent with Female Associate R's comment that male associates could get by doing less than female associates in the IP litigation group at Kirkland, Mr. Huehns joined in Ms.
26   Barath's attempts to offload more of his work onto Plaintiff despite having substantially less work than Plaintiff.  Despite this substantially lighter workload, Mr. Huehns felt he was
27   empowered to ask Plaintiff to take on his work.   To the extent that Mr. Huehns' disproportionately lighter workload than Plaintiff's was "burdensome" to him, even after a week-
28   long vacation, Kirkland demonstrated its view that his work was an albatross to be hung around Plaintiff's neck.

FIRST AMENDED COMPLAINT                          No. 4:22-cv-05990- HSG (TSH)

associate who admitted, during a team call with partners, to "dodging billable work"). Moreover, these offloading attempts continued notwithstanding Plaintiff repeatedly telling Ms. Barath that Plaintiff had no bandwidth for additional work and had to prioritize assignments on bigger cases with competing deadlines for share partners Mr. Alper and Mr. Deoras, who were also Ms. Barath's supervisors.

148.   In contrast, Defendants paid no respect to Plaintiff's scheduled vacation. Plaintiff had requested in advance to have off as scheduled vacation Friday, July 2 through Monday, July 5, 2021 (a federally-recognized national holiday). The partners, with repeated, advance notice of Plaintiff's scheduled vacation,[47] dumped an inordinate amount of work on Plaintiff to ensure (successfully) that she would work during her entire vacation. (*See supra* ¶ 69 n. 12.) Despite working all day on July 2, 2021 and almost missing her evening flight due to such work, around midnight that evening, Plaintiff received a rude email from Ms. Barath about Plaintiff being offline. What is more, Mr. Deoras tried to schedule a deposition for Plaintiff on July 5, 2021, which was, again, a federal holiday and part of Plaintiff's scheduled vacation. It was not until Plaintiff informed him that it would be impractical to have a deposition that day due to the federal holiday that he changed the date.[48]

149.   To illustrate Plaintiff's commitment, Plaintiff literally squeezed a 32-inch monitor into her suitcase and flew with the same in order to work productively during her entire vacation. On information and belief, Plaintiff's male comparators Mr. Blake, Mr. Walter, Mr. Calhoun, and/or Mr. Huehns never felt obligated to do or did anything similar. However, Defendants'

---

[47] On June 4, 2021, Plaintiff had informed Defendants Mr. Deoras, Ms. Schmidt, Mr. Fahey, and Kirkland (in addition to her other supervisors, Male Non-Share Partner Y, Ms. Barath, and Mr. Kane) that she would be traveling and out of office with limited availability on Friday, July 2, 2021 through Monday, July 5, 2021 (a federal holiday). On June 10, 2021, Plaintiff again informed Defendants Mr. Deoras, Ms. Schmidt, Mr. Fahey, and Kirkland of her travel plans. (At this point in time, Plaintiff told these Defendants to let her know if her travel plans would pose an issue. Defendants never told Plaintiff her travel plans would pose an issue.)

[48] Defendants' (including at least Mr. Deoras' and Mr. Fahey's) treatment of Plaintiff in disregarding her scheduled vacation is consistent with their prior last-minute assignments to Plaintiff either right before or during her planned travel over weekends whenever they had knowledge of the same (e.g., on Thanksgiving 2020 and in early March 2021), as discussed above.

FIRST AMENDED COMPLAINT                    No. 4:22-cv-05990- HSG (TSH)

1    alleged basis for terminating Plaintiff—poor performance—specified: "[Plaintiff] has not

2    contributed to her matters at either the substantive or commitment level that is expected of an

3    associate." (*See infra* ¶ 190.)

4    **Defendants' Discriminatory, Harassing, and Retaliatory Conduct Exemplified by Expert**

5    **Report**

6        150.   By July 2021, Plaintiff had been subjected to multiple months of a constant barrage

7    of work, which constituted a disproportionately heavier workload than that of male comparator

8    associates.  Around early July 2021, in a Skype message to Plaintiff, Mr. Blake expressed shock

9    at Plaintiff's inordinately large workload, saying he had thought he had an insufferable workload

10   until he heard what Defendants had assigned to Plaintiff.  Mr. Blake had previously told Plaintiff

11   at trial in April 2021 that he and another comparator male IP litigation associate (Mr. Calhoun)

12   always billed the most hours out of all IP litigation associates and that Mr. Alper and Mr. De

13   Vries eagerly awaited the regularly-scheduled distribution of reports on associates' hours,

14   demonstrating that they had knowledge of Plaintiff's disproportionate workload.  In sum, Mr.

15   Blake did not have to contend with the same sort of onerous and oppressive workload with which

16   Plaintiff had to contend.   In addition, Plaintiff's disproportionately heavy workload was

17   confirmed through Plaintiff's communications with comparator associates Mr. Walter and Mr.

18   Huehns.

19       151.   An exemplar of Defendant's discriminatory and retaliatory undermining of

20   Plaintiff was their reassigning to Plaintiff on short notice in the ITC Investigation the expert

21   report on patent invalidity, for which Kirkland's client bore the burden of proof (the "**Burden**

22   **Expert Report**").  This nearly 2,000-page expert report was the perfect vehicle to carry out

23   Defendants' retaliatory and discriminatory efforts because its inherent complexity and sheer

24   volume provided Defendants with substantial latitude to fabricate purported issues with

25   Plaintiff's work and provided a fitting anchor to try to sink Plaintiff in furtherance of their

26   discriminatory and retaliatory efforts.

27       152.   Additionally, the fact that Defendants would choose to (re)assign such a large

28   assignment to Plaintiff, especially given the tight turnaround, is irreconcilable with Defendants'

FIRST AMENDED COMPLAINT                              No. 4:22-cv-05990- HSG (TSH)

false purported concerns regarding Plaintiff's "performance" and "abilities." Per their defamatory "evaluations," such false concerns were deep-seated and longstanding at this time, which, if true, would raise serious questions regarding Defendants' adherence to their ethical duties to act in the client's best interest in assigning the Burden Expert Report to Plaintiff.

153. In June 2021, Defendants had originally assigned the lion's share of the Burden Expert Report to an associate also based out of the Firm's San Francisco office, Victoria Huang, and had assigned smaller components of the Burden Expert Report to other associates. Around Plaintiff's short vacation the first weekend of July 2021, Mr. Fahey reassigned the Burden Expert Report—in its entirety—to Plaintiff. None of the associates had started on the portions of the Burden Expert Report that Defendants had previously assigned to them. Ms. Huang had not even asked administrative staff to begin putting together a shell for the Burden Expert Report. The deadline (at that time) for the Burden Expert Report was July 23, 2021.

154. As noted above, Defendants had and continued to inundate Plaintiff with swathes of work[49] to ensure Plaintiff would have no bandwidth to substantively begin working on the Burden Expert Report until mid-July 2021 at earliest. Because Defendants, when reassigning the Burden Expert Report to Plaintiff, did not transfer to Plaintiff the associate support that they had assigned to Ms. Huang, Defendants effectively assigned the entire Burden Expert Report to one

---

[49] Such work included, on the ITC Investigation, continuing to develop and drive the patent invalidity and unenforceability defenses, e.g., by handling and driving the extensive third-party discovery. For example, Plaintiff reviewed and analyzed extensive third-party discovery (as noted above, around 14 parties had been subpoenaed, almost all of which were relevant to the unenforceability and invalidity defenses), coordinated and scheduled third-party depositions and prepared an order of proof on vacation for the many unenforceability and invalidity defenses. Moreover, Plaintiff had been assigned at least four depositions, including three between July 8 and July 10, 2021 for important fact witnesses (e.g., the inventor and putative pretermitted inventor) relevant to the invalidity and unenforceability defenses. In addition, on the District-Court Cases, Plaintiff was driving extensive, important third-party discovery relevant to the clients' defenses. Plaintiff had to spend considerable time working with the conflicts department at Kirkland in connection with extensive third-party discovery on both the District-Court Cases and the ITC Investigation. Plaintiff is aware that Defendants Kirkland (including by and through Mr. Kane and Ms. Barath), Mr. Deoras, and Mr. Fahey, Ms. Barath did not have male associates in the IP litigation group waste time on such ministerial tasks. In addition, on the District-Court Cases, Defendants tasked Plaintiff with additional discovery work.

Moreover, Plaintiff had to work on patent-infringement analyses for potential assertion in another litigation funded case, as discussed above. *See supra* ¶¶ 138–139.

FIRST AMENDED COMPLAINT                                    No. 4:22-cv-05990- HSG (TSH)

associate (Plaintiff) to complete within 13 days. Defendants' assignment of such an important assignment to Plaintiff, who they claimed in their "evaluations" was and had been woefully incompetent at every facet of litigation, defies logic unless driven by discriminatory and retaliatory animus.

155.    During the first week of July 2021, Plaintiff requested paralegal assistance (which would be largely ineffectual) to create the lengthy Burden Expert Report shell. Plaintiff had asked the paralegals to incorporate a multitude of cross references to facilitate drafting of the report. Plaintiff ultimately had to work with at least three other administrative staff/support personnel to create the very lengthy substantive shell of the Burden Expert Report to send to the joint defense group ("**JDG**"), which had agreed to contribute a relatively small portion of the Burden Expert Report. After this lengthy shell with a multitude of cross references was created, a Kirkland paralegal inexplicably went into the shell and began deleting the cross references.

156.    Kirkland's portion of the Burden Expert Report (around 1,425 of 1,915 pages) was extremely lengthy because Mr. Deoras refused to let Plaintiff rely on cross references, which would significantly shorten the length of and time to prepare the report. Instead, based on a vague and conclusory claim that Mr. Deoras'/Mr. Alper's/Mr. De Vries' team had previously gotten into "trouble" by using cross references, Mr. Deoras insisted that Plaintiff create and draft "the expert's" opinion in prose for every limitation of every asserted claim for the prior art references that Kirkland handled. In patent litigation, it is standard practice to rely on cross references. In fact, the other members of the JDG did so with the portions of the Burden Expert Report that they handled.

157.    In addition, Defendants did not provide Plaintiff with access to the expert on whose behalf she drafted the Burden Expert Report.[50] In patent litigation, it is standard practice for an associate working on an expert report to have access to the expert. This standard practice has many benefits, including increasing the likelihood that the report is deemed "prepared" by the

---

[50] In Mr. Deoras' "evaluation" of Plaintiff, he falsely claimed that her "technical analysis"— which he "evaluated" only with respect to Plaintiff's work on preliminary proceedings before the PTAB—merely "met expectations." Although Mr. Deoras "evaluated" Plaintiff's work on the Burden Expert Report, he did not comment on her "technical analysis."

FIRST AMENDED COMPLAINT                                    No. 4:22-cv-05990- HSG (TSH)

expert, rather than ghostwritten by another; that the expert's opinion is admissible; and that client money is not wasted.  These benefits seem like they would be particularly salient where the "technical analysis" of an associate ghostwriting an expert's report merely "met expectations" according to her supervisor.

158.   Defendants only purported to provide associate support to Plaintiff on the Burden Expert Report right before a week-long extension of time was granted (mere days before the Burden Expert Report the original July 23, 2021 deadline).  Specifically, the associate who Defendants purportedly proffered as assistance at the last hour—Ms. Huang, to whom the Burden Expert Report had originally been assigned—provided *de facto* no assistance.[51]  Over Skype message, Mr. Fahey discouraged Plaintiff from asking Ms. Huang to provide assistance. Consistent with the pretextual nature of Defendants' purported "support" supplied to Plaintiff at the last hour, Ms. Huang dodged most of Plaintiff's requests for assistance, vaguely stating that she was busy doing work for Mr. Fahey.

159.   Plaintiff is aware that on another IP case led by Defendants Mr. Alper and Mr. De Vries and managed by Mr. Deoras and Ms. Schmidt (in which the client sought attorneys' fees), Kirkland attorneys worked on expert reports at a rate of 85 minutes (1.4 hours) per page. Comparator Mr. Calhoun worked on said expert reports.  Although a different case, the per-page drafting rate provides a useful comparative data point and demonstrates the retaliatory, discriminatory, and harassing nature of the assigned Burden Expert Report.  **Applying the same rate (85 minutes per page) to Kirkland's portion of the Burden Expert Report (around 1,400 pages)** yields around **2,000 hours** of expected attorney work (for the Burden Expert

---

[51] In addition to defaming Plaintiff in their purported "evaluations," e.g., when Mr. Fahey stated, with respect to the Burden Expert Report, that "we had to entirely rewrite everything she wrote in a short period of time," Defendants continued to defame Plaintiff when they later told Kirkland's former chief HR officer and assistant general counsel that they "reassigned" the Burden Expert Report to Ms. Huang.  Defendants' outside counsel repeated this bald-faced lie in her May 6, 2022 letter: "Your work on an expert report was untimely and deficient. The work was reassigned to a first-year female associate on the team who completed the work successfully."  As noted above, the Burden Expert Report was reassigned to Plaintiff from Ms. Huang, who was a first-year associate; she does not possess a technical degree and holds a BA in "English and Peace and Conflict Studies."  Per her LinkedIn, she is no longer employed at Kirkland and works in mid-law (at Farella Braun + Martel LLP).

1  Report).  However, the same partners (the named Defendants) assigned Kirkland's portion of the

2  Burden Expert Report to Plaintiff and purportedly expected her to draft the same (alone, with no

3  support) within 13 days, i.e., within **312 hours**.[52]  Despite the near-infeasibility of Plaintiff timely

4  completing the expert report, Defendants also falsely and unbelievably claimed in their

5  "evaluations" that they somehow magically had time to "entirely rewrite" and "essentially . . .

6  redo[]" Plaintiff's work on the expert report in a short period of time.

7       160.   Plaintiff effectively and timely drove the Burden Expert Report to completion.  Mr.

8  Deoras said the Burden Expert Report was "fine" during a team call.  The only other information

9  that Defendants provided to Plaintiff regarding her work on the Burden Expert Report was on the

10 same team call, when a paralegal said it would have been nice to have had additional time to

11 more leisurely finalize the Burden Expert Report.

12      161.   Mr. Deoras falsely and maliciously stated in his "evaluation" that Plaintiff's "work

13 on invalidity expert reports [*sic*] was inefficient and essentially needed to be redone."  And Mr.

14 Fahey falsely and maliciously stated that "[w]e had to entirely rewrite everything she wrote in a

15 short period of time."   After Plaintiff was read her "evaluations" after she was fired, she

16 compared: (i) her first draft of a section of the Burden Expert Report that first opined on

17 anticipation and/or obviousness based on a certain prior art reference and that she had sent to Mr.

18 Deoras and Mr. Fahey for review, with (ii) the corresponding section in the as-served Burden

19 Expert Report.  Plaintiff's work in the first draft was almost identical to what was in the served

20 Burden Expert Report.  No substantive changes were made.  Defendants simply moved around

21 certain sentences and citations, but that was the extent of the changes.

22 **On July 23, 2021, Plaintiff Again Opposed Defendants' Unlawful Employment Practices**

23      162.   For the reasons discussed above, Plaintiff continued having concerns regarding

24 Defendants' conduct, which she reasonably, with good faith, believed constituted sex-based

25

26

27 ───────────────
   [52] In Mr. Deoras' "evaluation" of Plaintiff, he stated: "Her time management skills also need
28 significant development; although her workload has often been low relative to other associates,
   she is often unable to complete her assignments in an appropriate amount of time."

FIRST AMENDED COMPLAINT                          No. 4:22-cv-05990- HSG (TSH)

1    discrimination and/or harassment constituting a hostile work environment and/or retaliation for

2    her prior complaint, or could do so if repeated.

3         163.    After Defendants subjected Plaintiff to months of worsening treatment, Plaintiff

4    reached an inflection point near the end of July 2021.  This was after Plaintiff had to work during

5    her entire planned vacation, in part because Plaintiff had been forced to assume responsibility for

6    work on the District-Court Cases to allow male associates (including Mr. Huehns and Mr. Walter)

7    to go on vacation and/or bill less.  Moreover, due to the totality of Defendants' unlawful conduct,

8    including but not limited to burdening Plaintiff with a disproportionate workload and attempting

9    to sabotage Plaintiff, Plaintiff did not have an opportunity to start preparing for her scheduled

10   July 23, 2021 deposition that she would lead until the evening prior to this deposition.[53]

11        164.    In addition, due to Defendants' unlawful conduct, Plaintiff was consistently forced

12   to operate on well-below reasonable levels of sleep.  Plaintiff was only able to get a few hours at

13   most of sleep the night before the deposition.

14        165.    Immediately after Plaintiff took her deposition, as a driven associate, she called

15   Mr. Deoras to get general input regarding the deposition but abstained from complaining again

16   of Defendants' unlawful conduct given her fatigue.  Mr. Deoras said the deposition went fine.

17        166.    After decompressing and briefly resting, Plaintiff decided she needed to report

18   Defendants' Unlawful Employment Practices and felt the most readily available avenue was to

19   speak again with Mr. Deoras.  Given Plaintiff's established rapport with Mr. Deoras and his prior

20   statements that Plaintiff should reach out to him to talk to him about anything, Plaintiff

21   reasonably reported again to Mr. Deoras.  Moreover, Plaintiff reasonably believed at the time

22   that this approach, as opposed to Plaintiff escalating her concerns to the chief HR officer, would

23   reduce the risk of her becoming a pariah at the Firm,[54] especially given that she had been at the

---

[53] Further showing Defendants' efforts to sabotage Plaintiff, Defendants did not provide or even try to provide Plaintiff with an exemplar deposition outline, despite Plaintiff asking for the same to aid in her preparation.

[54] Plaintiff understood, including based on speaking with a former non-share partner at Kirkland and widespread publicity regarding Mr. Alper's, Mr. De Vries' and Mr. Deoras' recent string of high-profile victories, that Mr. Alper and Mr. De Vries were some of the most, if not the most, important and influential partners at Kirkland.  Mr. Alper's and Mr. De Vries' notoriety and palpable gravitas at the Firm contributed to Plaintiff's reluctance to report her being subjected to

FIRST AMENDED COMPLAINT                              No. 4:22-cv-05990- HSG (TSH)

Firm for less than a year and Plaintiff had been limited to only working on matters for Defendants Mr. Alper, Mr. De Vries, Mr. Deoras, Ms. Schmidt, and Mr. Fahey.  As noted above, the only applicable reporting contacts for the San Francisco office were two share partners who had left the Firm; and there was simply one firmwide contact, Kirkland's chief HR officer.

167.  Plaintiff had reservations regarding again reporting Defendants' Unlawful Employment Practices, including facing additional repercussions from reporting.  However, Plaintiff was so exasperated by the unfair and unlawful treatment to which Defendants subjected Plaintiff that she felt in earnest that the best course of action was for Plaintiff to have a frank discussion with Mr. Deoras, given that he was her direct supervisor and he had urged her to reach out during her April 29, 2021 reporting, in order to stand up for herself by discussing Defendants' extremely unfair treatment of her.

168.  Plaintiff called Mr. Deoras and they spoke for 21 minutes.  When Plaintiff complained of unfair treatment with respect to workload—i.e., having an inordinately larger workload than male associates, let alone any other associate—Mr. Deoras played dumb, claiming that he was not aware that Plaintiff had been assigned a lot of work, despite being her immediate supervisor.[55]  Plaintiff raised concerns regarding being asked to take on work for male associates (including those who were able to observe their vacation to the detriment of Plaintiff).  Additionally, Plaintiff raised concerns about Defendants' unreasonably reassigning the entire Burden Expert Report with the lack of associate support that Plaintiff had received to date on the report; and that the unreasonable allocation of work was weighing on Plaintiff's ability to get reasonable amounts of rest.

---

unfair and disparate treatment compared to male associates, while performing work for those partners.  Additionally, although Kirkland claimed to utilize an "open-assignment" (i.e., free-market) system with respect to associate assignments and ability to work with different partners, Defendants controlled Plaintiff's workflow and precluded her from working with other partners; Mr. Deoras even told Plaintiff on April 29, 2021 that she would have to continue working with Defendants Mr. Alper, Mr. De Vries, Mr. Alper, and Ms. Schmidt, regardless of how she was being treated.  Accordingly, Plaintiff had reasonable concerns that any reprisal from Defendants arising from her complaining could jeopardize her overall standing at the Firm and her ability to obtain work from other partners.  This concern proved prescient and true.

[55] Mr. Deoras used a similar tactic of ignorance during Plaintiff's April 29, 2021 reporting, when he falsely claimed that he was unaware of Plaintiff's non-trial work leading up to and at trial.

FIRST AMENDED COMPLAINT                                   No. 4:22-cv-05990- HSG (TSH)

**After Plaintiff's July 23, 2021 Reporting, Defendants Froze Plaintiff Out of Work**

After Plaintiff's July 23, 2021 reporting, Defendants froze Plaintiff out of work without explanation, which included precluding Plaintiff from working with other interested partners at the Firm based on Mr. Deoras' illusory promise that more work would be provided to Plaintiff from him and his co-Defendants. Freezing Plaintiff out of work and stymieing additional opportunities is yet another example of Defendants' discrimination and retaliation. From July 31, 2021, the date after the Burden Expert Report was served, to Plaintiff's termination on September 28, 2021, Plaintiff billed only around 100 hours. This sudden drop-off in hours stands in stark contrast to Plaintiff billing well over 200 hours in each of June and July 2021 and can only be explained by Defendants' discriminatory and retaliatory conduct.

**Defendants Engaged in *Ex-Post Facto* Attempts to Manufacture Purported Support for Defamatory Lies in Their "Evaluations" of Plaintiff**

169.   Because Defendants lacked actual examples showing deficient work performance by Plaintiff, Defendants engaged in efforts to fabricate *ex post facto* evidence as purported support for their false and malicious statements that Plaintiff was dreadfully incompetent at her job as an associate.

170.   In September 2021, for example, after Defendants had provided Plaintiff with little to no work for over a month, Defendants asked Plaintiff out of the blue <u>on the night of</u> September 14, 2021 to draft a letter to the ALJ in the ITC Investigation, which letter would have been due September 15, 2021. Plaintiff followed Mr. Fahey's instructions for drafting the letter—of note, ***Mr. Fahey explicitly told Plaintiff to focus on finding citations, not on wordsmithing***. Plaintiff sent Mr. Deoras and Mr. Fahey the letter, along with the documents cited therein, very early the morning of September 15, 2021.

171.   On September 15, 2021 at **10:17 am PST**, a paralegal emailed the Kirkland team for the ITC Investigation, attaching the <u>ALJ's order granting Kirkland's client's motion for</u> <u>summary determination and **terminating the investigation**</u>, thereby rendering the letter Plaintiff drafted moot. Mr. Deoras sent a team-facing email at **10:19 am PST** acknowledging the win and telling the team to go <u>pencils-down</u> on the matter.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

172.   Later that day, Mr. Deoras sent an email at **12:30 pm PST** to Plaintiff regarding her draft later, which, as noted above, was moot due to the ALJ order.  Mr. Deoras' email stated: "We don't need to work on this anymore, but here is how I **had** revised it."  Mr. Deoras attached a local copy showing his revisions to the letter, in which *Mr. Deoras haphazardly removed almost all, if not all, of Plaintiff's citations (which, as noted above, Mr. Fahey instructed Plaintiff to focus on in drafting the letter)*.  Importantly, Mr. Deoras' **revised draft was created four (4) minutes *after* he had sent the pencils-down email** (per the metadata, he created the draft at 10:23 am PST and revised it until 10:50 am PST).  In other words, Mr. Deoras went against his express instructions to go pencils-down and felt the need to forcibly rush purported revisions to Plaintiff's draft letter and to circulate them to Plaintiff while falsely implying that the revisions were made prior to receiving the ALJ order.

173.   Mr. Deoras' pattern of being reticent in terms of providing feedback when sought by Plaintiff and his unwillingness to provide detail in response to Plaintiff's question about why she was fired clearly demonstrate that this forced attempt to provide purported feedback was nothing more than a sham attempt to manufacture *ex post facto* evidence regarding Plaintiff's performance leading up to her termination.

**In September 2021, Mr. Deoras Reassigned Work on an Instituted IPR Proceeding from Mr. Huehns to Plaintiff**

174.   At Mr. Deoras' request, Plaintiff prepared an argument outline for a patent owner response ("**POR**") in an instituted IPR proceeding in which Mr. Huehns had drafted the deficient POPR.  Specifically, on September 7, 2021, three weeks before Plaintiff's surprise hit-job firing, Mr. Deoras sent Plaintiff a Skype message, asking her "to put together ideas for POR strategy" for this instituted IPR proceeding because "that would be helpful."

175.   Mr. Deoras' purported extreme dissatisfaction with Plaintiff's performance at every level of professional practice is inconsistent with his statement that it would be "helpful" for Plaintiff to develop a substantive argument outline mere weeks before he knew she would be

FIRST AMENDED COMPLAINT                                    No. 4:22-cv-05990- HSG (TSH)

fired for allegedly poor performance would be "helpful" to him or anyone at the Firm.[56]  This inconsistency is explained by Mr. Deoras' knowledge that Plaintiff was not being fired for poor performance but because Plaintiff was a strong-willed female who threatened the male-dominated status quo of Defendants' practice.

176.   Plaintiff developed material arguments that Mr. Huehns should have but failed to make, which arguments were in Plaintiff's POR argument outline and accompanying email that she sent to Mr. Deoras.  Mr. Deoras had Plaintiff begin drafting the POR.  Saliently, the POR filed in December 2021 included only Plaintiff's arguments, and the PTAB recently determined that the claims were not unpatentable, i.e., Plaintiff's arguments proved victorious.  Mr. Huehns is still employed at Kirkland.

177.   What is more, Defendants changed relevant citations from Plaintiff's outline to irrelevant citations and to less authoritative sources in the filed POR to cloak their reliance on Plaintiff's work and arguments, which was a necessary countermeasure given the outlandish and malicious nature of the lies proffered regarding Plaintiff's performance in their defamatory "evaluations."[57]  Given Defendants' wholly unscrupulous behavior, Plaintiff would not be surprised if Defendants billed the client for the time spent covering up their sex discrimination, retaliation, and defamation, which would clearly breach their ethical obligations to clients.

### **Defendants' Conduct Evidences the Hallmarks of Discrimination**

### **Defendants Departed from Kirkland's Standard Practices and Procedures When "Evaluating," "Reviewing," and Firing Plaintiff**

178.   Defendants' widespread departures from standard practices and procedures when "evaluating," "reviewing," and firing Plaintiff further demonstrate Defendants' discriminatory and retaliatory intent.

179.   *First*, Ms. Schmidt interjected herself into Plaintiff's entire review process despite (i) not being selected by Plaintiff as an evaluator; (ii) not being a member of either the IP

---

[56] (*See supra* ¶ 96.)

[57] Mr. Deoras' defamatory "evaluation" of Plaintiff falsely and maliciously stated that "every citation and factual and legal assertion needed to be double checked."

FIRST AMENDED COMPLAINT                     No. 4:22-cv-05990- HSG (TSH)

Litigation Associate Review Committee ("**ARC**") or the Firmwide ARC (or any other Kirkland committee); and (iii) having low familiarity with Plaintiff's work.[58] Ms. Schmidt submitted an "evaluation" of Plaintiff.  Two co-chairs of the Firmwide ARC confirmed that partners who evaluate an associate are selected by the associate.  Ms. Schmidt attended the August 16, 2021 IP Litigation ARC meeting with Akshay Deoras (who was a member of the IP Litigation ARC).[59] Like Plaintiff's other "evaluations," Ms. Schmidt's "evaluation" was received by every member of the IP Litigation ARC; was read aloud during the IP Litigation ARC meeting, per Mr. Deoras; and was "considered" by the IP Litigation ARC when it "considered" Plaintiff's "rating," per official Firm documentation.  Plaintiff's "rating" was a five (out of five), the worst possible rating, as discussed further below.  Thereafter, Defendants' "evaluations" and "rating" of Plaintiff were "approved" and "ultimately decided" by the Firmwide ARC and the Firm Committee, per official Firm documentation.

180.  ***Second***, contrary to the goals of the review being neutral and controlled, Mr. Deoras and Ms. Schmidt coordinated in their "evaluations" of Plaintiff, going so far as to explicitly call out in his/her own "evaluation" the other's "evaluation."  Such coordination is not only inconsistent with the goals of the review, but also a departure from the actual procedures and processes for reviewing associates at Kirkland.

181.  ***Additionally***, in an attempt to further taint and corrupt the review process, Male Non-Share Partner Y told Plaintiff that he had been told to criticize her work in his "evaluation." Based on Firm communique regarding the review process and purpose and to Plaintiff's

---

[58] As part of her efforts to forcibly insert herself into Plaintiff's "evaluation" and "review" process, Ms. Schmidt mischaracterized her "familiarity" with Plaintiff on her lengthy, unsolicited "evaluation" as "average."   In addition, Ms. Schmidt's "evaluation" misleadingly tallied Plaintiff's hours on the ITC investigation as if Ms. Schmidt had supervised Plaintiff's work on the same, despite Plaintiff doing *de minimis* work on the ITC investigation for Ms. Schmidt. Rather, all of Plaintiff's work on this matter was supervised by Mr. Deoras and Mr. Fahey, with Mr. Alper and Mr. De Vries serving as the managing partners on the matter.   Notably, Mr. De Vries did not include Plaintiff's hours on the ITC investigation despite Mr. De Vries serving as lead counsel on the same.

[59] Ironically and sadly, Mr. Deoras was a member of the Firm's inaptly-named "Diversity and Inclusion Committee."

FIRST AMENDED COMPLAINT                    No. 4:22-cv-05990- HSG (TSH)

1    knowledge, Defendants did not engage in such coordination or review steering with respect to

2    other associates, including male comparator associates.

3        182.   **Third**, as compared to all other IP litigation associates based out of the Firm's San

4    Francisco office, Plaintiff had a different "review attorney." The other associates had Male Share

5    Partner C as their "review attorney," which made sense given that he was a supervisor on their

6    (and Plaintiff's) matters, including Plaintiff's. (Male Share Partner C had previously sent team-

7    wide praise regarding Plaintiff's work, including noting the significant import of Plaintiff's

8    victory for related litigation.) The review attorney's role is approving an associate's

9    questionnaire, which triggered notice for the evaluators identified by the associate to submit

10   evaluations. Plaintiff's review attorney, however, was Jeanna Wacker, who was based out of the

11   Firm's New York office, which conveniently is also the office out of which the interloper, Ms.

12   Schmidt, was based.

13       183.   **Fourth**, the "evaluations" of Plaintiff by Mr. De Vries, Mr. Deoras, Ms. Schmidt,

14   and Mr. Fahey were extremely lengthy, which is a departure from established practice for

15   reviewing associates at Kirkland. Plaintiff was informed that "evaluations" at Kirkland are

16   typically short. For example, Male Non-Share Partner Y's "evaluation," which denoted his

17   "[f]amiliarity" (presumably with respect to performance) was "**[h]igh**" and which was the only

18   "evaluation" of Plaintiff that came anywhere close to being somewhat neutral (yet still was not

19   neutral), included **120 words**.

20       184.   Mr. De Vries' "evaluation," which denoted "**[a]verage**" "familiarity," included

21   **149 words.** Ms. Schmidt's (unsolicited) "evaluation," which denoted "**[a]verage**" "familiarity,"

22   included **281 words**. Mr. Fahey's "evaluation," which denoted "**[h]igh**" "familiarity," included

23   **349 words**. Mr. Deoras' "evaluation," which denoted "**[h]igh**" "familiarity," included **604**

24   **words** (and not a single kind one among them). In other words, despite Male Non-Share Partner

25   Y's "evaluation" accounting for one of five "evaluations" and despite his higher familiarity with

26   Plaintiff's performance than two other "evaluations" (including an unsolicited "evaluation" that

27   was nearly three times the length of his), his "evaluation" comprised **less than 8% of the total**

28   **words in all five evaluations**. Clearly Defendants felt the need to dilute Male Non-Share Partner

FIRST AMENDED COMPLAINT                                    No. 4:22-cv-05990- HSG (TSH)

1   Y's "evaluation" of Plaintiff to minimize the inconsistencies across evaluators and to guarantee

2   Plaintiff would be fired unlawfully based on a sham and hijacked "review" process.

3   185.   *Fifth*, Kirkland's associate review period runs from July 1 to June 30 every year,

4   i.e., the associate review process was supposed to cover Plaintiff's hours and performance from

5   November 16, 2020 through June 30, 2021.   In contrast, a substantial portion of Plaintiff's

6   "review" included statements regarding work completed by Plaintiff outside of the fixed review

7   period as defined by the Firm in official documentation, including Plaintiff's work on the Burden

8   Expert Report.   On information and belief, Defendants also revised their defamatory

9   "evaluations" to add additional false, malicious and defamatory statements in their "evaluations"

10   of Plaintiff following her July 23, 2021 complaint of Defendants' Unlawful Employment

11   Practices, which included, e.g., extreme falsehoods regarding Plaintiff's work on the Burden

12   Expert Report.

13   186.   *Sixth*, Defendants' "evaluations" were patently imbalanced and entirely excluded

14   Plaintiff's numerous accomplishments.   Instead, the "evaluations" consisted of false and

15   defamatory criticisms of Plaintiff's work.   But for Male Non-Share Partner Y's "evaluation," any

16   person reading the "evaluations" would have no indication that Plaintiff had completed even one

17   assignment successfully based on the four corners of Defendants' "evaluations."   Since Plaintiff's

18   firing, Defendants repeatedly gaslit Plaintiff and claimed she was fired because her performance

19   was allegedly horrible.   As discussed further below, Defendants' outside counsel continued this

20   gaslighting and subsequently restated unequivocally that Plaintiff was fired "because" of her poor

21   performance.   However, Defendants' outside counsel recently changed tune and—for the first

22   time—admitted that "some" of Plaintiff's work "may have been good," in a clear attempt to shift

23   the purported reason for Plaintiff's unlawful termination in anticipation of litigation.

24   187.   *Seventh*, with respect to Plaintiff, Kirkland did not follow its established, formal,

25   documented process and procedure designed to allow associates who were failing or purportedly

26   failing to meet performance standards to be notified of issues and to have an opportunity

27   remediate such issues.   Specifically, per Firm policy and established practice, the Firm placed an

28   associate with performance or other issues on so-called "probation" before terminating the

associate.  As discussed above, the associate review process resulted in the Firm assigning each associate a rating on a scale of one to five.  Probation was triggered by a rating of four.  Termination would be triggered, if at all, only by a subsequent rating of five, which would occur at earliest, if at all, during the next annual review.  Per official Kirkland documentation, receiving an overall rating of four was "rare"; to Plaintiff's knowledge, the Firm hardly ever, if ever, assigned an associate a rating of five.  If the Firm decided to place an associate on probation, an individual in Kirkland's Legal Recruiting and Development ("**LRD**") department would attend the associate's annual review (termed a "feedback meeting" by Kirkland regardless of the associate's rating), when the associate would be informed of performance issues, of being placed on probation, and of the opportunity to remediate such performance issues.  A few months later, the Firm would obtain an additional set of evaluations regarding the associate's performance during the probationary period to date; thereafter, the associate would have a mid-year review to discuss the associate's performance and progress in curing the identified issues.  However, the associate's rating would remain unchanged until the next annual review.  Plaintiff is aware of multiple associates in the IP litigation group who had been placed on and subsequently were taken off probation.  Instead, Plaintiff was fired, with HR present, during her first annual "review."  Defendants intentionally ensured that Plaintiff was deprived of this probationary process because they knew that it would offer Plaintiff an opportunity to rebuff their abject lies and would expose the defamatory, baseless, and pretextual nature of their criticisms of Plaintiff's work.  In other words, following Firm protocol regarding probation would have been fatal to Defendants' desire to unlawfully terminate Plaintiff.

188.  *Eighth*, per Kirkland's official video regarding the associate review process, a "feedback attorney," a share partner who supervised an associate and worked in the same office for the same practice group, would meet with the associate regarding the associate's review.  Per Firm policy, this feedback attorney: (i) would provide actual feedback to the associate, including discussion of "the feedback that was collected, and the rating, and the rest of the review"; and (ii) would be prepared to answer the associate's questions.  The purpose of the meeting was "for [the associate's] career development."  In contrast, as discussed further below, Plaintiff's

1    "feedback" attorney, Mr. Deoras, provided no feedback regarding Plaintiff's performance

2    beyond a vague, one-sentence statement of the reason for her termination and statements that

3    Plaintiff is talented and will be successful.  Mr. Deoras was unwilling to provide detail in

4    response to Plaintiff's question about why she was fired.

5        189.   These marked departures from Kirkland's standard, established practices

6    regarding its associate review process demonstrate that Plaintiff's "review" was a sham—the

7    atypical process used in her case was not designed to assess, evaluate, or review her performance.

8    Instead, the departures from practice allowed Defendants to use the hollowed-out sham "review"

9    process as a vehicle to carry out their unlawful, discriminatory and retaliatory termination of

10   Plaintiff.

11        **On September 28, 2021, Defendants Unlawfully Terminated Plaintiff**

12        190.   On September 28, 2021, Plaintiff was fired with no prior notice during what was

13   supposed to be her first associate review (and would have been Plaintiff's first review at

14   Kirkland).  During this firing meeting, Mr. Deoras provided a short, vague, and ambiguous

15   statement for Plaintiff's firing: "[Plaintiff] has not contributed to her matters at either the

16   substantive or commitment level that is expected of an associate."  Plaintiff was in complete

17   shock, especially in light of Plaintiff's high performance, Defendants' abundant real-time praise

18   of Plaintiff's work, and Defendants' never providing prior notice of alleged work performance

19   issues needing improvement prior to this unlawful termination.  Mr. Deoras was the partner with

20   whom Plaintiff had worked most closely at Kirkland.

21        191.   During this meeting, Mr. Deoras: (i) agreed Plaintiff would be shocked,[60] (ii)

22   thanked Plaintiff for her work, (iii) told Plaintiff she is "talented," and (iv) stated he was certain

23   of Plaintiff's future success as an IP litigator.  Mr. Deoras' acknowledgments of the shocking

24   nature of Plaintiff's firing and of Plaintiff's talent, contributions, and certain future success were

---

[60] After Plaintiff expressed shock regarding her termination and asked Mr. Deoras—a successful patent litigator whose job requires excellent communication skills—to provide details, he stuttered, stammered, agreed Plaintiff's shock was reasonable, and avoided answering Plaintiff's question while tripping over his own words.  ("**Sure, yeah, sure, so, um [stutter] u-u-u-nderstand [stutter] I understand that you're [stutter] th-th-that this may come as a shock**.") Plaintiff was nonplussed.

FIRST AMENDED COMPLAINT                         No. 4:22-cv-05990- HSG (TSH)

1   consistent with the praise Plaintiff had received from partners, including Defendants, throughout
2   her tenure at Kirkland, given that she had consistently provided excellent work and met or
3   surpassed expectations, as detailed above.  Saliently, such acknowledgments by Mr. Deoras were
4   flatly inconsistent with the aforementioned vague and ambiguous statement and with Defendants'
5   "evaluations."

6   192.   During this firing meeting, Plaintiff received no information regarding any
7   evaluation or alleged evaluation of her work performance.  The Firm offered four-months'
8   severance in exchange for Plaintiff's waiver of legal claims.  The severance offer was set to
9   expire one week later, on October 5, 2021, well before Plaintiff would be able to learn the
10  contents of the "evaluations."  On October 4, 2021, Plaintiff had a call with Chelsea Zbesko, an
11  HR supervisor who had attended the firing meeting, to decline the severance offer and inform
12  Defendants that she would seek legal redress for her sex-based discrimination, sex-based
13  harassment constituting hostile work environment, and retaliation claims under federal, state, and
14  local laws.

15  **Plaintiff Was Informed for the First Time of Alleged Deficiencies in Her Work After She**
16                                      **Was Fired**

17  193.   On Thursday, September 30, 2021, Plaintiff received an email from Frank
18  Tuccillo, a director of attorney engagement, with a link for associates based out of the Firm's
19  Bay Area offices to schedule appointments to "review" their evaluations in controlled conditions,
20  either in-person in the office or remotely by telephone.  Per Firm policy, this was the only way
21  associates could learn the contents of their evaluations because the Firm did not provide
22  associates with any copies of the same.  Mr. Tuccillo stated, consistent with Firm policy, that an
23  associate would be able to review his/her/their evaluations only after the feedback meeting.
24  Plaintiff scheduled an appointment to have her "evaluations" read to her telephonically.  On
25  Friday, October 1, 2021, Plaintiff accepted an Outlook calendar invitation for the "Kovalenko—
26  Bay Area Associate Review Feedback" meeting on Monday, October 11, 2021, at 10:15 am PST,
27  when Mr. Tuccillo would call Plaintiff or meet with Plaintiff via Zoom.  Plaintiff could not have
28  learned the contents of the defamatory "evaluations" prior to October 11, 2021 in light of the

FIRST AMENDED COMPLAINT                          No. 4:22-cv-05990- HSG (TSH)

1    Firm's aforementioned scheduling process to learn the contents of evaluations, the Firm's policy

2    of not providing copies of evaluations to associates, and Mr. Deoras' refusal (in contravention of

3    established Firm policies) to provide details regarding the reason for Plaintiff's termination in

4    response to her question during her September 28, 2021 firing.

5        194.   On October 11, 2021, Plaintiff's "evaluations" were read to her, which is when

6    Plaintiff was informed, <u>for the first time</u> of: (1) alleged work performance deficiencies; (2) the

7    alleged detail supporting the basis for Plaintiff's termination; (3) the fact that each of Defendants

8    Kirkland, Mr. De Vries, Mr. Deoras, Ms. Schmidt, and Mr. Fahey had published without

9    Plaintiff's consent a slew of malicious, defamatory statements regarding Plaintiff's profession

10   with knowledge or reckless disregard of falsity thereof, examples of which are noted throughout

11   this Amended Complaint; and (4) the extremely defamatory content of Defendants'

12   "evaluations."

**Plaintiff's "Evaluations" Contained Inconsistent Statements, Intentionally Omitted**

**Material Information and Context, and Exhibited Clear Coordination**

15       195.   Defendants' "evaluations" contained statements inconsistent with Defendants'

16   statements and conduct preceding the firing meeting, including without limitations Defendants'

17   statements to Plaintiff in emails, telephonically, on meetings, and in person, non-exhaustive

18   examples of which appear throughout this Amended Complaint.

19      196.   In addition, Male Non-Share Partner Y's "evaluation" is inconsistent with

20   Defendants' "evaluations," including with respect to length and characterization of Plaintiff's

21   performance.  For example, Male Non-Share Partner Y's evaluation stated: "Zoya helped defeat

22   IPRs on multiple challenging patents."  Conversely, when Mr. Deoras spoke of Plaintiff's work

23   on the same assignments, he omitted the fact that Plaintiff defeated IPRs by drafting multiple

24   successful POPRs and instead claimed that "[Plaintiff's] judgment in deciding which arguments

25   to include and prioritize needed improvement" and that "[Plaintiff] also had difficulty

26   communicating her analysis."

27      197.   As discussed throughout the Complaint, Defendants intentionally and maliciously

28   stripped their "evaluations" of any and all relevant, material information and context because

FIRST AMENDED COMPLAINT                No. 4:22-cv-05990- HSG (TSH)

1    such information and context would have contradicted the false and malicious narrative that

2    Defendants tried to spin in their defamatory "evaluations" with respect to Plaintiff's performance.

3    For example, Defendants Mr. De Vries, Ms. Schmidt, and Mr. Deoras deliberately excluded that

4    they had asked Plaintiff to serve as a last-minute substitute on their trial team because Plaintiff

5    was doing incredibly good work.[61]   Additionally, Defendants intentionally and maliciously

6    avoided acknowledging any of Plaintiff's successes or wins and relevant context, underscoring

7    the excellent nature of Plaintiff's performance, e.g., tight deadlines.   For example, as noted above,

8    Defendants' "evaluations" deliberately excluded Plaintiff's extremely successful results with

9    POPR Nos. 1 and 2, which Mr. Deoras had previously—in real-time—characterized as "key

10   wins" in his email stating "[Plaintiff] really did a fabulous job with these."   Moreover, Mr.

11   Deoras' "evaluation" failed to mention that Mr. Deoras had asked Plaintiff to draft POPR No. 2

12   on a condensed timeline and that Defendants Mr. Deoras, Mr. De Vries, Mr. Alper, and Kirkland

13   "were able to use a lot of [Plaintiff's] work on [POPR No. 2] with [two other POPRs addressing

14   the same primary prior art reference that POPR No. 2 addressed]."

15          198.    As another example, as discussed above, in the ITC Investigation Plaintiff, *inter

16   alia*, successfully obtained discovery for a large international company notoriously intransigent

17   with respect to complying with third-party subpoenas, and Plaintiff's efforts were expressly

18   acknowledged by the company and its outside counsel.   In contrast, Mr. Fahey and Mr. Deoras

19   falsely   and   maliciously   criticized   Plaintiff's   communications   with   third   parties   and

20   communication skills.   (*See supra* ¶¶ 143–146.)   However, Defendants' false criticisms in their

21   "evaluations" were not limited to her work on the ITC Investigation, e.g., Mr. Deoras stated that

22   Plaintiff "had difficulty communicating her analysis" on POPR Nos. 1 and 2.   (*But see supra* ¶¶

23   77–96.) Mr. Deoras' defamatory "evaluation" also falsely stated, without referencing a particular

---

[61] For instance, Mr. Deoras' "evaluation" falsely criticizes Plaintiff's work on POPR Nos. 1 and 2 and then immediately states: "Following the Omnitracs IPRs, we asked Zoya to join us for trial in the Gigamon v. Apcon matter."   The following sentence and remainder of Mr. Deoras' "evaluation" proceed to continue falsely criticizing Plaintiff's work.   Ms. Schmidt's "evaluation" states: "Zoya joined the Apcon matter shortly before trial to take the place of an associate who had left Although she was enthusiastic about joining the team, she did not contribute at trial."

FIRST AMENDED COMPLAINT                                No. 4:22-cv-05990- HSG (TSH)

1    matter, that Plaintiff "has a lot of trouble expressing herself" and that Plaintiff's "communication

2    skills need significant development."

3        199.   Similarly, Female Associate G told Plaintiff that Mr. Deoras' "evaluation" of her

4    included a false criticism stating she needed to improve her communication skills, inconsistent

5    with her evaluations from other partners.   Analogously, false criticisms of Plaintiff's

6    communication skills in Mr. Deoras' "evaluation" were inconsistent with Male Non-Share

7    Partner Y's "evaluation," notwithstanding Defendants' express instruction to Male Non-Share

8    Partner Y to criticize Plaintiff in his "evaluation" of Plaintiff.[62]   For example, Mr. Deoras falsely

9    stated that Plaintiff "needs to significantly improve her communication skills . . . with others in

10   the team" and that Plaintiff's "communication with team members has consistently been poor."

11   In contrast, Male Non-Share Partner Y stated that "[Plaintiff] makes a concerted effort to

12   communicate well with her colleagues[,] and it is always appreciated."

13       200.   Moreover, the falsity of Mr. Deoras' defamatory statements concerning Plaintiff's

14   communication skills is contradicted by Mr. Deoras' and his co-Defendants' conduct.   For

15   example, Mr. Deoras falsely stated in his evaluation that he "would be reluctant to have [Plaintiff]

16   speak directly with clients or opposing counsel."   However, in April 2021 Defendants Mr.

17   Deoras, Mr. Alper, Mr. De Vries, and Kirkland watched Plaintiff converse with their client's

18   CEO, while in the same room and in very close proximity, for around 30 minutes and were

19   perfectly comfortable letting Plaintiff do so.

20                      Defendants Coordinated in the Hit-Job "Review"

21       201.   The "review" is chock-full of examples of coordination by Defendants.

22   Defendants' coordination was necessary to create a facially-believable false narrative and to

23   avoid glaring inconsistencies that would unravel Defendants' web of lies.

24       202.   For example, as discussed above, Male Non-Share Partner Y told Plaintiff that

25   Defendants had directed him (Male Non-Share Partner Y) to criticize Plaintiff in his "evaluation"

26   of her.   Defendants' directive steered the narrative of Plaintiff's "review" and "evaluations,"

27

28   _____

[62] Defendants' instruction was discriminatory and retaliatory; Defendants did not similarly
instruct evaluators, including Male Non-Share Partner Y, to criticize male comparator associates.

FIRST AMENDED COMPLAINT                                    No. 4:22-cv-05990- HSG (TSH)

1   ensuring they were unfair, impartial, and prejudicial, which was entirely at odds with Kirkland's

2   touted goals for the associate review process, e.g., fairly and objectively assessing associates.

3        203.   As another example, Ms. Schmidt's "evaluation" expressly admitted to

4   coordinating with Mr. Deoras.  In reference to the ITC Investigation, Ms. Schmidt stated that

5   "[Plaintiff] does not produce usable work" and that "Akshay [Deoras] will be able to provide

6   more specifics on her work."[63]

7        204.   In addition, Ms. Schmidt's "evaluation" demonstrated that she, Mr. Deoras, and

8   Mr. Fahey coordinated with Mr. Alper and Mr. De Vries in discriminating, harassing, retaliating,

9   and defaming Plaintiff.  For example, Ms. Schmidt's "evaluation" further alleged that Plaintiff

10  "does not produce usable work," which "has required us to cut a substantial amount of her time"

11  on the ITC Investigation.  In or around June 2021, Mr. Fahey told Plaintiff he handled billing for

12  the ITC Investigation and met weekly with the client regarding the same.  Accordingly, on

13  information and belief, Mr. Fahey coordinated with Ms. Schmidt and Mr. Deoras to cut Plaintiff's

14  hours on the ITC Investigation, in order to fabricate *ex post facto* support for their defamatory

15  evaluations of Plaintiff.  In addition, because Mr. De Vries and Mr. Alper were lead counsel on

16  the ITC Investigation, they had knowledge of Plaintiff's good work on the same.  In addition,

17  Mr. Alper and Mr. De Vries knew or reasonably should have known about Ms. Schmidt's and

18  Mr. Fahey's discriminatory and retaliatory write-off(s) because at all relevant times Mr. Alper

19  and Mr. De Vries were on the Firm's Finance Committee, which "reviews" "client write-offs."

20  Mr. Alper and Mr. De Vries sanctioned, or, at minimum, intentionally overlooked, the unlawful

21  conduct.  These Defendants had the opportunity to do so given the loose controls that were in

22  place at Kirkland, which Kirkland has since attempted to remediate as demonstrated by its myriad

23  remedial job postings (which concern, e.g., ensuring compliance with write-off policies, handling

24  "difficult" requests by partners, and generating variance reports).

25

26  ---
    [63] Defendants' "substantial" cutting of Plaintiff's time is an example of their attempts to back up
27  their defamatory "evaluations' of Plaintiff to gap-fill for the absence of contemporaneous support
    for their false claims regarding Plaintiff's allegedly poor work.  Based on the chronology of the
    evaluations, Plaintiff understands that Defendants cut a substantial amount of her time in late
28  July 2021, after Plaintiff complained again of Defendants' Unlawful Employment Practices.

FIRST AMENDED COMPLAINT                    No. 4:22-cv-05990- HSG (TSH)

1    205.   In addition, similar language and statements and common themes among

2    Defendants' "evaluations" further demonstrate coordination.

3                              **Defendants Defamed Plaintiff**

4    206.   The four corners of Defendants' "evaluations" of Plaintiff convey an unequivocal

5    message: that Plaintiff was woefully deficient in every facet of practicing law, failed to contribute

6    at all during her time at the Firm, and was nothing more than a burden and liability due to her

7    professional incompetence.  All of the statements by Defendants in the summary of Plaintiff's

8    "review" are either statements of fact or statements of opinion implying an underlying basis in

9    fact.  All of the statements are false.  For any and all purported statements of opinion, the

10   underlying factual basis is false.  Defendants' "evaluations"—individually and collectively—are

11   defamatory because they are each without basis, indisputably contradict the truth, and directly

12   denigrate Plaintiff's professional skills and acumen.  The gravity, magnitude, and extent of the

13   lies regarding Plaintiff's professional abilities and acumen and Defendants' coordination show

14   that Defendants made the defamatory statements with malice, i.e., with knowledge or reckless

15   disregard of their falsity.  Defendants' publication was malicious, intentional, willful and done

16   with callous disregard for the foreseeable injury and damage to Plaintiff's professional career,

17   reputation, and livelihood and to foreseeable collateral damage to third parties who are close with

18   Plaintiff.  Defendants' defamation of Plaintiff caused and has continued to cause Plaintiff severe

19   emotional, psychological, and physical harm and injury.

20   207.   Defendants knowingly and maliciously published false, defamatory statements of

21   fact regarding Plaintiff's profession; each statement in Defendants' "evaluations" was not

22   privileged and had a natural tendency to injure Plaintiff's profession and occupation, including

23   without limitation Plaintiff's professional reputation, abilities, and performance.   Defendants

24   published such statements maliciously, with a state of mind arising from hatred or ill will toward

25   Plaintiff.  No Defendant had a good faith belief in the truth of any of the statements included in

26   their "evaluations."  As discussed above, each Defendant knew each statement was false when

27   each statement was published.

28

FIRST AMENDED COMPLAINT                          No. 4:22-cv-05990- HSG (TSH)

208.   The purpose of Defendants' "evaluations" of Plaintiff was not to serve as a management tool for evaluation and documentation of Plaintiff's performance.   Rather, the exclusive purpose of the "evaluations" was to provide a vehicle to publish defamatory statements of fact about Plaintiff to harm Plaintiff's professional reputation and standing and to effectuate Defendants' unlawful termination of Plaintiff.   Defendants' "evaluations" of Plaintiff served as the support for the purported poor-performance basis for terminating Plaintiff.

209.   Defendants' defamatory "evaluations" were published to and considered by at least around <u>118</u> individuals, including those on the IP Litigation ARC, Firmwide ARC, Associate and Non-Share Partner Compensation Committee, and Firm Committee, which collectively include numerous prominent, highly successful IP litigators.   Per Kirkland's official video regarding the 2021 Associate Review Process, Nicole Greenblatt, co-chair of the Firmwide ARC, stated that the IP Litigation ARC met to "consider" each IP litigation associate's rating and evaluations.   Mr. Deoras told Plaintiff during her firing meeting that the IP Litigation ARC listened to each associate's evaluations. After Plaintiff was fired, she received her "summary," which included Defendants' "evaluations."

210.   Per official Firm policy, the IP Litigation ARC was "established to review the performance of the Firm's associates and report the results to the Firmwide Associate Review Committee."   The IP Litigation ARC was comprised of 47 individuals—including numerous highly successful, prominent IP litigators and unnecessary personnel[64]—to whom Defendants published Plaintiff's defamatory "evaluations."   In addition, Leslie Schmidt and/or Leslie M. Schmidt, P.C., neither of which were members of either the IP Litigation ARC, the Firmwide ARC or any other Firm Committee, and Akshay Deoras (who was a member of the IP Litigation ARC) and/or Akshay S. Deoras, P.C. attended the August 16, 2021 IP Litigation ARC meeting, during which, on information and belief, he/she/they published additional defamatory statements regarding Plaintiff and/or, at minimum, the defamatory "evaluations" of their co-Defendants

---

[64] This included someone who was responsible for training onboarding associates.   This individual sent Plaintiff an email with a perplexing, demeaning remark after he had attended the August 16, 2021 meeting but before Plaintiff was fired.

FIRST AMENDED COMPLAINT                              No. 4:22-cv-05990- HSG (TSH)

were published to them (e.g., the defamatory "evaluations" of Michael De Vries and/or Michael W. DeVries, P.C. and of Mr. Fahey were published to Leslie Schmidt and/or Leslie M. Schmidt, P.C. and to Akshay Deoras and/or Akshay S. Deoras, P.C., and the defamatory "evaluation" of Leslie Schmidt and/or Leslie M. Schmidt, P.C. was published to Akshay Deoras and/or Akshay S. Deoras, P.C., and vice versa). The IP Litigation ARC published Defendants' defamatory "evaluations" to the Firmwide ARC.[65] Moreover, on information and belief, some if not all of Defendants' statements contained in Defendants' "evaluations" of Plaintiff were published to third parties outside of Kirkland by Defendants and/or their agents. This is consistent with a former Kirkland IP litigation partner telling Plaintiff that she was informed of the content of a former associate's evaluation, which served as the basis for that associate's termination from Plaintiff. Given the extremely widespread publication of the defamatory "evaluations" to myriad individuals in different locations, practice groups, departments, positions and roles at Kirkland, including personnel not involved in management of Kirkland or any of its PC Partners, it is reasonable to conclude that the defamatory statements have been subsequently and foreseeably republished and further disseminated outside the Firm. Defendants' absence of established and/or enforced policies or procedures concerning operational checks, controls, oversight, and/or compliance, including specifically with respect to the associate review process, further supports the reasonable conclusion that the defamatory statements comprising the evaluations have been further republished and disseminated to other individuals, including external third parties.

211. Moreover, Plaintiff has been unable to obtain even a single interview at any comparable or even close to comparable law firms, further underscoring the damage to Plaintiff's professional standing and reputation.

---

[65] In late September 2022, after Defendants had published their defamatory "evaluations" of Plaintiff but before she was fired, Plaintiff attended the PTAB Bar Association Annual Conference. Kirkland had paid for seats at a table. During the conference, a share partner based out of one of Kirkland's Los Angeles offices who was a member of the IP Litigation ARC and Firmwide ARC acted strangely toward Plaintiff, including quickly ending any conversations Plaintiff attempted to start and leaving the table as soon as practicable when Plaintiff was at the same table. Plaintiff managed to sit next to him during lunch one day. When Plaintiff tried to discuss PTAB work and her recent POPR successes, he quickly changed the topic to the Ryder Cup and left the table shortly thereafter after quickly finishing his meal.

FIRST AMENDED COMPLAINT                    No. 4:22-cv-05990- HSG (TSH)

212.   In addition, Kirkland is part of an insurance conglomerate, Attorneys' Liability Assurance Society ("**ALAS**"), which is comprised of 223 law firms with over 74,000 lawyers including 89 firms in the AmLaw 200.  Per ALAS' website, it is "managed and staffed by lawyers, most of whom are former partners at ALAS-caliber firms."  ALAS, https://www.alas.com.  Over the past several years, ALAS developed a program currently called "Data View" or similar, that provides information regarding outstanding claims against a member firm to all other member firms.  In addition, based on publicly available data, in the fall of each year, ALAS meets with each member firm and informs each of details regarding all open claims against member firms, purportedly to explain any rate increases in the upcoming year.  Plaintiff has not been able to secure a single job interview with a single member firm since her termination at Kirkland, despite having applied to numerous such firms since her termination at Kirkland.  On information and belief, the defamatory "evaluations" were published to ALAS personnel and to member firms.

213.   Per official Firm policy, the Firmwide ARC was supposed to ensure "consistency" of associate reviews "on a Firmwide basis" and was "expected to review Associate Review Committee activities with the objective of achieving uniform application of performance standards."  The Firmwide ARC was comprised of an additional 29 individuals—including numerous highly successful, prominent attorneys, including IP litigators—to whom Defendants published the defamatory "evaluations."  The defamatory "evaluations" were also published to the Firm Committee and the Associate & Non-Share Partner Compensation Committee, including at least around 51 additional individuals including unnecessary personnel.  (Per the official Kirkland video regarding the 2021 associate review process, the Associate & Non-Share Partner Compensation Committee determines bonuses "on a grid basis" based on hours and rating—i.e., there was no need for Kirkland to disseminate the defamatory summary to that committee, which included a total of 72 members (some of which were also a member of one or more of the aforementioned committees that received the "evaluations.")

214.   Plaintiff had no knowledge of the defamatory statements in Defendants' "evaluations" of her until October 11, 2021.  Plaintiff could not have learned of the defamatory

FIRST AMENDED COMPLAINT                         No. 4:22-cv-05990- HSG (TSH)

1  content of her "evaluations" prior to October 11, 2021, due to Defendants' conduct discussed

2  above, e.g., Mr. Deoras' failure to discuss the content of the "evaluations" during Plaintiff's

3  "feedback"/firing meeting beyond providing the vague, one-sentence statement of the reason for

4  her termination; Mr. Deoras' non-answer in response to Plaintiff asking him to provide details;

5  and the Firm's policies regarding keeping evaluations from associates, who do not receive copies

6  of the same, as discussed above.   Additionally, during Plaintiff's firing call, Mr. Deoras

7  intentionally and misleadingly characterized the aforementioned one-sentence statement as the

8  "summary" of Plaintiff's review.   Per official Firm communique, the "summary" of an

9  associate's review is sent to multiple Firm committees for consideration, approval, and ultimate

10  decision on the same.   Mr. Deoras' mischaracterization, combined with the fact that this was

11  Plaintiff's first "review" at Kirkland, led Plaintiff to believe that the one-sentence statement he

12  conveyed constituted Plaintiff's review (i.e., was the review "summary").

13      215.   However, as discussed above, on September 30, 2021, Plaintiff received an email

14  from Kirkland for scheduling an appointment to have her "review" read to her; the email stated

15  that associates would not be provided with any copies of the same.   That same day, as soon as

16  practicable, Plaintiff used the link in the email to schedule the same.   On October 1, 2021,

17  Defendants scheduled Plaintiff's review reading for October 11, 2021 and sent Plaintiff a

18  calendar invitation for the same.  On October 11, 2021, Plaintiff first learned of the defamatory

19  content and existence of Defendants' "evaluations," including the fact that Ms. Schmidt had

20  submitted an "evaluation" of Plaintiff.  At this time, Plaintiff learned that the review "summary"

21  was actually comprised of the individual "evaluations," i.e., Defendants' defamatory evaluations

22  of Plaintiff.   The copy of Plaintiff's review that was subsequently provided by Kirkland's

23  assistant general counsel or chief HR officer in late November 2021 confirms that the review

24  "summary" includes Defendants' individual "evaluations."     Plaintiff exercised reasonable

25  diligence in scheduling a call or Zoom meeting to have her "evaluations" read to her as soon as

26  practicable.

27      216.   Defendants' statements set forth in their alleged "evaluations" of Plaintiff were not

28  performance evaluations.  Here, Plaintiff was terminated immediately during her first "review"

81

1   and was never notified of or provided an opportunity to cure any purported work performance

2   issues.  Moreover, Defendants' numerous departures from practice, including without limitation

3   Ms. Schmidt inappropriately inserting herself into the associate review process, Plaintiff not

4   being placed on any formal or informal probation, the length of the "evaluations" and the express

5   coordination among Defendants' evaluations clearly demonstrate that the purpose of the

6   "evaluations" Mr. Deoras review process was not to serve as a management tool for examining,

7   appraising, judging, or documenting Plaintiff's performance.   In addition, Mr. Deoras'

8   unwillingness to provide any details during Plaintiff's "review," even when asked for details by

9   Plaintiff, demonstrated that the process was not intended to evaluate Plaintiff and that its

10  exclusive purpose was to defame Plaintiff unbeknownst to her.Sham "Investigation"

11      217.   During Plaintiff's October 4, 2021 call with Ms. Zbesko, she told Plaintiff that

12  Kirkland's chief HR officer, Wendy Cartland, would contact Plaintiff regarding her claims

13  against the Firm either that evening or the next day, October 5, 2021.  Defendants delayed

14  contacting Plaintiff.

15      218.   On November 5, 2021, Plaintiff and a third party met with Ms. Cartland and

16  Kirkland's assistant general counsel, Sarah Herlihy.  During this meeting, Ms. Herlihy said that

17  she "investigated" Plaintiff's claims of sex discrimination, sex harassment, and retaliation, and

18  that Plaintiff's alleged "poor" performance was the "reason for [Plaintiff's] termination."  Ms.

19  Herlihy stated that her "findings" were corroborated by "the partners' [i.e., Defendants']

20  recollections."  The only examples she provided for reaching her conclusion were that the Firm

21  employs females and that one of the people whose sex-based discriminatory and harassing

22  conduct Plaintiff had complained of (Leslie Schmidt) is a woman.  Plaintiff pointed out that both

23  reasons were legally irrelevant and unavailing.

24      219.   When asked multiple times about support for the defamatory "evaluations," Ms.

25  Herlihy stated that Plaintiff's dispute over her performance was nothing more than "he-said, she-

26  said."  When asked about the "review" and "evaluations" lacking any details regarding Plaintiff's

27  positive contributions and wins, Ms. Herlihy republished the defamatory statements made in

28  Defendants "evaluations" of Plaintiff and became increasingly agitated, evasive, and

FIRST AMENDED COMPLAINT                                    No. 4:22-cv-05990- HSG (TSH)

unprofessional.  After Plaintiff dismantled Ms. Herlihy's efforts to use red herrings to gaslight Plaintiff into believing she had no claims against the Firm, Ms. Herlihy abruptly hung up on Plaintiff and the third party.  During this meeting, Ms. Cartland stated nothing at all.

### Kirkland's Efforts to Dissuade Plaintiff from Filing a Lawsuit

220.  After Kirkland fired Plaintiff, Plaintiff applied in November 2021 for unemployment benefits with the D.C. Office of Employment Services ("**DOES**").  The unemployment benefits application requested the name of and contact information for Plaintiff's supervisor at Kirkland; Plaintiff listed Akshay Deoras with his contact information from the Kirkland website.  Despite Plaintiff following the procedures for applying for unemployment and following up multiple times with DOES, it did not process her claims.  Eventually, after speaking to multiple DOES employees, a claims examiner, and an adjudication specialist, DOES informed Plaintiff that her receipt of benefits had been delayed because Kirkland had brazenly lied to DOES and said Plaintiff had never worked at the Firm.  DOES further informed Plaintiff that Kirkland would have to pay a penalty for lying.  Defendants, including Kirkland, Akshay Deoras, and Akshay S. Deoras, P.C., knowingly lied about Plaintiff's employment in further retaliation and in an attempt to inappropriately, unlawfully withhold benefits from Plaintiff, thereby increasing the financial pressure on Plaintiff to drop her claims against Defendants.  That Defendants would lie to a government agency to gain leverage over Plaintiff speaks volumes of Defendants' integrity and ethicality and is especially jarring given Kirkland's stature as the largest law firm by revenue in human history.

221.  In addition, Kirkland deliberately failed to timely send Plaintiff her W-2 form for her 2021 tax return in advance of the filing deadline in further retaliation and in an effort to prejudice Plaintiff.  After serving Kirkland with the administrative complaint/charge, Plaintiff reached out to Kirkland on April 15, 2021 regarding its failure to comply with its legal obligation.  Ms. Cartland[66] acknowledged receipt that same date; however, Kirkland did not send Plaintiff

---

[66] On or around April 27, 2022, Kirkland uploaded a job posting for a chief HR officer.  Kirkland filled the role in June or July 2022.  Ms. Cartland is now a senior advisor to Kirkland's HR department.

FIRST AMENDED COMPLAINT                              No. 4:22-cv-05990- HSG (TSH)

1   her W-2 until the evening of the date taxes were due, requiring Plaintiff to request an extension
2   from the IRS.

3   **Results of Defendants' Unlawful Conduct**

4       222.   As a direct and proximate result of the acts and omissions of the Defendants,
5   Plaintiff has suffered, and continues to suffer, emotional distress and psychological damage, as
6   well as physical manifestations of the emotional distress and psychological damage.  This
7   includes, but is not limited to: humiliation, mental anguish, stress, fear, and depression.  The
8   physical manifestations include but are not limited to: nausea, vomiting, and migraines.

9       223.   Defendants' actions have also resulted in wage and benefit losses and are expected
10  to lead to additional economic loss in the future.

11      224.   Defendants' actions have disrupted Plaintiff's personal life, including requiring
12  her to downsize and move far outside the city where she used to reside for years.

13      225.   As a result of the Defendants' actions, Plaintiff will hire private counsel to
14  prosecute this action and the civil action that will follow.  Pursuant to federal and California law,
15  Plaintiff will be entitled to recover attorneys' fees associated with the prosecution of these claims.

16      226.   Defendants' acts and omissions were malicious or oppressive, and intended to vex,
17  injure, annoy, humiliate, and embarrass Plaintiff, all with conscious disregard of the rights and
18  safety of Plaintiff. Plaintiff is informed and believes, and based thereon alleges, that Defendants',
19  including without limitation Defendant Kirkland's, managing agents ratified the wrongful
20  conduct of its and other Defendants' supervisors, principals, alter egos, joint ventures,
21  employees, and/or agents, because they were aware of the discriminatory conduct, and failed to
22  take immediate remedial action after Plaintiff's April 29, 2021 reporting of Defendants'
23  discriminatory, harassing, and oppressive conduct and after Plaintiff's July 23, 2021 reporting of
24  Defendants' discriminatory, harassing, retaliatory, and oppressive conduct.

25  **Additional Facts**

26      227.   In 2021, share-partner distributions were an average of $7.4 million
27  ($7,388,000,000) per partner at Kirkland.

28

FIRST AMENDED COMPLAINT                    No. 4:22-cv-05990- HSG (TSH)

228.    In commiting the acts alleged herein, each of the Kirkland Partners was a principal, agent, servant, employee, employer, joint employer, associate, joint venture, unincorporated organization, trustee, beneficiary, joint stock company, partner, corporation, legal representative, owner, officer, and/or director, alter ego, and/or legal representative of or with Kirkland or of or with Kirkland and any one or more of its co-Defendant(s), and, in committing the acts alleged herein, was acting within the course and scope of said agency, employment, joint employment, integrated enterprise, association, joint venture, partnership, trust, legal representation and/or other legal relationship such that the actions of each Kirkland Partner are and can be attributed to Kirkland.

229.    Defendant Kirkland had at least 15 employees (e.g., associates, paralegals, and practice assistants) on its payroll for each working day in each of 20 or more calendar weeks in 2020, 2021, and 2022, the same years the Unlawful Employment Practices occurred.   For example, Kirkland's San Francisco office alone had 15 or more employees for each working day in each of 20 or more calendar weeks in each of 2020, 2021, and 2022.  Kirkland, which has no headquarters location, had over 2,000 attorneys during each of those years and well over 15 associates during 20-week periods.  (E.g., in 2021, Kirkland employed Plaintiff (as discussed below), Mr. Walter, Mr. Blake, Mr. Calhoun, Mr. Huehns, Male Associate M, Mr. Blake, Female Associate Z, Female Associate B, Male Associate Q, Male Associate A, Female Associate U, Ms. Huang, Female Associate Z, Female Associate J, Practice Assistant B, Paralegal C, Paralegal B, and Paralegal F.)

230.    Kirkland was Plaintiff's employer.  Kirkland controlled the terms and conditions of Plaintiff's employment and the means and manner of Plaintiff's work performance.  Kirkland exercised significant control over the details over of the manner, degree, volume, nature, and timing of the work performed by Plaintiff while employed at Kirkland.

231.    Kirkland had the right to control when, where, and how Plaintiff performed her job.  For example, Kirkland had the right to exercise where Plaintiff performed her job, and they began exercising that right by extending Plaintiff an offer as an associate based out of the Firm's San Francisco office, which would require Plaintiff to relocate to San Francisco after cessation

FIRST AMENDED COMPLAINT                                    No. 4:22-cv-05990- HSG (TSH)

1    of its COVID-19 closure and by requiring Plaintiff, as a term of her offer, to become licensed to

2    practice law in California, including by taking the February 2021 the California Bar Examination,

3    both of which Plaintiff did.   Kirkland stipulated that Plaintiff had to be available to work West

4    Coast hours before she would relocate to San Francisco upon its reopening after the lengthy

5    COVID-19 closure (following Plaintiff's termination), and Kirkland regularly exercised that

6    right throughout Plaintiff's tenure at Kirkland.   As discussed below, Kirkland exercised the right

7    to control where and when Plaintiff performed trial and non-trial work in April 2021 in

8    Washington, D.C., and in Texas.   Kirkland exercised control over Plaintiff attending a meeting

9    with the damages expert on a Sunday in April 2021 with Ms. Schmidt at Kirkland's office in

10   Houston.   Kirkland exercised control over Plaintiff meeting with Mr. De Vries with no prior

11   notice one evening in the kitchen at the trial site.   Kirkland regularly exercised their right to

12   control Plaintiff working on holidays (e.g., Thanksgiving 2020), on weekends and/or evenings

13   (e.g., when Plaintiff was in Atlanta in March 2021 and Mr. Fahey emailed her on Saturday

14   evening to complete infringement charting that evening and Sunday morning for his and Mr.

15   Deoras' review and ultimately for use by Kirkland, Mr. Alper, Mr. De Vries); in Florida on

16   scheduled vacation in July 2021; in Washington, DC on myriad other evenings and weekends).

17        232.   Kirkland had a continuing relationship with Plaintiff throughout her employment

18   ata Kirkland.   For example, Plaintiff was directly paid by Kirkland throughout Plaintiff's tenure

19   at the Firm as compensation for the work she performed for Kirkland.   Plaintiff regularly received

20   emails from Kirkland concerning Firm matters (including, e.g., a regularly-distributed

21   "Announcements" email, which on April 30, 2021 described "Kirkland [s]cor[ing] [a] [c]omplete

22   [v]ictory for Apcon in [j]ury [t]rial," stating that "[t]he team was led by Adam Alper, Michael

23   De Vries, Akshay Deoras, and Leslie Schmidt" and that "[c]ritical contributions were made at

24   trial by IP litigation . . . associates Sam Blake, Zoya Kovalenko [i.e., Plaintiff], [and others].").

25   Plaintiff also regularly corresponded with the Kirkland Partners throughout her tenure at the

26   Firm, including with respect to the conduct giving rise to Plaintiff's Title VII claims.   Defendants

27   Mr. Deoras, Mr. Fahey, Ms. Schmidt, Mr. De Vries, and Mr. Alper directly supervised Plaintiff's

28   work at Kirkland, at least 99% of which was for cases and matters managed by both Mr. Deoras

and Ms. Schmidt and led by both Mr. Alper and Mr. De Vries.  Mr. Deoras, Mr. Fahey, and Kirkland regularly assigned and directly supervised Plaintiff's work throughout the entirety of her tenure at the Firm.  Plaintiff's work was ultimately performed (and in certain instances was directly supervised by) Mr. Alper and Mr. De Vries.  Ms. Schmidt and Mr. De Vries assigned and directly supervised Plaintiff's work on a trial matter for the Firm.  Mr. Alper directly supervised Plaintiff's work on an assignment for one of his patent litigation cases and Plaintiff's work on his *pro bono* matter (representing a nonprofit founded and run by the spouse of a paralegal employed at Kirkland and working for Mr. Alper and Mr. De Vries) throughout Plaintiff's tenure at the Firm.[67]  To Plaintiff's knowledge, from at least December 2020 through July 2021, Plaintiff was the only associate who worked on this *pro bono* matter for Adam Alper's and Kirkland's client.

233.  Plaintiff is informed that an interviewed candidate only received an offer if every interviewer approved hiring the associate.

234.  Plaintiff shared a practice assistant, Julie Bueno, with Alper and Deoras defendants.  (However, Mr. Fahey told Plaintiff she could not really take advantage of Ms. Bueno for much if at all anything given that she worked for Adam Alper and Mr. Deoras so had no time to help Plaintiff and was of de facto no assistance to Plaintiff.)

235.  In April 2021, Michael De Vries told Plaintiff that he and Adam Alper had full authority (i.e., requiring no additional Firm approval because it had given its carte blanche preapproval) to hire 10 additional associates and/or non-share partners (with the view that any such non-share partners would want to become a full equity partner at Kirkland, per Mr. De Vries) for the IP litigation group.

236.  As but one of many examples of Kirkland's half-baked attempts to pay lip service to ethical and professional obligations, each of Plaintiff's defamatory "evaluations" reference

---

[67] This *pro bono* work included, e.g., conducting research and corresponding and conferencing with partners at Kirkland, including one who was responsible for professional responsibility matters at the Firm.  As a result of Plaintiff's work, including such correspondence and conferencing, Adam Alper resigned from his director role on the client's board of directors due to, e.g., ethical and professional responsibility concerns arising from his dual roles as counsel and director.

FIRST AMENDED COMPLAINT                          No. 4:22-cv-05990- HSG (TSH)

Plaintiff's purported work on specific client matters with no regard to ethical walls, e.g., due to the current and/or prior work of the members of the Firm's IP Litigation Associate Review Committee ("**ARC**") or Firmwide ARC.  As another example, Mr. Fahey provided Plaintiff with a "sample" document from another litigation (that he should not have sent given his obligations to current and/or former clients) from which Plaintiff was purportedly "walled-off" due to conflict.

237.   Per Firm policy, associates did not receive copies of their evaluations.  During Plaintiff's firing meeting, Mr. Deoras did not discuss the contents of Defendants' "evaluations" of her.   After Plaintiff was fired, an employee from Kirkland's Legal Recruiting and Development ("**LRD**") department read to Plaintiff Defendants' defamatory "evaluations."

238.   Alex Nakaba, an employee in Kirkland's LRD department, emailed Plaintiff on behalf of Kirkland and its co-Defendants, after she became licensed in California, stating it was a "long time coming" or similar (despite Plaintiff's passing the California Bar Examination on her first attempt).

239.   In addition, Mr. Nakaba and Akshay Deoras were on the IP Litigation ARC. Per Defendants' outside counsel, as stated in her May 6, 2022 letter, "the ultimate power to fire associates is entrusted to the Firm's Associate Review Committees."   Accordingly, at least Defendants Kirkland, Akshay Deoras, Akshay S. Deoras, P.C., Leslie Schmidt, and Leslie M. Schmidt, P.C., shared certain LRD personnel, to whom they published their and their co-Defendants Kirkland, Mr. De Vries, and Mr. Fahey's defamatory "evaluations" of Plaintiff to unlawfully terminate Plaintiff.

240.   Male Non-Share Partner Y managed multiple cases/matters for Kirkland and its co-Defendants.

241.   From March through mid-September 2021, Plaintiff had nearly weekly Zoom meetings with Defendants Mr. Deoras (from office space in the personal residence of Akshay Deoras shared with Akshay S. Deoras, P.C. and Kirkland) and Ms. Schmidt (from office space in the personal residence of Leslie Schmidt shared with Leslie M. Schmidt, P.C. and Kirkland) for a case led by Mr. Alper and Mr. De Vries.

FIRST AMENDED COMPLAINT                    No. 4:22-cv-05990- HSG (TSH)

242.   When Plaintiff was employed at Kirkland, its official policy delineating membership and responsibilities of its standing committees, which managed the Firm, named as its members individual partners (i.e., not their professional corporations).

243.   For example, Defendants Akshay Deoras, Michael De Vries, and Adam Alper (rather than Defendants Adam R. Alper, P.C., Michael W. DeVries, P.C., and Akshay S. Deoras, P.C.) collectively held 10 spots on several relevant committees, including the IP Litigation Associate Review Committee ("**ARC**"), the Associate and Non-Share Partner Compensation Committee (which receives the ARC's evaluations), the Finance Committee (which approves write-offs, *see infra* ¶ 202), the Non-Share Partner Review Committee, the Bay Area and Los Angeles Operations Committees (to which an Associate Review Committee co-chair was supposed to report problems concerning the associate review process).

244.   Inter-company transfers and promotions of personnel at Kirkland were common.

245.   Kirkland's "HR" department was not involved in Plaintiff's "review."   For example, Kirkland's chief HR officer at the time, Wendy Cartland, was neither a member of any of the three involved committees nor a member of the fourth committee that received and disseminated Plaintiff's review, the Non-Share Partner and Associate Compensation Committee, of which Adam Alper was a member.  The only committee of which Ms. Cartland was a member was the Benefits Committee.   However, Kirkland's chief administrative officer, Chiara Wroncinski, was on each of the four committees that received the defamatory evaluations, considered the same, disseminated, and approved and decided Plaintiff's "review" summary and sanctioned the unlawful termination and defamation of Plaintiff.  Per a recent job posting for an executive assistant for Ms. Wroncinski, she purports to engage in certain HR tasks and processes "data related to firm management[] [and] human resources."  In addition, as noted above, the IP Litigation ARC included at least four individuals from Kirkland's administrative departments (e.g., Legal Recruiting and Development, which deals with recruiting and training associates) but, to Plaintiff's knowledge, did not include HR personnel.

246.   Mr. Alper was a member of the Firm's Finance Committee, which: (i) reviewed the Firm's financial decisions concerning capital expenditures, leases, budgets, health care, client

FIRST AMENDED COMPLAINT                              No. 4:22-cv-05990- HSG (TSH)

write-offs, and other expenses; (ii) collaborated with other committees, including the Audit Committee, the Billing and Collections Committee, and the Benefits Committee, to recommend policies for the Firm's cash management, capital markets, benefits, client billing practices, and financial reporting; and (iii) worked closely with the Firm's financial staff in reviewing systems, operations, and accounting practices.  In addition, Adam Alper was a member of the Non-Share Partner and Associate Compensation Committee.

247.   Kirkland knew or should have known of its co-Defendants' conduct described herein but failed to undertake prompt corrective measures within its control.

<u>Agency</u>

248.   As discussed above, each Defendant is liable for the actions of its agents, e.g., unlawful actions, as described throughout this Amended Complaint, of its/his/her/their co-Defendants having the authority to act on behalf of, or at the direction of, any one or more of Defendant(s) that is or together are a covered entity, as applicable.

**Kirkland and Mr. Alper Are Covered Under the Federal EPA**

249.   Kirkland was an employer for purposes of the Federal EPA.  It engaged in commerce or in the production of goods for commerce with an annual gross volume of sales or business done of at least $500,000.

250.   For example, Kirkland's profits in each of 2020, 2021, and 2022 were billions of dollars.  In addition, the average profit per share partner exceeded $7 million ($7,388,000) in 2021.  *Kirkland & Ellis LLP*, ALM | Law.com (2022),  https://www.law.com/law-firm-profile/?id=173&name=Kirkland-Ellis (last visited Aug. 21, 2022).

251.   Kirkland was Plaintiff's employer for purposes of the Federal EPA because, as discussed above, it acted directly or indirectly in the interest of itself in relation to Plaintiff, who was its employee.

252.   As discussed above, Kirkland's multiple offices are part of the same establishment. The offices share a common website and personnel.  Kirkland is owned and managed by its partners based out of Kirkland's many offices.  Its standing committees (i.e., management committees) are comprised of partners who are based out of different Kirkland offices.  Plaintiff

FIRST AMENDED COMPLAINT                          No. 4:22-cv-05990- HSG (TSH)

was interviewed by Mr. Alper, Mr. De Vries, and Mr. Deoras, to work for them; Mr. De Vries was based out of an office in Los Angeles while Mr. Alper and Mr. Deoras are based out of the San Francisco office.  Plaintiff's work was also supervised by Male Non-Share Partner Y, who was based out of the Firm's Los Angeles office.  In addition, Plaintiff worked for and was supervised regularly by Mr. Fahey, who was based out of one of the Los Angeles offices and then the Salt Lake City office while supervising Plaintiff.  In addition, Plaintiff was supervised by Ms. Schmidt and by Mr. Kane, each of whom are based out of the Firm's New York office, out of which Mr. Walter was based (who is now based out of the Chicago office).  Plaintiff's work on POPR Nos. 1 and 2 was performed for Male Share Partner C, who praised her work at least on POPR No. 1 in a team-wide email and who was based out of the Firm's Chicago office. Accordingly, Kirkland's offices collectively form one establishment.

253.   As discussed above, Plaintiff performed work equal to her comparator male associates.  The jobs required equal skill, effort, and responsibility; and were performed under similar working conditions.  Kirkland paid Plaintiff less than male comparator associates, e.g., Mr. Walter, Mr. Blake, and Mr. Calhoun, because of sex.  The difference in pay was not made pursuant to a seniority system, a measure system, a system measuring earnings by quantity or quality of production, or a differential based on any other factor other than sex.

254.   As discussed above, Kirkland's compensation discrimination of Plaintiff affected, e.g., salary, bonuses (including at least the 2020 year-end bonus, 2021 special bonus and the 2021 year-end bonus Plaintiff did not receive due to Kirkland's unlawful termination of Plaintiff), vacation, and benefits (e.g., Plaintiff's travel accommodations to return home from the trial site in April 2021, as compared to Mr. Blake's).

255.   The prohibition against compensation discrimination under the EPA applies only to jobs within an establishment. An establishment is a distinct physical place of business rather than an entire business or enterprise consisting of several places of business. In some circumstances, physically separate places of business may be treated as one establishment. For example, if a central administrative unit hires employees, sets their compensation, and assigns

FIRST AMENDED COMPLAINT                                    No. 4:22-cv-05990- HSG (TSH)

them to separate work locations, the separate work sites can be considered part of one establishment.

### Kirkland Is Covered Under FEHA

256.   As described above, Kirkland was Plaintiff's employer.  Each of the Kirkland Partners was a principal, agent, servant, employee, partner, joint venture, and/or alter ego, of one or more of his/her/their/its co-Defendant(s), and, in committing the acts alleged herein, was acting within the course and scope of said integrated enterprise, joint employment, agency, employment, partnership, and/or joint venture with Kirkland or with Kirkland and any one or more of its co-Defendants.

257.   Kirkland is an employer within the meaning of FEHA, e.g., because it is a person within the meaning of FEHA regularly employing five or more persons, or is a person acting as an agent of an employer (e.g., another Defendant), directly or indirectly, and is organized for the purpose of private profit.  Cal. Gov't Code § 12926(d).  Kirkland is a person regularly employing one or more persons or regularly receiving the services of one or more persons providing services pursuant to a contract, or is a person acting as an agent of an employer, directly or indirectly.  Cal. Gov't Code § 12940(j)(4)(A); *id.* § 12925(d).

### CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### SEX DISCRIMINATION IN VIOLATION OF TITLE VII
### (Against Kirkland)

258.   Plaintiff hereby restates and re-alleges the allegations set forth in the paragraphs above as if fully set forth herein.

259.   In violation of Title VII, Kirkland discharged Plaintiff and discriminated against Plaintiff with respect to compensation, terms, conditions, and privileges of employment because of sex.  *See* 42 U.S.C. § 2000e *et seq.*, as amended; 42 U.S.C. § 2000e-2; *see also* 42 U.S.C. § 2000e-5(g); 42 U.S.C. § 1981a(a)(1), (b).  Plaintiff is and at all relevant times was a member of a protected class because of her sex.

260.   Plaintiff was employed by Kirkland from November 2020 through September 2021. Kirkland met the 15-employee numerosity requirement of Title VII and was therefore a

FIRST AMENDED COMPLAINT                           No. 4:22-cv-05990- HSG (TSH)

covered employer subject to liability under Title VII at all relevant times as described above. *See* 42 U.S.C. § 2000e.

261.   Kirkland discharged Plaintiff because of (i.e., by reason of or on account of) Plaintiff's sex.  If Plaintiff was male, Kirkland would not have discharged Plaintiff.

262.   Plaintiff was qualified for her position.  For example, when interviewing Plaintiff, each of Mr. Alper, Mr. De Vries, and a recruiting committee co-chair told Plaintiff her credentials were "very impressive," and Plaintiff produced excellent work at Kirkland, e.g., by substantially improving Defendants Mr. Alper's, Mr. De Vries', and Mr. Deoras' success rate with POPRs.

263.   Similarly-situated males were treated more favorably.  For example, male comparators are now IP litigation partners at Kirkland.

264.   In addition, Plaintiff was discriminated against by Kirkland with respect to compensation, terms, conditions, and privileges of employment.  Kirkland discriminated against Plaintiff because of her sex.  If Plaintiff was male, Plaintiff would not have been discriminated against with respect to compensation, terms, conditions, or privileges of employment.  Plaintiff was qualified for her position.  Similarly-situated males were treated more favorably.  For example, Kirkland discriminated against Plaintiff with respect to pay (e.g., with respect to wages, salary, bonuses (including special and year-end bonuses in 2021), salary increases at the end of 2020 and 2021), benefits (e.g., traveling home from trial site in rural area on commercial airfare in economy seating after having to arrange her own ride to the airport an hour away by asking Kirkland personnel left at trial site if any of them had availability to kindly transport Plaintiff to airport given that Ms. Schmidt had ensured Plaintiff would not have a rental car at the trial site because she suggested they ride together four hours to trial site from Houston versus traveling home in luxe, private accommodations on charter flight with male share-partner Defendants (Mr. Alper, Mr. De Vries, and Mr. Deoras) at their invitation, despite having performed substantially the same work for Mr. De Vries under worse working conditions), working conditions (e.g., with respect to Kirkland consistently ensuring Plaintiff's workload was disproportionately heavier; assigning deluge of work coinciding with Plaintiff's brief, scheduled travel plans largely weekends/federal holidays and offloading male associate work onto Plaintiff so he could enjoy

FIRST AMENDED COMPLAINT                              No. 4:22-cv-05990- HSG (TSH)

week-long vacation undisturbed; assigning work with short turnarounds, competing deadlines, and, e.g., no notice on Saturday evenings; Kirkland providing Plaintiff with relatively limited partner access and less associate support on substantially the same work; failing to remove Plaintiff's non-trial work leading up to and at trial as promised while removing male comparator's non-trial work while providing him with substantial support, partner access, and Plaintiff's assistance for trial, where they both worked on substantially the same assignments for Mr. De Vries, were added to the trial team at the same time, and generally worked on Mr. Alper's and Mr. De Vries' cases/matters), and the privilege of being employed at Kirkland.

265.    As a result of Kirkland's discrimination, Plaintiff has suffered and continues to suffer harm, including but not limited to financial loss, including without limitation lost wages, loss of benefits, loss of earnings, future lost earnings, lost future earning potential, impairment to Plaintiff's name, character, reputation, and professional standing; humiliation; psychological, physical, emotional, and other harm.

266.    Kirkland engaged in the acts alleged herein intentionally, willfully, maliciously, fraudulently, and oppressively; with the wrongful intention of injuring Plaintiff; with conscious disregard of, and with reckless indifference to, the protected rights and safety of Plaintiff, including federally-protected rights; and with an improper and evil motive amounting to malice. Plaintiff is thus entitled to recover compensatory damages for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and to recover punitive damages, in an amount according to proof.

267.    Plaintiff is entitled to all other remedies available for Title VII violations, including without limitation injunctive and other equitable relief, including without limitation back pay, including for lost benefits, interest on backpay, front pay in lieu of reinstatement due to the continuing hostility between Plaintiff and Kirkland and psychological injuries suffered by Plaintiff as a result of Kirkland's discrimination, retaliation, and harassment, and any other equitable relief as this Court deems appropriate.

268.    By reason of the conduct of Kirkland as alleged herein, Plaintiff necessarily has retained and will retain attorneys to litigate this action.  Plaintiff's attorneys will apply to appear

FIRST AMENDED COMPLAINT                           No. 4:22-cv-05990- HSG (TSH)

*pro hac vice* on Plaintiff's behalf in this action after local counsel is retained.  Plaintiff therefore will be entitled to reasonable attorneys' fees and litigation expenses, including costs and any expert witness fees, incurred in vindicating her rights by bringing this action.

## SECOND CAUSE OF ACTION

### SEX DISCRIMINATION IN VIOLATION OF FEHA
### (Against Kirkland)

269.   Plaintiff hereby restates and re-alleges the allegations set forth in the paragraphs above as if fully set forth herein.

270.   Kirkland wrongfully discriminated against Plaintiff in violation of FEHA because of Plaintiff's sex. Cal. Gov't Code § 12940(a).

271.   Defendant Kirkland was Plaintiff's employer under FEHA.  Plaintiff was an employee of Kirkland under FEHA from November 2020 through September 2021, as described above.

272.   Defendant Kirkland discharged Plaintiff.  Plaintiff's sex was a substantial motivating reason for Kirkland's decision to discharge Plaintiff.  Plaintiff was harmed. Kirkland's conduct caused Plaintiff's harm.

273.   Defendant Kirkland discriminated against Plaintiff in compensation and/or in terms, conditions, and/or privileges of employment.  Plaintiff's sex was a substantial motivating reason for Kirkland's decision to discriminate against Plaintiff in compensation and/or in terms, conditions, and/or privileges of employment.  Plaintiff was harmed.  Kirkland's conduct caused Plaintiff's harm.

274.   Kirkland failed to take any action in response to Plaintiff's complaints because of her sex.  Kirkland's practice of failing to take any action in response to Plaintiff's complaints was a substantial factor in causing Plaintiff's harm.  Kirkland's violations of FEHA caused Plaintiff to suffer harm as set forth above.

275.   Kirkland engaged in the acts alleged herein intentionally, willfully, maliciously, fraudulently, and oppressively; with the wrongful intention of injuring Plaintiff; with conscious disregard of, and with reckless indifference to, the protected rights and safety of Plaintiff; and with an improper and evil motive amounting to malice.  Plaintiff is thus entitled to recover

95

1     punitive damages, in an amount according to proof.  Cal. Civ. Code § 3294.  Kirkland authorized

2     and/or ratified the acts alleged herein.  *Id.*  Plaintiff is thus entitled to recover punitive damages,

3     in an amount according to proof.

**THIRD CAUSE OF ACTION**
**SEX DISCRIMINATION IN VIOLATION OF FEDERAL EQUAL PAY ACT**
**(Against Kirkland)**

276.  Plaintiff hereby restates and re-alleges the allegations set forth in the paragraphs

above as if fully set forth herein.

277.  Kirkland violated the Federal EPA by discriminating against Plaintiff with respect

to pay because of her sex.  *See* 29 U.S.C. 206(d).  Kirkland classified Plaintiff as a class-of-2017

associate rather than a male class-of-2016 associate even though she had graduated from law

school in 2016 and performed work that required equal skill, effort, and responsibility, and which

was performed under similar working conditions.  Kirkland paid Plaintiff a lower salary, lower

bonuses (e.g., the 2021 special bonuses) and provided fewer benefits / benefits worth

significantly less than such male class-of-2016 IP litigation associates who worked for the same

partners (e.g., Mr. Alper and Mr. De Vries) and performed such work requiring equal skill, effort,

and responsibility, under similar working conditions.  Such jobs were performed within the same

establishment.  Kirkland's conduct was intentional, willful, and malicious.

**FOURTH CAUSE OF ACTION**
**RETALIATION IN VIOLATION OF TITLE VII, 42 U.S.C. § 2000e *et seq.***
**(Against Kirkland)**

278.  Plaintiff re-alleges and incorporates every allegation in this Amended Complaint.

279.  Plaintiff opposed Kirkland's employment practices made unlawful under Title VII,

that is, sex discrimination and sex harassment.  Kirkland subjected Plaintiff to an adverse

employment action, that is discharge.  Plaintiff was subjected to the adverse employment action

because she opposed unlawful employment practices.

280.  As a result of Kirkland's harassment, discrimination, and retaliation, Plaintiff has

suffered and continues to suffer harm, including but not limited to financial loss, including

without limitation lost wages, loss of benefits, loss of earnings, future lost earnings, lost future

FIRST AMENDED COMPLAINT        No. 4:22-cv-05990- HSG (TSH)

1   earning potential, impairment to Plaintiff's name, character, reputation, and professional

2   standing; humiliation; psychological, physical, emotional, and other harm.

3       281.   Kirkland engaged in the acts alleged herein intentionally, willfully, maliciously,

4   fraudulently, and oppressively; with the wrongful intention of injuring Plaintiff; with conscious

5   disregard of, and with reckless indifference to, the protected rights and safety of Plaintiff,

6   including federally-protected rights; and with an improper and evil motive amounting to malice.

7   Plaintiff is thus entitled to recover compensatory damages for future pecuniary losses, emotional

8   pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary

9   losses, and punitive damages, in an amount according to proof.  Plaintiff is thus entitled to recover

10  punitive damages from Defendants in an amount according to proof.

11      282.   Plaintiff is entitled to all other remedies available for Title VII violations, including

12  without limitation injunctive and other equitable relief, including without limitation back pay,

13  including for lost benefits, interest on backpay, front pay in lieu of reinstatement due to the

14  continuing hostility between Plaintiff and Defendants and psychological injuries suffered by

15  Plaintiff as a result of Defendants' discrimination, retaliation, and harassment, and any other

16  equitable relief as this Court deems appropriate.

17      283.   By reason of the conduct of Defendants as alleged herein, Plaintiff necessarily will

18  retain attorneys to litigate the action.  Plaintiff therefore will be entitled to reasonable attorneys'

19  fees and litigation expenses, including expert-witness fees and costs, incurred in vindicating her

20  rights by bringing an action.

21
22
**FIFTH CAUSE OF ACTION**
**RETALIATION IN VIOLATION OF FEHA**
**(Against Kirkland)**

23      284.   Plaintiff hereby restates and re-alleges the allegations set forth in the paragraphs

24  above as if fully set forth herein.

25      285.   Plaintiff complained of harassment and discrimination that violated FEHA.  Cal.

26  Gov't Code § 12940(h).  Kirkland took no action to ensure that Plaintiff was not retaliated against

27  for having complained.  As a result of Kirkland's action or inaction, Plaintiff was subject to

28

FIRST AMENDED COMPLAINT          No. 4:22-cv-05990- HSG (TSH)

additional discrimination, retaliation, and additional sex-based harassment. Kirkland's violations of the FEHA caused Plaintiff to suffer harm as set forth above.

286.   Kirkland engaged in the acts alleged herein intentionally, willfully, maliciously, fraudulently, and oppressively; with the wrongful intention of injuring Plaintiff; with conscious disregard of, and with reckless indifference to, the protected rights and safety of Plaintiff; and with an improper and evil motive amounting to malice.  Plaintiff is thus entitled to recover punitive damages, in an amount according to proof.  Kirkland authorized or ratified the acts alleged herein.  Cal. Civ. Code § 3294.  Plaintiff is thus entitled to recover punitive damages, in an amount according to proof.

287.   By reason of the conduct of Kirkland as alleged herein, Plaintiff necessarily will retain attorneys to litigate the action.  Plaintiff therefore will be entitled to reasonable attorneys' fees and litigation expenses, including expert-witness fees and costs, incurred in vindicating her rights by bringing an action.

### SIXTH CAUSE OF ACTION
### SEX HARASSMENT CONSTITUTING HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII, 42 U.S.C. § 2000e *et seq.*, as amended
### (Against Kirkland)

288.   Plaintiff hereby restates and re-alleges the allegations set forth in the paragraphs above as if fully set forth herein.

289.   Plaintiff was subjected to working in a severe, persistent and/or pervasive sex-based hostile work environment, which interfered with her work performance, denied her employment privileges, and adversely affected the terms and conditions of her job on the basis of her sex.  The harassing conduct to which Plaintiff was subjected to was so severe, widespread, and/or persistent that a reasonable woman in Plaintiff's circumstances would have considered the work environment to be hostile and/or abusive.  Plaintiff considered the work environment to be hostile and/or abusive.  Kirkland failed to take prompt, remedial and effective action to stop the harassing conduct as alleged herein.

290.   Kirkland failed to exercise reasonable care to prevent and promptly correct the sex-based harassing behavior constituting a hostile work environment.  Plaintiff reasonably tried to

FIRST AMENDED COMPLAINT                                    No. 4:22-cv-05990- HSG (TSH)

take advantage of any preventive or corrective opportunities provided by the employer and reasonably tried to avoid harm.

291.   As a result of Kirkland's harassment, discrimination, and retaliation, Plaintiff has suffered and continues to suffer harm, including but not limited to financial loss, including without limitation lost wages, loss of benefits, loss of earnings, future lost earnings, lost future earning potential, impairment to Plaintiff's name, character, reputation, and professional standing; humiliation; psychological, physical, emotional, and other harm.

292.   Kirkland engaged in the acts alleged herein intentionally, willfully, maliciously, fraudulently, and oppressively; with the wrongful intention of injuring Plaintiff; with conscious disregard of, and with reckless indifference to, the protected rights and safety of Plaintiff, including federally-protected rights; and with an improper and evil motive amounting to malice. Plaintiff is thus entitled to recover compensatory damages for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and punitive damages, in an amount according to proof.

293.   Plaintiff is entitled to all other remedies available for Title VII violations, including without limitation injunctive and other equitable relief, including without limitation back pay, including for lost benefits, interest on backpay, front pay in lieu of reinstatement due to the continuing hostility between Plaintiff and Kirkland and psychological injuries suffered by Plaintiff as a result of Kirkland's discrimination, retaliation, and harassment, and any other equitable relief as this Court deems appropriate.

294.   By reason of the conduct of Kirkland as alleged herein, Plaintiff necessarily will retain attorneys to litigate the action.  Plaintiff therefore will be entitled to reasonable attorneys' fees and litigation expenses, including expert-witness fees and costs, incurred in vindicating her rights by bringing an action.

## SEVENTH CAUSE OF ACTION
### FAILURE TO PREVENT DISCRIMINATION AND RETALIATION
Cal. Gov't Code § 12940 *et seq.*
(Against Kirkland)

295.   Plaintiff hereby restates and re-alleges the allegations set forth in the paragraphs above as if fully set forth herein.

FIRST AMENDED COMPLAINT                     No. 4:22-cv-05990- HSG (TSH)

296.     Kirkland failed to take reasonable steps to prevent harassment, discrimination, and retaliation based on Plaintiff's sex and/or gender.  Plaintiff was an employee of Kirkland .  Plaintiff was subjected to harassment, discrimination, and retaliation in the course of employment.   Kirkland failed to take all reasonable steps to prevent the harassment, discrimination, and retaliation.  Plaintiff was harmed.  Kirkland's failure to take all reasonable steps to prevent harassment, discrimination, and retaliation was a substantial factor in causing Plaintiff's harm.  Cal. Gov't Code § 12940(j)(1).

297.     Kirkland failed to take any action in response to Plaintiff's complaints because of her sex.  Kirkland's practice of failing to take any action in response to Plaintiff's complaints was a substantial factor in causing Plaintiff's harm.  Kirkland's violations of FEHA caused Plaintiff to suffer harm as set forth above.

298.     Kirkland engaged in the acts alleged herein intentionally, willfully, maliciously, fraudulently, and oppressively; with the wrongful intention of injuring Plaintiff; with conscious disregard of, and with reckless indifference to, the protected rights and safety of Plaintiff; and with an improper and evil motive amounting to malice.  Plaintiff is thus entitled to recover punitive damages, in an amount according to proof.  Kirkland authorized and ratified the acts alleged herein, and acted with advance knowledge and conscious disregard of the protected rights and safety of Plaintiff.  Cal. Civ. Code § 3294.

299.     As a result of Defendants' violations of the FEHA, Plaintiff has been harmed as set forth above.

300.     By reason of the conduct of Defendants as alleged herein, Plaintiff necessarily will have to retain attorneys to litigate the present action.  Plaintiff is therefore entitled to reasonable attorneys' fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

### EIGHTH CAUSE OF ACTION
### DEFAMATION
**(Against Kirkland, Michael De Vries, Michael W. DeVries, P.C., Akshay Deoras, Akshay S. Deoras, P.C. and Mark Fahey)**

301.     Plaintiff hereby restates and re-alleges the allegations set forth in the paragraphs above as if fully set forth herein.

FIRST AMENDED COMPLAINT                                    No. 4:22-cv-05990- HSG (TSH)

302.   Defendants Kirkland, Michael De Vries, Michael W. DeVries, P.C., Akshay Deoras, Akshay S. Deoras, P.C. and Mark Fahey published statements in their "evaluations" regarding Plaintiff, each of which was false, defamatory, and unprivileged, and had a natural tendency to injure because each concerned Plaintiff's profession and practice and/or caused special damage.  Cal. Civ. Code §§ 44, 45, 45a, 46.  Defendants Kirkland, Michael De Vries, Michael W. DeVries, P.C., Akshay Deoras, Akshay S. Deoras, P.C. and Mark Fahey acted with actual malice in making the statements, because each Defendant knew the statement was false or subjectively entertained serious doubt as to its truth.  The statements were written.  Their republication was reasonably foreseeable given Kirkland's official policies and procedures. The "evaluations" and statements therein were not used as a management tool for evaluation or documentation of Plaintiff's performance.  Rather, each statement in each of the Defendants' "evaluations" served as the alleged factual basis for Plaintiff's termination.

303.   Plaintiff is not a public figure.

304.   In publishing the statements, they were communicated to third persons, e.g., those on the ARCs, the Firm Committee, the Associate & NSP Committee, and others outside Kirkland, who understood both the defamatory meaning of the statement and its application to Plaintiff, to whom reference was made.  All the statements in the "evaluations" were statements of fact or statements of opinion that implied a provably false factual assertion.  Plaintiff discovered, with reasonable diligence, the defamatory content of the "evaluations" on October 11, 202 as described above.

305.   The defamation committed by Defendants Kirkland, Michael De Vries, Michael W. DeVries, P.C., Akshay Deoras, Akshay S. Deoras, P.C. and Mark Fahey of Plaintiff resulted in Plaintiff's loss of reputation, shame, mortification, hurt feelings, emotional distress, and damages to Plaintiff's profession or occupation, unemployment, inability to find gainful, comparable employment, derailed career trajectory, and other harms, resulting in damages exceeding $75,000, in an amount to be proven at trial.  For Plaintiff's defamation claim, Plaintiff is entitled to general damages for loss of reputation, shame, mortification, and hurt feelings; to

special damages to compensate Plaintiff for damages to Plaintiff's profession or occupation, and to punitive damages.

### NINTH CAUSE OF ACTION
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (As to All Defendants)

306.   Plaintiff re-alleges and incorporates every allegation in this Amended Complaint.

307.   When Defendants failed to take corrective action, Defendants knew that Plaintiff would continue to suffer extreme emotional distress and harm as a result of their failure to act.

308.   When Defendants retaliated against Plaintiff in lieu of taking corrective action in response to her April and July 2021 complaints and her post-firing October 2021 complaint, Defendants knew that Plaintiff would continue to suffer extreme emotional distress and harm as a result of their actions.

309.   As a direct and consequential result of Defendants' actions, Plaintiff has suffered severe emotional distress to her person.  Such harm includes without limitation pain, bodily ailments, anxiety, humiliation, anger, shame, embarrassment, frustration, and fear.  Plaintiff alleges Defendants are responsible for the harm she suffered.

310.   By reason of the conduct of Defendants as alleged herein, Plaintiff necessarily will have to retain attorneys to litigate the present action.  Plaintiff is therefore entitled to reasonable attorneys' fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

311.   Defendants engaged in the acts alleged herein maliciously, fraudulently, and oppressively; with the wrongful intention of injuring Plaintiff with the conscious disregard of the rights and safety of Plaintiff; and with an improper and evil motive amounting to malice.  Plaintiff is thus entitled to recover punitive damages from Defendants in an amount according to proof.

### PRAYER FOR RELIEF

312.   WHEREFORE, Plaintiff respectfully requests this Court:

i.   Find that Defendants intentionally discriminated against Plaintiff because of sex in violation of Title VII, the federal EPA, and/or FEHA, *see, e.g.*, 42 U.S.C. § 2000e-2(a);

FIRST AMENDED COMPLAINT                                    No. 4:22-cv-05990- HSG (TSH)

ii.   Find that Defendants intentionally harassed Plaintiff, constituting a hostile work environment, because of sex in violation of Title VII, 42 U.S.C. § 2000e-2(a);

iii.   Find that Defendants intentionally retaliated against Plaintiff because she engaged in protected activity by opposing Defendants' employment practice(s) made unlawful by Title VII, 42 U.S.C. § 2000e-3(a);

iv.   Find that Defendants engaged in discriminating against, harassing, and/or retaliating against Plaintiff with malice or with reckless indifference to Plaintiff's federally-protected rights, 42 U.S.C. § 1981a(b);

v.   Award Plaintiff any and all relief, to the greatest extent allowed by law, including without limitation the following:

vi.   Award Plaintiff punitive damages and compensatory damages under Title VII to compensate Plaintiff for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and punitive damages, for Defendants' discrimination, harassment, and/or retaliation, in an amount not exceeding the statutory limits, 42 U.S.C. § 1981a(b);

vii.   Award Plaintiff equitable relief under Title VII, including without limitation injunctive relief and affirmative action, including without limitation awarding Plaintiff front pay in lieu of reinstatement, with backpay and interest; and other equitable relief as this Court deems appropriate, 42 U.S.C. § 1981a(b); 42 U.S.C. 2000e-5(g); 42 U.S.C. 2000e-5(e)(3)(B);

viii.   Award Plaintiff costs under Title VII, including without limitation reasonable attorneys' fees, including without limitation expert fees, 42 U.S.C. § 2000e-5;

ix.   Award Plaintiff any other relief authorized under Title VII;

x.   Award Plaintiff general damages in amounts according to proof no less than the jurisdictional limit(s) of this Court;

xi.   Special damages in amounts according to proof, together with prejudgment interest;

xii.   Exemplary and punitive damages in amounts according to proof;

FIRST AMENDED COMPLAINT                    No. 4:22-cv-05990- HSG (TSH)

xiii.   Attorneys' fees and costs, as afforded under California Government Code Section 12965(b) and any other applicable statute;

xiv.   Interest as provided by law;

xv.   Grant any and all other relief to which this Court deems just and proper.

WHEREFORE, Plaintiff prays that the Court grant such relief as may be appropriate, including injunctive orders, damages, costs, and attorneys' fees.

## DEMAND FOR JURY TRIAL

Plaintiff respectfully requests a trial by jury of any and all issues on which a trial by jury is available under applicable law.

Respectfully submitted this 20th day of September 2023.

By:   */s/ Zoya Kovalenko*
Zoya Kovalenko (Cal. SBN 338624)
13221 Oakland Hills Blvd., Apt. 206
Germantown, MD 20874
678 559 4682
zoyavk@outlook.com

PLAINTIFF ZOYA KOVALENKO

FIRST AMENDED COMPLAINT                    No. 4:22-cv-05990- HSG (TSH)